UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| KUMHO TIRE (VIETNAM) CO., LTD., )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>UNITED STATES, PAPER AND FORESTRY, )<br>RUBBER, MANUFACTURING, ENERGY, )<br>ALLIED INDUSTRIAL AND SERVICE WORKERS )<br>INTERNATIONAL UNION, AFL-CIO, CLC )<br><br>Defendant-Intervenor. ) | Court No. 21-00397 |

BRIEF OF KUMHO TIRE (VIETNAM) CO., LTD. IN SUPPORT OF
ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

PUBLIC VERSION

PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER DELETED FROM PAGES ii, 10-16 AND 20

WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C.  20036
(202) 774-5500

Attorneys for Kumho Tire (Vietnam) Co., Ltd.

January 18, 2022

<u>Table of Contents</u>

<u>Page</u>

STATEMENT PURSUANT TO RULE 56.2(C)(1) ......................................................................... 2

    A.   Administrative Determination under Review ......................................................... 2

    B.   Issues of Law and Summary of Reasons
         for Reversing Commerce's Determination ............................................................ 2

STATEMENT PURSUANT TO RULE 44.1 ................................................................................. 4

ARGUMENT ........................................................................................................................ 5

    A.   Commerce's Decision to Countervail KTV's Acquisition of Land-Use
         Rights Was Arbitrary and Unsupported by Substantial Evidence ........................ 5

        1.   KTV's Acquisition of Land-Use Rights Pre-Dated
             Vietnam's Accession to the World Trade Organization,
             and thus Did Not Confer Countervailable Subsidies ................................... 5

             a.   Under Commerce's Longstanding Practice, Land-
                 Use Rights Obtained before Vietnam's Accession
                 to the WTO Are Not Countervailable Subsidies ................................... 5

             b.   The Record Demonstrates that KTV's Land-Use
                 Rights Were Acquired in an Agreement Signed in
                 2006, Before Vietnam's Accession to the WTO ................................... 6

             c.   Commerce's Conclusion that KTV Acquired Its Land-Use
                 Rights after the January 2007 Cut-Off Date Is Contrary to
                 Vietnamese Law and the Evidence on the Record ............................... 8

                 (1)  Commerce's Preliminary Determination ....................................... 8

                 (2)  Commerce's Final Determination ................................................. 9

                     (a)  The [                    ] by KTV Did Not Modify
                         the Material Terms of the 2006 Agreement ....................... 11

                     (b)  The Clarification in the 2012 Agreement of
                           Becamex's  Obligations to Provide Security
                           Services Did Not Modify  the Land-Use Rights
                         Established by the 2006 Agreement ..................................... 14

Page

(3) KTV's Acquisition of Land-Use Rights Was Governed by
the Agreements with the Government-Controlled Entity
Becamex, and Not by Any Land-Use Rights Certificate ........... 16

(4) KTV's Rights and Obligations as the Lessee of the Land
under the Terms Set Forth in the 2006 Agreement Were
Explicitly Described in the 2006 Agreement ............................ 21

B. Commerce's Imposition of Countervailing Duties to
Address Alleged Currency Undervaluation Is Unlawful ..................................... 23

1. Commerce Lacks the Authority to Treat
Foreign- Government Action that Allegedly Results
in an Undervalued Currency as a Subsidy .................................................... 23

a. Under Longstanding Administrative Practice, Currency
Devaluations Do Not Constitute Countervailable Subsidies .............. 23

b. Because Congress Has Acquiesced in Commerce's Long-
Standing Practice, Commerce Lacked Authority to Modify
that Practice without Express Congressional Authorization .............. 28

2. Commerce's Outsourcing of Basic Factual
Findings Regarding Alleged Currency Under-
Valuation to Treasury Is Contrary to the Statute ......................................... 31

3. Treasury's Finding that the Vietnamese Dong
Was Undervalued As a Result of Vietnamese
Government Action Is Not Supported by Substantial
Evidence on the Record of the Commerce Proceeding ............................... 32

a. The Data Needed to Assess the Validity of the
Treasury Report Was Not Included in the Record .............................. 32

b. The Treasury Department Report Identifies
a Range of Possible Results and Does Not
Provide Any Basis for Choosing Among Them ................................... 35

4. The Alleged Vietnamese-Government Currency Practices
Do Not Satisfy the Statutory Definition of Subsidy .................................... 37

a. The Alleged Vietnamese-Government Currency Practices Do
Not Constitute a "Financial Contribution" under the Statute ............. 37

PUBLIC VERSION

Page

b.    The Alleged Vietnamese-Government Currency Practices Do Not Provide a "Benefit" to the Recipient under the Statute ................................................................................................... 40

c.    The Alleged Vietnamese-Government Currency Practices Are Not "Specific" under the Statute .................................... 40

CONCLUSION .......................................................................................................... 43

ATTACHMENT

1.    Excerpt from the 2005 Civil Code of Vietnam

Table of Authorities

Page

<span style="font-variant: small-caps">Cases</span>

*Bugliotti v. Republic of Argentina*,
  952 F.3d 410 (2d Cir. 2020) ........................................................................ 17

*Faragher v. City of Boca Raton*,
  524 U.S. 775 (1998) ..................................................................................... 30

*Forest Grove Sch. Dist. v. T.A.*,
  129 S. Ct. 2484  (2009) ................................................................................ 30

*GPX Int'l Tire Corp. v. United States*,
  666 F.3d 732 (Fed. Cir. 2011) ..................................................................... 30

*Hercules, Inc. v. United States*,
  673 F. Supp. 454 (CIT 1987) ....................................................................... 38

*Knickerbocker Life Ins. Co. v. Norton*,
  96 U.S. 234 (1877) ....................................................................................... 12

*Lorillard v. Pons*,
  434 U.S. 575 (1978) ..................................................................................... 30

*TMK IPSCO v. United States*,
  222 F. Supp. 3d 1306 (CIT 2017) ................................................................. 5

*United States v. Hammond Lead Products*,
  440 F.2d 1024  (C.C.P.A. 1971) ................................................................... 24

<span style="font-variant: small-caps">Statutes</span>

19 U.S.C § 1677 ...................................................................... 13, 31, 37, 39, 41

19 U.S.C. § 1671(f)(2) ..................................................................................... 5

19 U.S.C.§ 1671b ........................................................................................... 32

Title VII Trade Facilitation and Trade Enforcement Act of 2015,
  Pub. L. No. 114-125, Title VII (2016) ......................................................... 29

Trade Act of 1988 ................................................................................... 28, 29

Trade Facilitation and Trade Enforcement Act of 2015,
  Pub. L. No. 114-125, 130 Stat. 122, 156-61 (2016) .................................... 29

Page

Trade Preferences Extension Act of 2015,
    Pub. L. No. 114-27, 129 Stat. 362, 383-87 (2015) ........................................................ 29

ADMINISTRATIVE DECISIONS

*Aluminum Extrusions from the People's Republic of China:*
    *Final Affirmative Countervailing Duty Determination*,
    76 Fed. Reg. 18521 (Apr. 4, 2011) ................................................................. 27

*Carbon Steel Wire Rod from Poland;*
    *Final Negative Countervailing Duty Determination,*
    49 Fed. Reg. 19374 (May 7, 1984) ................................................................ 27

*Carbon Steel Wire Rod from Poland;*
    *Preliminary Negative Countervailing Duty Determination*,
    49 Fed. Reg. 6768 (Feb. 23, 1984) ........................................................... 26, 27

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses*
    *from the People's Republic of China:*
    *Final Affirmative Countervailing Duty Determination*,
    75 Fed. Reg. 59213 (Sept. 27, 2010) .......................................................... 27

*Certain New Pneumatic Off-the-Road Tires (OTR Tires) from the People's Republic of*
    *China: Final Affirmative Countervailing Duty Determination and Final Negative*
    *Determination of Critical Circumstances*,
    73 Fed. Reg. 40480 (July 15, 2008) ............................................................... 6

*Final Affirmative Countervailing Duty Determination: Stainless Steel Bar from Italy*,
    67 Fed. Reg. 3163 (Jan. 23, 2002) ................................................................ 13

*Final Negative Countervailing Duty Determination; Pork Rind Pellets from Mexico*,
    48 Fed. Reg. 39105 (Aug. 29, 1983) ......................................................... 26, 42

*Lamb Meat from New Zealand;*
    *Preliminary Affirmative Countervailing Duty Determination,*
    46 Fed. Reg. 58128 (Nov. 30, 1981) ............................................................. 25

*Phosphate Fertilizers from the Russian Federation:*
    *Final Affirmative Countervailing Duty Determination*,
    86 Fed. Reg. 9479 (Feb. 16, 2021) ........................................................... 5, 16

*Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam:*
    *Final Affirmative Countervailing Duty Determination*,
    75 Fed. Reg. 16428 (April 1, 2010) ............................................................... 6

Page

*Wire Decking from the People's Republic of China:*
*Final Affirmative Countervailing Duty Determination*,
75 Fed. Reg. 32902 (June 10, 2010) ............................................................... 6

REGULATIONS

19 C.F.R. § 351.505(b) ................................................................................... 13

19 C.F.R. § 351.528 ....................................................................................... 31

ADMINISTRATIVE MATERIALS

Letter from Law Office of Jeffrey M. Winton PLLC to Jeffrey Kessler, Assistant Secretary
for Enforcement and Compliance .................................................................. 28

Memorandum from Team to R. Lorentzen re Countervailing Duty Investigation:
Aluminum Extrusions from the People's Republic of China, Subsidy Allegation.... 27, 42

Memorandum from Team to R. Lorentzen re Countervailing Duty Investigation: Certain
Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from
the People's Republic of China New Subsidy Allegation ......................................... 27, 42

*Modification of Regulations Regarding Benefit and Specificity in Countervailing Duty*
*Proceedings,* 85 Fed. Reg. 6031 (May 4, 2020) ............................................. 28

Report to Congress: Macroeconomic and Foreign Exchange Policies of Major Trading
Partners of the United States, January 2020 .................................................... 33

T. Ashby McCown, Patricia Pollard and John Weeks, Department of the Treasury,
"Equilibrium Exchange Rate Models and Misalignments: Occasional Paper No. 7,"
March 2007 ...................................................................................................... 34

COURT RULES

USCIT R.44.1 .................................................................................................. 17

LEGISLATIVE HISTORY

161 Cong. Rec. 6570-71 (2015) ..................................................................... 29

161 Cong. Rec. H9296-97 (daily ed. Dec. 11, 2015) ...................................... 29

H.R. Rep. No. 111-646 .................................................................................... 29

Page

H.R. Rep. No. 114-376, at 75-79 (2015)............................................................................. 29

PUBLIC VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| KUMHO TIRE (VIETNAM) CO., LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | Court No. 21-00397 |
| ) | |
| and ) | |
| ) | |
| UNITED STATES, PAPER AND FORESTRY, ) | |
| RUBBER, MANUFACTURING, ENERGY, ) | |
| ALLIED INDUSTRIAL AND SERVICE WORKERS ) | |
| INTERNATIONAL UNION, AFL-CIO, CLC ) | |
| ) | |
| Defendant-Intervenor. ) | |

BRIEF OF KUMHO TIRE (VIETNAM) CO., LTD. IN SUPPORT OF
ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

This brief is submitted on behalf of Kumho Tire (Vietnam) Co., Ltd. ("KTV") to

contest the final determination by the U.S. Department of Commerce ("Commerce") in the

countervailing duty investigation on Passenger Vehicle and Light Truck Tires ("PVLT

Tires") from the Socialist Republic of Vietnam.

