*PUBLIC VERSION*

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| KUMHO TIRE (VIETNAM) CO., LTD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | Court No. 21-00397 |
| ) | |
| and ) | |
| ) | |
| UNITED STATES, PAPER AND FORESTRY ) | |
| RUBBER, MANUFACTURING, ENERGY, ) | |
| ALLIED INDUSTRIAL AND SERVICE ) | |
| WORKERS INTERNATIONAL UNION, ) | |
| AFL-CIO, CLC, ) | |
| ) | |
| Defendant-Intervenor. ) | |

## ORDER

Upon consideration of the plaintiffs' Rule 56.2 motion for judgment on the agency record, defendant's opposition, and all other pertinent papers, it is hereby

ORDERED that the plaintiffs' Rule 56.2 motion for judgment on the agency record is denied; and it is further

ORDERED that judgment shall issue for the United States.

Dated: _____            _____
          New York, New York                          JUDGE

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| KUMHO TIRE (VIETNAM) CO., LTD, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant, | )     Court No. 21-00397 |
| and | )     **PUBLIC VERSION** |
| UNITED STATES, PAPER AND FORESTRY RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | )     Business Proprietary Information Removed from Pages 44-46 |
| Defendant-Intervenor. | ) |

<br>

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

OF COUNSEL:
RACHEL BOGDAN
Attorney
Department of Commerce
Office of the Chief Counsel
  for Trade Enforcement & Compliance

ELIZABETH ANNE SPECK
Trial Attorney
Department of Justice
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-0369
Fax: (202) 307-0972
Email: Elizabeth.speck@usdoj.gov

March 21, 2022

Attorneys for Defendant

## **TABLE OF CONTENTS**

STATEMENT PURSUANT TO RULE 56.2 ...................................................................2

    I.     Administrative Decision Under Review ............................................................2

    II.    Statement Of Laws...........................................................................................2

STATEMENT OF FACTS ..........................................................................................2

    I.     Currency Undervaluation.................................................................................2

    II.    Provision of Land for Less Than Adequate Remuneration ...............................5

ARGUMENT .............................................................................................................7

    I.     Standard Of Review .......................................................................................7

    II.    Commerce May Lawfully Impose Countervailing Duties To Address The
           Undervaluation Of Currency..........................................................................8

           A.     The Statute Authorizes Commerce To Countervail Currency Exchanges
                  Involving Undervalued Currency .......................................................8

           B.     Finding The Exchange of Currency Undervaluation Constitutes A
                  Countervailable Subsidy Is Consistent With Commerce's Practice .............11

    III.   Treasury's Role In Evaluating Currency Undervaluation is Lawful ...........................14

    IV.   Commerce's Determination To Countervail Currency Exchanges Is Supported By
           Substantial Evidence And Is Otherwise In Accordance With Law ............................15

           A.     Legal Framework For Countervailing Currency Exchanges.........................16

           B.     Commerce's Determination That KTV's Exchanges Of  U.S. Dollars for
                  Vietnamese Dong Constituted Financial Contributions Is Supported By
                  Substantial Evidence And In Accordance With Law ...................................18

           C.     Commerce's Determination That The Currency Program Was Specific Is
                  Supported By Substantial Evidence And In Accordance With Law ...........22

           D.     Substantial Evidence Demonstrates That The Undervaluation Of The
                  Vietnamese Dong Conferred A Benefit.......................................................27

V.     Commerce's Determination To Countervail KTV's Preferential Rent As A Provision
       For A Good At Less Than Adequate Remuneration Is Supported By Substantial
       Evidence And In Accordance With Law ....................................................................37

       A.  Legal Framework For Less Than Adequate Remuneration Determinations .........38

       B.  Commerce Reasonably Determined That Becamax Could Not Lease To KTV
           Until After Vietnam's Accession To The WTO .....................................................39

       C.  Commerce Reasonably Determined That KTV's Lease Underwent Several
           Material Changes Since January 11, 2007 ............................................................42

CONCLUSION.......................................................................................................................46

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                        **Page(s)**

*Agro Dutch Indus. v. United States,*
    508 F.3d 1024 (Fed. Cir. 2007) ............................................................................. 11

*Aristocraft of America LLC v. U.S.,*
    269 F. Supp. 3d 1316 ............................................................................................ 32

*Atl. Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984) ............................................................................... 7

*Bellion Spirits v. United States,*
    393 F. Supp. 3d 5 (D.D.C. 2019) .......................................................................... 15

*Canadian Solar Inc. v. United States,*
    No. 18-00184, 2020 WL 898557, (Ct. Int'l Trade Feb. 25, 2020) ........................... 37

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
    511 U.S. 164 (1994) .............................................................................................. 10

*Chevron, U.S.A. v. Natural Resources Defense Council,*
    467 U.S. 837 (1984) ................................................................................. 7, 21, 24

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938) ................................................................................ 7, 36, 45

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) ........................................................................................ 7, 44

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) .............................................................................................. 13

*GPX Int'l Tire Corp. v. United States,*
    666 F.3d 732 (Fed. Cir. 2011) ......................................................................... 13, 14

*Huvis Corp v. United States,*
    570 F. 3d 1347 (Fed. Cir. 2009) ............................................................................ 13

*Hynix Semiconductor, Inc. v. United States,*
    425 F. Supp. 2d 1287 (Ct. Int'l Trade 2006) ......................................................... 19

*McGee v. Mathis,*
    71 U.S. 143 (1866) ......................................................................................... 43, 44

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006) ............................................................................ 7, 31

*PSC VSMPO-Avisma Corp. v. U.S.*,
  688 F.3d 751 (Fed. Cir. 2012) .................................................................................. 31

*Rebar Trade Action Coal. v. United States*,
  No. 14-00268, 2016 WL 5122639 (Ct. Int'l Trade Sept. 21, 2016) ........................ 42

*Seiko v. United States*,
  36 F.3d 1565 (Fed. Cir. 1994) .................................................................................. 21

*Timken Co. v. United States*,
  354 F.3d 1334 (Fed. Cir. 2004) ............................................................................ 8, 21

*TMK IPSCO v. United States*,
  222 F. Supp. 3d 1306 (Ct. Int'l Trade 2017) ........................................................... 39

*U.S. Telecom Ass'n v. F.C.C.*,
  359 F.3d 554 (D.C. Cir. 2004) .................................................................................. 15

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009) ........................................................................................... 7, 8, 22

*United States v. Hammond Lead Products Inc.*,
  440 F.2d 1024 (C.C.P.A. 1971) ............................................................................ 9, 10

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) .............................................................................................. 7

19 U.S.C. § 1671b(b)(4)(B) ............................................................................................ 32

19 U.S.C. § 1671(f)(2) ..................................................................................................... 39

19 U.S.C. § 1677 ......................................................................................................... 4, 16

19 U.S.C. § 1677(5) .................................................................................................. *passim*

19 U.S.C § 1677j(e)(3) .................................................................................................... 32

**Rules**

USCIT Rule 44.1 ............................................................................................................. 41

**Regulations**

19 C.F.R. § 351.102(b) ................................................................................................... 41

19 C.F.R. § 351.502 ............................................................................................ 2, 16, 23

19 C.F.R. § 351.511(a)(1) ............................................................................................... 6

19 C.F.R. § 351.524(d)(2) ............................................................................................. 31

19 C.F.R. § 351.528 ............................................................................................. *passim*

*Aluminum Extrusions from the People's Republic of China*,
   76 Fed. Reg. 18,521 (Dep't of Commerce Apr. 4, 2011)................................. 12, 13

*Carbon Steel Wire Rod from Poland*,
   49 Fed. Reg. 19,374, 19,375 (Dep't of Commerce May 7, 1984) ..................... 11, 12

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China*,
   75 Fed. Reg. 59,213 (Dep't of Commerce Sept. 27, 2010)................................. 12, 13

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*,
   78 Fed. Reg. 50,387 (Dep't of Commerce Aug. 19, 2013)................................... 4, 41

*Certain New Pneumatic Off-the-Road Tires From the People's Republic of China*,
   73 Fed. Reg. 40,480 (Dep't of Commerce July 7, 2008) ............................. 41, 42, 43

*Modification of Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings; Proposed Rule and Request for Comments*,
   84 Fed. Reg. Reg. 24,406 (Dep't Commerce May 28, 2019) ............................ 16, 24

*Modification of Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings*,
   85 Fed. Reg. 6031 (Dep't Commerce Feb. 4, 2020) (*Final Rule*) .................... *passim*

*Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*,
   86 Fed. Reg. 28566 (Dep't of Commerce May 27, 2021) ....................................... 2

*Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam*,
   74 Fed. Reg. 45,811 (Dep't of Commerce Sept. 4, 2009)......................................... 4

*Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam*,
   75 Fed. Reg. 16,428 (Dep't of Commerce April 1, 2010)................................. 4, 39, 41

*Pork Rind Pellets from Mexico*,
   48 Fed. Reg. 39,105 (Dep't of Commerce Aug. 29, 1983)..................................... 11

*Wire Decking from the People's Republic of China*,
   75 Fed. Reg. 32,902 (Dep't Commerce June 10, 2010)......................................... 43

*PUBLIC VERSION*

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

_____
                                        )
KUMHO TIRE (VIETNAM) CO., LTD,          )
                                        )
                Plaintiff,              )
                                        )
        v.                              )
                                        )
UNITED STATES,                          )
                                        )
                Defendant,              )          Court No. 21-00397
                                        )
                                        )          **PUBLIC VERSION**
and                                     )          Business Proprietary Information
                                        )          Removed from Pages
UNITED STATES, PAPER AND FORESTRY       )          44-46
RUBBER, MANUFACTURING, ENERGY,          )
ALLIED INDUSTRIAL AND SERVICE           )
WORKERS INTERNATIONAL UNION,            )
AFL-CIO, CLC,                           )
                                        )
                Defendant-Intervenor.   )
_____)

**DEFENDANT'S RESPONSE IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this opposition to the motion for

judgment upon the administrative record filed by plaintiff Kumho Tire (Vietnam) Co., Ltd.

(Kumho Tire or KTV).  Kumho Tire challenges the final determination and resulting

countervailing duty order issued by the United States Department of Commerce (Commerce) in

the countervailing duty investigation of passenger vehicle and light truck tires from the Socialist

Republic of Vietnam.  As we demonstrate below, the Court should deny Kumho Tire's motion

because the final determination is supported by substantial evidence and is otherwise in

accordance with law.

## STATEMENT PURSUANT TO RULE 56.2

### I.   Administrative Determination Under Review

The administrative determination under review is the final determination of the countervailing duty investigation of passenger vehicle and light truck tires from Vietnam. *Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam*, 86 Fed. Reg. 28,566 (Dep't of Commerce May 27, 2021) (P.R. 476) (final aff. CVD determin.),[1] and accompanying issues and decision memorandum (P.R. 468) (IDM).  The period of investigation is January 1, 2019, through December 31, 2019.

### II.   Statement Of The Issues

1.  Whether Commerce's determination to countervail the exchange of undervalued Vietnamese dong is supported by substantial evidence and is otherwise in accordance with law.