STATEMENT PURSUANT TO RULE 56.2(C)(1)

A.   *Administrative Determination under Review*

Commerce's notice of the Final Determination with respect to KTV was published in the Federal Register on May 27, 2021.[1]  Commerce's discussion of the issues raised in the final results with respect to KTV was set forth in two memoranda dated May 21, 2021.[2]  A countervailing duty order on PVLT Tires from the Socialist Republic of Vietnam was issued on July 19, 2021.[3]

B.   *Issues of Law and Summary of Reasons*
     *for Reversing Commerce's Determination*

   1.   *Whether Commerce properly determined that KTV's acquisition of land-use*
        *rights was countervailable, in light of evidence demonstrating that those*
        *rights were acquired before the cut-off date for finding Vietnamese*
        *transactions to constitute subsidies?*

The countervailing duty ("CVD") statute provides that Commerce is not required to impose countervailing duties on imports from non-market economy ("NME") countries when it finds that it "is unable to identify and measure subsidies provided by the government of the nonmarket economy country ... because the economy of that country is essentially comprised of a single entity."  To implement that provision, Commerce's

---

[1] *See Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*; 86 Fed. Reg. 28566 (May 27, 2021) (Public Record ("PR") 476).

[2] *See* Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam (May 21, 2021) (PR-468) (hereinafter, "Final Determination Memorandum"); Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Final Determination Analysis Memorandum for Kumho Tire (Vietnam) Co., Ltd. (May 21, 2021) (PR-471, Confidential Record ("CR") 190) (hereinafter, "Final Analysis Memorandum").

[3] *See Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Countervailing Duty Order*; 86 Fed. Reg. 38013 (July 19, 2021) (PR-487).

- 2 -

longstanding practice has been to apply a uniform cut-off date for the specific country. Under that practice, any alleged subsidies before the cut-off date are *not* countervailable, while alleged subsidies after that date are countervailable.  In the case of Vietnam, Commerce has determined this cut-off date to be January 11, 2007, which is the date of Vietnam's accession to the World Trade Organization ("WTO").

In its final determination, Commerce held that KTV had obtained the rights to the land on which its headquarters and main facility are located after the January 11, 2007, cut-off date, and that KTV paid less-than-adequate remuneration ("LTAR") for those rights. As a result, Commerce calculated that KTV received a subsidy of 5.16 percent from this program.  That conclusion was, however, unsupported by the evidence.  In reality, the land-use rights were granted by the Government of Vietnam to KTV's parent company (prior to the formal establishment of KTV) under Vietnamese law, in April 2006.  As a matter of law, no further government action was needed to convey those rights to KTV. Furthermore, the undisputed evidence also confirms that all of the essential terms and conditions pertaining to KTV's land lease were established by that April 2006 agreement, which explicitly acknowledged that the land-use rights would be exercised by KTV, and which also required the relevant Government authority to enter into an agreement with KTV on identical terms once KTV was established.  In these circumstances, Commerce's finding that KTV received a subsidy due to its acquisition of land-use rights cannot be sustained.

> 2. *Whether Commerce determination that Vietnam's currency practices constituted a countervailable subsidy was lawful, in light of longstanding and consistent administrative practice dating back at least 50 years that currency devaluation does not constitute a countervailable subsidy, and in light of Congress's acquiescence in that practice?*

In 2020, Commerce adopted a regulation allowing it to impose countervailing duties to offset alleged undervaluation of a foreign country's currency due to actions by the foreign government.  In its final determination in this case, Commerce relied on that new regulation to find that KTV received a subsidy of 1.69 percent from alleged Vietnamese government intervention in foreign-exchange markets.

Commerce's 2020 regulation was, however, directly inconsistent with administrative precedent that dates back at least to 1971, and that was re-confirmed most recently in 2011. The countervailing duty law has been revised and reenacted on numerous occasions over that period.  In those amendments, Congress has always been aware of the administrative practice concerning currency valuation practices.  Nevertheless, Congress has consistently made clear that such practices should be addressed by the Treasury Department through negotiations, and not through the imposition of countervailing duties.  In view of this Congressional acquiescence, the Court should hold that Commerce's 2020 regulation is invalid, and that the imposition of countervailing duties in this case in response to alleged Vietnamese government currency practices case was unlawful.

<u>STATEMENT PURSUANT TO RULE 44.1</u>

Pursuant to USCIT Rule 44.1, notice is hereby given regarding KTV's intention to raise issues under the laws of the Socialist Republic of Vietnam in this appeal.

<u>ARGUMENT</u>

A.   *Commerce's Decision to Countervail KTV's Acquisition of Land-Use Rights Was Arbitrary and Unsupported by Substantial Evidence*

1.   *KTV's Acquisition of Land-Use Rights Pre-Dated Vietnam's Accession to the World Trade Organization, and thus Did Not Confer Countervailable Subsidies*

a.   *Under Commerce's Longstanding Practice, Land-Use Rights Obtained before Vietnam's Accession to the WTO Are Not Countervailable Subsidies*

Under the countervailing duty statute, Commerce is not required to impose countervailing duties on imports from a non-market-economy ("NME") country when it "is unable to identify and measure subsidies ... because the economy of that country is essentially comprised of a single entity."[4]  To implement that provision, Commerce's longstanding practice has been to apply a uniform cut-off date for the specific country. Under that practice, any alleged subsidies before the cut-off date are *not* countervailable, while alleged subsidies after that date are countervailable.[5]  Commerce's practice of defining a single uniform cut-off date for each NME country has been affirmed by this Court.[6]  In the case of Vietnam, Commerce has determined this cut-off date to be January 11, 2007, which is the date of Vietnam's accession to the World Trade Organization ("WTO").[7]

---

[4] *See* 19 U.S.C. § 1671(f)(2).

[5] *See, e.g., Phosphate Fertilizers from the Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9479 (Feb. 16, 2021), and accompanying Issues and Decision Memorandum, at cmt. 2d (Feb. 8, 2021) (hereinafter, "*Phosphate Fertilizers from Russia*").

[6] *See TMK IPSCO v. United States*, 222 F. Supp. 3d 1306, 1317 (CIT 2017).

[7] *See Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 85 Fed. Reg. 71607 (Nov. 10,

*(footnote continued on following page)*

In past cases, Commerce has held that the country-specific cut-off date governs the countervailability of alleged provision of land-use rights for less-than-adequate remuneration.  As a result, Commerce will not countervail any land-use transactions whose essential terms and conditions were established prior to the defined country-specific cut-off date.[8]

In this case, Commerce determined that the essential terms under which KTV acquired its land-use rights were not established until after the January 2007 cut-off date for Vietnam.  However, that conclusion is contrary to the evidence, which demonstrates that all of the terms for KTV's land-use rights were established in April 2006.

> b.   *The Record Demonstrates that KTV's Land-Use Rights Were Acquired in an Agreement Signed in 2006, Before Vietnam's Accession to the WTO*

KTV received the rights to use the land on which its head office and main factory are located through an "In-Principle" lease agreement dated April 28, 2006, entered into by a

---

*(footnote continued from previous page)*
2020) (PR-399), and accompanying Issues and Decision Memorandum, at 5 (Oct. 30, 2020) (hereinafter, "Preliminary Determination Memorandum") (PR-296).  *See also Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 16428 (April 1, 2010), and accompanying Issues and Decision Memorandum (Mar. 25, 2010) (hereinafter, "*Polyethylene Retail Carrier Bags from Vietnam*").

[8] *See, e.g.*, *Wire Decking from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 32902 (June 10, 2010), and accompanying Issues and Decision Memorandum, at cmt. 14 (June 3, 2010) (hereinafter, "*Wire Decking from China*"); *Certain New Pneumatic Off-the-Road Tires (OTR Tires) from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Negative Determination of Critical Circumstances*, 73 Fed. Reg. 40480 (July 15, 2008), and accompanying Issues and Decision Memorandum, at section IV.D "Programs Determined To Be Not Used" (July 7, 2008) (hereinafter, "*OTR Tires from China*").

PUBLIC VERSION

government-controlled land-development company named Becamex IDC Corporation.[9]
Because KTV had not yet formally been established as a legal entity, the agreement was
negotiated and signed by KTV's parent company Kumho Tire (H.K.) Co., Ltd.
("KT-HK").  However, the In-Principle Agreement explicitly contemplated that the land-
use rights that it established were intended for the use of KTV.  In fact, the first "recital" of
the April 2006 In-Principle Agreement stated that the agreement was subject to KT-HK
"applying for and obtaining an investment license establishing Kumho Tire (Vietnam) Co.,
Ltd. ('KHV') as a 100% foreign owned enterprise in Vietnam…."[10]

The April 2006 In-Principle Agreement fully described the land leased to KTV.[11]  It
also describes the rent (with a one-time initial payment and subsequent annual payments),
maintenance and management fees, and sewage/waste treatment fees to be paid by KTV.[12]
Finally, the April 2006 In-Principle Agreement committed Becamex and KTV to sign a
"land sublease contract" that "will contain terms consistent with this Agreement," with the
express proviso that "rights and obligations agreed between the Parties and set forth below
in articles herein that are applicable to the Land Sublease Contract shall be incorporated
into the Land Sublease Contract so as to be consistent with this Agreement."[13]

---

[9] *See* KTV's December 14, 2020, Supplemental Response, at 2 and
Appendix 1 (PR-417-418, CR-138-140).  *See also* Government of Vietnam's October 7,
2020, Supplemental Response at 31 (PR-248, CR-92).

[10] *See* April 2006 In-Principle Agreement, Recital A (provided in KTV's December 14,
2020, Supplemental Response, at Appendix 1 (PR-417-418, CR-138-140)).

[11] *See id.,* at Article 1.1 (definition of "Site"); *id.,* at Annexure 1 (PR-417-418, CR-138-
140).

[12] *See id.,* at Articles 3.1 and 3.2 (PR-417-418, CR-138-140).

[13] *See id.,* at Recital B (PR-417-418, CR-138-140).

Pursuant to the obligation set forth in the April 2006 In-Principle Agreement, KTV and Becamex entered into a "Land Lease Agreement" on April 20, 2012.[14]  As required by the April 2006 In-Principle Agreement, the substantive terms of the April 2012 Land Lease Agreement (including the description of the property and the terms of rent, maintenance and management fees, and sewage/waste treatment fees) reflected the substantive terms of the April 2006 In-Principle Agreement without change.[15]  The 2012 Agreement did clarify one minor term (Becamex's obligation to provide security services to KTV).  But it made no changes to KTV's *land-use* rights or the price that KTV paid for them.

    c.   *Commerce's Conclusion that KTV Acquired Its Land-Use Rights after the January 2007 Cut-Off Date Is Contrary to Vietnamese Law and the Evidence on the Record*

    (1)  *Commerce's Preliminary Determination*

In its preliminary determination, Commerce took the position that the date of KTV's acquisition of its land-use rights was uncertain, because the land-use-rights certificate ("LURC") obtained by KTV from the local Vietnamese government appeared to refer to numerous amendments post-dating the January 2007 cut-off date.[16]  Following the preliminary determination, Commerce asked KTV to clarify the meaning of the statement on the land-use rights certificate.[17]  In response, KTV explained that the reference to

---

[14] A copy of the April 2012 Land Lease Agreement was provided in Appendix 2 of KTV's December 14, 2020, Supplemental Response (PR-417-418, CR-138-140).

[15] *See, e.g.*, April 2012 Land Lease Agreement, at Article 1.1 and Appendix 1 (describing property being leased); *see id.*, at Articles 4.1, 4.2, and 4.3 (describing rent, maintenance and management fees, and sewage/waste treatment fees) (provided in KTV's December 14, 2020, Supplemental Response, at Appendix 2 (PR-417-418, CR-138-140)).

[16] *See* Preliminary Determination Calculations for Kumho Tire (Vietnam) Co., Ltd., dated October 30, 2020, at 2 (PR-393, CR-131).