2.  Whether Commerce's determination to countervail Kumho Tire's provision of land use for less than adequate remuneration is supported by substantial evidence and is otherwise in accordance with law.

## STATEMENT OF FACTS

### I.   Currency Undervaluation

In February 2020, Commerce published a modification to its countervailing duty regulations that explained how it would determine the existence of a benefit and specificity when Commerce is examining a potential subsidy resulting from the exchange of currency. *Modification of Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings*, 85 Fed. Reg. 6,031 (Dep't of Commerce Feb. 4, 2020) (*Final Rule*).  In the *Final Rule*, Commerce modified 19 C.F.R. § 351.502 to add subsection (c), which states that in

---

[1] Citations to public and confidential documents from the administrative record are identified as "P.R. __" and "C.R.__," respectively.

determining specificity, Commerce will normally consider enterprises that buy or sell goods internationally to comprise a "group" of enterprises or industries within the meaning of 19 U.S.C. § 1677(5A)(D). And Commerce added new section, 19 C.F.R. § 351.528, which "provides guidance for Commerce's determinations of undervaluation and benefit when examining a potential subsidy resulting from the exchange of an undervalued currency." *Final Rule*, 85 Fed. Reg. at 6,031. Subsection 351.528(a) states that in the exchange of undervalued currency, Commerce normally will consider whether a benefit is conferred through the exchange of U.S. dollars and a foreign currency only if there has been government action on the exchange rate that contributes to an undervaluation of the currency during the relevant period. The new regulation also clarified at subsection 351.528(c) that Commerce will request an evaluation and conclusion from the United States Department of the Treasury (Treasury) when examining this potential subsidy. Also, the new regulation explains at subsection 351.528(b) how Commerce will determine whether a benefit was conferred through currency undervaluation for the relevant period. The revised regulation applies to all segments of Commerce's proceedings initiated after April 6, 2020. *Final Rule*, 85 Fed. Reg. at 5,031.

On May 13, 2020, Commerce received a countervailing duty petition concerning imports of passenger tires from Vietnam alleging that the government of Vietnam was providing a subsidy to Vietnamese producers of passenger tires through the undervaluation of the Vietnamese dong. Preliminary Decision Memorandum (PDM), Nov. 4, 2020, P.R. 296 at 1. After initiating an investigation of this allegation, Commerce requested that Treasury evaluate whether Vietnam's currency was undervalued during the period of investigation and whether government action contributed to such undervaluation, and Treasury responded on August 24, 2020. *Id.* at 3 (citing Letter from Treasury, Aug. 24, 2020, P.R. 165) (Treas. Response)); *see*

*also* 19 C.F.R. § 351.528(c).  Commerce sent Treasury a request for additional information regarding its undervaluation report, to which Treasury responded on September 24, 2020.  *See* PDM, P.R. 296 at 3 (citing Letter from Treasury, Sept. 24, 2020, P.R. 227 (Treas. Supp. Response)).

In the *Preliminary Determination*, Commerce determined that for all foreign currency exchange transactions involving the state-owned commercial banks Vietinbank and Vietcombank, a direct financial contribution occurred by an "authority" under 19 U.S.C. § 1677(5)(B) in the form of a direct transfer of funds within the meaning of 19 U.S.C. § 1677(5)(D)(i).  *Id.* at 20-21.  In addition, Commerce determined that the exchange of currency by private Vietnamese and foreign owned banks was entrusted or directed by the government of Vietnam under 19 U.S.C. § 1677(5)(B)(iii) during the relevant period and thus constitute financial contributions in the form of direct transfers of funds to KTV.  *Id.* at 21-22 (citing *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam,* 78 Fed. Reg. 50,387 (Dep't of Commerce Aug. 19, 2013) (final affirmative CVD determ.), and accompanying IDM at 14; *Polethylene Retail Carrier Bags from the Socialist Republic of Vietnam*, 74 Fed. Reg. 45,811, 45,816-17 (Dep't of Commerce Sept. 4, 2009) (prelim. affirmative CVD determ.), *unchanged in final,* 75 Fed. Reg. 16,428 (Dep't of Commerce Apr. 1, 2010) (final affirmative CVD determ.); and Government of Vietnam Initial Questionnaire Response (GOV IQR), Aug. 25, 2020, P.R. 170, at Exh. F-1; Financial Sector Memorandum pt. 1, Nov. 4, 2020, P.R. 310, at Attachment 1, p. 11).

Further, relying on data from the International Monetary Fund, Commerce determined that the group of enterprises constituting the traded goods sector (*i.e.*, enterprises that buy or sell goods internationally) predominantly used the government of Vietnam's currency undervaluation

*Id.* at 23-24 (citing IMF/OECF Memorandum, Oct. 8, 2020, P.R. 254, at Attachments 1-2; Government of Vietnam Response to 3rd Supp. Questionnaire (GOV SQR3), Oct. 19, 2020, P.R. 287 at 1; USD Inflow Calculation Memo, Nov. 4, 2020, P.R. 303).  Thus, Commerce determined this program is *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(II).  *Id.* at 24.

Regarding benefit, Treasury reported that the Vietnamese dong was undervalued during 2019 (*i.e.*, the period of investigation) by 4.7 percent.  *Id.* at 24 (citing Treas. Response, P.R. 165).  Treasury also reported that this undervaluation was a result of government of Vietnam action.  *Id.* at 24-25 (citing Treas. Response, P.R. 165).  Accordingly, Commerce determined that the government actions on the exchange rate had the effect of undervaluing the Vietnamese dong vis-à-vis the U.S. dollar by 4.7 percent.  *Id.* at 25.  Commerce calculated the benefit in accordance with 19 C.F.R. § 351.528(b) and determined a net countervailable subsidy rate for the exchange of undervalued currency of 1.69 percent *ad valorem* for KTV.  *Id.*

Commerce made no changes to its countervailing duty determination with respect to this program in the final determination.  IDM at 4.

## II.     Provision of Land for Less Than Adequate Remuneration

Commerce preliminarily determined that KTV's preferential rent and land-use rights constitute a countervailable subsidy.  PDM at 25–27 (citing Government Supp. Questionnaire Response (GOV SQR1), Oct. 7, 2020, P.R. 248, C.R. 92 at 31; GOV SQR1, P.R. 250 at Exh. G-11; Kumho Tire Questionnaire Response (KTV IQR), P.R. 159-160, C.R. 32-25 at 34-35 and Appendices 13-B, 13-D, and 13-H; GOV IQR, P.R. 166, C.R. 51 at 15-16).  Commerce found that "the {GOV} (at the central and local level) . . . ultimately decides whether and how land is used in Vietnam under a unified but decentralized land planning system."  PDM, P.R. 296 at 11; Land Analysis Memorandum, Oct. 30, 2020, P.R. 298–302, (Land Memorandum).  The record

showed that an entity that the government of Vietnam reported is majority-owned by the Binh Duong Provincial People's Committee, which the government reported is a Vietnamese government authority, provided the land on which KTV's head office and tire production plant sit.  PDM, P.R. 296 at 25 (citing KTV IQR, P.R. 160 at 34).  And Commerce determined that preferential rent constitutes a financial contribution in the form of the provision of a good (*i.e.*, land) within the meaning of 19 U.S.C. § 1677(5)(D)(iii).  PDM, P.R. 296 at 27.

Commerce also determined KTV's preferential rent is specific within the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(iv) because Vietnamese law identified a list of "areas with difficult socio-economic conditions or specially difficult economic conditions" that are subject to the rental price floors and ceilings stipulated, including the townships in which KTV's leased lands are located.  *Id.* at 26-27 (citing KTV IQR, P.R. 159-160, C.R. 32-35, at 35, Apps. 13-B, 13-D, & 13-H).  Finally, Commerce determined that this program provides a benefit "equal to the difference between the market rate for rent in the locality and the actual rent paid" pursuant to 19 U.S.C. § 1677(5)(E)(iv) and 19 C.F.R. § 351.511(a)(1).  Commerce calculated a net countervailable subsidy rate of 7.41 percent *ad valorem* for KTV.  PDM, P.R. 296 at 27.

Commerce made no changes to its financial contribution and specificity determinations with respect to this program in the final determination.  IDM at 4, 41–42.  Because Commerce modified its calculation for the benchmark for land, however, it calculated a revised net countervailable subsidy rate of 5.16 percent *ad valorem* for KTV for this program.  *Id.* at 4, 46-48.

## ARGUMENT

### I.    Standard Of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence upon the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).

"Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may also be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from evidence upon the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Thus, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) cleaned up), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

When the Court examines the lawfulness of Commerce's statutory interpretations, it employs the two-pronged test established in *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984). The Court first examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency must comply with Congress's clear intent. *Id*. at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. In such cases, "{a}ny reasonable construction of the

7

statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (cleaned up), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *Eurodif*, 555 U.S. at 316 (citation omitted).

## II.    Commerce May Lawfully Impose Countervailing Duties To Address The Undervaluation Of Currency

In its final determination and in accordance with its regulations, Commerce found that KTV received a countervailable subsidy from its exchange of U.S. dollars to undervalued Vietnamese dong during the period of investigation.  IDM at 4.  KTV, however, erroneously contends that Commerce may not countervail the subsidy of currency undervaluation because: (1) Commerce purportedly has a longstanding practice of determining that currency devaluations are not countervailable subsidies, and (2) Congress acquiesced to such alleged practice.  KTV Br at 23-30.  As we demonstrate below, there is no merit to either claim.

### A.    The Statute Authorizes Commerce To Countervail Currency Exchanges Involving Undervalued Currency

Contrary to KTV's assertions, Congress granted Commerce statutory authority to countervail all injurious subsidies.  IDM at 10; *Final Rule* 85 Fed. Reg. at 6,031.  The statute provides that Commerce *shall* countervail such a subsidy when a program, good, or service provides a financial contribution by a government authority within the meaning of 19 U.S.C §1677(5)(D) that confers a benefit within the meaning of 19 U.S.C §1677(5)(E), and is specific within the meaning of 19 U.S.C §1677(5A).  19 U.S.C. § 1671 (if Commerce determines that a countervailable subsidy exists, "then there shall be imposed upon such merchandise a countervailing duty . . . .").  Congress created no statutory exception for subsidies generated by currency undervaluation.

8

KTV also wrongly contends that Congress's delegation of certain authority to Treasury to address exchange manipulation somehow prohibits Commerce from administering the countervailing duty law to an otherwise countervailable subsidy involving currency undervaluation.  KTV Br. at 29.  As Commerce explained in the *Final Rule*, even if other U.S. Government agencies or international bodies have an overlapping interest, Congress still commanded Commerce to investigate alleged subsidies when the petitioner satisfies the applicable initiation requirements.  *Final Rule*, 85 Fed. Reg. 85 at 6,032.  Thus, Treasury's congressional mandate is distinct from Commerce's mandate to address countervailable subsidies.  Indeed, Commerce routinely investigates programs involving, for example, export credits and equity infusions, which are potential forms of subsidization that may also be practices monitored by other governmental and international entities.  *Id.*  Here, in promulgating its *Final Rule* and conducting its currency undervaluation analysis, Commerce has ensured that its analysis of currency undervaluation adheres to the principles and requirements of the U.S. countervailing duty law, and that it fits squarely within the financial contribution-benefit-specificity framework.