[17] *See* Countervailing Duty Investigation: Kumho Tire (Vietnam) Co., Ltd. – Supplemental Questionnaire, dated November 23, 2020 (PR-405, CR-137).

amendments on the land-use-rights certificate did not describe amendments to KTV''s land-use rights, but instead referred to amendments to KTV's investment registration certificate (which is a business license document that does not purport to describe any land-use rights).[18]  In support of its explanation, KTV also submitted a letter from a Vietnamese lawyer explaining the meaning of land-use-rights certificates under Vietnamese law.  That letter explained that:

> The contents of LURC and its standard form are governed under Article 3 of Circular 17 /2009/TT-BTNMT. In accordance with that Article, with respect to rights of land user, the LURC only stipulates the origin of use and purpose of use, which can be referred under the Law on Land. *The LURC does not define the rights and obligations of the land user.*  Instead, those rights and obligations are defined by the relevant provisions of the Law on Land for the specific form of land *and by the provisions of the agreements under which the land is leased (or sub-leased) to the user*.[19]

In short, under Vietnamese law, any amendments to the land-use-rights certificate would not affect KTV's actual land-use rights.  Instead, KTV's land-use rights were defined by the lease agreements with the government-controlled corporation Becamex.

### (2)  Commerce's Final Determination

Despite the clear evidence that KTV's land-use rights were fixed before Vietnam's accession to the WTO by the 2006 In-Principle Agreement, Commerce's final determination continued to take the position that those land-use rights constituted countervailable subsidies.  In support of that conclusion, Commerce relied on the following arguments:

---

[18] *See* KTV's December 14, 2020, Supplemental Response, at 5 (PR-417-418, CR-138-140).

[19] *Id.,* Appendix 5 at 2-3 (PR-417-418, CR-138-140).

(1)   One of the [                                    ] that KTV was required to make under
      the April 2006 In-Principle Agreement was paid [      ].[20]

(2)   The 2012 Agreement between KTV and Becamex changed the material terms of
      the agreement, because the 2012 Agreement specifies that (i) Becamex

      [


      ] and (ii) [




                                                                            ].

      According to Commerce, "there does not appear to be any corresponding
      provision in the April 2006 In-Principle Agreement."[21]

(3)   Becamex could not have conveyed land-use rights to KTV prior to the
      January 11, 2007 cut-off date, because Becamex "obtained its land use rights
      certificate on January 17, 2007."  According to Commerce, this meant that
      "Becamex, by law, could not lease land to KTV until January 17, 2007.[22]

(4)   Because KTV and its parent company KT-HK are different entities, "one of the
      material terms of the land lease (*i.e.*, the parties to the lease) was not established
      until {KTV} itself signed the lease in 2012."[23]

As discussed more fully below, however, Commerce's arguments are completely without

merit:  They reflect a desperate effort to justify a pre-ordained conclusion, not a rational

---

[20] *See* Final Analysis Memorandum, at 2-3 (PR-471, CR-190).

[21] *See id.* (PR-471, CR-190).

[22] *See* Final Determination Memorandum, at 41 (PR-468).

[23] *See id.* (PR-468).

analysis of the evidence on the record concerning the terms of the relevant agreements and

the requirements of Vietnamese law.

        *(a)   The [                ] by KTV Did Not Modify*
                *the Material Terms of the 2006 Agreement*

      Both the 2006 In-Principle Agreement and the 2012 Land-Lease Agreement stated

that KTV was required to make [

      ].[24]  The last of these [

       ].”[25]  Article 3.3 of the 2006 In-Principle Agreement

also provided that if KTV [

      ].”[26]  The Agreement further provided that,

     [

              ].[27]

Under these provisions, the last of the [               ].

However, that [

      ][28]

      Commerce concluded that Becamex's failure to insist on the [

     ] meant that not all of the essential terms and conditions of

---

[24] *See* KTV's December 14, 2020, Supplemental Response, at Appendix 1 (PR-417-418, CR-138-140).

[25] *See id.*, at Appendix 1, Article 3.1 (PR-417-418, CR-138-140).

[26] *See id.*, at Appendix 1, Article 3.3 (PR-417-418, CR-138-140).

[27] *See id.*, at Appendix 1, Article 3.3 (PR-417-418, CR-138-140).

[28] *See id.*, at Appendix 2, Article 5.1 (PR-417-418, CR-138-140).

KTV's land use agreement.  In this regard, Commerce also stated that the failure of the 2012 Lease Agreement to address KTV's earlier [                    ] represented a material change in the terms between the 2006 In-Principle Agreement and the 2012 Land Lease Agreement.[29]

As a matter of law, Commerce is wrong.  A failure of one party to comply with the terms of an agreement does not constitute the negotiation of a new agreement.  Instead, such a failure represents, at most, a breach of the existing contract.  Under basic contract-law principles in Vietnam and the United States, a party to a contract is never required to respond to a breach of contract by terminating the agreement and negotiating a new one. For example, Article 709 of the 2005 Civil Code of Vietnam explicitly provides that, "if the lessee is late in paying the agreed rent for the lease of the land use rights, the lessor may grant an extension…."[30]  U.S. contract law establishes the same basic principle.[31]

Furthermore, a party is not required to insist on full satisfaction of its contractual remedies (such as late-payment penalties).  While a party may have rights to terminate the agreement or to insist on the imposition of penalties described in an Agreement, it also has the right to waive the breach.  In fact, the 2006 In-Principle Agreement specifically addressed that possibility.[32]

---

[29] *See* Final Analysis Memorandum, at 2 (PR-471, CR-190).

[30] A copy of the relevant provision of Vietnamese law is provided in Attachment 1 of this brief.

[31] *See generally Knickerbocker Life Ins. Co. v. Norton*, 96 U.S. 234 (1877).

[32] Article 10.1 of the 2006 In-Principle Agreement provided that

[

]

*(footnote continued on following page)*

- 12 -

This does not mean that the [                                    ] had no

significance under the countervailing duty laws.  Because Becamex is a government-

controlled entity, the failure of Becamex to collect payment on time or to insist that interest

or penalties be paid as a result of the delay may itself constitute a countervailable

subsidy.[33]  In fact, Commerce's past decisions have explicitly indicate that a government

entity's agreement to accept late lease payments constitutes a separate subsidy in the form

of a zero-interest loan.[34]  However, under Commerce's regulations, the benefit of such a

loan is attributed only to the period for which the loan was extended.[35]  In other words, any

benefit from Becamex's failure to insist on [                                    ]

might have represented a subsidy to KTV during the period from [

_____

*(footnote continued from previous page)*
In addition, Article 13.4 of that Agreement provided that:

     [



        ].

*See* 2006 In-Principle Agreement, (provided in KTV's December 14, 2020, Supplemental
Response, at Appendix 1) (PR-417-418, CR-138-140).

[33] Under the statute, action by a government authority that results in "foregoing or not
collecting revenue that is otherwise due" constitutes a "financial contribution" that may
give rise to a subsidy finding.  *See* 19 U.S.C § 1677(5)(D).

[34] *See Final Affirmative Countervailing Duty Determination: Stainless Steel Bar from
Italy,* 67 Fed. Reg. 3163 (Jan. 23, 2002), and accompanying Issues and Decision
Memorandum (Jan. 15, 2002), at cmt. 7 ("Regarding Valbruna's late lease payments to the
GOB, we agree with the petitioners that this constitutes an additional benefit to Valbruna.
The lease states that these payments are due no later than sixty days after the invoice date.
Therefore, we find that the non-collection of these monies provided Valbruna with a
financial contribution in the form of a direct transfer of funds, *i.e.*, a zero-interest loan. The
benefit from this interest-free loan is the amount of interest that would be due on a
comparable commercial loan.").

[35] *See* 19 C.F.R. § 351.505(b).

] — that is, from the date the payment was due until the date the payment was actually made.  There was no basis under Commerce's regulations or past practice to treat the [                    ] as a subsidy during the 2019 fiscal year period examined in this case.

> *(b)  The Clarification in the 2012 Agreement of Becamex's
>       Obligations to Provide Security Services Did Not Modify
>       the Land-Use Rights Established by the 2006 Agreement*

Commerce's final determination also contended that Article 3.1 of the 2012 Land Lease Agreement, under which Becamex committed to provide [

], constituted a material change from the 2006 Agreement.[36]  In this regard, Article 3.1 of the 2012 Land Lease Agreement provided that Becamex might be held responsible for any damage if it fails to [

].[37]  The 2006 In-Principle Agreement did not contain an explicit provision addressing either Becamex's obligations to provide security and control traffic, or the consequences of Becamex's failure to do so.

As an initial matter, it should be noted that Becamex's agreement to these terms in 2012 did not represent a modification of KTV's *land* use rights.  The 2012 Agreement gave KTV exactly the same rights to *use* the land in question as the 2006 In-Principle Agreement had.  KTV could build its headquarters and factory on the land and use the land in the manner contemplated by those agreements for the lease terms described in those agreements.

---

[36] *See* Final Analysis Memorandum, at 2 (PR-471, CR-190).  *See also* 2012 Land Lease Agreement, Article 3.1 (provided in Appendix 2 of KTV's December 14, 2020, Supplemental Response) (PR-417-418, CR-138-140).

[37] *See id.* (PR-417-418, CR-138-140).

Instead, the provisions identified by Commerce addressed a different issue: Becamex's commitment to provide certain additional services — in particular, security and traffic control in common areas of the industrial zone — to KTV.  If Becamex had agreed to provide these services for the first time in the 2012 Land Lease Agreement, its agreement to do so without additional charge to KTV might possibly have constituted a separate, new subsidy.  But there was no allegation in this case that Vietnamese government entities had provided security services and traffic control for less than adequate remuneration, and Commerce made no finding that Becamex's provision of those services to KTV was made for less than adequate remuneration.

Furthermore, the evidence indicates that the security services and traffic control were not newly added by the 2012 Land Lease Agreement and were not services provided uniquely by Becamex to KTV.  The land that KTV leases from Becamex is part of a larger industrial zone with more than 200 tenants.  The entire industrial zone is managed by Becamex.[38]  The security services and traffic control, by their nature, relate to the operation of the industrial zone, and not to individual parcels leased to individual tenants like KTV.  There is simply no basis on the record to conclude that there was no security or traffic control in common areas of the industrial zone before the 2012 Land Lease Agreement was signed.[39]

---

[38] *See, e.g.,* Petitioner's September 10, 2020, Submission, Exhibit 1, at 3 (PR-208, CR-82).

[39] A picture of the entrance of a different industrial zone managed by Becamex was submitted by Petitioner.  *Id.* (PR-208, CR-82).  It shows that the zone has an entrance gatehouse, which means that [

          ] were part of the integral structure of Becamex-operated zones, and not some later add-on.

And, in any event, Commerce's conclusion that Becamex's agreement to provide such services constituted a change in the agreement between Becamex and KTV is unsupported by the record.  The 2006 In-Principle Agreement clearly required Becamex to maintain order on and around KTV's site.  In particular, Article 9 of the 2006 In-Principle Agreement provided that:

[

].[40]

It is KTV's position that Article 9 of the 2006 In-Principle Agreement obligated Becamex to provide [                              ] provision.  The more explicit terms in the 2012 Agreement describing those services are simply an elaboration of "technical nature" of Becamex's existing obligation under Article 9 of the 2006 In-Principle Agreement.  Under Commerce's past decisions, such technical changes after the cut-off date do not transform the pre-cut-off government action into a countervailable subsidy.[41]

> (3)  *KTV's Acquisition of Land-Use Rights Was Governed by the Agreements with the Government-Controlled Entity Becamex, and Not by Any Land-Use Rights Certificate*

The April 2006 In-Principle Agreement explicitly obligated Becamex to obtain a Land-Use Rights Certificate for KTV.[42]  Pursuant to that obligation, Becamex obtained the Land-Use Rights Certificate for the specific property that was leased to KTV on January 17, 2007.  The 2007 Land-Use Rights Certificate describes only the specific

---

[40] *See id*., at Appendix 1, Article 9 (PR-417-418, CR-138-140) (emphasis added).