Nor does *United States v. Hammond Lead Products Inc.*, 440 F.2d 1024, 1025 (C.C.P.A. 1971), hold that Commerce lacks statutory authority to countervail the exchange of an undervalued currency.  KTV Br. at 24-25.  In *Hammond Lead*, the court examined provisions of the then-existing countervailing duty statute administered by Treasury.  440 F.2d at 1025.  Specifically, the court analyzed whether the alleged Mexican taxation system on refined lead constituted a "bounty or grant" within the meaning of the applicable statute at the time, a term that no longer exists in today's statute.  *Id.* at 1025, 1030-31.  As KTV acknowledges, the countervailing duty statute has undergone substantial changes since 1971, most significantly in

1994 through the enactment of the Uruguay Round Agreements Act of 1994 (URAA).  Pub. L.

103–465, vol. 1 at 925-936 (1994), *reprinted at at* 1994 U.S.C.C.A.N. 4,040, 4,238-4,248.  For

example, the URAA replaced the term "bounty or grant" with the current statutory definition of a

"countervailable subsidy," which is defined as a financial contribution that confers a benefit and

is specific.  *Id.*  Also, *Hammond Lead* was issued eight years before responsibility for

administering the countervailing duty statute was transferred to Commerce in 1979.  Thus, given

the material changes to the countervailing duty laws since the time of *Hammond Lead*, an

interpretation of the old statute is hardly persuasive, much less binding.

     KTV's claims that failed statutory amendments somehow show that Congress barred

Commerce from addressing subsidies resulting from the exchange of undervalued currency fare

no better.  KTV Br. at 29.  KTV has cited nothing to support its claim that Congress felt

compelled to act on currency because Commerce lacked the statutory authority to countervail

currency-related subsidies.

     Further, that these proposals failed more reasonably suggests that Congress concluded the

amendments were unnecessary because Commerce already possessed the authority to countervail

subsidies resulting from currency undervaluation.  IDM at 11.  As the Supreme Court explained

in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187

(1994), "{c}ongressional inaction lacks persuasive significance because several equally tenable

inferences may be drawn from such inaction, including the inference that the existing legislation

already incorporated the offered change."  And the United States Court of Appeals for the

Federal Circuit has also explained that "failed legislative proposals are a particularly dangerous

ground on which to rest an interpretation of a prior statute."  *Solid Waste Agency of N. Cook

County v. United States Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001) (cleaned up).  Thus,

contrary to KTV's assertions, Congress never stripped Commerce of its statutory authority to countervail the exchange of undervalued currency and to promulgate corresponding regulations. KTV Br. at 4.

## B. Finding The Exchange of Currency Undervaluation Constitutes A Countervailable Subsidy Is Consistent With Commerce's Practice

KTV further errs in claiming that Commerce has a "longstanding practice" in determining that subsidies resulting from currency devaluations are not countervailable under the statute. *Final Rule*, 85 Fed. Reg. at 6,033. Indeed, as KTV acknowledges in its brief, Commerce has addressed currency subsidies as part of its practice. KTV Br. at 25-27.

To support the so-called "50-year understanding" that Commerce does not countervail the exchange of undervalued currency, KTV relies on proceedings from the 1980s. KTV Br. at 25-26. But as explained above, the URAA made several changes to the countervailing duty statute, which makes statements from proceedings predating its passage irrelevant because they do not apply to the current law.

In any event, the cases on which KTV relies have distinguishing elements that further limit their utility. *Carbon Steel Wire Rod from Poland* and *Pork Rind Pellets from Mexico* dealt with multiple currency exchange rates, not the type of unified exchange rate system at issue in this regulation. *Carbon Steel Wire Rod from Poland*, 49 Fed. Reg. 19,374, 19,375 (Dep't of Commerce May 7, 1984) (final negative CVD determ.); *see also Pork Rind Pellets from Mexico*, 48 Fed. Reg. 39,105, 39,107 (Dep't of Commerce Aug. 29, 1983) (final negative CVD determ.). Thus, Commerce's statement in *Wire Rod from Poland,* for example, that "an allegedly undervalued unified exchange rate does not constitute a countervailable subsidy" can be viewed as *dicta* given that a unified exchange rate was not the program at issue in that investigation. *Final Rule*, 85 Fed. Reg. at 6,033. And Commerce ultimately determined that, at that time, it

11

could not apply the countervailing duty law to non-market economies such as Poland, thereby mooting Commerce's initial currency statements in the preliminary determination. *Carbon Steel Wire Rod from Poland*, 49 Fed. Reg. at 19,375.

KTV also incorrectly suggests that Commerce declined to initiate an investigation of allegations from 2010 based on broader grounds that it determined currency-valuation practices were not "specific" within the meaning of the statute. KTV Br. at 27 (citing *Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 18,521 (Dep't of Commerce Apr. 4, 2011) (final affirmative CVD determ.), and accompanying IDM at cmt. 33),[2] and *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China*, 75 Fed. Reg. 59,213 (Dep't of Commerce Sept. 27, 2010) (final affirmative CVD determ.), and accompanying IDM at cmts. 5-7).[3] But Commerce did not dismiss the allegations raised in these proceedings on their face as inconsistent with the statute. Instead, Commerce thoughtfully weighed the evidence presented with each allegation that the subsidy provided a financial contribution, conferred a benefit, and was specific before determining whether such allegations met Commerce's standard for initiation.

In *Aluminum Extrusions,* Commerce identified relevant record information demonstrating the allegation was unsupported by the record and explained that it "determined that Petitioners' allegation *failed to provide the elements necessary* for the imposition of CVD duties and *was not supported by information* reasonably available to Petitioners." *Aluminum Extrusions*, 76 Fed. Reg. at 18,521, and accompanying IDM at cmt. 33 (emphasis added). Commerce made a similar

---

[2]  This document is Attachment 3 of KTV's September 8, 2020, rebuttal to Treasury's currency undervaluation report, C.R. 76, P.R. 202.

[3]  This document is Attachment 2 of KTV's September 8, 2020, rebuttal to Treasury's currency undervaluation report, C.R. 76, P.R. 202.

determination in *Coated Paper from China*: "We disagree that Petitioners' allegation was supported by information reasonably available to them at the time their revised allegation was filed." *Coated Paper from China*, 75 Fed. Reg. 59, 213, and accompanying IDM at cmts. 5, 7.

In any event, to the extent the Court concludes that Commerce has changed its position, Commerce is always permitted to change its positions and policies provided that it reasonably explains such change, and it has done so in the *Final Rule* through notice-and-comment rulemaking and in preliminary and final decision memoranda, as detailed below. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also Huvis Corp v. United States*, 570 F. 3d 1347, 1354 (Fed. Cir. 2009).

Also flawed is KTV's argument that Commerce lacks the authority to modify an alleged "longstanding practice" because Congress has acquiesced to such alleged practice. KTV Br. at 30. KTV relies primarily on *GPX Int'l Tire Corp. v. United States*, 666 F.3d 732, 740 (Fed. Cir. 2011)). KTV Br. at 30. In *GPX*, the Federal Circuit determined that, because Commerce had previously interpreted the statute to provide that countervailing duties could not be assessed on imports from non-market economy countries and, because Congress had subsequently amended the statute without disturbing Commerce's interpretation, Congress had, in effect, ratified the agency's interpretation of the statute. *GPX Int'l Tire Corp.*, 666 F.3d at 737–45.[4] There, the court relied, in part, on prior agency briefs and Federal Circuit precedent upholding Commerce's interpretation that countervailing duties could not be assessed on imports from non-market

---

[4] *GPX* was shortly thereafter vacated because Congress enacted new legislation permitting the imposition of antidumping and countervailing duties on non-market economy countries. In fact, one of the bill's sponsors specifically noted that the new legislation "overturns an erroneous decision by the Federal circuit {sic} that the Department of Commerce does not have the authority to apply these countervailing duty rules to nonmarket economies." 158 Cong. Rec. H1167 (daily ed. Mar. 6, 2012) (statement of Rep. David Camp).

economies.  *GPX*, 666 F.3d at 741–745.  Conversely, here, Commerce has not articulated a practice that subsidies related to currency undervaluation are not countervailable.  Nor has the Federal Circuit ever affirmed that alleged "practice."  Instead, Commerce in the past did not initiate on currency undervaluation allegations because the petitioners' allegations in those particular proceedings were unsupported.  Thus, Congress has not "acquiesced" to any Commerce practice.

### III.   Treasury's Role In Evaluating Currency Undervaluation is Lawful

Commerce appropriately sought guidance from Treasury in making determinations regarding whether undervalued currency gives rise to a countervailable subsidy.  Thus, there is no merit is KTV's assertion that Commerce failed to fulfil its statutory obligation to administer the countervailing duty laws because Commerce asked Treasury to submit a report on currency undervaluation.  KTV Br. at 31-32.

In the *Final Rule*, Commerce explained that its new regulations do not delegate any decision-making authority from Commerce to Treasury.  Instead, the new regulation provides that Commerce will request and expect to receive Treasury's evaluation and conclusion concerning undervaluation, government action and the bilateral U.S. dollar rate gap during a countervailing duty proceeding.  *Final Rule*, 85. Fed. Reg at 6,038.  Recognizing Treasury's experience in evaluating currency undervaluation, Commerce defers to Treasury's expertise, but it has not delegated to Treasury the ultimate determination of whether currency undervaluation results in a countervailable subsidy in a given case.  As the United States Court of Appeals for the District of Columbia Circuit has recognized, one Federal agency may lawfully turn to another for "advice and policy recommendations" in an area where that other agency might have particular expertise.  *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 568 (D.C. Cir. 2004) ("{A}

federal agency may turn to an outside entity for advice and policy recommendations, provided the agency makes the final decisions itself'"); *see also Bellion Spirits v. United States*, 393 F. Supp. 3d 5, 15–17 (D.D.C. 2019) (upholding the Alcohol and Tobacco Tax and Trade Bureau's reliance on the scientific fact-finding and analysis of the Food and Drug Administration because the Bureau retained ultimate decision-making authority).  Thus, Commerce appropriately sought Treasury's guidance.

Also, contrary to KTV's assertions, Commerce carefully analyzed Treasury's report and asked follow-up questions.  KTV Br. at 32; Treasury Supp. Response, P.R. 227 (responding to Commerce's questions).  Specifically, Commerce asked Treasury to: (1) "provide an explanation for the inclusion of the 'safe asset index' and 'demeaned volatility index (VIX) capital account openness' in {its} model" and "explain why it was not necessary to include a money supply variable in {its} current account gap regression estimation;" (2) provide a more detailed explanation of its core findings from the table on page 3 of its report; and (3) explain discrepancies between its estimated undervaluation of the dong and the International Monetary Fund's (IMF) IMF's estimated undervaluation of the dong.  *Id.*  Although Commerce may not need to issue supplemental questions to Treasury in every case, here Commerce's issuance of questions demonstrates that Commerce carefully and independently analyzed Treasury's report.