[41] *See Phosphate Fertilizers from Russia*, at cmt. 2d (denying to countervail mining-rights licenses obtained before the cut-off date despite changes of technical nature).

[42] *See* April 2006 In-Principle Agreement, Article 5.1(10) (provided in KTV's December 14, 2020, Supplemental Response, at Appendix 1 (PR-417-418, CR-138-140)).

property leased to KTV and was issued by the Department of Planning and Investment of Binh Duong Province to Becamex.[43]  Becamex later arranged for the Land-Use Rights Certificate, which described the same property, to be issued to KTV on October 26, 2012, following the signing of the 2012 Land Lease Agreement.[44]

In its Final Determination, Commerce contended that, because the initial Land-Use Rights Certificate was issued to Becamex on January 17, 2007, "Becamex, by law, could not lease land to {KTV} until January 17, 2007 — after Vietnam's accession to the WTO on January 11, 2007."[45]  But Commerce failed to cite any relevant provision of Vietnamese law to support that claim.  And, in fact, Commerce's interpretation of Vietnamese law is simply wrong.[46]

---

[43] *See* KTV's December 14, 2020, Supplemental Response, at Appendix 3 (PR-417-418, CR-138-140).

[44] *See id*. at Appendix 4 (PR-417-418, CR-138-140).  The April 2012 Land Lease Agreement specifically committed Becamex to "ensure that the Certificate of Land Use Right shall be issued to the Lessee within 03 months the signing of this Land Lease Agreement."  *See id.* at Appendix 3 (PR-417-418, CR-138-140).

[45] *See* Final Determination Memorandum, at 41 (PR-468).

[46] In this regard, we note that the interpretation of foreign law is a question of law to be determined by the Court, and not a question of fact to be reviewed based on substantial evidence before the agency.  *See generally* USCIT R.44.1; *see also Bugliotti v. Republic of Argentina*, 952 F.3d 410, 413 (2d Cir. 2020) ("Rule 44.1 preserves a district court's freedom to employ fact-like procedures, including by taking written and oral testimony, as sometimes may be required to adjudicate foreign legal questions {and} simultaneously requires law-like appellate review of foreign-law determinations, while maintaining a district court's flexibility to tailor fact-like methods of inquiry to the needs of the case.").

It should also be noted that the 2006 In-Principle Agreement includes a choice-of-law clause.  *See* KTV's December 14, 2020, Supplemental Response, at Appendix 1, Article 12 ("The making, validity, interpretation, performance of, and resolution of disputes arising from this Agreement shall be governed by the Laws of Vietnam.") (PR-417-418, CR-138-140).

PUBLIC VERSION

In its memorandum addressing Land-Use Rights in Vietnam, Commerce concluded that "{l}and-use rights in Vietnam are legally recognized by the issuance of land-use rights certificates" and "holding land-use rights certificates significantly improves land-use rights security."[47]  However, those conclusions do not mean that Becamex was legally unable to enter into a valid lease agreement with KTV before it received a land-use-rights certificate. As Commerce found in its Land-Use Memorandum, it is undoubtedly true that land-use-rights certificates provide convenient evidence, for farmers in particular, which provides that that the holder has the right to use the land.[48]  However, the actual right to use the land is established by the land-lease agreement itself, and not by any certificate.

As described above, the relationship between the land-lease agreement and the land-use-rights certificate was explained by a Vietnamese lawyer as follows:

> The contents of LURC and its standard form are governed under
> Article 3 of Circular 17 /2009/TT-BTNMT. In accordance with that
> Article, with respect to rights of land user, the LURC only stipulates

---

[47] *See* Final Determination Memorandum, at 41 (PR-468) (citing Memorandum, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Analysis of Vietnam's Land-Use Rights," dated October 30, 2020, at 22 (hereinafter, "Land Memorandum") (PR-298-302)).

[48] The relevant portion of the Land Memorandum reads as follows:

> Land-use rights in Vietnam are legally recognized by the issuance of
> land-use rights certificates.  According to the *Land Law*, it is the state's
> responsibility to issue land-use rights certificate "to land users who are
> eligible as prescribed by law."  In practice, it is found that holding
> land-use rights certificates significantly improves land-use rights
> security, which is an important determinant of *farm production*
> outcomes, with farmers holding formal certificates having significantly
> higher yield than those without.

*See* Land Memorandum, at 22 (citing Article 26.2 of the *Land Law of the Socialist Republic of Vietnam* No. 45/2013/QH13 (adopted by the National Assembly in 1986, amended in 1988, 1993, 1998, 2003, further amended November 29, 2013, promulgated July 1, 2014) and *Agricultural Policies in Viet Nam 2015*, OECD Food and Agricultural Reviews, at 210) (PR-298-302).

> the origin of use and purpose of use, which can be referred under the
> Law on Land. *The LURC does not define the rights and obligations of*
> *the land user.*  Instead, those rights and obligations are defined by the
> relevant provisions of the Law on Land for the specific form of land
> *and by the provisions of the agreements under which the land is leased*
> *(or sub-leased) to the user*.[49]

This conclusion is supported by the actual text of the relevant Vietnamese law, the 2003

Law on Land, which provides that:

> Land use right certificates mean the certificates granted by competent
> State agencies to land users in order to protect their legitimate rights
> and interests."[50]

Under this provision, a land-user-rights certificate confirms the holders existing rights and

interests.  Nothing in the law prevents the holder of land-use rights from leasing land to

another entity before such a certificate was issued.

Under Article 90.4 of the 2003 Law on Land, organizations investing in production or

businesses located in industrial zones (such as Becamex) are entitled to sub-lease land

attached to infrastructure from another economic organization investing in, constructing

and commercially operating infrastructure of industrial zones.[51]  Under relevant

Vietnamese law, a land lease or sub-lease agreement is a type of lease contract of property

(which is a type of civil contract).[52]  Under Article 388 of the 2005 Civil Code, a civil

contract is an agreement between parties in relation to the establishment, modification or

---

[49] *See* KTV's December 14, 2020, Supplemental Response, Appendix 5 at 2-3 (PR-417-418, CR-138-140).

[50] *See* 2003 Law on Land, Article 4.20 (provided in Attachment 1 to Land Memorandum) (PR-298-302).

[51] *See* KTV's December 14, 2020, Supplemental Response, at Appendix 5 (PR-417-418, CR-138-140).

[52] *See id.* (PR-417-418, CR-138-140).

termination of civil rights and obligations.[53]  Parties to a contract have the right to agree on

the contents in the contract.  Accordingly, under Article 402 of the 2005 Civil Code, rights

and obligations of each of the parties shall be contained in a contract.[54]

The 2006 In-Principle Agreement includes an explicit representation by Becamex,

that Becamex [

].”[55]  In addition, the 2006 In-Principle Agreement also records that

[

][56]

The rights and obligations of Becamex and KT-HK and its successor KTV are contained in

the 2006 In-Principle Agreement under Vietnamese law.  Commerce's suggestion that

Becamex had no authority to enter into a land-lease agreement with KTV before the

issuance of the Land-Use Rights Certificate to Becamex on January 17, 2007, is contrary

to both Vietnamese law and to the specific representations made by Becamex.

Finally, it should be noted that Becamex is not independent of the Government of

Vietnam.  Instead, it is a government-controlled land-development corporation, which

operates an industrial park that was formally authorized by the Government of Vietnam

before Vietnam acceded to the WTO in January 2007.[57]  Commerce's finding of a subsidy

from the provision of land-use rights to KTV was entirely premised on the assumption that

---

[53] *See id.* (PR-417-418, CR-138-140).

[54] *See id.* (PR-417-418, CR-138-140).

[55] *See id.*, Appendix 1, at Article 5.1 (PR-417-418, CR-138-140).

[56] *See id.*, Appendix 1, at Article 5.2 (PR-417-418, CR-138-140).

[57] *See, e.g.,* Petitioner's September 10, 2020, Submission, Exhibit 1, at 3 (PR-208, CR-82).

PUBLIC VERSION

Becamex acted on behalf of the government.  If Becamex had itself been a private entity, there would have been no basis for Commerce to find that the lease from Becamex to KTV constituted a government subsidy.  Consequently, Commerce's suggestion that Becamex lacked the legal authority to enter into a binding lease agreement with KTV on behalf of the Vietnamese government before January 17, 2007, is fundamentally inconsistent with Commerce's finding that Becamex's lease agreement with KTV constituted a subsidy.

> **(4)  KTV's Rights and Obligations as the Lessee of the**
> **Land under the Terms Set Forth in the 2006 Agreement**
> **Were Explicitly Described in the 2006 Agreement**

Finally, Commerce's Final Determination contended that the parties to the lease were not identified in the 2006 In-Principle Agreement, because KT-HK and KTV are two legally-distinct entities and because KT-HK signed the 2006 In-Principle Agreement. According to Commerce, "one of the material terms of the land lease (*i.e.*, the parties to the lease) was not established until KTV itself signed the lease in 2012."[58]  Commerce's conclusion is, however, contrary to the terms of the 2006 In-Principle Agreement and the relevant provisions of Vietnamese law.

As explained above, the 2006 In-Principle Agreement was negotiated and signed by KT-HK because KTV had not yet been established in April 2006.  Under Vietnamese law, a parent company (such as KT-HK) of a foreign-owned Vietnamese enterprise (such as KTV) is permitted to sign contracts to serve the incorporation and operation of the foreign-owned Vietnamese enterprise prior to said enterprise's registration and incorporation.[59]  As

---

[58] *See* Final Determination Memorandum, at 41 (PR-468).

[59] *See* Article 14.1 of the 2005 Law on Enterprises (provided in Appendix 5 of KTV's December 14, 2020, Supplemental Response (PR-417-418, CR-138-140)).  An explanation of the implications of Article 14.1 for KTV's land-use rights was set forth in a statement by a Vietnamese legal expert.  *See* Letter from Vu Son Tung, December 12, 2020

*(footnote continued on following page)*

such, the 2006 In-Principle Agreement is properly considered a pre-incorporation contract as prescribed in Article 14.1 of the 2005 Law on Enterprises.  In other words, KT-HK, as the owner and founder of KTV, was legally authorized to sign the 2006 In-Principle Agreement with Becamex on behalf of KTV.  Furthermore, according to Article 14.2 of the Law on Enterprises, a foreign-owned Vietnamese enterprise, once incorporated, must continue exercising the rights and performing obligations arising from the pre-incorporation contract.[60]  Consequently, even in the absence of a subsequent agreement between KTV and Becamex, both KTV and Becamex remained bound by the terms of the 2006 In-Principle Agreement.

Finally, Commerce's suggestion that the identity of KTV as the lessee was not established by the 2006 In-Principle Agreement is simply wrong.  The very first "recital" of the 2006 In-Principle Agreement explicitly stated that the agreement was subject to KT HK "applying for and obtaining an investment license establishing Kumho Tire (Vietnam) Co., Ltd. ('KHV') as a 100% foreign owned enterprise in Vietnam…."  Furthermore, the terms of the 2006 In-Principle Agreement specifically required Becamex to enter into a sublease agreement with KTV following the registration and incorporation of KTV (without identifying a specific time-frame for the conclusion of that agreement).  According to 2006 In-Principle Agreement, the sublease agreement between Becamex and

_____

*(footnote continued from previous page)*
(provided in Appendix 5 of KTV's December 14, 2020, Supplemental Response (PR-417-418, CR-138-140)).