## IV.    Commerce's Determination To Countervail Currency Exchanges Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law

As demonstrated below, Commerce's decision to countervail KTV's exchanges of U.S. dollars for undervalued Vietnamese dong because these transactions constituted financial contributions that conferred a benefit to KTV and were specific is supported by substantial evidence and in accordance with law.

A.    <u>**Legal Framework For Countervailing Currency Exchanges**</u>

Similar to Commerce's other countervailing duty regulations that do not directly address financial contribution for subsidies, the *Final Rule* does not address financial contribution under 19 U.S.C. §§ 1677 (5)(B) and (D) for currency undervaluation.  *Final Rule,* 85 Fed. Reg. at 6034.  The preamble to the *Final Rule*, however, provides that "{t}he receipt of domestic currency from an authority (or an entity entrusted or directed by an authority) in exchange for U.S. dollars could constitute the financial contribution under {19 U.S.C. § 1677 (5)(D)}."  *Id.* (citing *Modification of Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings; Proposed Rule and Request for Comments*, 84 Fed. Reg. 24,406, 24,408 (Dep't of Commerce May 28, 2019) (*Proposed Rule*)).

For private banks, a private entity may make a financial contribution when it has been entrusted or directed by a government authority and "if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments."  19 U.S.C. § 1677(5)(B)(iii).  The Statement of Administrative Action (SAA) that accompanied the URAA states that, "the Administration intends that the 'entrusts or directs' standard shall be interpreted broadly," and "plans to continue its policy of not permitting the indirect provision of a subsidy to become a loophole when unfairly traded imports enter the United States and injure a U.S. industry."  H. Rep. No. 103-316, vol. 1, at 926 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4239 (1994).

Regarding specificity, as explained in 19 C.F.R. § 351.502(c), enterprises that buy or sell goods internationally can be a "group" of enterprises for purposes of 19 U.S.C. § 1677(5A)(D).  Thus, in determining whether a currency-related subsidy is specific within the meaning of 19

U.S.C. § 1677(5A)(D), Commerce will examine whether this group is a predominant user of the subsidy in accordance with 19 U.S.C. § 1677(5A)(D)(ii)(II) or received a disproportionate amount of the subsidy in accordance with 19 U.S.C. § 1677(5A)(D)(ii)(III).  19 C.F.R. § 351.502(c); *Final Rule*, 85 Fed. Reg. at 6,031

Commerce determines whether a benefit exists by performing four analyses.  First, Commerce examines whether the currency of the country under investigation is undervalued during the relevant period.  19 C.F.R. § 351.528(a)(1).  In determining whether there is undervaluation, Commerce examines whether there is a real effective exchange rate (REER) gap (*i.e.*, a gap between the respondent country's REER and the REER that achieves an external balance over the medium term that reflects appropriate policies (equilibrium REER)).  *Id.* at § 351.528(a)(1).  Second, Commerce examines whether there has been government action on the exchange rate that contributes to such undervaluation beyond the exercise of monetary and credit policy by a government or central bank.  *Id.* at § 351.528(a)(2).  Third, if there is undervaluation on a REER basis and government action contributed to such undervaluation, Commerce examines whether there is a difference between the nominal, bilateral U.S. dollar rate consistent with the equilibrium REER and the actual nominal, bilateral U.S. dollar rate during the relevant time period (*i.e.*, a bilateral rate gap between the U.S. and the respondent country).  *Id.* at § 351.528(b)(1).  Commerce asks Treasury for an evaluation and conclusion as to whether the currency during the relevant period is undervalued on a REER basis, there has been government action on the exchange rate that contributed to such undervaluation, and whether there is a bilateral rate gap between the United States and respondent country.  *Id.* at § 351.528(c).  Finally, Commerce determines the amount of benefit by examining the difference between the

amount of local currency the respondent company received in its exchange of U.S. dollars and the amount it would have received absent the bilateral gap. *Id.* at § 351.528(b)(2).

**B. Commerce's Determination That KTV's Exchanges Of U.S. Dollars for Vietnamese Dong Constituted Financial Contributions Is Supported By Substantial Evidence And In Accordance With Law**

Commerce determined that there is a financial contribution when KTV exchanges U.S. dollars for Vietnamese dong with Vietnamese state-owned banks or private banks that were entrusted or directed. IDM at 14 (citing PDM, P.R. 296 at 20). Regarding state-owned banks, the record demonstrates that the State Bank of Vietnam is the government authority that handles foreign exchange activities through various laws and decrees. *Id.* Also, only after an Authorized Credit Institution receives approval from the State Bank of Vietnam is it allowed to engage in the foreign exchange activities. *Id.*; GOV IQR, P.R. 166 at 40-42. Authorized Credit Institutions include the Vietinbank and Vietcombank, state-owned commercial banks with 64.46 percent and 74.8 percent majority government ownership, respectively. IDM at 14; PDM, P.R. 296 at 20 (citing GOV IQR, P.R. 170 at Exh. F-1). Record evidence further demonstrates that the banks are vested with government authority. IDM at 14; PDM, P.R. 296 at 20-21 (citing Financial Sector Memorandum, P.R. 310 at Attachment 1, p. 11). Thus, for all foreign currency exchange transactions involving the Vietinbank and Vietcombank, Commerce found a direct financial contribution by an "authority" under 19 U.S.C. § 1677(5)(B) in the form of a direct transfer of funds within the meaning of 19 U.S.C. § 1677(5)(D)(i). IDM at 14; PDM, P.R. 206 at 20-22.

Also, Commerce found that, based on the government of Vietnam's implementation of law and decrees, the government requires private banks that are Authorized Credit Institutions to exchange currency and to do so within a narrow exchange rate. IDM at 15 (citing Petition, Parts 15-16, May 12, 2020, P.R. 16-17 at Exhs. VI-49, VI-53, and VI-56; GOV IQR, P.R. 170 at Exhs.

F-2, F-3, and F-8; PDM, P.R. 296 at 22).  By requiring private banks to exchange currency with any party wishing to do so, and limited to a narrow exchange rate, the government of Vietnam "entrusts or directs" private banks to provide this financial contribution.  IDM at 16; 19 U.S.C. § 1677 (5)(B)(iii).  Commerce concluded that providing the contribution "would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments," within the meaning of the statute because, as the government of Vietnam stated, the private banks are engaging in the same practice as the government-owned banks like Vietinbank and Vietcombank, all within the parameters set by the government to engage in a "government subsidy function" within the meaning of 19 U.S.C. § 1677(5)(B)(iii).  *Id.* (citing *Hynix Semiconductor, Inc. v. United States*, 425 F. Supp. 2d 1287, 1305-07 (Ct. Int'l Trade 2006)).

KTV's claims regarding financial contribution are misleading and mischaracterize Commerce's determination.  KTV. Br. at 38-39.  First, in challenging Commerce's financial contribution finding that is required for a finding of *undervaluation*, KTV mistakenly implicates Commerce's finding regarding "government action on the exchange rate."  KTV Br. at 38-39.  As detailed in the Legal Framework section above, findings of financial contribution and of currency undervaluation are separate and distinct analyses.  Second, KTV incorrectly contends that Commerce's financial contribution decision was based on net purchases and sales of all entities rather than one recipient.  KTV Br. at 39.  But Commerce did exactly the opposite and analyzed the exchanges of a single recipient, KTV's exchanges of U.S. dollars for Vietnamese dong on a transaction-by-transaction basis.  PDM at 25 (citing Prelim. Calc. Memo for KTV, Nov. 5, 2020, P.R. 393, C.R. 130; KTV IQR, P.R. 160, C.R. 34 at Appendix 9-A).

KTV also incorrectly states that Commerce did not find that the government of Vietnam required banks to exchange currency at a particular rate.  KTV. Br. at 38.  Commerce explained in detail that the government of Vietnam required banks to exchange currency within a narrow exchange rate, and, therefore, "entrusts or directs" these private entities to make a financial contribution by providing dong at an undervalued rate.  IDM at 15, 16.  Commerce explained that that record evidence established that pursuant to Ordinance No. 28/2005/PL-UBTVQH11, of December 13, 2005, the State Bank of Vietnam's objective is to "carry out the purchase and sale of foreign currency on the domestic foreign currency market in order to achieve the objectives of the national monetary policy." IDM at 15 (citing Petition Part 15, P.R. 16 at Exh. VI-53).  Article 30 of this law defines the State Bank of Vietnam's involvement to be applicable to the Vietnam dong supply and demand.  *Id.*  Specifically, Article 30 states that "{t}he exchange rate mechanism applicable to the Vietnamese dong shall be determined on the basis of supply and demand for the foreign currency market as regulated by the State" and "{t}he State Bank of Vietnam shall determine the exchange rate applicable to the Vietnamese dong in accordance with specific macro-economic objectives …" *Id.*  Through the government's legislation, private banks, like government of Vietnam state-owned banks, must exchange U.S. dollars for dong for any party wishing to do so, and the rates for that exchange must be within the State Bank of Vietnam established rate of *+/ – 3 percent* to *+/-1 percent*.  IDM at 15 (citing Petition Part 15, P.R. 16, at Exh. VI-49 at 5).  Commerce also identified additional provisions that specify that authorized credit institutions are responsible for meeting the demand for foreign currency of the residential institutions or individuals for their payment of currency transactions abroad.  IDM at 15-16 (citing GOV IQR, P.R. 170 at Exhs. F-2 and F-3; PDM, P.R. 296 at 22; Petition, Part 16, P.R. 17 at Exh. VI-56).  Thus, Commerce's determination that Vietnamese state-owned banks

and private banks are authorities within the meaning of the statute and provide a financial contribution through the exchange of U.S. dollars for Vietnamese dong is supported by substantial evidence and in accordance with law.

Commerce also reasonably concluded that the exchange of currency is a straightforward example of a "direct transfer of funds" (*i.e.*, the exchange of U.S. dollars for Vietnamese dong) as set forth in 19 U.S.C. § 1677(5)(D).  KTV Br. at 37 (challenging Commerce's interpretation). Here, what constitutes a "direct transfer" is undefined in the statute; therefore, the Court must uphold Commerce's interpretation so long as it is reasonable.  *Timken*, 354 F.3d at 1342 ("To survive judicial scrutiny, {Commerce's} construction need not be the only reasonable interpretation or even the most reasonable interpretation…") (quoting *Koyo Seiko v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994)).

As the *Final Rule* states, "{t}he word 'transfer suggests a conveyance, passing or exchange of something from one person to another.  The word 'funds' suggests money or some monetary resource."  *Final Rule*, 85 Fed. Reg. at 6,034; *see also* IDM at 13.  An exchange of currency falls within this common meaning of the terms "transfer" and "funds."  *Id.*

As Commerce explained in the IDM, the SAA states that "{s}ection 771(5)(D) of the Act, lists the four broad generic categories of government practices that constitute a 'financial contribution,'" and that "{t}he examples of particular types of practices falling under each of the categories are not intended to be exhaustive."  SAA, H.R. Doc. 103-316, vol. 1 at 927 (1994); *see also* IDM at 13.  The SAA further explains that "{t}he Administration believes that these generic categories are sufficiently broad so as to encompass the types of subsidy programs generally countervailed by Commerce in the past, although determinations with respect to particular programs will have to be made on a case-by-case basis."  *Id.*  Thus, the Court should

sustain Commerce's reasonable interpretation.  *Chevron,* 467 U.S. at 837; *see also Eurodif*, 555

U.S. at 316 (Commerce's "interpretation governs in the absence of unambiguous statutory

language to the contrary or an unreasonable resolution of language that is ambiguous.").