[60] *See* Article 14.2 of the 2005 Law on Enterprises (provided in Appendix 5 of KTV's December 14, 2020, Supplemental Response (PR-417-418, CR-138-140).  An explanation of the implications of Article 14.2 for KTV's land-use rights was set forth in a statement by a Vietnamese legal expert.  *See* Letter from Vu Son Tung, December 12, 2020 (provided in Appendix 5 of KTV's December 14, 2020, Supplemental Response (PR-417-418, CR-138-140)).

KTV "will contain terms consistent with this Agreement," and the "rights and obligations agreed between the Parties and set forth below in articles herein that are applicable to the Land Sublease Contract shall be incorporated into the Land Sublease Contract so as to be consistent with this Agreement."[61]  In these circumstances, there is no basis for Commerce's assertion that the identity of the actual user of the land-use rights was not identified in the 2006 In-Principle Agreement.

In short, the evidence in this case demonstrates that the terms of the 2012 Lease Agreement between KTV and Becamex were identical in all material respects to the terms of the 2006 In-Principle Agreement.  No changes in KTV's land-use rights or payment obligations were made after 2006.  Consequently, Commerce's conclusion that KTV's right to use the land was acquired only after the January 11, 2007, cut-off date is contrary to the evidence and inconsistent with the relevant provisions of Vietnamese law.  In these circumstances, Commerce's finding that KTV received a subsidy through its acquisition of land-use rights from Becamex cannot be sustained.

B.   Commerce's Imposition of Countervailing Duties to
     Address Alleged Currency Undervaluation Is Unlawful

     1.   Commerce Lacks the Authority to Treat Foreign-
          Government Action that Allegedly Results
          in an Undervalued Currency as a Subsidy

          a.   Under Longstanding Administrative Practice, Currency
               Devaluations Do Not Constitute Countervailable Subsidies

More than 50 years ago, the old Court of Customs and Patent Appeals observed that, while an "undervalued" exchange rate may benefit exporters, a devaluation of the currency

---

[61] *See* April 2006 In-Principle Agreement, Recital B (provided in KTV's December 14, 2020, Supplemental Response, at Appendix 1 (PR-417-418, CR-138-140)).

does not constitute a countervailable subsidy under U.S. law.  In the 1971 decision in

*Hammond Lead Products,* the CCPA explained that:

> Nothing, at least in the short range, stimulates exports more than a
> devaluation of the currency. After devaluation, the exporter gets more
> home currency for each article he exports, and with it can purchase
> more goods and services at home, and he obtains these benefits largely
> at the expense of the producer for the home market who now gets paid
> in devalued currency. Yet we do not assess countervailing duties
> against countries because they devalue their currencies. Why not? The
> only valid reason is that these devaluations have been encouraged by
> our government, in the effort it has expended since Bretton Woods for
> a worldwide system of freely convertible currencies.[62]

The CCPA also noted that Congress was well aware of the issue, but had acquiesced in the

interpretation of the countervailing duty laws that excluded currency valuation practices

from the definition of a subsidy:

> The Congress is, of course, well aware of these problems, and it would
> seem it elects to rely on executive discretion to avoid making the
> United States ridiculous by penalizing imports from foreign countries
> which have taken reasonable action, action our own government takes
> or counsels.[63]

The countervailing duty statute has been amended on several occasions since the CCPA

made those observations.  Responsibility for administering the countervailing duty statute

was transferred from the Treasury Department to Commerce in 1980.  The countervailing

duty provisions of the statute were substantially re-written in 1979 to implement the results

of the "Tokyo Round" of multilateral negotiations, and again in 1995 to implement the

results of the "Uruguay Round."  The terminology used to describe the criteria for finding

subsidies has changed considerably to reflect international agreement, as embodied most

recently in the Uruguay Round Agreement on Subsidies and Countervailing Measures.

---

[62] *United States v. Hammond Lead Products*, 440 F.2d 1024, 1030–31 (C.C.P.A. 1971).

[63] *Id.,* at 1031.

Yet, until 2020, agency practice under Commerce's interpretation of the statute remained the same as it had under Treasury in 1971.  And, while Congress was fully aware of that practice, it made no effort to overturn it.

In fact, one of Commerce's earliest decisions after it assumed responsibility for administering the countervailing duty laws explicitly re-affirmed the longstanding Treasury position that devaluations of an exchange rate that applied equally to all imports and exports do not constitute a subsidy.  Thus, in its 1981 preliminary determination in the investigation of *Lamb Meat from New Zealand,* Commerce explained that:

> Since the New Zealand exchange rate is the same for all sectors of the economy, for export as well as import transactions, and are freely available to all to use in converting currencies, we do not consider the periodic adjustment of the rate to be a subsidy within the meaning of the countervailing duty law.[64]

Two years later, in its 1983 final determination involving *Pork Rind Pellets from Mexico,* Commerce held that a preferential exchange rate that applied to all imports and to all conversions of export earnings was not "specific" and therefore did not constitute a subsidy.[65]  And, one year later, in its 1984 preliminary determination in the investigation of

---

[64] *See Lamb Meat from New Zealand; Preliminary Affirmative Countervailing Duty Determination,* 46 Fed. Reg. 58128, 58131 (Nov. 30, 1981).

There was no final determination in the *New Zealand Lamb* investigation, because the petitioners withdrew their petition after Commerce's preliminary determination was made.

[65] In the *Mexican Pork Rind Pellets* case, Commerce explained that:

> The Department has determined that the operation of the Mexican exchange rate system does not confer an export bounty or grant on pork rind pellets....  Whether or not the pork rind pellet industry exported pellets to the United States, it would be eligible to import pork skins at the controlled rate because this item is contained on the January 18, 1983 revision to the tariff list. Further, all exporters are required to convert their foreign earnings at the less favorable controlled exchange rate.

*(footnote continued on following page)*

*Steel Wire Rod from Poland*, Commerce explicitly relied on the CCPA's decision in

*Hammond Lead* to support the conclusion that "we do not assess countervailing duties

against countries which devalue their currency."  In the *Polish Wire Rod* case, Commerce

also re-affirmed its earlier holding that a dual exchange rate system does not constitute a

subsidy where a single rate applied to all import and export transactions.[66]

_____

*(footnote continued from previous page)*

> Additionally, we find that the dual exchange rate system does not
> benefit a "specific enterprise or industry, or group of enterprises or
> industries" within Mexico as specified in section 771(5)(B) of the Act,
> because all firms may import many different goods using the
> controlled exchange rate. As indicated above, the goods on the tariff
> list for which foreign currency may be obtained at the controlled rate
> range from plants and animal products to orange peelers to heavy
> machinery. Because the Mexican government, through the creation of
> the above-described tariff list, has not singled out for benefit a specific
> industry or enterprise or a specific group of industries or enterprises,
> the Department determines that the Mexican dual exchange rate
> system does not operate to confer a domestic subsidy on the pork rind
> pellet industry.

*Final Negative Countervailing Duty Determination; Pork Rind Pellets from Mexico*, 48
Fed. Reg. 39105, 39107 (Aug. 29, 1983).

[66] *See Carbon Steel Wire Rod from Poland; Preliminary Negative Countervailing Duty
Determination*, 49 Fed. Reg. 6768, 6771 (Feb. 23, 1984).

In *Polish Wire Rod,* Commerce explained that:

> As recognized by the CCPA in *United States v. Hammond Lead
> Products, Inc.*, 440 F.2d 1024, 1030 (1971), a devaluation in a market
> economy stimulates exports, but, nevertheless, does not confer a
> subsidy...:

> Based on our experience and judicial precedent, we do not believe that,
> in a market economy country, a multiple exchange rate system
> including both a non-trade exchange rate (or rates) and a uniform
> exchange rate applied to trade transactions confers a bounty or grant
> within the meaning of the Act. To the extent that the uniform exchange
> rate applied to trade has any meaning in a nonmarket economy
> country, like Poland, the economic effects would be identical to those
> in a market economy. The divergence between a trade rate and non-

*(footnote continued on following page)*

In view of Commerce's clear policy against treating currency-valuation practices as a countervailable subsidy, petitioners generally did not include allegations of such subsidies in their petitions for almost 30 years. In 2010, however, two petitions were filed alleging that China's undervaluation of its currency constituted a countervailable subsidy. In both of those cases, Commerce declined to initiate an investigation of the currency claims, on the grounds that currency-valuation practices were not "specific" to an industry or group of industries, and therefore could not constitute subsidies under the U.S. countervailing duty laws.[67]

---

*(footnote continued from previous page)*
> trade rate (or rates) would be equivalent to a devaluation or revaluation, and hence we would not find the multiple exchange rate to confer a subsidy.

*Id.*

The final determination in *Polish Wire Rod* did not address the currency-valuation issue, because Commerce made a negative determination based on the broader principle that the countervailing duty law did not apply to non-market economies. *See Carbon Steel Wire Rod from Poland; Final Negative Countervailing Duty Determination,* 49 Fed. Reg. 19374 (May 7, 1984).

[67] *See Aluminum Extrusions from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 76 Fed. Reg. 18521 (Apr. 4, 2011), and accompanying Issues and Decision Memorandum at cmt. 33; *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59213 (Sept. 27, 2010), and accompanying Issues and Decision Memorandum, at cmts. 5-7. *See also* Memorandum from Team to R. Lorentzen re Countervailing Duty Investigation: Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China New Subsidy Allegation – Currency, Aug. 30, 2010, at 5; Memorandum from Team to R. Lorentzen re Countervailing Duty Investigation: Aluminum Extrusions from the People's Republic of China, Subsidy Allegation – Currency, Aug. 30, 2010, at 5.

In 2020, however, Commerce reversed course, promulgating regulations that would allow it to treat undervalued currencies as a countervailable subsidy.[68]  In explaining those regulations, Commerce denied that the proposed regulations were contrary to its a longstanding practice.[69]  In particular, Commerce asserted that the decision in *Polish Steel Wire Rod* was mere *dicta*.  It did not address its other precedents addressing this issue, even though its 2010 decisions were explicitly cited in the comments on the proposed regulations to which Commerce purported to respond.[70]

> b.  *Because Congress Has Acquiesced in Commerce's Long-Standing Practice, Commerce Lacked Authority to Modify that Practice without Express Congressional Authorization*

As the CCPA noted in the *Hammond Lead* decision, "The Congress is, of course, well aware of these problems...."  In 1988, several years after Commerce issued its decisions in *New Zealand Lamb, Mexican Pork Rind Pellets, and Polish Steel Wire Rod*, Congress explicitly addressed foreign government manipulation of exchange rates in the Trade Act of 1988.  In that Act, Congress made the explicit finding that:

> policy initiatives by some major trading nations that manipulate the value of their currencies in relation to the United States dollar to gain competitive advantage continue to create serious competitive problems for United States industries....[71]

---

[68] *See Modification of Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings,* 85 Fed. Reg. 6031 (May 4, 2020).

[69] *Id.,* at 6033 ("Commerce does not have an established practice that it does not find currency undervaluation to be countervailable.").

[70] *See, e.g.,* Letter from Law Office of Jeffrey M. Winton PLLC to Jeffrey Kessler, Assistant Secretary for Enforcement and Compliance, June 27, 2019, at 8.  (A copy of this letter is available at « https://www.regulations.gov/comment/ITA-2019-0002-0021 »).

[71] *See* Trade Act of 1988, P.L. 100-418, § 3002(6), 22 U.S.C. § 5302(6).