### C. Commerce's Determination That The Currency Program Was Specific Is Supported By Substantial Evidence And In Accordance With Law

Commerce determined that the exchange of U.S. dollars for Vietnamese dong is *de facto*

specific within the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(II) because the group of enterprises

constituting the traded goods sector is the predominant user of the subsidy as it accounted for

71.94 percent of U.S. dollar inflows into Vietnam during the period of investigation.  IDM at 18

(citing PDM at 23-24); GOV IQR, P.R. 170, at Exh. F-1; GOV Second Supp. Questionnaire

Response (GOV SQR2), Oct. 13, 2020 at 5; IMF/OECD Memo, P.R. 254 at Attachment 1; Initial

Questionnaire to Government of Vietnam, July 7, 2020, P.R. 99 at Currency Undervaluation

Appendix; GOV SQR3, P.R. 287, at 1; Commerce Letter to Gov. of Vietnam, Oct. 8, 2020, P.R.

255, at 1).

Commerce based its specificity determination on information provided by the

government of Vietnam and data submitted by the State Bank of Vietnam to the IMF.  PDM at

23-24 (citing IMF/OECD Memo, P.R. 254, at Attachments 1-2; USD Inflow Calc. Memo, P.R.

303; Treasury Response, P.R. 165).  Because the State Bank of Vietnam does not collect U.S.

dollar trading by field or sector, Commerce relied on U.S. dollar inflows to Vietnam as a proxy

for currency conversions.  PDM, P.R. 296 at 23-24.  Using the State Bank of Vietnam data,

which was reported to the IMF, Commerce calculated the total portion of U.S. dollar inflow into

the Vietnamese economy through exports of goods, exports of services, various forms of

portfolio and direct investment, and earned income from abroad.  *Id.*  Also, to account for U.S.

dollar inflows that may not have resulted in currency conversion, Commerce discounted

Vietnam's exports of goods by the amount of recorded intermediary inputs that are subsequently used for re-exportation. *Id.*; IDM at 18-19. This adjustment reflects the reality that Commerce's analysis includes information about companies that are engaged in both the buying and selling of goods internationally. IDM at 19. Commerce explained the purpose of the specificity test "is to function as an initial screening mechanism to winnow out *only* those foreign subsidies which truly are broadly available and widely used throughout an economy." IDM at 20 (citing SAA, H.R. Doc. 103-316, vol. 1 at 929(1994)). Thus, "{e}ven if exchanges of USD for VND are broadly available in Vietnam, when nearly 72 percent of those exchanges benefit one particular sector of the economy, it cannot be said that the subsidy is widely used throughout the economy." IDM at 20. "Such concentrated usage of a subsidy is the opposite of wide usage," and Commerce thus reasonably determined that the specificity test should not "winnow out" such a subsidy. *Id.* Thus, substantial evidence supports Commerce's specificity determination.

And Commerce's determination is in accordance with law because it is a reasonable construction of 19 U.S.C. § 1677(5A)(D), which states that a subsidy can be specific if provided to "a group" of enterprises or industries but does not define the word "group." KTV Br. at 42 (arguing that Commerce's interpretation is unreasonable); *Final Rule*, 85 Fed. Reg. at 6,031, 6,039.

Commerce's interpretation of the statute in 19 C.F.R. § 351.502(c) is permissible because enterprises that buy or sell goods internationally are an identifiable set of enterprises, and they constitute a subset of all economic actors within a country. *Final Rule*, 85 Fed. Reg. at 6,031. Also, Commerce explained that this regulatory modification is similar to prior interpretations of the statutory term "group." *Id.* at 6,031, 6,039. For example, Commerce has found state-owned enterprises and foreign-invested enterprises to comprise ''groups'' under the statute. *Id.* at 6,039

(citing Import Administration Policy Bulletin 10.1, "Specificity of Subsidies Provided to State-owned Enterprises," 2010, *available at* https://enforcement.trade.gov/policy/pb-10.1.pdf and *Citric Acid and Certain Citrate Salts From the People's Republic of China*, 74 Fed. Red. 16,836 (Dep't of Commerce Apr. 13, 2009) (final affirmative countervailing duty determination), and accompanying IDM at cmt. 16). Thus, Commerce's interpretation should be sustained is a reasonable construction of an undefined statutory term. *Chevron,* 467 U.S. at 837; *see also Final Rule*, 85 Fed. Reg. at 6,039.

Notably, KTV cites no legislative history or precedential case law to demonstrate Commerce's determination that enterprises that buy or sell goods internationally can be a "group" of enterprises is an unreasonable. Further, in the *Proposed Rule*, Commerce explained that "{t}he specificity test in the statute focuses the countervailing duty remedy only on those government interventions that benefit particular sectors of the economy." 84 Fed. Reg. at 24,408. And in the preamble to the *Final Rule*, Commerce explained that Commerce could not apply a "bright line rule" to determine whether "an enterprise or industry or group of industries would be deemed a predominant user or a disproportionate beneficiary." *Final Rule*, 85 Fed. Reg. at 6,040. Thus, Commerce explained it would evaluate on a case-by-case-basis whether a group of enterprises would constitute a disproportionate or predominant beneficiary of the subsidy in accordance with the statute. *Id.*

KTV asserts that Commerce's specificity finding is flawed because: (1) "nothing in Vietnamese law requires holders of foreign currency to formally convert that currency into dong," and (2) Commerce's focus on conversions of foreign currency fails to address the impact of whether the exchange rate is used disproportionately in certain sectors. KTV Br. at 41. Neither argument is persuasive. Contrary to KTV's assertions, it is reasonable to assume that

Vietnamese firms would convert their export earnings from U.S. dollars to Vietnamese dong because the firms use the dong currency in their daily operations.  To the extent that KTV maintains that Vietnamese firms retain U.S. dollars to use to purchase inputs for products that are re-exported, Commerce explained that it adjusted its specificity calculation to account for any U.S. dollars that may be needed for such intermediary input purchases.  IDM at 18 (citing PDM, P.R. 296 at 24; IMF/OECD Memo, P.R.254 at Attachment 2).  Importantly, because the government of Vietnam does not record data on exchanges of U.S. dollars for Vietnamese dong, Commerce's application of U.S. dollar inflows into Vietnam as a proxy for exchanges of U.S dollars for Vietnamese dong is reasonable.  IDM at 19.

Turning to KTV's second allegation, KTV challenges Commerce's approach in determining whether the traded goods sector was the predominant user of a subsidy.  But Commerce's approach was reasonable.  As detailed above, Commerce sought information from the government of Vietnam regarding data on U.S. dollar trading by field or sector.  IDM at 18 (citing PDM, P.R. 296 at 23); GOV IQR, P.R. 170 at Exh. F-1; GOV SQR2 at 5; GOV SQR3, P.R. 287 at 1, 3; Initial Gov. Questionnaire, P.R. 99 at Currency Undervaluation Appendix; IMF/OECD Memo, P.R. 254 at Attachment 1; Commerce Supplemental Questionnaire to Vietnam, P.R. 255 at 1.  Because the government of Vietnam was unable to provide data on U.S. dollar trading by field or sector, Commerce relied on data of U.S. dollar inflows to Vietnam as a proxy for this information.  *Id.*; IMF/OECD Memo, P.R. 254 at Attachment 1.  Commerce explained that, because the subsidy in question benefits companies that exchange U.S. dollars for Vietnamese dong, it relied upon the data available to it in this investigation to estimate the subsection of the overall users of this subsidy who could reasonably be determined to be in the internationally traded goods sector.  IDM at 19.  Commerce explained that, using the State Bank

of Vietnam data which was reported to the IMF, it calculated the total portion of U.S. dollar

inflow into the Vietnamese economy during the period of investigation through the following

four major channels of exchange: (1) exports of goods, (2) exports of services, (3) various forms

of portfolio and direct investment; and (4) earned income from abroad.  PDM, P.R. 296 at 23-24.

Further, Commerce reasonably concluded that companies that *buy* goods internationally are

unlikely to be exchanging the U.S. dollar for Vietnamese dong, and thus determined that it would

not be appropriate to incorporate them into its analysis of U.S. dollar inflows to Vietnam as a

proxy for U.S. dollar conversions to Vietnamese dong.  IDM at 19.  Therefore, to account for

U.S. dollar inflows which may not have resulted in currency conversion, Commerce discounted

Vietnam's exports of goods value by the amount of intermediary imported inputs (based on

OECD estimates) to arrive at a reasonable estimate of exports that earned foreign exchange.

PDM, P.R. 296 at 24 (citing IMF/OECD Memo, P.R. 254 at Attachment 2; USD Inflow Calc.

Memo, P.R. 303).  Thus, Commerce's approach to analyzing whether the traded goods sector

was the predominant user of the subsidy was reasonable and supported by substantial evidence.

Indeed, KTV provides no alternative to Commerce's approach.

　　　　Nor is there merit to KTV's argument that Commerce's predominant user analysis failed

to address the possibility that other sectors of the economy beyond intermediary good exporters

might have chosen to hold foreign currency in non-dong denominated accounts.  KTV Br. at 42,

n 107.  Commerce explained the reasonable basis for its analysis through examining four

channels of U.S. dollar inflows.  PDM, P.R. 296 at 23-24; IDM at 18-20.  Further, KTV

identifies no record evidence supporting its assertion that Commerce should have discounted

other sectors of the economy in its predominant user analysis because such users exchanged no

U.S. dollars for Vietnamese dong during the period of investigation.  In fact, KTV's position

suggests only that Commerce's specificity analysis was overly conservative, and that the real share of U.S. dollar conversions by the traded goods sector was greater than 72 percent.

Finally, KTV's assertion regarding the impact of converting Vietnamese dong on a company's profitability is misplaced.  KTV Br. at 41.  Whether exchanging U.S. dollars for Vietnamese dong impacts a company's profitability is irrelevant for Commerce's specificity analysis.  Rather, in determining whether a subsidy is *de facto* specific, as explained above, Commerce examined whether:  (1) the traded goods sector constitutes a group of enterprises within the meaning of the statute; and (2) this group is a predominant used of the subsidy.  IDM at 18-19; 19 U.S.C. §§ 1677(5A)(D) and (D)(iii)(II).  Thus, the "actual impact of the exchange rate on economic actors" is not a relevant consideration to Commerce's specificity analysis.  KTV Br. at 41-42.