Nevertheless, Congress did not direct Commerce to modify its treatment of currency valuation in countervailing duty cases. Instead, it directed Treasury to prepare annual reports to Congress on exchange rate policy and, where appropriate, to initiate negotiations to address any manipulation.[72]

Congress again turned to currency manipulation after Commerce's refusal, in 2010, to initiate countervailing duty investigations of currency-valuation practices. Congress was very much aware of Commerce's refusal in the 2010 cases to consider alleged currency manipulation to be a subsidy.[73] In response, it specifically considered legislation that would have overturned Commerce's practice and required "currency manipulation" to be treated as a countervailable subsidy.[74] In the end, however, Congress decided to assign authority to address exchange rate "manipulation" to the Treasury Department, and not to Commerce.[75] Furthermore, although Congress has reenacted the relevant provisions of the countervailing duty statute in 2015 and 2016, it has not altered the definition of subsidy to overturn Commerce's longstanding practice.[76]

---

[72] *Id.* §§ 3004 and 3005, 22 U.S.C. § 5304 and 5305.

[73] For example, during consideration of the proposed Currency for Fair Trade Act, H.R. 2378, 111th Cong. (2010), the House committee report noted: "{I}n two pending countervailing duty investigations the Department of Commerce decided not to investigate allegations that the undervaluation of the currency of the People's Republic of China (the renminbi, or 'RMB') confers a countervailing subsidy." H.R. Rep. No. 111-646, at 7 (2010).

[74] *See* 161 Cong. Rec. 6570-71 (2015) (text of Senate Amendment 1224).

[75] *See* Title VII Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125, Title VII (2016). *See also* H.R. Rep. No. 114-376, at 75-79 (2015) (conference committee report); 161 Cong. Rec. H9296-97 (daily ed. Dec. 11, 2015) (adoption of conference committee recommendations).

[76] *See, e.g.*, Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362, 383-87 (2015); Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125, 130 Stat. 122, 156-61 (2016).

In short, the administrative practice by Commerce and Treasury has been consistent from at least 1971 through 2019.  Congress has been aware of this practice — not only through "deemed" knowledge as a matter of law, but in actual fact.  And yet, although Congress undertook substantial amendments to the countervailing duty laws in 1979, 1984, 1988, 1995, and 2015, it has never overturned the longstanding administrative practice that currency valuation practices, even outright manipulation, is not within the purview of the countervailing duty laws.

This Congressional acquiescence in the Department's longstanding practice precludes Commerce from unilaterally altering its approach.  As the Supreme Court has observed, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."[77]  And, in the words of the Federal Circuit, "Once Congress has ratified a statutory interpretation through reenactment, agencies no longer have discretion to change this interpretation."[78]  Consequently, "if Commerce believes that the law should be changed, the appropriate approach is to seek legislative change."[79]

In these circumstances, the Court should hold invalid Commerce's 2020 modification of its regulations to allow certain currency-valuation practices to be treated as a countervailable subsidy.  And, Commerce's determination in this case that Vietnam's currency practices constituted a countervailable subsidy should be reversed.

---

[77] *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978).  *See also, e.g.*, *Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2491-92 (2009); *Faragher v. City of Boca Raton*, 524 U.S. 775, 792 (1998).

[78] *See GPX Int'l Tire Corp. v. United States*, 666 F.3d 732, 740 (Fed. Cir. 2011).

[79] *Id.* at 745.

> 2. *Commerce's Outsourcing of Basic Factual*
>    *Findings Regarding Alleged Currency Under-*
>    *Valuation to Treasury Is Contrary to the Statute*

The 2020 amendment to Commerce's regulations provides that, in analyzing issues of currency undervaluation under 19 C.F.R. § 351.528, "the Secretary will request that the Secretary of the Treasury provide its evaluation and conclusion as to the determinations under paragraphs (a) and (b)(1) of this section." In this regard, paragraph (a) of 19 C.F.R. § 351.528 requires a determination that the currency has been undervalued as a result of government action, while paragraph (b)(1) requires a determination of "benefit" to be made based on the difference between the actual exchange rate and the exchange rate that should have existed in the absence of undervaluation. In this case, Commerce sent a letter to Treasury asking it to "provide its evaluation and conclusion as to the determinations under both paragraphs (a) and (b)(1) of section 351.528, with respect to the allegation in PVLT tires from Vietnam."[80] Treasury responded by providing its report on the alleged undervaluation of the Vietnamese dong.[81] Commerce's findings that the Vietnamese dong was undervalued was based exclusively on the conclusions set forth in the Treasury report, and did not reflect any independent analysis by Commerce itself.[82]

The statute explicitly defines the Secretary of Commerce to be the "administering authority" for purposes of the countervailing duty laws,[83] and to make all of the

---

[80] *See* Letter from J.Maeder to A. Baukol, July 8, 2020 (PR-101).

[81] *See* Letter from A. Baukol to J.Maeder, August 24, 2020 (PR-165).

[82] *See* Preliminary Determination Memorandum at 24 (PR-296).

[83] *See* 19 U.S.C. § 1677(1).

determinations required by statute.[84]  In this case, however, Commerce failed to fulfill its

statutory obligation.

It may be that Commerce was permitted to seek input and advice from Treasury with

respect to currency valuation issues.  But, there is a difference between taking advice and

outsourcing a decision.  In this case, Commerce undertook no independent analysis of the

Treasury report — and failed to obtain the information from Treasury that would be

needed to assess the validity and reliability of Treasury's analysis.  In such circumstances,

Commerce's determination cannot be sustained.

   3.   *Treasury's Finding that the Vietnamese Dong*
        *Was Undervalued As a Result of Vietnamese*
        *Government Action Is Not Supported by Substantial*
        *Evidence on the Record of the Commerce Proceeding*

        a.   *The Data Needed to Assess the Validity of the*
             *Treasury Report Was Not Included in the Record*

As mentioned, Commerce's finding that the Vietnamese dong was undervalued as a

result of government action was based entirely on findings set forth in a report by the

Treasury Department.  The Treasury Report's conclusions were, in turn, based entirely on

the results of a regression analysis conducted by Treasury.  While the Report contained

some conclusory descriptions of the data used in its analysis, that data itself was not

included in the report.

---

[84] *See* 19 U.S.C.§ 1671b(b)(1) "{T}he *administering authority* shall make a determination,
based upon the information available to it at the time of the determination, of whether there
is a reasonable basis to believe or suspect that a countervailable subsidy is being provided
with respect to the subject merchandise...." (emphasis added)); 19 U.S.C.§ 1671d(a)(1)
("{T}he *administering authority* shall make a final determination of whether or not a
countervailable subsidy is being provided with respect to the subject merchandise...."
(emphasis added)).

Furthermore, the Treasury Report made clear that several key variables (including the variables for intervention in foreign exchange markets) were based on Treasury staff estimates.[85]  In addition, it is also apparent that the data set used by Treasury had numerous undisclosed gaps,[86] as well as inconsistencies with other Treasury Reports.[87]  There may also have been mathematical or model-specification errors that have been hidden by the lack of transparency.[88]

---

[85] For example, Treasury claims that one of the "contributions" reflected in the GERAF methodology is a new approach to deriving "comprehensive estimates of foreign exchange intervention."  *See* Treasury Report, at Global Exchange Rate Assessment Framework Methodology Attachment, at 3. ("GERAF Methodology") (PR-165). However, the description provided by Treasury for the derivation of this key variable provides little insight into how Treasury might have derived it.  For example, the description notes that "{t}his adjustment requires assumptions about both the currency and asset composition of reserves in order to isolate returns on assets held in reserves and currency valuation moves from actual purchases and sales, including estimations of transactions in foreign exchange derivatives markets."  *Id.* at 6 (PR-165)*.*  But, Treasury has failed to articulate what these assumptions might have been.

[86] According to the table of summary statistics provided in the GERAF Methodology paper attached to the Treasury Report, the GERAF Model analysis was intended to cover 51 countries for a period of 32 years– from 1986 to 2018.  Based on these parameters, a "full" data set (*i.e.*, data from all countries for all years) would encompass 1,632 sets of observations (where a "set of observations" refers to data for a given country in a given year).  However, the summary statistics for the GERAF model indicate that the relevant data include only 1,273 sets of observations — which suggests that 359 sets of observation are "missing" from the data used in the GERAF analysis (PR-165).

[87] For example, the Treasury Report estimated that "that the Vietnamese government — through the State Bank of Vietnam — undertook net purchases of foreign exchange in 2019 totaling about $22 billion."  *See* Treasury Report at 1 (PR-165).  By contrast, the Treasury's Foreign Exchange Report published in January 2020 reported that "{t}he Vietnamese authorities have credibly conveyed to Treasury that net purchases of foreign exchange were 0.8 percent of GDP {roughly $2.1 Billion} over the four quarters through June 2019."  *See* Report to Congress: Macroeconomic and Foreign Exchange Policies of Major Trading Partners of the United States, January 2020, at 8.  (A copy of this Report was provided in Attachment 17 of KTV's September 8, 2020, Submission (PR-202; CR-76)). The information on the record does not allow these inconsistent findings to be reconciled.

[88] As explained in an "Occasional Paper" issued by Treasury officials in 2007,

*(footnote continued on following page)*

- 33 -

KTV asked Commerce to request that Treasury place the data that underlay its analysis on the record, so that the parties could test both the accuracy of the data and the reliability of Treasury's analysis.[89]  Commerce refused.[90]

In these circumstances, there is no basis for finding that the conclusions set forth in the Treasury Report, which were adopted by Commerce without independent analysis, were supported by any actual data.  In order for the Court to determine whether the Treasury findings that Commerce adopted as its own were themselves supported by the evidence, the evidence on which Treasury purported to rely must be part of the record before the Court.  Because Commerce did not include that data on the record of the proceeding, the Court must conclude that the Treasury findings that the Vietnamese dong was undervalued as a result of government action is not supported by substantial evidence.

_____

*(footnote continued from previous page)*

> {T}he result of any exchange rate model should be interpreted with a full understanding of the model's key assumptions and mathematical structure, and the limitations that these imply. The value of an exchange rate can differ from the equilibrium value implied by a model because the model takes inadequate account of cyclical, temporary or random influences, or simply because the model fails to account for some important features of the economy, including the functioning of global capital markets.

*See* T. Ashby McCown, Patricia Pollard and John Weeks, Department of the Treasury, "Equilibrium Exchange Rate Models and Misalignments: Occasional Paper No. 7," March 2007, at 1.  (A copy of this paper was provided in Attachment 7 of KTV's September 8, 2020, Submission.)  ...." (emphasis added).

[89] *See* KTV's August 28, 2020, Letter (PR-187).

[90] *See* Memorandum to the File, Interested Parties' Request for Underlying Data (PR-192).

PUBLIC VERSION

> b.  *The Treasury Department Report Identifies*
>     *a Range of Possible Results and Does Not*
>     *Provide Any Basis for Choosing Among Them*

In Appendix C to its summary of the GERAF Methodology, the Treasury Report provides the results for six "Alternative Estimators" that represent variations on the GERAF model used to calculate the results reported in the Treasury Report. The different models generate strikingly different results. Among other things,

- The GERAF model relied upon in the Treasury Report has the lowest R-squared of any of the models considered: The R-squared for the GERAF model is only 0.385, while the R-squared for the six "Alternative Estimators" are 0.415, 0.545, 0.568, 0.605, 0.616, 0.744, and 0.745. In other words, Treasury's preferred model "fits" the data *much* worse than any of the "alternative" specifications considered by Treasury.

- The coefficients calculated for the foreign-exchange-intervention variables vary considerably among the alternate models. In particular, the coefficient for "FXI/GDP" varies from 0.227 to 0.789 (*i.e.*, a factor of 3.5). The coefficient for the interaction term ((FXI/GDP)*K Openness) is negative in six regressions and positive in two regressions.

Significantly, the Treasury Report did not explain why the specific version it relied upon was to be preferred to the alternate models. Nor did it explain how its estimation of the effect of alleged Vietnamese Government action on the bilateral exchange rate would have been affected by using these alternate models.[91]

---

[91] Because the data underlying the analysis in the Treasury Report has not been made available to the parties, the parties were unable to calculate how the estimated effect would have changed under the different models.