### D. Substantial Evidence Demonstrates That The Undervaluation Of The Vietnamese Dong Conferred A Benefit

In its August 24, 2020 report, Treasury found that the Vietnamese dong was undervalued during 2019 because there was a gap between Vietnam's REER and its equilibrium REER (*i.e.*, the real effective exchange rate that achieves an external balance over the medium term that reflects appropriate policies).  Treasury Response, P.R. 165; PDM, P.R. 296 at 24.  Treasury also reported:  "the Government of Vietnam's actions on the exchange rate had the effect of undervaluing the dong vis-à-vis the U.S. dollar by 4.7%."  *Id.*  Treasury explained that it conducted its analysis using its Global Exchange Rate Assessment Framework (GERAF) and provided a methodology paper and summary of how it applied the GERAF for purposes of evaluating currency valuations.  Treasury Response, P.R. 165 at pdf. pages 1-3.  Treasury's GERAF model is based on the IMF's External Balance Assessment model, a widely accepted approach for currency valuation estimates, which Treasury built upon to "allow{} for rigorous

estimation of currency valuations relative to the dollar."  Treasury Response, P.R. 165 at 2 (pdf.

page 7).  Further, Treasury explained that:

> GERAF's assessment provides a detailed framework for assessing,
> among other factors, the impact of specific government policies—
> including those that could be considered "government action on
> the exchange rate" in 19 CFR 351.528—on currency
> undervaluation. Moreover, GERAF can quantify the impact of a
> particular domestic policy on a given currency's valuation *as well
> as* the collective impact of all other countries' policies on that
> given currency's valuation. These features allow Treasury to make
> a granular assessment of the extent to which a country's
> government action on the exchange rate contributed, if at all, to
> REER undervaluation and nominal, bilateral undervaluation vis-à-
> vis the U.S. dollar.

*Id.* at pdf. page 4 (Summary).  Put differently, Treasury's GERAF model quantifies the impact of

a particular domestic policy on a given currency's valuation as well as the collective impact of

all other countries' policies on that given currency's valuation.  These features allow Treasury to

make a granular assessment of the extent to which a country's government action on the

exchange rate contributed, if at all, to REER undervaluation and nominal, bilateral

undervaluation vis-à-vis the U.S. dollar.  Thus, Treasury employed GERAF "to assess the extent

to which currency valuations have been affected by the actual levels of foreign exchange

intervention and capital controls, and how these levels compare to the desirable levels of foreign

exchange intervention or capital controls for the economy in question."  *Id.* at pdf. page 5

(Summary, page 2).  In short, Treasury assessed the impact on currency valuation by analyzing

intervention in foreign exchange markets and controls on cross-border capital flows.  *Id.*

Treasury's government action finding was based on analysis of the government of

Vietnam's purchase and sale of foreign exchange reserves over the period of investigation.

Treasury Response, P.R. 165 at 1-2 (pdf. pages 6-7).  Using its complex and interdependence

country economic model, where the sale of foreign exchange reserves in one country affected

28

changes in the stock of foreign exchange in more than 50 other considered countries, Treasury estimated that the government of Vietnam's actions on the exchange rate had the effect of undervaluing the dong vis-à-vis the U.S. dollar by 4.7 percent. *Id.* at 1, 11-12 (pdf. pages 1, 16-17). This is shown in the table of the Treasury report, which identifies that government action associated with the trading of foreign exchange reserves accounted for the full 4.7 percent of the reported undervaluation. *Id.* at pdf. page 3, row I.

Consistent with 19 C.F.R. § 351.528(b)(1), Treasury assessed the difference between the nominal, bilateral dong exchange rate against the U.S. dollar consistent with the equilibrium REER and the actual nominal, bilateral dong exchange rate against the U.S. dollar in 2019. *Id.* at pdf. page 2. It concluded that, taking into account the impact of government action on the exchange rate, the actual, nominal bilateral dong exchange rate against the U.S. dollar in 2019 was 23,224 dong per U.S. dollar, whereas the nominal, bilateral dong exchange rate against the U.S. dollar consistent with the equilibrium REER was 22,134 dong per U.S. dollar. *Id.* Thus, on a bilateral basis, Treasury concluded that the government of Vietnam's actions on the exchange rate caused the undervaluation of the dong vis-à-vis the U.S. dollar by 4.7 percent. *Id.*

Treasury included in its 32-page report calculations and sources supporting its conclusions. *Id.* at 3-32. Treasury explained the specifications of the GERAF model and construction of variables to estimate the key drivers of current account balances. *Id.* at 8-11 (.pdg pages 8-16); *see also* Appendix A. The report also identified a list of data sources, descriptions, and countries included in the GERAF sample, in addition to robustness checks and regression extensions. *Id.* at Appendix A, B, and C.

After analyzing Treasury's report, Commerce issued requests for clarification regarding Treasury's findings, including, for example, differences in its conclusion as compared to the

IMF's estimation of the dong and line items in its table of variables used in the GERAF model. Commerce Clarification Questions, Sept. 17, 2020, P.R. 215.  Treasury provided clarifications to all of Commerce's questions.  Treasury Supp. Response, P.R. 227.  After considering Treasury's report and questionnaire response, and as explained above, Commerce determined that Vietnam's currency vis-à-vis the U.S. dollar was undervalued by government action during the period of investigation by 4.7 percent.  PDM, P.R. 296 at 24; IDM at 4.

Commerce then determined the amount of benefit by examining the difference between the amount of local currency KTV received in its exchange of U.S. dollars (based on KTV's reported transaction of U.S. dollars to Vietnamese dong) and the amount it would have received absent the bilateral gap by applying the 4.7 percent undervaluation reported by Treasury to each currency exchange transaction reported by KTV.  PDM, P.R. 296 at 25 (citing 19 C.F.R. § 351.528(b)(2); KTV Prelim. Calc. Memo, P.R. 393, C.R. 130).  Commerce aggregated the total benefits in U.S. dollars based on the sum of these individual transactions during the period of investigation.  *Id.*  Using this benefit as a numerator, Commerce calculated a countervailable subsidy rate for the exchanges of currency by dividing the benefits obtained by KTV during the period of investigation by KTV's total sales conducted in U.S. dollars.  On this basis, Commerce determined a net countervailable subsidy rate of 1.69 percent *ad valorem* for KTV.  PDM, P.R. 296 at 25; IDM at 4.

KTV contends that Treasury's findings are not based on substantial evidence and that Commerce was required to have Treasury place all of the data underlying its analysis on the record.  KTV Br. at 32.  But KTV has not demonstrated that the record is incomplete.  Contrary to KTV's assertions, concluding that a determination is supported by substantial evidence does not require the Court to engage in an endless hunt for documentation.  Instead, the Court is

"limited to determining whether the record is adequate to support the administrative action" and "must not improperly intrude upon an agency's power to implement { } proper procedures for constructing an agency record." *PSC VSMPO-Avisma Corp. v. U.S.*, 688 F.3d 751, 761 (Fed. Cir. 2012) ("A court cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered.").

Here, accordance with its regulations, Commerce sought and obtained an undervaluation determination from Treasury. 19 C.F.R. § 351.528(c). Treasury's determination included over 30 pages of supporting documentation, including the GERAF model's specification and variable construction, a complete list of variables, sources and descriptions, the countries used in the sample, and summary statistics for the panel sample of observations in the baseline regression specification. *See* Treasury Response, P.R. 165 at 6 (pdf. page 11), Appendices A, B. And Commerce requested and received responses to its supplemental questions. Treasury Supp. Response, P.R. 227. Thus, Commerce's reliance on the Treasury report without the underlying data was reasonable. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (substantial evidence is such evidence that "a reasonable mind might accept as adequate" such evidence to support Commerce's conclusion).

Here, obtaining Treasury's report on undervaluation is similar to other instances in the antidumping or countervailing duty laws where Commerce relies on expertise or advice from other agencies as part of its determinations and otherwise does not require placement of the underlying data on the record. IDM at 23. For example, pursuant to 19 C.F.R. § 351.524(d)(2), Commerce relies on asset depreciation tables of the Internal Revenue Service for purposes of

allocating non-recurring subsidies, without placing the IRS's underlying data on the record.  And 19 U.S.C § 1677j(e)(3) provides that in certain circumvention inquiries, the U.S. International Trade Commission may provide advice to Commerce as to whether an affirmative circumvention determination would be inconsistent with the Commission's prior affirmative injury determination, but the statute does not require that the Commission provide to Commerce its underlying analysis or data on which it bases this advice.  Also, 19 C.F.R. §351.301(c)(3)(i) allows parties to submit benchmark information to measure the adequacy of remuneration, and there is no requirement that they submit specific underlying sale-by-sale data, rather than aggregate data.  Notably, the government of Vietnam also did not place on the record the underlying data used in reports on which it relies, such as IMF reports.  Vietnam Government Comments on Treasury Report, Sept. 8, 2020, P.R. 205-206.  Further, in determining the creditworthiness of a firm, Commerce collects credit ratings or other information from independent sources (*e.g.*, feasibility reports, market studies, country and industry economic forecasts) relevant to assessing the firm's future financial position but does not require the underlying data from such sources to be placed on the record.  19 C.F.R. § 351.505(a)(4)(D).

And pursuant to 19 U.S.C. § 1671b(b)(4)(B) and § 1677(36), Commerce relies on United States Trade Representative's (USTR) list of "developing countries" for purposes of *de minimis* countervailable subsidy levels, without requiring USTR's entire underlying analysis to be on the record.  Commerce also relies on reports like the Doing Business Report from the World Bank without requiring these organizations to place the underlying data on the record.  Indeed, the Court has not required that Commerce place the underlying data from the World Bank on the record to hold such a determination is supported by substantial evidence.  *E.g.*, *Aristocraft of America LLC v. U.S.*, 269 F. Supp. 3d 1316, 1328 (sustaining as reasonable Commerce's

32

methodology for assessing a surrogate value for brokerage and handling based on World Bank data and holding "{t}he Court has repeatedly affirmed Commerce's use of World Bank data as a reliable and accurate source to value {brokerage and handling, and so does again here}").  Thus, Commerce's practice of relying on expertise and conclusions from other sources without requiring the underlying data has not rendered such determinations *per se* unsupported by substantial evidence.

KTV attempts to discredit Treasury's report by asserting that certain variables were based on Treasury staff estimates, the data set Treasury used had undisclosed gaps, and the findings were inconsistent with other Treasury reports.  KTV Br. at 33.  These assertions are misleading and fail to recognize that the model and calculation are supported by evidence and reasoned explanation.  First, Treasury's model relied on foreign exchange trading by central banks around the world, whose data are publicly available through institutions such as the IMF.  Second, regarding KTV's allegation that the data set included undisclosed gaps because it included data from only 51 countries, this fails to recognize that the 51 countries included were major economies that account for more than 90 percent of global economic activity and even more of the stock of international reserves.  Treasury Report, P.R. 165 at 3 (pdf. page 8).  Third, the report KTV cites as demonstrating alleged "inconsistencies," compares a different time period (*i.e.*, June 2018 through June 2019) than what was examined in Treasury's undervaluation report (*i.e.*, January 2019 through December 2019), explaining why the net purchases of foreign exchange differ.  KTV Br. at 33 n. 87.