In short, the Treasury Report's own analysis of "Alternate Estimators" indicates that its GERAF model is less accurate than other models that might have been used.  It provides no explanation why the GERAF model should nevertheless be preferred.  And, in any event, the inconsistent magnitudes and signs of the foreign-exchange-intervention variables indicates that the predicted relationship between the foreign-exchange-intervention variables and exchange rates may be spurious.  In these circumstances, there was no reasonable basis for Commerce to rely upon the output of Treasury's GERAF model, or the conclusions drawn from that model by the Treasury Report, in making its determination in this case.

In its final determination, Commerce asserted that it was reasonable to rely on the model preferred by Treasury because various statistical measures were "not indicative of the GERAF model's inaccuracy when compared to the other iterations provided" by Treasury.[92]  But Commerce's convoluted locution — "not indicative of model inaccuracy compared to other iterations" — simply means that the statistical measures of accuracy provided no basis for preferring the GERAF model to other iterations.  When faced with a variety of iterations that give vastly different results with similar statistical measures of accuracy, the only plausible conclusion is that the correct result is unknown — not, as Commerce would have it, that any one of the iterations can be presumed to be correct.  In the absence of any explanation as to why Treasury's GERAF model was more reliable than the other iterations provided by Treasury, Commerce's blind reliance on the output of the GERAF model is patently unreasonable.

---

[92] *See* Final Determination Memorandum, at 25 (PR-468).

    4.   *The Alleged Vietnamese-Government Currency Practices*
          *Do Not Satisfy the Statutory Definition of Subsidy*

Under the statute, a countervailable subsidy exists only where there is a "financial contribution," that provides a "benefit" to the recipient, and the subsidy is "specific" to an enterprise, industry, or group of enterprises or industries.[93]  The alleged currency practices by the Government of Vietnam do not meet any of those requirements.

    a.   *The Alleged Vietnamese-Government Currency Practices Do*
          *Not Constitute a "Financial Contribution" under the Statute*

The statute defines the term "financial contribution" to mean one of the following four items:

    (i)   the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees,

    (ii)   foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income,

    (iii)  providing goods or services, other than general infrastructure, or

    (iv)  purchasing goods.[94]

In this case, Commerce asserted that the alleged Vietnamese-government currency practices constituted a "direct transfer of funds."[95]  But the Vietnamese government currency practices at issue in this case does not fall under that category.

The statute identifies a number of examples of transactions that constitute a "direct transfer of funds" — specifically, as grants, loans, equity infusions, and loan guarantees. Currency conversion is not like any of those transactions.  It is not a simple gift of money

---

[93] *See* 19 U.S.C. § 1677(5)(B) and (5A).

[94] *See* 19 U.S.C. § 1677(5)(D).

[95] *See, e.g.,* Final Determination Memorandum, at 13-14 (PR-468).

from the government to the recipient with no expectation of return (like a grant).[96]  It is not a government agreement to give money today in exchange for potential future repayment with interest (like a loan).  It is not a government agreement to give money in exchange for an ownership interest in a company (like an equity infusion).  And, it is not a government agreement to take on the risk of non-payment by some other entity (like a loan guarantee).  Instead, currency conversion is simply an exchange (at some exchange rate) of one currency into another, transferring one store of value into a different one.

Significantly, there is nothing that prevents holders of the currencies from making the exchange at the exchange rate (whether that rate is set by the market or by government order) completely outside of government auspices.  The subsidy claim in this case is not based on the fact that KTV was able to convert foreign currency into Vietnamese *dong*.  Instead, the claim is based on alleged Vietnamese government action to affect the exchange rate.

According to Commerce's determination, the Government of Vietnam did not dictate an exchange rate and require banks to convert currency at that rate by fiat.  Instead, as Commerce recognized, the exchange rate was determined by supply and demand in the foreign-currency market.[97]  Commerce determined, however, that the market exchange rate was distorted by Vietnamese government action, in particular an imbalance in the *net* overall purchases of foreign-currency by the Vietnamese government.[98]  In other words,

---

[96] *See* e.g., *Hercules, Inc. v. United States*, 673 F. Supp. 454, 474-75 (CIT 1987).

[97] *See, e.g.,* Final Determination Memorandum, at 15 and 16 (PR-468).

[98] According to the Treasury Report that was relied upon by Commerce,

> we conclude that the Vietnamese government—through the State Bank
> of Vietnam—undertook net purchases of foreign exchange in 2019

*(footnote continued on following page)*

Commerce's determination was premised on the assumption that there would have been less, or even no, undervaluation if the Vietnamese Government, on the whole, had purchased fewer dollars or sold more Vietnamese *dong*.

The net balance of a government's purchases and sales of currency in the foreign-currency market do not meet the statutory definition of "financial contribution," because those actions do not constitute a "direct transfer of funds" to KTV.  Indeed, there is no evidence in this case that the Vietnamese government itself purchased foreign currency from KTV as part of the currency operations that allegedly resulted in the undervaluation of the *dong*.

Commerce's complaint was with the overall impact of *all* sales and purchases in the foreign-currency markets, not the purchases of foreign currency from one individual exporter.  Consequently, Commerce's imposition of countervailing duties is not based on any actual "transfers" from the Government of Vietnam, but instead on net transfers by the Government with numerous other parties.  Because the statutory definition requires that subsidies be evaluated in terms of a specific "recipient,"[99]  Commerce's finding of a "financial contribution" in this case based on net purchases and sales with entities other than KTV is not consistent with the statute.

---

*(footnote continued from previous page)*
> totaling about $22 billion. Treasury concludes that these net purchases of foreign exchange had the effect of undervaluing Vietnam's REER by 4.2%.

*See* Letter from A. Baukol to J.Maeder, August 24, 2020, at 1-2 (PR-165).  *See also* Preliminary Determination Memorandum, at 24-25 (PR-296).

[99] *See* 19 U.S.C. § 1677(5)(C), (5)(D), and (5A)(D).

    b.    *The Alleged Vietnamese-Government Currency Practices*
          *Do Not Provide a "Benefit" to the Recipient under the Statute*

Commerce's determination that KTV received a benefit from the alleged

undervaluation of the Vietnamese *dong* was based on the fact that KTV actually converted

some of the foreign currency it earned on export transactions into *dong*.  However,

Commerce's analysis ignored the fact that KTV and its suppliers also make extensive

purchases in foreign currency.  Indeed, KTV itself had extensive purchases of equipment

and other inputs that were denominated in U.S. dollars.[100]  Furthermore, the prices paid by

KTV in Vietnamese *dong* for natural rubber (the largest input for tire production) were

based on international market prices denominated in U.S. dollars.[101]  Consequently, the

additional income (in *dong)* that KTV might have realized by converting foreign currency

into *dong* at an allegedly inflated rate was balanced by increased costs (in *dong)* from

converting input prices into *dong* at the same inflated rate.

    As discussed above, Commerce's past decisions indicate that, when the same

exchange rate applies to both exports and imports by an exporter, there is no benefit.[102]

Commerce's finding of a benefit in this case was, therefore, inconsistent with Commerce's

long-established practice, and contrary to the statute.

    c.    *The Alleged Vietnamese-Government Currency*
          *Practices Are Not "Specific" under the Statute*

    A countervailable subsidy exists under the U.S. countervailing duty laws only when

the subsidy is "specific," as a matter of law or of fact, to an enterprise, industry or group of

---

[100] *See, e.g.,* KTV's August 24 Submission, Appendices 7-A-2 and 7-B-2 (PR-162, CR-33, 38-39).

[101] *Id.,* at 29 and Appendix 8-D (PR-160, 163, CR-40).

[102] *See,* above, at 25-27.

enterprises or industries.[103]  In its Final Determination, Commerce claimed that it could

satisfy the "specificity" requirement by treating the exporters in the country under

examination as a single "group" of enterprises or industries.[104]  Because Commerce found

that more foreign currency was converted into *dong* by exporters of goods than by

exporters of services, or for portfolio and direct investment, or from earned income from

abroad,[105] it concluded that the Vietnamese exchange rate constituted a "specific" subsidy.

There are, however, several fundamental problems with that suggestion.  For

example, there is nothing in Vietnamese law or economic theory that requires Vietnamese

holders of foreign currency to formally convert that currency into *dong*.  Instead, they may

have a choice:  They may choose to hold the currency in foreign-currency denominated

bank accounts, or, as an alternative, they may choose to convert the foreign currency into

Vietnamese *dong* and hold the receipts in accounts denominated in Vietnamese *dong*.[106]

The choice has no impact on their profitability, because their financial reports will state

their results in Vietnamese *dong* by calculating what the *dong* value of their foreign-

currency holdings would be if converted at the official rate, whether they actually make

that conversion or not.  Consequently, Commerce's focus on the actual conversions of

foreign currency into *dong* fails to address the actual impact of the exchange rate on

---

[103] *See* 19 U.S.C. § 1677(5)(B) and (5A).

[104] *See* Final Determination Memorandum, at 19-20 (PR-468).

[105] *Id.,* at 19 (PR-468).

[106] *See, e.g.,* KTV's February 26, 2021, Submission, Appendix VE-13, at 3 (showing balances held by KTV in foreign-currency-denominated bank accounts and amounts converted into *dong*) (PR-447-448, CR-174-177).

PUBLIC VERSION

economic actors in Vietnam, or whether the exchange rate is disproportionately "used" in

certain sectors.[107]

Furthermore, Commerce's suggestion that all exporters of goods might be classified

as a group of enterprises or industries is contrary to the statutory scheme.  As Commerce

itself has observed,

> Under the statutory scheme, subsidies to exporters are countervailable
> as export subsidies….  That scheme is set on its head by treating
> exporters as a "group" for purposes of finding a domestic subsidy
> under section 771(5A)(D) of the Act.[108]

In short, the Final Determination's suggestion that exporters as a whole constitute a

"group" for purposes of the countervailing duty statute is contrary to both the statute and to

the Commerce's established practice.  In these circumstances, Commerce's finding that the

currency undervaluation in this case was "specific" cannot be sustained.

---

[107] Commerce claimed that it addressed the possibility that holders of foreign currency might not actually convert that currency into *dong* by "discount{ing} Vietnam's exports of goods by the amount of intermediary goods inputs."  *See* Final Determination Memorandum, at 19 (PR-468).  However, that analysis did not address the possibility that other sectors of the economy (such as service exporters, investors in portfolio or direct investment, or earned income from abroad) might have chosen to hold foreign currency in foreign-currency accounts, and not in *dong*-denominated accounts.

[108] *See* Memorandum from Team to R. Lorentzen re Countervailing Duty Investigation: Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China New Subsidy Allegation – Currency, Aug. 30, 2010, at 5; Memorandum from Team to R. Lorentzen re Countervailing Duty Investigation: Aluminum Extrusions from the People's Republic of China, Subsidy Allegation – Currency, Aug. 30, 2010, at 5.

*See also Final Negative Countervailing Duty Determination; Pork Rind Pellets from Mexico*, 48 Fed. Reg. 39105, 39107 (Aug. 29, 1983).

PUBLIC VERSION

CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant KTV's motion for judgment on the agency record, and remand this matter to Commerce for disposition in a manner consistent with the judgment of this Court.

Respectfully submitted,

/s/Jeffrey M. Winton

Jeffrey M. Winton
Vi N. Mai
Amrietha Nellan

WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C.  20036
(202) 774-5500

Attorneys for Kumho Tire (Vietnam) Co., Ltd.

January 18, 2022

Certificate of Compliance

Pursuant to the Court's "Standard Chambers Procedures," I, Jeffrey M. Winton, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the brief contains 12,324 words including headings, footnotes, and quotations, but not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block.