Contrary to KTV's claims, KTV Br. at 36, Commerce explained why Treasury's GERAF model was reasonable.  Specifically, Commerce stated that the GERAF model that Treasury used to assess the Vietnamese dong's valuation is similar to existing equilibrium real effective

exchange rate (REER) models – including, most notably, the multilaterally consistent Current Account balance model developed and used by the IMF in its External Balance Assessment methodology.  IDM at 23.  As Commerce explained, the GERAF model builds upon the IMF's REER External Balance Assessment model by adding a safe asset index variable measuring the relative safeness of currencies and government securities, by incorporating and quantifying the impact of foreign exchange intervention on current accounts across countries with varying degrees of capital account mobility, and by including various other macroeconomic variables. *Id.*  Further, the GERAF model adds precision to under/over multilateral valuation assessments of currencies by also extending its analysis to include valuation assessments vis-à-vis the U.S. dollar.  *Id.*  Finally, Commerce explained that the GERAF model adds an additional analytic element by estimating the depth to which the under/over valuation was attributable to government intervention because it can isolate the effect of individual domestic policies (*e.g.*, government action on the exchange rate) and assess to what extent, if any, that policy contributed to the domestic currency's valuation.  *Id.* at 24.

Commerce also reasonably explained why it elected not to rely on the IMF's equilibrium real exchange rate model in assessing the level of Vietnamese dong undervaluation.  First, the IMF's latest estimate on the record did not cover the 2019 period of investigation, and instead covered only 2018.  IDM at 24 (citing Government of Vietnam Response to Treasury Response, Sept. 8, 2020, P.R. 205, at Attachment 2 at 1, 12, 36).  As such, conditions regarding whether the dong was valued fairly in 2018 and how much of its potential under- or overvaluation was attributable to government intervention were subject to the circumstances of 2018.  Because these conditions change from year to year, it was not appropriate to rely upon an analysis of prior year's estimates.  Also, Commerce noted that the 2019 IMF Article IV report on the record

showing 15.2 percent overvaluation in 2018 based on the multilateral real exchange rate model states that the model's "fit" (*i.e.*, the extent to which the data in the model accurately assess the Vietnamese dong's valuation) is "poor"; therefore, for its assessment the IMF relied on the results of the current account regression, where the level of undervaluation is 8.4 percent. *Id.*

KTV also attempts to discredit Treasury's report because it provides the results for six alternative estimators that represent variations on the GERAF model used to calculate Vietnamese dong valuation. KTV Br. at 23. Contrary to this claim, the presentation of alternative estimators is a feature of Treasury's approach, not a flaw. Specifically, the alternative estimators and extensions in Appendix C of Treasury's submission strengthen the results of the analysis because they serve as robustness checks for the GERAF model adopted by Treasury (in Column 1 of Appendix C1), meaning that the signs, significance, and general order of magnitudes are comparable. Treasury Report, P.R. 165 at Appendix C1. Comparing these results, therefore, shows how accurate each model is and provides a basis from which to compare the model Treasury used. Had these indicators been wildly different from the alternative models, one could have reasonably questioned their validity. Given that the signs, significance, and general order of magnitudes of Treasury's report were all highly comparable vis-à-vis the other models, this signals that the Treasury's estimates do not deviate significantly from alternative methodologies and are reasonable. IDM at 25.

Also unsupported by record facts is KTV's assertion that Treasury's own analysis of the six alternate estimators included in its submission indicate that the GERAF model is less accurate than the alternative models provided in Appendix C. KTV Br. at 36. In its final determination, Commerce acknowledged that the R-squared of the GERAF model (.385) is lower than the R squared of the other six alternative estimators in Table C1. IDM at 25; Treasury

Report, P.R. 165.  But Commerce also explained that the root mean square error is the second lowest in the GERAF model, which indicates a relatively high absolute "fit" compared to the other estimators in Table C1.  IDM at 25.  Commerce also explained that generally "the P values of the GERAF model regressors are also comparatively low and the coefficient for the foreign exchange intervention (FXI/GDP) regressor is consistent in signs and magnitude and generally highly significant (at the 1 percent level) across the range of models in Tables C1-C3."  *Id.* Therefore, Commerce concluded that contrary to KTV's assertions, the robustness indicators are generally consistent and not indicative of the GERAF model's inaccuracy when compared to the other iterations provided in Appendix C.  *Id.*  Thus, there is no merit to KTV's assertion that Treasury's analysis of alternate estimators indicates that the GERAF model is less accurate than other models.

Indeed, none of KTV's concerns demonstrates that Treasury's model is unusable or demonstrate any specific instances where the data or results are clearly flawed.  Although Commerce acknowledged that there might be other methods of measuring an equilibrium exchange rate, Treasury's analysis is reasonable and KTV has not provided any record information invalidating Treasury's model.  IDM at 25-26.  Therefore, consistent with 19 C.F.R. § 351.528 and based on the record facts, Commerce reasonably concluded that Treasury's model provides a reasonable and economically sound methodology.  *Id.; see also Consol. Edison Co.*, 305 U.S. at 229.

Finally, KTV asserts that, because KTV made purchases in U.S. dollars, any alleged benefit from converting U.S. dollars to Vietnamese dong was offset by such increased costs from converting input prices into dong at the same inflated rate.  KTV Br. at 40.  But this position is contrary to what is contemplated by the statute and Commerce's regulations.  19 U.S.C.

§ 1677(6) (providing limited circumstances where Commerce may offset the net countervailable subsidy); 19 C.F.R. § 351.528(b)(2).  Here, Commerce based its benefit calculation on KTV's reported transaction of U.S. dollars to Vietnamese dong.  PDM, P.R. 296 at 25.

KTV's argument is similar to one that the Court rejected in *Canadian Solar Inc. v. U.S.*, No. 18-00184, 2020 WL 898557 (Ct. Int'l Trade Feb. 25, 2020), in which the plaintiff requested that Commerce offset the respondent's purchase of inputs made at less than adequate remuneration by purchases made at or above benchmark world market prices.  But the Court disagreed, holding that "{t}he government's practice of not calculating a 'negative benefit' is in accordance with the statute as a respondent still receives a countervailable benefit in situations where only some of its inputs were provided for less than adequate remuneration." *Id.* at *7. Similarly, here, by countervailing only those exchanges of U.S. dollar for Vietnamese dong during the period of investigation, Commerce is acting consistently with its regulations and is "simply effectuating its statutory mandate." *Id*.

**V.    Commerce's Determination To Countervail KTV's Preferential Rent As A Provision For A Good At Less Than Adequate Remuneration Is Supported By Substantial Evidence And In Accordance With Law**

In the final determination, Commerce determined that KTV received for less than adequate remuneration preferential rent because it (1) constituted a financial contribution from a government authority in the form of the provision of a good (*i.e.*, land) within the meaning of 19 U.S.C. § 1677(5)(D)(iii); (2) is specific within the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(iv); and (3) provides a benefit "equal to the difference between the market rate for rent in the locality and the actual rent paid" within the meaning of 19 U.S.C. § 1677(5)(E)(iv) and 19 C.F.R. § 351.511(a)(1).

KTV claims that because it acquired its land-use rights before Vietnam's accession date to the WTO, its preferential rent is not countervailable.  KTV Br. at 5-23.  According to KTV, its land-use rights originated in an "in principle" agreement entered into between its parent company, Kumho Tire (H.K.) Co., Ltd. (KT-HK) and Becamex IDC Corporation (Becamex) on April 28, 2006.  *Id.* at 5–8.  KTV also contends that the essential terms and conditions governing KTV's land-use transactions were established before Vietnam's January 11, 2007, WTO accession date.  *Id.*  Consequently, KTV contends that Commerce contradicted the relevant legal framework and Commerce's practice of treating the WTO accession date as a cut-off date for imposing countervailing duties on merchandise from Vietnam.  *Id.* at 5–16.  But as explained below, KTV is incorrect, and Commerce's determination is supported by substantial evidence and is otherwise in accordance with law.

### A. Legal Framework For Less Than Adequate Remuneration Determinations

Commerce will determine a subsidy is countervailable when an authority provides a financial contribution, a benefit is thereby conferred, and the subsidy is specific.  19 U.S.C. § 1677(5).  In cases where an authority provides a financial contribution through the provision of goods or services, the statute defines a benefit as occurring where those goods or services "are provided for less than adequate remuneration."  *Id.* at § 1677(5)(E)(iv).  The adequacy of remuneration "shall be determined in relation to prevailing market conditions for the good or service being provided" in the country which is subject to the investigation or review.  *Id.* at § 1677(5)(E).  Prevailing market conditions include "price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  *Id.*

With regard to non-market economy countries, such as Vietnam, Commerce cannot impose countervailing duties where Commerce "is unable to identify and measure subsidies

provided by the government of the nonmarket economy country . . . because the economy of that

country is essentially comprised of a single entity." 19 U.S.C. § 1671(f)(2).  Commerce treats

Vietnam's WTO accession date, January 11, 2007, as the cut-off date from which Commerce can

identify and measure subsidies in Vietnam. *TMK IPSCO v. United States*, 222 F. Supp. 3d 1306,

1317 (Ct. Int'l Trade 2017) (affirming Commerce's use of another non-market economy

country's (China) WTO accession date as a uniform cut-off date for each category of subsidy

program); *see also Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam*, 75

Fed. Reg. 16,428 (Dep't of Commerce Apr. 1, 2010) (*PRCBs from Vietnam*) (final affirm.

countervailing duty determination), and accompanying IDM.

### B. Commerce Reasonably Determined That Becamex Could Not Lease To KTV Until After Vietnam's Accession To The WTO

In its final determination, citing to its Land Memorandum, Commerce determined that

"{l}and-use rights in Vietnam are legally recognized by the issuance of land-use rights

certificates and holding land-use rights certificates significantly improves land-use rights

security." IDM at 41 (citing Land Memorandum, P.R. 298 at 22).  In other words, holding a

land-use certificate is necessary to transact land.  Land Memorandum, P.R. 298 at 22.

Commerce's conclusion in its Land Memorandum was based on the Land Law of the Socialist

Republic of Vietnam No. 45/2013/QH13 (adopted by the National Assembly in 1986, amended

in 1988, 1993, 1998, 2003, further amended November 29, 2013, promulgated July 1, 2014)

(Land Law), which states "{t}he Government considers and approves the land use plannings and

plans of the provinces and centrally-run cities" which involves the issuance of land-use

certificates. *Id.* at 22, Attachment 2 (citing Article 26.2 of the Land Law); *id* (citing Land Law

Article 48) (providing that land use right certificates shall be issued for every land plot).

According to evidence produced by KTV, Becamex, the entity with whom KTV later entered into an April 20, 2012 lease for the land at issue here, did not obtain its land-use rights certificate until January 17, 2007. *Id.* (citing KTV's Supplemental Questionnaire Response (KTV Supp QR), Dec. 14, 2020, P.R. 417-418, C.R. 138-139 at 3-4, Apps. 2-3). Thus, Becamex's rights to the land it leased to KTV in 2012 attained legal significance only after Vietnam's January 11, 2007 WTO accession date, regardless of when Becamex and KTV-HK had agreed upon the lease terms. *Id.* Therefore, by law, Becamex could not lease land to KTV—and KTV's benefit from such lease did not begin—until January 17, 2007, when Becamex obtained its land-use rights certificate. *Id.* Regardless of when Becamex and KTV's parent agreed upon the terms of the lease, the commencement of the provision of goods for less than adequate remuneration through the KTV's land lease did not occur until after Vietnam's accession to the WTO. *Id.* On this basis alone Commerce was lawfully permitted to countervail this subsidy.