/s/ Jeffrey M. Winton

January 18, 2022

Attachment 1

Excerpt from the 2005 Civil Code of Vietnam

Article 709

Vietnamese Original

**QUỐC HỘI**

Luật số: 33/2005/QH11

**CỘNG HÒA XÃ HỘI CHỦ NGHĨA VIỆT NAM**

Độc lập - Tự do - Hạnh phúc

# QUỐC HỘI
## NƯỚC CỘNG HÒA XÃ HỘI CHỦ NGHĨA VIỆT NAM
### Khóa XI, kỳ họp thứ 7
*(Từ ngày 05 tháng 5 đến ngày 14 tháng 6 năm 2005)*

## BỘ LUẬT DÂN SỰ

*Căn cứ vào Hiến pháp nước Cộng hòa xã hội chủ nghĩa Việt Nam năm 1992 đã được sửa đổi, bổ sung theo Nghị quyết số 51/2001/QH10 ngày 25 tháng 12 năm 2001 của Quốc hội Khóa X, kỳ họp thứ 10;*

*Bộ luật này quy định về dân sự.*

## PHẦN THỨ NHẤT
## NHỮNG QUY ĐỊNH CHUNG

### Chương I
### NHIỆM VỤ VÀ HIỆU LỰC CỦA BỘ LUẬT DÂN SỰ

**Điều 1. Nhiệm vụ và phạm vi điều chỉnh của Bộ luật dân sự**

Bộ luật dân sự quy định địa vị pháp lý, chuẩn mực pháp lý cho cách ứng xử của cá nhân, pháp nhân, chủ thể khác; quyền, nghĩa vụ của các chủ thể về nhân thân và tài sản trong các quan hệ dân sự, hôn nhân và gia đình, kinh doanh, thương mại, lao động (sau đây gọi chung là quan hệ dân sự).

Bộ luật dân sự có nhiệm vụ bảo vệ quyền, lợi ích hợp pháp của cá nhân, tổ chức, lợi ích của Nhà nước, lợi ích công cộng; bảo đảm sự bình đẳng và an toàn pháp lý trong quan hệ dân sự, góp phần tạo điều kiện đáp ứng nhu cầu vật chất và tinh thần của nhân dân, thúc đẩy sự phát triển kinh tế - xã hội.

**Điều 2. Hiệu lực của Bộ luật dân sự**

1. Bộ luật dân sự được áp dụng đối với quan hệ dân sự được xác lập từ ngày Bộ luật này có hiệu lực, trừ trường hợp được Bộ luật này hoặc nghị quyết của Quốc hội có quy định khác.

2. Bộ luật dân sự được áp dụng trên lãnh thổ nước Cộng hòa xã hội chủ nghĩa Việt Nam.

3. Bộ luật dân sự được áp dụng đối với

thuê không chấm dứt ngay hành vi vi phạm thì bên cho thuê có quyền đơn phương chấm dứt thực hiện hợp đồng, yêu cầu bên thuê trả lại đất đang thuê và bồi thường thiệt hại;

3. Yêu cầu bên thuê trả lại đất khi thời hạn cho thuê đã hết.

**Điều 707. Nghĩa vụ của bên thuê quyền sử dụng đất**

Bên thuê quyền sử dụng đất có các nghĩa vụ sau đây:

1. Sử dụng đất đúng mục đích, đúng ranh giới, đúng thời hạn cho thuê;

2. Không được hủy hoại, làm giảm sút giá trị sử dụng của đất và phải thực hiện các yêu cầu khác như đã thỏa thuận trong hợp đồng thuê quyền sử dụng đất;

3. Trả đủ tiền thuê quyền sử dụng đất đúng thời hạn, đúng địa điểm và theo phương thức đã thỏa thuận; nếu việc sử dụng đất không sinh lợi thì bên thuê vẫn phải trả đủ tiền thuê, trừ trường hợp có thỏa thuận khác;

4. Tuân theo các quy định về bảo vệ môi trường; không được làm tổn hại đến quyền, lợi ích hợp pháp của người sử dụng đất xung quanh;

5. Trả lại đất đúng tình trạng như khi nhận sau khi hết thời hạn thuê, trừ trường hợp có thỏa thuận khác.

**Điều 708. Quyền của bên thuê quyền sử dụng đất**

Bên thuê quyền sử dụng đất có các quyền sau đây:

1. Yêu cầu bên cho thuê chuyển giao đất đủ diện tích, đúng vị trí, số hiệu, hạng đất, loại đất và tình trạng đất như đã thỏa thuận;

2. Được sử dụng đất thuê ổn định theo thời hạn như đã thỏa thuận;

3. Được hưởng hoa lợi, lợi tức từ việc sử dụng đất;

4. Đơn phương chấm dứt thực hiện hợp đồng theo quy định tại Điều 426 của Bộ luật này;

5. Yêu cầu bên cho thuê giảm, miễn tiền thuê trong trường hợp do bất khả kháng mà hoa lợi, lợi tức bị mất hoặc bị giảm sút.

**Điều 709. Chậm trả tiền thuê quyền sử dụng đất**

Khi bên thuê chậm trả tiền thuê quyền sử dụng đất theo thỏa thuận thì bên cho thuê có thể gia hạn; nếu hết thời hạn đó mà bên thuê không thực hiện nghĩa vụ thì bên cho thuê có quyền đơn phương chấm dứt thực hiện hợp đồng, yêu cầu bên thuê trả lại đất. Bên cho thuê có quyền yêu cầu bên thuê trả đủ tiền trong thời gian đã thuê kể cả lãi đối với khoản tiền chậm trả theo lãi suất cơ bản do Ngân hàng Nhà nước quy định tương ứng với thời gian chậm trả tại thời điểm thanh toán.

English Translation

NATIONAL ASSEMBLY

No. 33-2005-QH11

SOCIALIST REPUBLIC OF VIETNAM
Independence - Freedom - Happiness

# CIVIL CODE
# OF
# VIETNAM

Pursuant to the 1992 Constitution of the Socialist Republic of Vietnam as amended by Resolution 51-2001-QH10 passed by Legislature X of the National Assembly at its 10th Session on 25 December 2001;

This Law regulates civil matters.

## PART ONE

## GENERAL PROVISIONS

### CHAPTER I

### Tasks and Effectiveness of Civil Code

**Article 1**    *Tasks and governing scope of Civil Code*

The Civil Code regulates the legal status of and the legal standards for conduct of individuals, legal entities and other subjects; the rights and obligations of subjects in property and personal relations arising from civil relations, marriage and family, business, trade and labour (hereinafter together referred to as *civil relations*).

The Civil Code shall have the tasks of protecting the legal rights and interests of individuals and organizations and the interests of the State and the public; of ensuring equality and legal stability in civil relations; of contributing to the satisfaction of the physical and spiritual needs of the people, and of promoting socio-economic development.

**Article 2**    *Effectiveness of Civil Code*

1.    The Civil Code shall apply to civil relations established as from the date of effectiveness of the Code, unless otherwise provided by the Code or a resolution of the National Assembly.

2.    The Civil Code shall apply throughout the Socialist Republic of Vietnam.

3.    The Civil Code shall apply to civil relations involving foreign elements, except as otherwise provided by an international treaty of which the Socialist Republic of Vietnam is a member.

**Article 3**    *Application of customary practice and analogous law*

Matters which are not addressed by law nor agreed by the parties may be regulated by customary practice and, if there is no customary practice, they may be regulated by analogous provisions of law provided that such customary practice and analogous provisions of law must not be inconsistent with the principles set out in this Code.

© Allens Arthur Robinson - Vietnam Laws Online Database on www.vietnamlaws.com



6.	To notify the lessee of third party rights with respect to the leased land.

**Article 706**  *Rights of lessors of land use rights*

A lessor of land use rights has the following rights:

1.	To demand full payment of the land rent from the lessee.

2.	To demand the lessee of the land use rights ceases immediately any use of the land which is not for the correct purpose or any destruction or devaluation of the land.  If the lessee fails to do so, the lessor may terminate unilaterally the performance of the contract and demand the lessee return the leased land and compensate for damage.

3.	To demand the lessee return the land upon expiry of the term of lease.

**Article 707**  *Obligations of lessees of land use rights*

A lessee of land use rights has the following obligations:

1.	To use the land for the correct purpose, within the agreed boundaries and for the agreed term of lease.

2.	Not to destroy the land or reduce its utility value and to satisfy all other requirements as agreed in the contract for lease of the land use rights.

3.	To pay the rent for the lease of the land use rights in full, at the time and place and by the method of payment as agreed.  Notwithstanding that the land use fails to generate a profit, the lessee must pay land rent in full, unless otherwise agreed.

4.	To comply with the regulations on environmental protection and not harm the legal rights or interests of users of neighbouring land.

5.	Upon expiry of the term of the lease, to return the land in the same condition as it was received, unless otherwise agreed.

**Article 708**  *Rights of lessees of land use rights*

A lessee of land use rights has the following rights:

1.	To demand the lessor deliver the full area of land strictly in accordance with the agreed location, symbol, class, category and status of the land.

2.	To enjoy uninterfered use of the leased land for the agreed term.

3.	To enjoy the benefits and income derived from the land use.

4.	To terminate unilaterally the performance of the contract in accordance with article 426 of this Code.

5.	In the event that an event of *force majeure* results in loss or reduction of benefits and income, to request the lessor reduce the rent or exempt the lessee from paying any rent.

**Article 709**  *Late payment of rent for lease of land use rights*

Allens Arthur Robinson

*Clear Thinking*

If the lessee is late in paying the agreed rent for the lease of the land use rights, the lessor may grant an extension.  If the lessee fails to pay the rent within such extension, the lessor has the right to terminate unilaterally the performance of the contract and demand the lessee return the land.  The lessor has the right to demand the lessee to pay full rent with respect to the period of time for which the land has been leased, including interest on the rent outstanding, for the period of time for which it remains outstanding, at the basic interest rate provided by the State Bank at the time when payment is made.

**Article 710**  *Compensation for damage caused by recovery of land*

1.      If a lessor or lessee deliberately breaches the obligations of a land user resulting in the recovery of land by the State, such party must compensate the other party for any damage.

2.      Where a contract for lease of land use rights is effective but the State recovers the land due to national defence or security requirements, in the national or public interest or for economic development, the contract for lease of the land use rights shall terminate prior to its full term.

        Where the lessee has paid rent in advance, the lessor must refund to the lessee the prepaid rent[128] corresponding to the period for which the land has not been used.  If the lessee has not yet paid rent, the lessee must only pay rent for the period for which it used the land.

        A lessor shall be compensated by the State for any damage caused by recovery of the land in accordance with law and the lessee shall be compensated by the State for the loss of benefits from the land.

**Article 711**  *Right to continue lease of land use rights upon death of party*

1.      Where the lessor of land use rights is an individual who dies, the lessee may, nevertheless, continue the lease of the land use rights until the expiry of the term of lease.

2.      Where the lessee of land use rights is an individual who dies, the members of the family household of the lessee may continue the lease of the land use rights until the expiry of the term of lease but the authorized State authorities must be notified thereof.

**Article 712**  *Transfer of land use rights during term of lease of land use rights*

As long as the term of a lease of land use rights remains in effect, the lessor has the right to transfer the land use rights to another person, if so permitted by the authorized State body, but the lessor must notify the lessee in order for the lessee to perform the obligations of the lessee to the transferee of the land use rights.

A lessee may, nevertheless, continue the lease of the land use rights until the expiry of its term in accordance with the contract.

**Article 713**  *Termination of contracts for lease of land use rights*

1.      A contract for lease of land use rights shall terminate in the following cases:

        (a)      The lease expires without extension;

        (b)      As agreed by the parties;

---

128      *Allens Arthur Robinson Note*: The literal translation is "the remaining rent".



Allens Arthur Robinson

*Clear Thinking*