KTV contends that KTV's provision of land-use for less than adequate remuneration was obtained in the 2006 "in principle" agreement and was not limited by a land-use rights certificate. KTV Br. at 16. Puzzlingly, KTV asserts both that "Commerce failed to cite any relevant provision of Vietnamese law" to support its claim that Becamex could not lease land to KTV until it obtained its land-use certificate and also that "Commerce's interpretation of Vietnamese law is simply wrong." KTV Br. at 17. Contrary to KTV's assertions, Commerce cited relevant provisions of Vietnamese law to support its conclusion that Becamex by law could not lease land to KTV until January 17, 2007. IDM at 41 (citing Land Memorandum, P.R. 298 at 22 and *id.* at Attachment 2 (placing the Land Law on the record).

Turning to KTV's next argument, KTV invokes USCIT Rule 44.1, which provides that the interpretation of foreign law is a question of law to be determined by the Court and not a question of fact to be reviewed based on substantial evidence. KTV Br. at 17, n 46. KTV claims that the 2003 Vietnamese Law on Land establishes that Becamex could have leased land to KTV before obtaining its land use certificate that purportedly establishes that "Commerce's interpretation of Vietnamese law is wrong." KTV Br. at 19. KTV's argument, however, misapplies the appropriate standard of review because Commerce relied on Vietnamese law as relevant fact for its determination. Commerce regularly relies on foreign laws in support of its countervailing duty determinations because such information, particularly during investigations, routinely is placed on the agency record as factual information. *E.g., Certain New Pneumatic Off-the-Road Tires From the People's Republic of China*, 73 Fed. Reg. 40,480 (Dep't of Commerce July 7, 2008) (final affirm. countervailing duty determ.) (*OTR Tires from China*), and accompanying IDM at cmt. F.13 (explaining Commerce interprets foreign laws to be factual information within the meaning of 19 C.F.R. § 351.102(b)); *PRCBs from Vietnam*, 75 Fed. Reg. 16,428, and accompanying IDM at cmt. 9 (explaining Commerce's determination to rely on external benchmark information when valuing land-use rights in Vietnam); *Certain Frozen Warmwater Shrimp from Vietnam*, 78 Fed. Reg. 50,387, and accompanying IDM at cmt. 6 (explaining Commerce cannot rely on tier one benchmarks for its less than adequate remuneration analysis of Vietnam's land market).

As explained in *OTR Tires from China*, Commerce does not rely on foreign laws in countervailing duty proceedings "for the purpose of making legal arguments concerning U.S. law or international obligations, but rather for the purpose of determining relevant facts*." OTR Tires from China* 73 Fed. Reg. 40,480, and accompanying IDM at cmt. F.13. And this Court has also

recognized that "{t}he agency's determination on the record of the meaning and operation of foreign law is one of fact." *Rebar Trade Action Coal. v. United States*, No. 14-00268, 2016 WL 5122639, at *3 (Ct. Int'l Trade Sept. 21, 2016).

Thus, the question before the Court is whether Commerce's determination that the record, including Vietnamese laws on the record, demonstrated that Becamex did not obtain its land-use rights and thus ability to rent to KTV until after Vietnam's WTO accession is supported by substantial evidence. The true nature of KTV's assertion is that Commerce's conclusion that Becamex could not lease its land to KTV before it obtained its land use certificate is unsupported by the record. Ironically, to support its argument, KTV cites to different Vietnamese laws on Commerce's record, including an interpretation of such laws by a Vietnamese lawyer, to assert that Becamex was not prevented from leasing land to KTV before obtaining its land-use certificate. KTV's Br. at 18-21 (citing, for example, KTV's December 14, 2020 Supplemental Response, Appendix 5, P.R. 417-418, C.R. 138-140 and 2003 Law on Land, Article 4.20 (provided in Attachment 1 to Land Memorandum), PR-298-302). The proper standard of review is substantial evidence on the record or otherwise in accordance law. As detailed above, Commerce cited record evidence supporting its determination that Becamex could not lease land to KTV until it obtained its land-use certificate.

### C. Commerce Reasonably Determined That KTV's Lease Underwent Several Material Changes Since January 11, 2007

Contrary to KTV's assertions, KTV Br. at 6, the terms of KTV's 2012 land lease with Becamex were not materially the same as those of the 2006 "in principle" agreement with KTV's parent company. In its final determination, based on record evidence, Commerce identified three essential terms and conditions of KTV's 2006 land use in principle agreement that were not established until the 2012 agreement, after Vietnam's accession to the WTO on January 11,

2007.  Accordingly, Commerce determined that it was appropriate to countervail KTV's

preferential rent in accordance with its cut-off date practice involving Vietnam countervailing

duty proceedings.

Commerce typically relies on the date of the land-use contract or a later date if there are

*any* subsequent material changes to the contract to establish when land-use has commenced.

*E.g., Certain OTR Tires from China*, 73 Fed. Reg. 40,480, and accompanying IDM at cmt. H.2.;

*see also Wire Decking from the People's Republic of China*, 75 Fed. Reg. 32,902 (Dep't of

Commerce June 10, 2010) (final affirmative countervailing duty determination), and

accompanying IDM at cmt 14 ("We verified that *all* of the essential terms and conditions

associated with Eastfound Metal's land-use rights were established in the May 2000 agreement"

and "we are not countervailing any transactions whose essential terms and conditions are

established prior to the December 11, 2001 {People's Republic of China's WTO accession}, cut-

off date") (emphasis added)).  Accordingly, Commerce needs to find only that *one* of the

material terms of the 2006 in principle agreement changed in the 2012 agreement in order to

determine that KTV obtained the land-use rights after Vietnam's accession to the WTO so that it

can constitute a countervailable subsidy.

As explained in its decision memorandum, Commerce found that "one of the material

terms of the land lease (*i.e.*, the parties to the lease) was not established until KTV itself signed

the lease in 2012" where only KTV's parent company, a distinct entity, signed the 2006 "in

principle" agreement.  IDM at 41.  The Supreme Court has long recognized that the parties to an

agreement are an essential term to a valid agreement.  *McGee v. Mathis*, 71 U.S. 143, 154 (1866)

("All the elements of a contract met in the transaction, -competent parties, proper subject-matter,

sufficient consideration, and consent of minds.").  Thus, on this basis alone, the Court may hold

that Commerce's determination to rely on the 2012 contract as the date by which the land-use provision was established and therefore was countervailable is supported by substantial evidence.

KTV does not dispute that it did not exist when the 2006 agreement was negotiated and signed.  KTV Br. at 21.  Despite KTV's reliance on Vietnamese law, KTV Br. at 21-22, which KTV failed to cite in its administrative brief to demonstrate that Commerce should not countervail KTV's preferential rent, Commerce reasonably determined based on basic principles of U.S. contract law that where the parties to the agreement were not established until KTV signed the agreement, a material term to the agreement was not yet established.  *McGee*, 71 U.S. at 154.  Further, the possibility of drawing inconsistent conclusions from evidence upon the record does not render Commerce's findings unsupported by substantial evidence.  *Consolo*, 383 U.S. at 620.

Commerce further explained in a business proprietary memorandum that additional essential terms and conditions of KTV's land use agreement were not established prior to January 11, 2007.  KTV Analysis Memorandum, May 25, 2021, P.R. 471, C.R. 190 at 2-3.  First, Commerce determined that the 2006 "in principle" agreement specified that ███████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████ *Id.* at 2.  However, ███████ ███████████████████████████████████████████████████████████ ████ pursuant to the terms of the agreement.  *Id.*  Further, the 2006 "in principle" agreement provided that if [██████████████████████████████████████████ ██████████████████████████████████ *Id.*  When the [██████████] was agreed upon in the 2012 land lease agreement [██████████████████████████ ██████████] in the 2006 "in principle" agreement.  *Id.*  Thus, Commerce determined this to be

additional material changes to the terms between the 2006 "in principle" agreement and the 2012 land lease agreement. *Id.*

KTV contends that Commerce improperly interpreted that the 2012 Lease Agreement did not address [████████████████████] and that it represented a material change in the terms between the 2006 "in principle" agreement and the 2012 land lease agreement. *Id.* at 12. KTV cites to U.S. contract law and Vietnamese civil law[5] to assert that a grant may be extended if a lessee is late in paying agreed upon rent, that a party may waive a breach of an agreement, and "a failure of one party to comply with the terms of an agreement does not constitute the negotiation of a new agreement." But Commerce's interpretation is not "by law" incorrect. KTV Br. at 12. Commerce examined the two distinct agreements and determined that one provision in the 2006 agreement, *i.e.*, [████████████████████████████████ ████████████████████] was not addressed in the 2012 agreement. A reasonable mind could thus conclude that the lack of inclusion of such provision was a material change in the terms of the 2006 to the 2012 agreement. *Consol. Edison Co.*, 305 U.S. at 229.

Also, contrary to KTV's position that the lack of reference to this issue in the 2012 agreement simply could have reflected a waiving of a breach of the 2006 agreement or an extension granted by Becamex, KTV Br. at 11-12, the 2012 agreement does not state that Becamex was waiving [██████████████████████████] or that Becamex otherwise [████████████████████████]. KTV does not to cite to anything in the 2012 agreement supporting its point.

---

[5] KTV includes an excerpt of Vietnamese civil code as an attachment to its brief to support its assertion that "a party to a contract is never required to respond to a breach of contract by terminating the agreement and negotiating a new one." KTV Br. at n 30, Attachment 1. However, this information is located on the record of this segment of the proceeding. Commerce Financial Sector Memorandum pt. 47, P.R. 356 at 258, and pt. 48, P.R. 357 at 50-51.

Finally, Commerce identified a material change through the addition of a new provision in the 2012 land lease agreement that was not present in the 2006 "in principle" agreement. *Id.* at 2-3. This provision specified that Becamex █████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████ *Id.* at 3. Consequently, Commerce concluded these further represent material changes between the 2006 "in principle" agreement and the 2012 land lease agreement such that KTV's land use rights may constitute a countervailable subsidy. *Id.* Thus, Commerce reasonably determined this change to be related to KTV's land-use rights as the [█████████████████████████████████████].

## CONCLUSION

For these reasons, we respectfully request that the Court deny KTV's motion for judgment on the agency record and sustain Commerce's final determination.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

/s/ Patricia M. McCarthy
PATRICIA M. MCCARTHY
Director

46

OF COUNSEL:         /s/ Elizabeth Anne Speck
RACHEL BOGDAN        ELIZABETH ANNE SPECK
Attorney           Trial Attorney
Department of Commerce     Department of Justice
Office of the Chief Counsel     Commercial Litigation Branch
 for Trade Enforcement & Compliance P.O. Box 480
            Ben Franklin Station
            Washington, D.C. 20044
            Tel: (202) 307-0369
            Fax: (202) 307-0972
            Email: Elizabeth.speck@usdoj.gov


March 21, 2022        Attorneys for Defendant

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that this brief complies with the appropriate word-count limitation. According to the word-count function of the software used to prepare this brief, the brief contains 13,817 words.

<u>s/ Elizabeth Anne Speck</u>
Elizabeth Anne Speck