**UNITED STATES COURT OF INTERNATIONAL TRADE**
**Before the Honorable Timothy M. Reif, Judge**

| | |
|---|---|
| _____ )  | |
| KUMHO TIRE (VIETNAM) CO., LTD., ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| *v.* ) | |
| ) | |
| UNITED STATES, ) | **PUBLIC VERSION** |
| ) | |
| *Defendant,* ) | Court No. 21-00397 |
| ) | |
| *and* ) | Business Proprietary Information |
| ) | Removed from Pages 16-22 |
| UNITED STEEL, PAPER AND ) | |
| FORESTRY, RUBBER, ) | |
| MANUFACTURING, ENERGY, ALLIED ) | |
| INDUSTRIAL AND SERVICE WORKERS ) | |
| INTERNATIONAL UNION AFL-CIO, ) | |
| CLC, ) | |
| ) | |
| *Defendant-Intervenor.* ) | |
| _____ ) | |

**DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Roger B. Schagrin
Elizabeth J. Drake
Saad Y. Chalchal*
SCHAGRIN ASSOCIATES
900 Seventh St. N.W. Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel for United Steel, Paper and
Forestry, Rubber, Manufacturing, Energy,
Allied Industrial and Service Workers
International Union AFL-CIO, CLC*

Date:  March 28, 2022

*Only admitted in New York and New
Jersey. Practice limited to matters before
federal courts and agencies.

Public Version

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

STATEMENT PURSUANT TO RULE 56.2 ............................................................................2

   I.  Administrative Determination Under Review ...................................................................2

   II.  Issues Presented for Review ...........................................................................................3

STATEMENT OF FACTS ......................................................................................................3

ARGUMENT ..........................................................................................................................9

   I.  Standard of Review ........................................................................................................9

   II.  Commerce's Decision to Countervail Land-Use Rights Provided to KTV at a Preferential Rental Rate Is Supported By Substantial Evidence and Otherwise in Accordance With Law ....................................................................................................11

      A.  Legal Framework for Countervailing Land-Use Arrangements in Proceedings Involving Vietnam ................................................................................................12

      B.  Commerce Correctly Found that Becamex Was Not Legally Entitled to Lease the Land to a Third Party Until Becamex's Land-Use Rights Certificate Was Issued on January 17, 2007 ..............................................................................................14

      C.  Commerce Reasonably Concluded that the 2012 Lease Agreement Materially Altered the Essential Terms and Conditions of KTV's Land-Use Rights ..................17

   III.  Commerce Lawfully Countervailed the GOV's Undervaluation of the Vietnamese Dong Vis-à-vis the U.S. Dollar ....................................................................................22

      A.  Legal Framework for Countervailing Currency Undervaluation ................................23

      B.  Commerce Has the Statutory Authority to Countervail the Exchange of Undervalued Currency Where the Three Elements of a Countervailable Subsidy Exist ......................................................................................................................25

      C.  The Court Should Reject KTV's Unexhausted Argument that Commerce "Outsourced" its Currency Undervaluation Determination to Treasury ....................32

      D.  Commerce's Finding that the Vietnamese Dong Was Undervalued During the POI Is Supported by Substantial Evidence ........................................................................35

      E.  Commerce Properly Found that Each Element of a Countervailable Subsidy Exists ......................................................................................................................40

1. The Exchange of U.S. Dollars for Vietnamese Dong Constitutes a Financial Contribution ................................................................................40

2. The Currency Undervaluation Subsidy Is *De Facto* Specific to the Traded Goods Sector ................................................................................42

3. The Benefit Is the Extra Vietnamese Dong Received Because of the Currency Undervaluation ................................................................................44

CONCLUSION ................................................................................46

# TABLE OF AUTHORITIES

**Cases**

*Altx, Inc. v. United States*,
  370 F.3d 1108 (Fed. Cir. 2004)....................................................................................10

*Apex Frozen Foods Private Ltd. v. United States*,
  862 F.3d 1322 (Fed. Cir. 2017)............................................................................. 23-24

*Bamberger v. Clark*,
  390 F.2d 485 (D.C. Cir. 1968)......................................................................................16

*Bellion Spirits v. United States*,
  393 F. Supp. 3d 5 (D.D.C. 2019)..................................................................................34

*Canadian Solar Inc. v. United States*,
  Ct. No. 18-00184, 2020 WL 898557 (Ct. Int'l Trade February 25, 2020) ........................ 44-45

*Ceramica Regiomontana, S.A. v. United States*,
  636 F. Supp. 961 (Ct. Int'l Trade 1986), *aff'd* 810 F.2d 1137 (Fed. Cir. 1987)........................38

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*,
  467 U.S. 837 (1984).........................................................................10-11, 23-24

*China First Pencil Co. v. United States*,
  427 F. Supp. 2d 1236 (Ct. Int'l Trade 2006) ...........................................................38

*Consolidated Edison Co. v. NLRB*,
  305 U.S. 197 (1938)......................................................................................10

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1996)......................................................................................10

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)......................................................................................31

*FCC v. Nat'l Citizens Committee for Broadcasting*,
  436 U.S. 775 (1978)......................................................................................38

*FCC v. NextWave Pers. Commc'ns, Inc.*,
  537 U.S. 293 (2003)......................................................................................10

*GPX Int'l Tire Corp. v. United States*,
  645 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) ...........................................................13

**Public Version**

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ..........................................................................................37

*Holder v. Martinez Gutierrez,*
  566 U.S. 583 (2012) ..........................................................................................29

*Huvis Corp. v. United States,*
  570 F.3d 1347 (Fed. Cir. 2009)..........................................................................31

*Huvis Corp. v. United States,*
  525 F. Supp. 2d 1370 (Ct. Int'l Trade 2007) ...........................................................10

*JBF RAK LLC v. United States,*
  790 F.3d 1358 (Fed. Cir. 2015)....................................................................33, 39

*Mitsubishi Heavy Indus., Ltd. v. United States,*
  275 F.3d 1056 (Fed. Cir. 2001)..........................................................................10

*Mortgage Investors Corp. of Ohio v. Gober,*
  220 F.3d 1375 (Fed. Cir. 2000)..........................................................................38

*Nat'l Organization of Veterans Advocates, Inc. v. Sec'y of Veterans Affairs,*
  809 F.3d 1359 (Fed. Cir. 2016)..........................................................................11

*Nippon Steel Corp. v. United States,*
  458 F.3d 1345 (Fed. Cir. 2006)..........................................................................10

*Nuove Industrie Elettriche di Legnano S.p.A. v. United States,*
  739 F. Supp. 1567 (Ct. Int'l Trade 1990) ...............................................................16

*SKF USA Inc. v. United States,*
  254 F.3d 1022 (Fed. Cir. 2001)..........................................................................24

*Solarworld Americas, Inc. v. United States,*
  182 F. Supp. 3d 1372 (Ct. Int'l Trade 2016) ...................................................... 39-40

*Timken Co. v. United States,*
  354 F.3d 1334 (Fed. Cir. 2004)..........................................................................11

*TMK IPSCO v. United States,*
  179 F. Supp. 3d 1328 (Ct. Int'l Trade 2016) ...........................................................13

*Torrington v. United States,*
  68 F.3d 1347 (Fed. Cir. 1995)............................................................................37

**Public Version**

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ..................................................................................................11

*United States v. Hammond Lead Prods. Inc.*,
    440 F.2d 1024 (CCPA 1971) .............................................................................. 25-26

*U.S. Telecom Ass'n v. Federal Comm'ns Commission*,
    359 F.3d 554 (D.C. Cir. 2017) ..................................................................................34

*Weishan Hongda Aquatic Food Co. v. United States*,
    273 F. Supp. 3d 1279 (Ct. Int'l Trade 2017), *aff'd* 917 F.3d 1353 (Fed. Cir. 2019) ................33

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................................... 9-10

19 U.S.C. § 1671(f)(1) ..............................................................................................12

19 U.S.C. § 1671(f)(2) ..............................................................................................12

19 U.S.C. § 1677(5)(A) ....................................................................................... 12, 23

19 U.S.C. § 1677(5)(B) .......................................................................................12, 23

19 U.S.C. § 1677(5)(D) ...................................................................................5, 12, 23

19 U.S.C. § 1677(5)(D)(i) ..................................................................................40, 42

19 U.S.C. § 1677(5)(E) ...............................................................................................5

19 U.S.C. § 1677(5A) ..........................................................................................12, 23

19 U.S.C. § 1677(5A)(D) .............................................................................................3

19 U.S.C. § 1677(5A)(D)(iii)(II) ..........................................................................5, 42

19 U.S.C. § 1677(6) ...................................................................................................44

19 U.S.C. § 3512(d) ..................................................................................................29

28 U.S.C. § 2637(d) ..................................................................................................32

**Regulations**

19 C.F.R. § 351.301(a) ..............................................................................................37

Public Version

19 C.F.R. § 351.309(c) ................................................................................................. 32-33

19 C.F.R. § 351.502(c) ..................................................................................................3, 5

19 C.F.R. § 351.528 ....................................................................................................4, 5, 35

19 C.F.R. § 351.528(c) ..................................................................................................6, 36

**Administrative Determinations**

*Aluminum Extrusions from the People's Republic of China,*
    76 Fed. Reg. 18,521 (Dep't Commerce April 4, 2011) ...........................................30

*Carbon Steel Wire Rod from Poland,*
    49 Fed. Reg. 19,374 (Dep't Commerce May 7, 1984) ...........................................28

*Carbon Steel Wire Rod from Poland,*
    49 Fed. Reg. 6,768 (Dep't Commerce February 23, 1984) ........................... 28-29, 45

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China,*
    75 Fed. Reg. 59,213 (Dep't Commerce September 27, 2010)............................... 30-31

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China,*
    73 Fed. Reg. 40,480 (Dep't Commerce July 15, 2008) ...........................................13

*Certain Steel Wire Garment Hangers from the Socialist Republic of Vietnam,*
    77 Fed. Reg. 75,973 (Dep't Commerce December 26, 2012) ........................... 12-13

*Lamb Meat from New Zealand,*
    47 Fed. Reg. 1,316 (Dep't Commerce January 12, 1982) ......................................27

*Lamb Meat from New Zealand,*
    46 Fed. Reg. 58,128 (Dep't Commerce November 30, 1981)........................27, 29, 45

*Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam,*
    86 Fed. Reg. 38,013 (Dep't Commerce July 19, 2021) ...................................... 2-3, 9

*Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam,*
    86 Fed. Reg. 28,566 (Dep't Commerce May 27, 2021) ...........................................2

*Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam,*
    85 Fed. Reg. 71,607 (Dep't Commerce November 10, 2020)......................................7

*Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam,*
    85 Fed. Reg. 38,850 (Dep't Commerce June 29, 2020) ...........................................5

Public Version

*Phosphate Fertilizers from the Russian Federation*,
  86 Fed. Reg. 9,479 (Dep't Commerce February 16, 2021) ......................................................13

*Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam*,
  75 Fed. Reg. 16,428 (Dep't Commerce April 1, 2010) ................................................. 11-13, 22

*Pork Rind Pellets from Mexico*,
  48 Fed. Reg. 39,105 (Dep't Commerce August 29, 1983) ........................................... 27-29, 45

**Other Authorities**

*Antidumping Duties; Countervailing Duties*,
  62 Fed. Reg. 27,296 (Dep't Commerce May 19, 1997) ...........................................................37

*Countervailing Duties*,
  63 Fed. Reg. 65,348 (Dep't Commerce November 25, 1998)...................................................45

*Modification of Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings*,
  85 Fed. Reg. 6,031 (Dep't Commerce February 4, 2020) ................................................. *passim*

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act,
  H.R. Rep. No. 103-316, vol. 1 (1994)...................................................................................29, 40

Trade Facilitation and Trade Enforcement Act of 2015,
  Pub. L. No. 114-125, 130 Stat. 122 (2016)......................................................................... 31-32

Trade Preferences Extension Act of 2015,
  Pub. L. No. 114-27, 129 Stat. 362 (2015)................................................................................31

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**Before the Honorable Timothy M. Reif, Judge**

|  |  |  |
|---|---|---|
| KUMHO TIRE (VIETNAM) CO., LTD., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| UNITED STATES, | ) | **PUBLIC VERSION** |
| | ) | |
| *Defendant,* | ) | Court No. 21-00397 |
| | ) | |
| *and* | ) | Business Proprietary Information |
| | ) | Removed from Pages 16-22 |
| UNITED STEEL, PAPER AND | ) | |
| FORESTRY, RUBBER, | ) | |
| MANUFACTURING, ENERGY, ALLIED | ) | |
| INDUSTRIAL AND SERVICE WORKERS | ) | |
| INTERNATIONAL UNION AFL-CIO, | ) | |
| CLC, | ) | |
| | ) | |
| *Defendant-Intervenor.* | ) | |

**DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Defendant-Intervenor United Steel, Paper and Forestry, Rubber, Manufacturing, Energy,

Allied Industrial and Service Workers International Union AFL-CIO, CLC ("USW") respectfully

submits this response in opposition to the motion for judgment on the agency record filed by

Plaintiff Kumho Tire (Vietnam) Co., Ltd. ("KTV") in the above-captioned action. KTV contests

two aspects of the U.S. Department of Commerce's ("Commerce") final determination in the

countervailing duty ("CVD") investigation of passenger vehicle and light truck ("PVLT") tires

from the Socialist Republic of Vietnam ("Vietnam").[1]  Specifically, KTV challenges:

---

[1]     The brief accompanying KTV's motion is hereinafter referred to as "KTV Br." (ECF
Nos. 30-1 and 31-1).

(1) Commerce's decision to countervail KTV's land-use rights for its head office and tire production facility, which KTV acquired through a lease agreement with a state-owned land-development company (KTV Br. 5-23); and (2) Commerce's decision to countervail the exchange of U.S. dollars for Vietnamese dong based on an exchange rate tightly controlled by the State Bank of Vietnam that undervalued the Vietnamese dong vis-à-vis the U.S. dollar, resulting in the direct transfer of more Vietnamese dong in exchange for each U.S. dollar converted because of the undervaluation. *Id.* at 23-42. The USW fully supports Commerce's decisions on these issues and requests the Court to sustain the final determination.[2]  As explained below, the Court should deny KTV's motion for judgment on the agency record because it has failed to demonstrate that Commerce's final determination is unsupported by substantial evidence or otherwise not in accordance with law.

## STATEMENT PURSUANT TO RULE 56.2

### I.    Administrative Determination Under Review

The administrative determination under review is Commerce's final determination in the CVD investigation of PVLT tires from Vietnam, after which Commerce issued a CVD order. *Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam*, 86 Fed. Reg. 28,566 (Dep't Commerce May 27, 2021) (P.D. 476) ("*Final Determination*"), and accompanying Issues and Decision Memorandum (P.D. 468) ("IDM"); *see also Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam*, 86 Fed. Reg. 38,013 (Dep't Commerce July

---

[2]    Unless expressed otherwise, the USW hereby incorporates by reference and endorses the Government's response to KTV's motion for judgment on the agency record, hereinafter referred to as "Gov't Resp. Br." (ECF Nos. 36 and 37).

19, 2021) (P.D. 487) ("*CVD Order*").[3]  The period of investigation ("POI") is January 1, 2019 through December 31, 2019.

## II.     Issues Presented For Review

1.       Whether Commerce's decision to countervail KTV's lease for the government-provided land on which KTV's head office and tire production facility are located is supported by substantial evidence and in accordance with law, where the record demonstrates that all essential terms and conditions were finally established after January 11, 2007 (*i.e.*, Commerce's "cut-off" date from which it identifies and measures countervailable subsidies in Vietnam).

2.       Whether Commerce's decision to countervail the exchange of U.S. dollars for undervalued Vietnamese dong is supported by substantial evidence and in accordance with law, where the record demonstrates the existence of a financial contribution that conferred a benefit and the subsidy was specific to a discrete group of enterprises.

## STATEMENT OF FACTS

On February 4, 2020, Commerce published a final rule in the *Federal Register* to fill a gap in the CVD law. *Modification of Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings*, 85 Fed. Reg. 6,031 (Dep't Commerce February 4, 2020) ("*Currency Final Rule*"). The notice-and-comment rulemaking resulted in two modifications to Commerce's CVD regulations. The first change added new paragraph (c) under 19 C.F.R. § 351.502 to clarify that "enterprises that buy or sell goods internationally (*i.e.*, enterprises in the traded goods sector of an economy)" comprise a "group" of enterprises for purposes of analyzing whether the specificity requirement of a countervailable subsidy under 19 U.S.C. § 1677(5A)(D)

---

[3]       Citations to the public documents from the administrative record are designated as "P.D." and citations to confidential documents containing business proprietary information from the administrative record are designated as "C.D."

is met. *Id.* at 6,031. The second change added new section 351.528 to provide guidance on Commerce's methodology for determining "undervaluation and benefit when examining a potential subsidy resulting from the exchange of an undervalued currency." *Id.* These modifications went into effect on April 6, 2020. *Id.*

On May 13, 2020, the USW filed a CVD petition regarding imports of PVLT tires from Vietnam and alleged the existence of several countervailable subsidy programs. Petition: Volume VI, P.D. 9 (May 13, 2020). Relevant to this litigation, the USW alleged that the Government of Vietnam ("GOV") provides a countervailable subsidy by fixing an exchange rate that undervalues the Vietnamese dong vis-à-vis the U.S. dollar. *Id.* at 38-59. The petition included assessments from the Department of Treasury ("Treasury"), the International Monetary Fund ("IMF"), the World Bank, and independent analysts concurring that the GOV has intervened in the exchange market for many years to undervalue the dong, particularly against the U.S. dollar. *Id*. at 38-50 and Exs. VI-46, VI-47, VI-48, and VI-58–VI-70, P.D. 15–17. Treasury, the IMF, and the World Bank explained that the GOV operates a crawling peg system to tightly manage the exchange rate, and these active interventions, in the words of the World Bank, are "aimed at helping exports …." *Id*. at 41-43. All Authorized Credit Institutions in the country are required by law to exchange Vietnamese dong for U.S. dollars within a tight band of the daily rate established by the State Bank of Vietnam. *Id*. at 42-46. The IMF calculated the Vietnamese dong was undervalued by 8.4 percent in 2018. *Id*. at 46 and Ex. VI-46. In May of 2019, Treasury added Vietnam to its currency monitoring list for the first time, estimating the dong was undervalued by 7 percent in 2018. *Id*. at 47 and Ex. VI-67. In January 2020, Treasury again included Vietnam in its monitoring list due to continued undervaluation in the last half of 2018 and the first half of 2019. *Id*. at 49 and Ex. VI-47. Independent analysts agreed that the GOV was

intervening in exchange markets in 2019 to "preserve Vietnam's export competitiveness." *Id*. at 46-47 and Ex. VI-62. The U.S. trade deficit with Vietnam hit an all-time high of $55.4 billion in 2019. *Id*. at 40-41 and Ex. VI-44.

The petition alleged all the necessary elements to warrant initiating an investigation into the undervaluation of the Vietnamese dong as a countervailable subsidy. First, the petition alleged that the receipt of Vietnamese dong in exchange for U.S. dollars from state-owned banks or private banks entrusted or directed to exchange currency at a rate controlled by the GOV is a direct transfer of funds and thus constitutes a financial contribution under 19 U.S.C. § 1677(5)(D). *Id.* at 50-54. Second, the petition alleged that the exchange of U.S. dollars for undervalued Vietnamese dong is *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(II) and 19 C.F.R. § 351.502(c) because enterprises that buy or sell goods internationally are the predominant users of the subsidy. *Id.* at 54-56. Lastly, the petition alleged that the currency undervaluation subsidy conferred a benefit under 19 U.S.C. § 1677(5)(E) and 19 C.F.R. § 351.528 because action by the GOV on the exchange rate undervalued the Vietnamese dong during the POI and, as a result, Vietnamese exporters of PVLT tires received more Vietnamese dong from state-owned banks (and private banks entrusted and directed by the GOV) than they otherwise would have received absent the domestic currency's undervaluation. *Id.* at 56-59.

On June 22, 2020, Commerce found that the allegations contained in the petition for each subsidy program (including the currency undervaluation subsidy program) were sufficient and initiated a CVD investigation. *Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam*, 85 Fed. Reg. 38,850 (Dep't Commerce June 29, 2020) (P.D. 92); *see also* Initiation Checklist, P.D. 91 (June 24, 2020). Commerce selected KTV and Sailun (Vietnam) Co., Ltd. ("Sailun") for individual examination as mandatory respondents and issued an initial

questionnaire requesting information on the two mandatory respondents and their use of subsidy programs. Initial Questionnaire, P.D. 98 and 99 (July 8, 2020). From July through October 2020, Commerce made additional requests for information and received responses from the GOV and the mandatory respondents.

In response to Commerce's request to report any other forms of assistance provided by the GOV, KTV reported, among other things, that it acquired land-use rights for its head office and tire production facility from a [          ] land developer in Vietnam—Becamex IDC Corporation ("Becamex"). KTV Initial Questionnaire Response at 34-36, P.D. 160 and C.D. 33 (August 24, 2020) ("KTV IQR"); KTV Response to October 13, 2020 Supplemental Questionnaire at 2-3, P.D. 284 and C.D. 121 (October 19, 2020) ("KTV Oct. 19 SQR"); KTV Response to November 23, 2020 Supplemental Questionnaire at 2-6, P.D. 418 and C.D. 139 (December 14, 2020) ("KTV Dec. 14 SQR"); KTV Response to January 21, 2021 Supplemental Questionnaire at 2-6, P.D. 434 and C.D. 171 (February 4, 2021) ("KTV Feb. 4 SQR"). KTV submitted documentation relating to its land-use rights, including a copy of KTV's land-use rights certificate (dated October 26, 2012), a copy of KTV's lease agreement with Becamex (dated April 20, 2012), a copy of Becamex's land-use rights certificate (dated January 17, 2007), and a copy of an "in-principle" agreement between KTV's parent company and Becamex that was executed before KTV's existence and that purportedly established the terms and conditions for the land-use rights conveyed to KTV in the 2012 lease agreement (dated April 28, 2006). KTV IQR at Appendix 13-B and Appendix 13-C; KTV Dec. 14 SQR at 2-6, Appendix 1, and Appendix 3.

Additionally, in accordance with 19 C.F.R. § 351.528(c), Commerce issued a letter to Treasury requesting its evaluation and conclusion regarding the Vietnamese dong's valuation.

Letter from Commerce to Treasury, P.D. 101 (July 8, 2020). Treasury responded, concluding

that "the Vietnamese dong was undervalued during the relevant period" as a result of

government action on the exchange rate because "the Vietnamese government—through the

State Bank of Vietnam—undertook net purchases of foreign exchange in 2019 totaling about $22

billion" and these purchases of foreign exchange "had the effect of undervaluing the dong vis-à-

vis the U.S. dollar by 4.7 percent." Letter from Treasury to Commerce, P.D. 165 (August 24,

2020) ("Treasury Report"). Treasury assessed the Vietnamese dong's valuation using its Global

Exchange Rate Assessment Framework ("GERAF")—a multilaterally consistent method for

assessing the extent of any currency misalignment and whether government policies contribute to

the misalignment—and Treasury's response included materials explaining how GERAF was

applied along with the calculations to support its conclusions. *Id.*

After reviewing Treasury's response, Commerce issued a follow-up request asking

Treasury to clarify and provide additional explanation for certain aspects of its report. Treasury

Supplemental Questionnaire, P.D. 215 (September 17, 2020). Treasury responded to all of

Commerce's questions. Treasury SQR, P.D. 227 (September 24, 2020). Thereafter, Commerce

provided interested parties an opportunity to submit new factual information to rebut, clarify, or

correct the information contained in Treasury's responses to Commerce's requests. Factual

Information Deadline, P.D. 186 (August 26, 2020).

On November 10, 2020, Commerce published its affirmative preliminary determination,

which included the two subsidy programs at issue in this action in the preliminary net subsidy

rates. *Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam*, 85 Fed.

Reg. 71,607, 71,608-09 (Dep't Commerce November 10, 2020) (P.D. 399) ("*Preliminary*

*Determination*"), and accompanying Preliminary Decision Memorandum (P.D. 296) ("PDM").

7

**Public Version**

Commerce preliminarily countervailed KTV's preferential rent for the land leased [

]. PDM at 25-27; *see also* KTV Preliminary Calculation Memorandum at 2, P.D. 393

and C.D. 130 (October 30, 2020). Commerce also preliminarily countervailed KTV's exchanges

of U.S. dollars for Vietnamese dong involving Vietnam's state-owned banks (*i.e.*, Vietinbank

and Vietcombank) and private banks (Authorized Credit Institutions) entrusted and directed by

the GOV to apply the government-controlled exchange rate. PDM at 20-25. Specifically,

Commerce preliminarily found that: (1) the Vietnamese dong received in the exchange of U.S.

dollars constitutes a financial contribution in the form of a direct transfer of funds; (2) such

exchanges of currency are *de facto* specific because the traded goods sector is the predominant

user of the currency subsidy as this group of enterprises that buys or sells goods internationally

accounts for 71.94 percent of U.S. dollar inflows to Vietnam; and (3) Treasury's report

supported the conclusion that the Vietnamese dong was undervalued by 4.7 percent as a result of

GOV action on the exchange rate and the undervaluation resulted in Vietnamese banks providing

more Vietnamese dong for each U.S. dollar converted than would otherwise be the case.

On May 27, 2021, after considering interested parties' administrative case and rebuttal

briefs, Commerce published its affirmative final determination. *Final Determination*, 86 Fed.

Reg. at 28,566. Commerce continued to countervail the two subsidy programs at issue in this

action. Commerce disagreed with KTV's claim that the essential terms and conditions of its

land-use arrangement with Becamex were established prior to January 11, 2007, *i.e.*, the date

Vietnam acceded to the World Trade Organization ("WTO") and the date from which Commerce

identifies and measures countervailable subsidies in proceedings involving Vietnam. IDM at 41-

42. Commerce explained that, although the 2006 Agreement-In-Principle between KTV's parent

company and Becamex was executed prior to the "cut-off" date, the record supported

countervailing KTV's land-use rights because Becamex was only vested with the authority to

lease the land after the cut-off date, when it received its land-use rights certificate on January 17,

2007, and, as further explained in a proprietary memorandum accompanying the final

determination, a comparison of the 2006 Agreement-In-Principle with the 2012 lease agreement

showed that material changes were made to the essential terms and conditions of the land-use

arrangement. *Id.*; KTV Final Analysis Memorandum at 2-3, P.D. 471 and C.D. 190 (May 21,

2021). Commerce determined that KTV received a countervailable subsidy at a rate of 5.16

percent for the land it leased from Becamex. IDM at 4. Further, Commerce rejected claims made

by respondent interested parties (including KTV) that Commerce lacked the statutory authority

to countervail currency undervaluation or promulgate the *Currency Final Rule*, or that the

exchange of U.S. dollars for Vietnamese dong does not constitute a countervailable subsidy.

IDM at 5-29. Commerce determined that KTV received a countervailable subsidy at a rate of

1.69 percent based on its exchanges of U.S. dollars for undervalued Vietnamese dong during the

POI. *Id.* at 4.

On July 19, 2021, following the International Trade Commission's affirmative final

material injury determination, Commerce published a CVD order establishing *ad valorem* net

countervailable subsidy rates of 7.89 percent for KTV and 6.23 percent for Sailun, from which

Commerce established an "all others" rate of 6.46 percent. *CVD Order*, 86 Fed. Reg. at 38,014.

KTV subsequently filed this action to contest Commerce's final determination.

## ARGUMENT

### I.    Standard of Review

The standard of review requires that the Court sustain any determination, finding, or

conclusion by Commerce unless it is "unsupported by substantial evidence on the record, or

otherwise not in accordance with law" 19 U.S.C. § 1516a(b)(1)(B)(i). The substantial evidence standard requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence is "more than a mere scintilla," but "less than the weight of the evidence." *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004). The substantial evidence standard requires the Court to assess whether the administrative determination under review is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Importantly, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1996). A party challenging an agency determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001).

Commerce's determination is in accordance with law if it has met all constitutional, statutory, regulatory, and procedural requirements. *Huvis Corp. v. United States*, 525 F. Supp. 2d 1370, 1374 (Ct. Int'l Trade 2007) (citing *FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 300 (2003)). When determining whether Commerce's interpretation and application of the statute is in accordance with law, the Court applies the two-step analysis established in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). The Court first examines "whether Commerce has directly spoken to the precise question at issue," and, if it has, the agency must comply with Congress's clear intent. *Id.* at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. The agency's statutory construction need not be the only permissible one, or even one the Court would have reached if

the issue initially had arisen in a judicial proceeding. *Id.* Rather, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009). Where Congress has explicitly left a gap for the agency to fill, there has been an "express delegation of authority to the agency to elucidate a specific provision of the statute by regulation" and the ensuing legislative rules "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44; *see also Nat'l Organization of Veterans Advocates, Inc. v. Sec'y of Veterans Affairs*, 809 F.3d 1359, 1364 (Fed. Cir. 2016).

## II.    Commerce's Decision to Countervail Land-Use Rights Provided to KTV at a Preferential Rental Rate Is Supported By Substantial Evidence and Otherwise in Accordance With Law

Commerce lawfully determined that KTV received a countervailable subsidy when the GOV, through Becamex, entered into a lease agreement with a preferential rental rate for KTV's head office and tire production facility. KTV contends that Commerce cannot countervail KTV's land-use rights because they were acquired when KTV's parent company entered into the Agreement-In-Principle with Becamex on April 28, 2006. Commerce acknowledged that, under its practice in CVD proceedings involving Vietnam, the date from which it identifies and measures subsidies is January 11, 2007. PDM at 5 (citing *Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam*, 75 Fed. Reg. 16,428 (Dep't Commerce April 1, 2010) ("*PRCBs from Vietnam*"), and accompanying IDM at Comment 3). However, Commerce reasonably concluded from the record that KTV acquired its land-use rights after the cut-off date. Commerce explained that Becamex was not vested with the authority to lease the land to a third

party until after the cut-off date, when Becamex was issued its land-use rights certificate on January 17, 2007. IDM at 41. Commerce did not stop its analysis here. Commerce also explained that a comparison of the 2006 Agreement-In-Principle and the 2012 Lease Agreement revealed multiple material changes. *Id.* at 41-42; KTV Final Analysis Memorandum at 2-3. Therefore, Commerce found that the date of the latter agreement is the date when all the essential terms and conditions of the land-use arrangement were established. KTV disagrees with Commerce's conclusions, but none of KTV's arguments demonstrate that Commerce's decision to countervail KTV's land-use rights is unsupported by substantial evidence or otherwise contrary to law.

### A.  Legal Framework for Countervailing Land-Use Arrangements in Proceedings Involving Vietnam

By statute, a subsidy is countervailable if the following elements are satisfied: (1) an "authority" (that is, a government or any public entity of a country) has provided, directly or indirectly, a financial contribution; (2) a benefit is thereby conferred on the recipient of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries. 19 U.S.C. § 1677(5)(A)-(B); *see also* 19 U.S.C. § 1677(5)(D), (5)(E), and (5A). The CVD law applies to non-market economies, such as Vietnam, and Commerce must impose a duty equal to the amount of countervailable subsidies. 19 U.S.C. § 1671(f)(1). The only exception to this requirement is when Commerce "is unable to identify and measure subsidies" provided, directly or indirectly, by an authority of the non-market economy country "because the economy of that country is essentially comprised of a single entity." *Id.* § 1671(f)(2). Commerce, through practice, has determined that the date from which it is able to identify and measure subsidies in Vietnam is January 11, 2007—*i.e.*, the date Vietnam became a member of the WTO. *PRCBs from Vietnam* IDM at Comment 3; *see also Certain Steel Wire Garment Hangers from the Socialist Republic of Vietnam*, 77 Fed. Reg.

75,973 (Dep't Commerce December 26, 2012) ("*Hangers from Vietnam*"), and accompanying IDM at 13. Commerce relied on the same cut-off date in the final determination underlying this action.[4]  PDM at 5; IDM at 41.

Further, Commerce's practice is to countervail a land-use arrangement if the essential terms and conditions were all established after the cut-off date, and it typically relies on the date of the land-use contract as the date on which such terms were established. *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 73 Fed. Reg. 40,480 (Dep't Commerce July 15, 2008), and accompanying IDM at 26. However, Commerce uses a later date for its subsidy analysis if there are any subsequent material changes to the land-use contract. *PRCBs from Vietnam* IDM at 24 (using the last date of a material change to the contract); *Hangers from China* IDM at 13 (using the date of the latest contract); *Phosphate Fertilizers from the Russian Federation*, 86 Fed. Reg. 9,479 (Dep't Commerce February 16, 2021), and accompanying IDM at 23-25 (examining whether mining rights have been materially altered after licenses were granted). The date on which the authority last alters the essential terms and conditions of the land-use rights is the date on which the financial contribution occurs, and thus the appropriate date for Commerce's analysis.

---

[4]      We note that this Court previously has questioned the reasonableness of Commerce's practice of applying a uniform cut-off date of December 11, 2001 in CVD proceedings involving the People's Republic of China. *TMK IPSCO v. United States*, 179 F. Supp. 3d 1328, 1343-44 (Ct. Int'l Trade 2016); *GPX Int'l Tire Corp. v. United States*, 645 F. Supp. 2d 1231, 1246-50 (Ct. Int'l Trade 2009). However, Commerce's practice of applying the uniform cut-off date of January 11, 2007 in proceedings involving Vietnam is not at issue in this action.

Public Version

**B.      Commerce Correctly Found that Becamex Was Not Legally Entitled to Lease the Land to a Third Party Until Becamex's Land-Use Rights Certificate Was Issued on January 17, 2007**

In a memorandum analyzing Vietnam's land market, Commerce reviewed Vietnam's land laws and explained that "{l}and-use rights in Vietnam are legally recognized by the issuance of land-use rights certificates." Vietnam's Land-Use Rights Memorandum at 22, P.D. 298 (October 30, 2020). Commerce also found that land-use rights certificates are issued "to land users who are eligible as prescribed by law" and "holding certification of one's land-use rights is necessary to transact the land …." *Id.* Thus, by law, a land user in Vietnam must hold a land-use rights certificate to lease the land to another party.

Although KTV's parent company and Becamex entered into the Agreement-In-Principle prior to the January 11, 2007 cut-off date, Becamex did not obtain its land-use rights certificate until January 17, 2017. IDM at 41 (citing KTV Dec. 14 SQR at 3-4 and Appendix 3). Commerce found that "Becamex, by law, could not lease land to KTV until January 17, 2007 – after Vietnam's accession to the WTO on January 11, 2007." IDM at 41. The essential terms and conditions of any conveyance of land-use rights simply could not have been established until Becamex held a land-use rights certificate. Therefore, Commerce did not consider it appropriate to use any date prior to the date Becamex obtained its land-use rights certificate and reasonably determined that "the provision of KTV's land did not occur until after Vietnam's accession to the WTO, regardless of when Becamex and KTV's parent agreed upon the terms of the lease." *Id.*

KTV attempts to downplay the importance of land-use rights certificates and argues that Commerce's interpretation of Vietnamese law is wrong. KTV Br. 16-21. KTV's position, however, is belied by the record and its proffered interpretation of Vietnamese law should be rejected. In support of its decision, Commerce quoted and cited to its memorandum on

Public Version

Vietnam's land market, and the findings in that memorandum are drawn directly from attachments containing various provisions of Vietnamese law. Commerce found that, according to Vietnamese law, "{l}and-use rights in Vietnam are legally recognized by the issuance of land-use rights certificates" and "holding certification of one's land-use rights is necessary to transact the land." Vietnam's Land-Use Rights Memorandum at 22. The Government's brief identifies specific provisions in the 2013 version of the *Land Law of the Socialist Republic of Vietnam* that support Commerce's finding. Gov't Resp. Br. 39. In addition, Article 188 within Chapter 11 (entitled "Rights and Obligations of Land Users") of Vietnam's land law plainly states that "{l}and users may exercise the rights to exchange, transfer, lease, sublease, inherit, donate or mortgage land use rights and contribute land use rights as capital" when the four conditions enumerated in Clause 1 are met, the first of which requires "{h}aving the certificate."[5] Vietnam's Land-Use Rights Memorandum at PDF p. 316. Article 168 similarly provides that "{l}and users may exercise the rights to transfer, lease, sublease, donate and mortgage land use rights and to contribute land use rights as capital *upon receipt of a certificate*." *Id.* at PDF p. 310 (emphasis added).

KTV's expedient reading of Vietnam's land law and civil code does not identify any error in Commerce's reasoning. KTV Br. 18-20. If anything, KTV has shown that Becamex may have had the right to *use* the land—not *lease* the land to different entity—when it did not hold a land-use rights certificate. There is no genuine issue with respect to when a land user is legally

---

[5]     Article 106 in the 2003 version of Vietnam's land law, the law in effect at the time of the 2006 Agreement-In-Principle, also requires a land user to obtain a land-use certificate as a condition to any transfer of land-use rights. Vietnam's Land-Use Rights Memorandum at PDF p. 95.

Public Version

entitled to lease land under Vietnamese law.[6] Article 188 of Vietnam's land law unequivocally

supports Commerce's understanding that a land user must hold a land-use rights certificate, in

addition to certain other enumerated conditions, before land-use rights can be legally transferred

to another party. Thus, Commerce correctly found that Becamex was not legally entitled to lease

the land (and neither KTV's parent nor KTV itself could have obtained the land-use rights) until

after the cut-off date, when Becamex obtained its land-use rights certificate on January 17, 2007.

      KTV suggests that Commerce's finding that Becamex needed a land-use rights certificate

is somehow inconsistent with Commerce's finding that Becamex is a governmental authority,

KTV Br. 20-21, but Vietnam's land law does not provide any exception for state-owned land

users, and they too must satisfy the prescribed conditions to transact land. KTV has not shown

otherwise. KTV also relies on Becamex's representations in the 2006 Agreement-In-Principle

that it [                                                                                                                    ],

---

[6]     KTV invokes USCIT Rule 44.1 and states that "the interpretation of foreign law is a question of law to be determined by the Court, and not a question of fact to be reviewed based on substantial evidence before the agency." KTV Br. 17 n.46. As the Government explains, the substantial evidence standard of review still applies because Commerce considers foreign law placed on the administrative record as factual information and this Court has agreed that Commerce makes factual determinations concerning the meaning and operation of foreign law. Gov't Resp. Br. 41-42.

    Even if the Court were to treat the question of whether a land user can transact land *before* obtaining a land-use rights certificate as an issue of law, deference to Commerce's determination is appropriate because Commerce considered Vietnamese law for purposes of administering the CVD law. *Bamberger v. Clark*, 390 F.2d 485, 488 (D.C. Cir. 1968) (agency deference on a question of foreign law has "broadest scope when the legal question is one involving the meaning of a statute continually applied and interpreted by the executive branch."); *see also Nuove Industrie Elettriche di Legnano S.p.A. v. United States*, 739 F. Supp. 1567, 1571-74 (Ct. Int'l Trade 1990). In other words, the question before Commerce was precisely when KTV received a financial contribution and Commerce answered this question by considering all evidence on the record (including relevant provisions of Vietnamese law) to identify the date that all essential terms and conditions of the land-use arrangement were finally established.

but Becamex's representations cannot overcome Vietnam's land law that says a land user is only

entitled to lease land if it holds a land-use rights certificate.

### C.    Commerce Reasonably Concluded that the 2012 Lease Agreement Materially Altered the Essential Terms and Conditions of KTV's Land-Use Rights

Commerce could have stopped its analysis upon finding that Becamex could not lease the

land until after the cut-off date because its land-use rights certificate was issued on January 17,

2007. Instead, Commerce further bolstered its decision to countervail KTV's land-use rights by

explaining that the 2012 Lease Agreement materially altered the essential terms and conditions

of the land-use arrangement. IDM at 41-42; KTV Final Analysis Memorandum at 2-3. The Court

should reject KTV's position that the terms of the 2006 Agreement-In-Principle and the 2012

Lease Agreement were identical in all material respects. KTV Br. 11-16, 21-23. Any one of the

material changes discussed below is enough to support Commerce's conclusion that the essential

terms and conditions of KTV's land-use arrangement were not fixed until 2012 at the earliest.

First, Commerce found that the parties to the lease is an essential term that was not

established until KTV itself signed the 2012 Lease Agreement. IDM at 41. KTV does not dispute

that the parties to the lease is an essential term. Rather, KTV asserts that Commerce's finding is

contrary to provisions of Vietnamese law that allow a parent company to sign contracts in

connection with the establishment and operation of a subsidiary prior to the date that subsidiary

is established. KTV Br. 21-22. However, even accepting KTV's statement regarding Vietnamese

law as true, KTV's parent company did not agree to the 2006 Agreement-In-Principle on behalf

of KTV in such a manner that would cause the terms of that agreement to become binding on

KTV by operation of law after KTV was established as an entity. Instead, the 2006 Agreement-

In-Principle between KTV's parent company and Becamex states that it will [

].

17

KTV Dec. 14 SQR at Appendix 1, Recital A. Identifying KTV as the entity that would be the

lessee in a potential future agreement between KTV and Becamex did not, in effect, establish

KTV as a party bound by the terms of the 2006 Agreement-In-Principle. If KTV [

]. Thus,

Commerce reasonably found that KTV signing the 2012 Lease Agreement constitutes a material

change because KTV itself became a party to the lease agreement and agreed to be bound by the

terms of that agreement.

      Second, Commerce identified a material change that relates to [                    ]. KTV

Final Analysis Memorandum at 2. Specifically, the [                ] under the 2006 Agreement-In-

Principle included [                              ]. KTV Dec. 14 SQR at Appendix 3, Article 3.1(1).

Based on the [                              ], the [                              ] was

[                         ], the [                              ] was [

   ], and the [                                   ] was [                    ]. *Id.*

The 2006 Agreement-In-Principle further provides that if [

]. *Id.* at Appendix 3, Article 3.3.

Commerce explained that the "[

] in the 2006 'in principle' agreement."

KTV Final Analysis Memorandum at 2 (citing KTV IQR at Appendix 13-A). However, the 2012

Lease Agreement [

]. *Id.* Commerce found that

this [           ] in the 2012 Lease Agreement constituted a material change to the [

   ]. *Id.*

KTV argues that, as a matter of contract law, the "failure of one party to comply with the terms of an agreement does not constitute the negotiation of a new agreement" and Becamex was "not required to insist on full satisfaction of its contractual remedies (such as late-payment penalties)" and had the "right to waive the breach." KTV Br. 12. But KTV misapprehends the nature of the material change that Commerce identified. Commerce did not find that the material change was KTV's [

]. Rather, Commerce found that the 2012 Lease Agreement's [

] materially changed the [                    ] that were established in the 2006 Agreement-In-Principle. KTV Final Analysis Memorandum at 2. As stated above, the 2006 Agreement-In-Principle [                                        ] and provides that [

]. KTV Dec. 14 SQR at Appendix 1, Articles 3.1 and 3.3. The 2006 Agreement-In-Principle also states that [

]. *Id.* at Appendix 1, Article 13.2. Additionally, [

]. *Id.* at Appendix 1, Article 13.4. Taken together, these provisions in the 2006 Agreement-In-Principle show that Becamex's failure [                    ] on KTV's [                ] cannot be viewed as an implied waiver and Becamex [

]. [

] in the 2012 Lease Agreement materially altered the [            ], because

19

Public Version

Becamex [                                                              ] and

Becamex [                                                              ] under the new

agreement with KTV. KTV IQR at Appendix 13-B, Article 5.1(a).[7]

Third, Commerce explained that under the terms of the 2012 Lease Agreement [

]. KTV Final Analysis Memorandum

at 2 (quoting KTV IQR at Appendix 13-B, Article 3.1). If [

]. *Id.* There was no corresponding provision in the 2006 Agreement-In-Principle,

and, thus, Commerce found the new provision in the 2012 Lease Agreement constituted a

material change to the rights and obligations of the parties. *Id.* at 2-3.

According to KTV, there was no material change because "{t}he 2012 Agreement gave

KTV exactly the same rights to *use* the land in question as the 2006 In-Principle Agreement

had." KTV Br. 14 (emphasis in original). KTV is wrong because the 2012 Lease Agreement

[

]. KTV claims that there in fact is a

corresponding provision in the 2006 Agreement-In-Principle. KTV Br. 16. However, KTV does

not explain why it is appropriate to interpret the [                ] provision as [

]. In addition, that provision in the 2006 Agreement-In-

Principle [                ] that Becamex would be [

]. KTV argues that "the evidence indicates that

---

[7]     KTV's comments that the [            ] payment might otherwise have constituted a
countervailable subsidy in the form of a zero-interest loan are unrelated to, and do nothing to
undermine, the finding that Commerce actually made. KTV Br. 13-14.

the security services and traffic control were not newly added by the 2012 Land Lease

Agreement and were not services provided uniquely by Becamex to KTV" because "{t}he entire

industrial zone is managed by Becamex." KTV Br. 15. KTV fails to cite to any evidence on the

record to support its argument that Becamex had some preexisting contractual commitment to

[                                                                      ]. In a footnote, KTV

references a picture of an entrance gatehouse of a *different* industrial zone, which KTV believes

is proof that Becamex had a [                ] in each of the zones it operated. It is unclear how an

entrance gatehouse is the equivalent of a [                ]. In any event, the picture is not

evidence that Becamex had any *obligation* to [                        ] in the industrial zone, or

that [                                                                ], before the

2012 Lease Agreement. Therefore, Commerce reasonably found that the change materially

altered the rights and obligations of the parties.

Moreover, Commerce's decision memoranda also recognized that other material changes

between the 2006 Agreement-In-Principle and the 2012 Lease Agreement existed. KTV Final

Analysis Memorandum at 3 (stating that "there are *at least two* {sic} material changes …."

(emphasis in original)). But Commerce ostensibly did not deem it necessary to expend additional

time and resources to say more on the issue, because it had already concluded that Becamex

could not lease the land until after the cut-off date and detailed three material changes to the

essential terms and conditions of the land-use arrangement. Commerce sufficiently addressed the

issue. Nevertheless, the other material changes that the USW identified in its administrative

rebuttal brief also supported countervailing KTV's land lease. USW Rebuttal Br. 3-5, P.D. 462

and C.D. 188 (March 24, 2021). For example, the 2006 Agreement-In-Principle states that the

lease term will [                        ], but the 2012 Lease Agreement states that the

lease term [                              ]. KTV Dec. 14 SQR at Appendix 1, Article 2; KTV IQR at

Appendix 13-B, Article 1.3. Commerce previously has found that altering the duration of the

term is a material change. *PRCBs from Vietnam* IDM at 24. The 2012 Lease Agreement also

[                                                      ] in the 2006 Agreement-In-

Principle: (1) [

                         ]; and (2) at Article 2.2 [

                              ]. KTV IQR at Appendix 13-B, Articles 2.1 and 2.2.

Ample evidence in the record supports Commerce's finding that the essential terms and

conditions of the land-use agreement were materially altered after the January 11, 2007 cut-off

date. Therefore, the Court should sustain Commerce's decision to countervail the preferential

rent under KTV's lease agreement with Becamex.

### III.   Commerce Lawfully Countervailed the GOV's Undervaluation of the Vietnamese Dong Vis-à-vis the U.S. Dollar

Commerce initiated an investigation into whether PVLT tire producers and exporters in

Vietnam received a countervailable subsidy resulting from the exchange of U.S. dollars in return

for Vietnamese dong based on a government-controlled exchange rate that undervalued the dong

vis-à-vis the dollar. Commerce did so because it found that the petition sufficiently alleged the

existence of a financial contribution that confers a benefit and meets the specificity requirement.

Initiation Checklist at 21-25, P.D. 91 (June 24, 2020)*.* In conducting its investigation, Commerce

followed procedures it established in the *Currency Final Rule* and sought advice from Treasury

for its expert view on the valuation of the Vietnamese dong during 2019.[8] After taking all record

---

[8]     The IMF estimated the Vietnamese dong was undervalued by 8.4 percent in 2018, and Treasury had already found the dong was devalued in 2018 and at least through the first half of 2019. Petition: Volume VI at 46-49.

evidence into consideration, Commerce determined that government action on the exchange rate undervalued the Vietnamese dong vis-à-vis the U.S. dollar and both KTV and Sailun received countervailable subsidies through their exchanges of U.S. dollars for undervalued Vietnamese dong. IDM at 4-29.

KTV argues that Commerce's decision to countervail currency undervaluation is unlawful for four reasons. First, KTV argues that Commerce lacks statutory authority to countervail subsidies resulting from the exchange of undervalued currency, which consequently invalidates the *Currency Final Rule*. KTV Br. 23-30. Second, KTV argues that Commerce failed to fulfill its statutory obligation to administer the CVD laws because it unlawfully "outsourced" the threshold finding of whether the Vietnamese dong was undervalued. *Id.* at 31-32. Third, KTV argues that substantial evidence does not support finding that the Vietnamese dong was undervalued during the POI. *Id.* at 32-36. Lastly, KTV argues that the GOV's currency practices do not meet the statutory definition of a countervailable subsidy because there is no financial contribution, benefit, or specificity. *Id.* at 37-42. Below we demonstrate why the Court should reject each of KTV's arguments and sustain Commerce's decision to countervail the GOV's undervaluation of the Vietnamese dong.

A.      **Legal Framework for Countervailing Currency Undervaluation**

As explained above, the three elements of a countervailable subsidy are financial contribution, specificity, and benefit. 19 U.S.C. § 1677(5)(A)-(B); *see also* 19 U.S.C. § 1677(5)(D), (5)(E), and (5A). Congress has provided some additional guidance for each of the three elements; however, where the statue is silent, Congress has conferred Commerce with broad discretion to fill the statutory gaps to administer the CVD law in the way it deems most suitable so long as the agency exercises its gap-filling authority in a reasonable manner. *Apex*

*Frozen Foods Private Ltd. v. United States*, 862 F.3d 1322, 1330 (Fed. Cir. 2017) (when the statute is silent, under *Chevron* step two "we ask whether Commerce's exercise of its gap-filling authority and its explanation are reasonable"); *see also SKF USA Inc. v. United States*, 254 F.3d 1022, 1030 (Fed. Cir. 2001) (under *Chevron*, "agencies are entitled to formulate policy and make rules to fill any gap left, implicitly or explicitly, by Congress" (internal quotations omitted)).

Relevant to this litigation, the statute does not directly address the question of whether currency undervaluation can constitute a countervailable subsidy. The absence of explicit direction from Congress on that point gives rise to a gap in the CVD law. Commerce appropriately filled that gap when it conducted notice-and-comment rulemaking and adopted the *Currency Final Rule*. 85 Fed. Reg. at 6,031 (filling a gap in the CVD law, which does not "specify how to determine the existence of a benefit or specificity when Commerce is examining a potential subsidy resulting from the exchange of currency under a unified exchange rate system"). Commerce announced in the *Currency Final Rule* that the amount of extra domestic currency that a firm receives based on an undervalued exchange rate is countervailable to the extent the three statutory requirements of financial contribution, benefit, and specificity are met. *Id.* at 6,032 (clarifying that the final rule establishes an approach to analyze currency undervaluation in a way that "adheres to the principles and conforms to the requirements of the U.S. CVD law, and that fits squarely within the financial contribution-benefit-specificity framework"). The Government's brief explains how currency undervaluation could result in a financial contribution that confers a benefit and is specific to a discrete group of enterprises. Gov't Resp. Br. 16-18.

Similar to its other CVD regulations, Commerce stated that the modifications in the *Currency Final Rule* "do not resolve all potential complex issues that will arise" and that these

issues "should be addressed incrementally and over time, through Commerce's experience in individual cases—which are informed by arguments put forward by the interested parties as well as the underlying administrative record." *Id.* at 6,032-33. The CVD investigation on PVLT tires from Vietnam is the first case where Commerce applied the updates made in the *Currency Final Rule* in determining that the exchange of U.S. dollars for undervalued Vietnamese dong constitutes a countervailable subsidy.

### B.   Commerce Has the Statutory Authority to Countervail the Exchange of Undervalued Currency Where the Three Elements of a Countervailable Subsidy Exist

Notwithstanding the gap that Congress left in the statute for Commerce to fill, KTV argues that Commerce somehow lacks the authority to countervail the exchange of undervalued currency in light of *dicta* from a decision by the Court of Customs and Patent Appeals ("CCPA") from over 50 years ago. KTV Br. 23-25. The CCPA's decision in *United States v. Hammond Lead Prods. Inc.*, issued in 1971, did not hold that the exchange of undervalued currency cannot be a countervailable subsidy under the CVD law that existed at the time. 440 F.2d 1024 (CCPA 1971). The issue was not even before the CCPA. At issue was whether the lower court possessed jurisdiction over a civil action protesting the classification and duties the Customs Service applied to imports of litharge from Mexico based on a domestic manufacturer's assertion that a bounty was bestowed on such imports and a CVD should be imposed. In the CCPA's words,

> the question of course is whether Congress intended that the countervailing duty provision of the Tariff Act of 1930 … is to work in harness with the American Manufacturer's Protest … so that an American manufacturer can obtain the assessment of countervailing duties by reason of the action of a foreign government, without the acquiescence of the Treasury Department in the assessment.

*Id.* at 1027. The CCPA ultimately held that the lower court did not have jurisdiction over the case, in large part because "Article III courts should abstain if possible from passing on

25

controversies not essentially judicial in nature" and the decision to impose a CVD "involves judgments in the political, legislative, or policy spheres." *Id.* at 1030.

KTV completely ignores the CCPA's concerns regarding separation of powers and relies on statements of mere *dicta* where the CCPA surmises that countervailing duties were not being imposed in response to the devaluation of a currency because Treasury, the agency that administered the CVD law at the time, exercises some discretion in defining what government practices confer bounties or grants. KTV Br. 24-25 (quoting *Hammond*, 440 F.2d at 1030-31). Yet, the CCPA's decision does not identify any specific case in which Treasury previously confronted such a government practice and decided that, as a matter of law, it could never confer a countervailable bounty or grant under any factual circumstance. The CCPA resolved the appeal on jurisdictional grounds, and nothing in the decision demonstrates that Treasury adopted an interpretation of the CVD law that excluded currency undervaluation. KTV has not shown that Treasury adopted such an interpretation for Congress to ratify when it made changes to the CVD law in the Trade Agreements Act of 1979. Nor has KTV explained why Treasury's practices should limit Commerce's current application of the CVD law.

Next, KTV turns to prior administrative decisions from the 1980s after the Trade Agreements Act of 1979 and Reorganization Plan No. 3 of 1979 transferred the authority for administering the CVD law from Treasury to Commerce. KTV Br. 25-26. It argues that these decisions represent a longstanding Commerce view that the law does not recognize the exchange of undervalued currency as a countervailable subsidy, and Congress acquiesced to that interpretation of the CVD law when it re-enacted the statute multiple times thereafter. *Id.* However, as explained below, these prior administrative decisions did not establish such an interpretation for Congress to ratify, because they were limited to the factual circumstances and

individual records of those cases and either were preliminary determinations that were never finalized or involved a dual exchange rate system rather than the type of unified exchange rate system addressed in the *Currency Final Rule*.

KTV acknowledges that no final determination was ever made in the investigation on lamb meat from New Zealand that was initiated in 1981. KTV Br. 25 n.64; *see also Lamb Meat from New Zealand*, 47 Fed. Reg. 1,316 (Dep't Commerce January 12, 1982) ("By virtue of the withdrawal of the petition and termination of the investigation, the preliminary determination and all preliminary conclusions reached therein, as to whether the programs investigated do or do not constitute subsidies are without legal force or effect."). But even if the Court were to consider the preliminary determination in that investigation, Commerce preliminarily found that the New Zealand government's periodic adjustment of the exchange rate was not countervailable because there was no *de jure* limitation on access to the exchange rate and the facts did not otherwise demonstrate that the users of the exchange rate were limited on a *de facto* basis. *Lamb Meat from New Zealand*, 46 Fed. Reg. 58,128, 58,131 (Dep't Commerce November 30, 1981). Similarly, in the 1983 investigation on pork rind pellets from Mexico, Commerce found that the operation of the Mexican exchange rate system does not result in a subsidy that is specific and therefore was not found to be countervailable in that case. *Pork Rind Pellets from Mexico*, 48 Fed. Reg. 39,105, 39,107 (Dep't Commerce August 29, 1983). Stated differently, the factual circumstances present in those cases did not satisfy the specificity requirement.[9] Commerce's specificity findings were based on the individual records of those cases and in no way should be construed as an interpretation that the exchange of undervalued currency could never be found

---

[9]     We note that no party cited to *Lamb Meat from New Zealand* and *Pork Rind Pellets from Mexico* in administrative case or rebuttal briefs.

specific and thus countervailed. Also, *Pork Rind Pellets from Mexico* is inapposite because it dealt with a dual exchange rate system and the *Currency Final Rule* concerns only unified exchange rate systems.

KTV also relies on Commerce's 1984 preliminary determination in the investigation on steel wire rod from Poland. KTV Br. 26 (citing *Carbon Steel Wire Rod from Poland*, 49 Fed. Reg. 6,768, 6,771 (Dep't Commerce February 23, 1984)). Commerce aptly explained in the *Currency Final Rule* why its preliminary determination in that investigation did not establish that currency undervaluation is not countervailable:

> … Commerce's finding in that 1984 investigation dealt with multiple currency exchange rates, not the type of unified exchange rate system at issue in this regulation. Therefore, Commerce's statement that 'an allegedly undervalued unified exchange rate does not constitute a countervailable subsidy' can be viewed as *dicta* given that a unified exchange rate was not the program at issue in that investigation. Moreover, in the final determination of *Carbon Steel Wire Rod from Poland*, Commerce ultimately determined that it cannot apply the CVD law to non-market economies … such as Poland (at that time), rendering moot Commerce's initial statements in the preliminary determination.

85 Fed. Reg. at 6,033 (citing *Carbon Steel Wire Rod from Poland*, 49 Fed. Reg. 19,374, 19,375 (Dep't Commerce May 7, 1984)). KTV acknowledges that no final decision was made regarding the currency exchange subsidy in that investigation. KTV Br. 27 n.66.

Even assuming *arguendo* that Commerce's three decisions from the 1980s adopted an interpretation of the statute that excludes the exchange of undervalued currency, Congress did not legislatively ratify that interpretation because it completely overhauled the CVD law in 1994 by passing the Uruguay Round Agreements Act ("URAA"). KTV does not dispute, and in fact agrees, that the changes made by the URAA were significant. KTV Br. 24. One change included replacement of the term "bounty or grant" with the current statutory definition of a "subsidy" as being a financial contribution that confers a benefit. Congress also provided much needed

clarification on the specificity test, because it was not being applied as intended and in light of its original purpose. Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. 1, at 929-32, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4241-44 ("SAA"); *see also* 19 U.S.C. § 3512(d) (regarding the SAA as an authoritative interpretation and application of the CVD law, as amended by the URAA). In other words, Congress did not acquiesce in the way the specificity requirement had been applied prior to the URAA.

Congress clarified that "{t}he specificity test was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the benefit of the subsidy is spread throughout an economy" and "was not intended to function as a loophole through which narrowly focus{}ed subsidies provided to or used by discrete segments of an economy could escape the purview of the CVD law." SAA at 930 (emphasis in original). This clarification and expression of Congress's intent is important because, as stated above, Commerce found that the specificity requirement was not satisfied in *Lamb Meat from New Zealand* and *Pork Rind Pellets from Mexico*. Commerce's explanation for not preliminarily countervailing the exchange of currency in *Carbon Steel Wire Rod from Poland* reveals that the record did not support finding specificity in that case as well. 49 Fed. Reg. at 6,771 (referring to the devaluation of currency in that case as "an economy-wide adjustment" and stating "no reason to believe that the exchange rate has any effect on the decision to export"). "{T}he doctrine of congressional ratification applies only when Congress reenacts a statute without relevant change." *Holder v. Martinez Gutierrez*, 566 U.S. 583, 593 (2012). Given the changes to the CVD law in 1994 and the SAA's clarification on the intended application of the specificity test, KTV's theory of Congressional acquiescence to

Commerce's so-called "practice" unravels and Commerce's pre-URAA decisions are not binding on its current application of the statute.

KTV posits that in 2010 and 2011 Commerce declined to initiate investigations in response to allegations of subsidies resulting from China's devaluation of its currency "on the grounds that currency-valuation practices were not 'specific' to an industry or group of industries, and therefore could not constitute subsidies under the U.S. countervailing duty laws." KTV Br. 27 (citing *Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 18,521 (Dep't Commerce April 4, 2011), and accompanying IDM at Comment 33; and *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China*, 75 Fed. Reg. 59,213 (Dep't Commerce September 27, 2010), and accompanying IDM at Comments 5–7). KTV grossly mischaracterizes Commerce's reasons for declining to initiate investigations into China's currency practices. Commerce explained in the *Currency Final Rule* that it did not initiate investigations into China's currency practices because "the petitioners' allegations in those particular proceedings were unsupported by reasonably available information regarding the statutory elements for imposition of a CVD" and the decision "was not based on any practice regarding currency-related subsidies."[10] 85 Fed. Reg. at 6,033. Information on the records of both cases contradicted the allegations, and there was insufficient support that the currency subsidy was *de facto* specific based on predominant use or disproportionality because the evidence presented showed that foreign invested enterprises did not convert the vast majority of their foreign currency earnings. *Aluminum Extrusions from the People's Republic of China* IDM at Comment 33; *Certain Coated Paper Suitable for High-*

---

[10]     KTV overlooks this discussion in the *Currency Final Rule* and incorrectly states that Commerce did not address its two decisions in 2010 and 2011 that declined to initiate an investigation in response to allegations concerning China's currency practices. KTV Br. 28.

*Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China* IDM at Comment 6. At no point did Commerce find that currency undervaluation cannot legally be considered a countervailable subsidy, nor did Commerce specifically foreclose the possibility of ever countervailing currency undervaluation in the future.

Regardless, even if Commerce did not initiate in response to the subsidy allegations in 2010 and 2011 because at that time it did not intend to countervail currency undervaluation, Commerce is permitted to change its interpretation of the law as long as it provides a reasoned explanation. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also Huvis Corp. v. United States*, 570 F.3d 1347, 1354 (Fed. Cir. 2009). Here, Commerce has not only provided a reasoned explanation for its interpretation that subsidies resulting from the exchange of undervalued currency can be countervailable, it went through the trouble of conducting notice-and-comment rulemaking to adopt the *Currency Final Rule*. The interpretation of specificity and benefit embodied in the *Currency Final Rule* is thus entitled to substantial deference, notwithstanding Commerce's position on different currency allegations in prior proceedings.

Congress has not re-enacted any of the relevant provisions of the CVD law in the approximately ten years between Commerce's decisions not to investigate alleged currency practices in 2010 and 2011 and Commerce's adoption of the *Currency Final Rule*. Yet, KTV claims that the Trade Preferences Extension Act of 2015 ("TPEA") and the Trade Facilitation and Trade Enforcement Act of 2015 ("TFTEA") "reenacted the relevant provisions of the countervailing duty statute …." KTV Br. 29. This statement is simply false. The TPEA amended certain provisions relating to the application of adverse facts available, the definition of material injury, dumping calculations, and the selection of voluntary respondents. Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362, 383-87 (2015). The TFTEA

Public Version

strengthened trade enforcement and anti-evasion procedures. Trade Facilitation and Trade

Enforcement Act of 2015, Pub. L. No. 114-125, 130 Stat. 122, 156-61 (2016). Neither piece of

legislation re-enacted the relevant provisions of the CVD law. Thus, even if Commerce had

adopted a statutory interpretation regarding the countervailability of currency undervaluation in

2010 and 2011—which it did not—Congress has not re-enacted the relevant provisions of the

CVD law since that time.[11] The Court should therefore reject KTV's claims and hold that

Commerce has the statutory authority to countervail subsidies resulting from the exchange of

undervalued currency so long as the three statutory elements are satisfied.

### C.     The Court Should Reject KTV's Unexhausted Argument that Commerce "Outsourced" its Currency Undervaluation Determination to Treasury

KTV argues that Commerce's undervaluation determination cannot be sustained because

it "was based exclusively on the conclusions set forth in the Treasury Report, and did not reflect

any independent analysis by Commerce itself." KTV Br. 31. KTV failed to exhaust its

administrative remedies by not raising this new argument in its administrative case brief. *See*

*generally* KTV Case Br., P.D. 454 and C.D. 184 (March 9, 2021); *see also* 28 U.S.C. § 2637(d)

(generally requiring exhaustion of administrative remedies); 19 C.F.R. § 351.309(c) (requiring

---

[11]     KTV suggests that Commerce does not have the authority to countervail subsidies resulting from currency undervaluation because Congress delegated to Treasury the authority to examine possible currency manipulation. KTV Br. 29. As Commerce stated in the *Currency Final Rule*, "Commerce makes its determination regarding CVDs pursuant to a different legal authority from Treasury's statutory currency determinations, and for a different statutory purpose." 85 Fed. Reg. at 6,037-38. Thus, Treasury's authority with respect to currency manipulation does not infringe upon Commerce's authority to remedy injurious subsidies that satisfy the three statutory elements, regardless of what form they take.

case briefs to present *all* arguments); *JBF RAK LLC v. United States*, 790 F.3d 1358, 1366 (Fed. Cir. 2015) (noting this Court's "strict view" of the exhaustion requirement) (citation omitted)).

KTV stated in its administrative case brief that Commerce's finding of undervaluation "was based entirely on a report prepared by the Treasury Department for this case." KTV Case Br. at 18. However, this statement was made in connection with KTV's other claim that Commerce cannot rely on Treasury's report when the supporting data underlying Treasury's analysis are not part of the administrative record. KTV did not separately raise the specific argument that Commerce's reliance on Treasury's report was an unlawful subdelegation of Commerce's statutory duties to Treasury. *Weishan Hongda Aquatic Food Co. v. United States*, 273 F. Supp. 3d 1279, 1286-89 (Ct. Int'l Trade 2017), *aff'd* 917 F.3d 1353 (Fed. Cir. 2019) (declining to address specific argument not raised before Commerce). KTV does not assert that any of the exceptions to the exhaustion requirement apply here. Thus, the Court should disregard this specific argument that KTV failed to raise before Commerce when it had the opportunity to do so in its administrative case brief.

Even if the Court were to consider KTV's unexhausted argument—which it should not— Commerce squarely addressed the same concern before finalizing the *Currency Final Rule*. 85 Fed. Reg. at 6,037-38. Commerce enlisted Treasury to provide its expert view on whether government action on the exchange rate contributes to an undervaluation of the currency of the country under investigation, and will *normally* defer to Treasury's expertise, but Commerce retained its authority to consider the record as a whole and make its own determinations regarding government action on the exchange rate, the extent of undervaluation, and countervailability. *Currency Final Rule*, 85 Fed. Reg. at 6,038. Commerce explained that, although an agency cannot subdelegate its ultimate decision-making authority to another agency,

"{i}t is lawful for one federal agency to turn to another for 'advice and policy recommendations' in an area where that other agency might have particular expertise." *Id.* (citing *U.S. Telecom Ass'n v. Federal Comm'ns Commission*, 359 F.3d 554, 568 (D.C. Cir. 2017), and *Bellion Spirits v. United States*, 393 F. Supp. 3d 5, 15-17 (D.D.C. 2019)). Treasury is the agency in the Executive branch that has considerable experience in complex currency-related matters and, thus, is well-suited to provide advice and policy recommendations on the valuation of a foreign country's currency.

KTV does not dispute that "Commerce was permitted to seek input and advice from Treasury with respect to currency valuation issues," but avers that "there is a difference between taking advice and outsourcing a decision" and here "Commerce undertook no independent analysis of the Treasury report …." KTV Br. 32. Although KTV is correct that "{a}n agency may not … merely 'rubber-stamp' decisions made by others under the guise of seeking their 'advice,'" *U.S. Telecom Ass'n*, 359 F.3d at 568, KTV is wrong that Commerce abdicated its duties as the administrating authority and rubber-stamped Treasury's assessment in this case. Commerce's conduct in this investigation shows that it adopted Treasury's evaluation and conclusion regarding undervaluation after a meaningful independent review of Treasury's report and all other information on the record. Specifically, Commerce carefully reviewed Treasury's report and issued a supplemental questionnaire that asked Treasury to clarify and explain certain aspects of its analysis. Treasury Supplemental Questionnaire, P.D. 215. Also, before rendering a final determination, Commerce addressed arguments raised by interested parties and explained why it relied on Treasury's report to assess the Vietnamese dong's valuation. IDM at 21-26. Thus, Commerce fulfilled its statutory responsibilities and satisfied itself that Treasury's GERAF

model is a reasonable methodology to use in determining whether, and to what extent, the Vietnamese dong is undervalued vis-à-vis the U.S. dollar.

>**D.**     **Commerce's Finding that the Vietnamese Dong Was Undervalued During the POI Is Supported by Substantial Evidence**

Commerce's regulations set forth a four-part analysis for determining whether the exchange of currency confers a benefit. 19 C.F.R. § 351.528(a)–(b). First, Commerce must determine whether the domestic currency of the country under investigation was undervalued during the relevant period, and Commerce will normally make this determination by examining whether there is "a gap between the country's real effective exchange rate (REER) and the real effective exchange rate that achieves an external balance over the medium term that reflects appropriate policies (equilibrium REER)." *Id.* § 351.528(a)(1). Second, Commerce determines whether government action on the exchange rate contributes to undervaluation of the country's domestic currency other than the exercise of monetary and credit policy by an independent central bank or monetary authority. *Id.* § 351.528(a)(2). Third, if the first two determinations are affirmative, Commerce determines the extent that the country's domestic currency is undervalued vis-à-vis the U.S. dollar by examining the bilateral real effective exchange rate gap between the country under investigation and the United States. *Id.* § 351.528(b)(1). Fourth, Commerce determines the amount of benefit received by a particular firm based on the difference between the amount of domestic currency a firm received in exchange for U.S. dollars and the amount of domestic currency that firm would have received if the domestic currency was not undervalued. *Id.* § 351.528(b)(2). Because Treasury has considerable experience in currency-related matters, Commerce requests Treasury's evaluation and conclusion as to whether, and to

35

what extent, the domestic currency of the country under investigation is undervalued vis-à-vis the U.S. dollar. *Id.* § 351.528(c).

In accordance with 19 C.F.R. § 351.528(c), Commerce asked Treasury for its evaluation and conclusion concerning the Vietnamese dong's valuation during the 2019 POI. Treasury responded with a 32-page report and concluded that "the Vietnamese dong was undervalued during the relevant period" as a result of government action on the exchange rate because "the Vietnamese government—through the State Bank of Vietnam—undertook net purchases of foreign exchange in 2019 totaling about $22 billion" and these purchases of foreign exchange "had the effect of undervaluing the dong vis-à-vis the U.S. dollar by 4.7 percent" or "1,090 dong per U.S. dollar." Treasury Report at PDF pp. 1-2.

Treasury assessed the Vietnamese dong's valuation using GERAF, which the report explains is "a flexible tool created by the Department of the Treasury (Treasury) to study currency valuations" and "{t}he model provides a rigorous, multilaterally consistent method for assessing external imbalances, exchange rate misalignment, and the role of policy in contributing to both." Treasury Report at PDF p. 6. "GERAF builds on a substantial body of literature and applied practices for assessing currency valuations," including the Dynamic Equilibrium Exchange Rate model, the Fundamental Equilibrium Exchange Rate model, and the IMF's External Balance Assessment. *Id.* However, unlike other models for assessing currency valuations that do not take into account the impact of particular macroeconomic policies on exchange rates, GERAF allows "Treasury to make a granular assessment of the extent to which a country's government action on the exchange rate contributed, if at all, to {real effective exchange rate} undervaluation and nominal, bilateral undervaluation vis-à-vis the U.S. dollar." *Id.* at PDF p. 4.

Treasury's report included: (1) materials explaining how it applied its GERAF model, including details on the variables employed (*id.* at PDF pp. 4-20); (2) the calculations supporting its conclusions (*id.* at PDF p. 3); (3) a list and description of the data sources for each variable in the calculations (*id.* at PDF pp. 23-29); and (4) robustness checks and regression extensions to test the accuracy and reliability of the GERAF model's results. *Id.* at PDF pp. 30-32. Treasury also supplemented its report with responses to Commerce's follow-up questions. Treasury SQR, P.D. 227. In the final determination, after reviewing all evidence on the record, Commerce found that "Treasury's model provides a reasonable and economically sound methodology for assessing the level of {Vietnamese dong} undervaluation due to government action on the exchange rate" and used the GERAF model "as a basis for calculating the amount of benefit resulting from its undervaluation …." IDM at 26.

KTV contends that Commerce's currency undervaluation finding is not supported by substantial evidence because Commerce was allegedly required to obtain the underlying data used in Treasury's report and place that data on the record. KTV Br. 32-34. But KTV fails to cite to any authority that required Commerce to obtain and place such data on the record. It is well settled that "agencies with statutory enforcement responsibilities enjoy broad discretion in allocating investigative enforcement resources." *Torrington v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995) (citing *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). Although Commerce has the discretion to request information from any person at any time, *see* 19 C.F.R. § 351.301(a), it will do so only when it deems necessary. *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,333 (Dep't Commerce May 19, 1997). Commerce turned to Treasury for its input because of the agency's expertise in currency-related matters. Treasury provided sufficient information in its responses, including the sources of the data relied upon, that allowed

Commerce to confirm the reliability and credibility of Treasury's valuation of the Vietnamese

dong vis-à-vis the U.S. dollar during the POI. Indeed, the Government's brief describes many

situations where Commerce routinely relies on the expertise or advice of other agencies to make

certain determinations in trade remedy proceedings and the other agencies' underlying data or

supporting documentation is not placed on the record. Gov't Resp. Br. 31-33. "Where the

evidence is reasonably reliable, the court 'will not impose its own views as to the sufficiency of

the agency's investigation or question the agency's methodology.'" *China First Pencil Co. v.

United States*, 427 F. Supp. 2d 1236, 1239 (Ct. Int'l Trade 2006) (quoting *Ceramica

Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 966 (Ct. Int'l Trade 1986), *aff'd* 810 F.2d

1137 (Fed. Cir. 1987)).

KTV's claim is nothing more than a fishing expedition, and its remaining arguments fail

to identify any genuine issue with Treasury's report that would call into question its reliability

and credibility. KTV asserts that certain variables were based on Treasury staff estimates and

calculations, KTV Br. 33, but such estimates and calculations were completed in conjunction

with data from sources that are publicly available through international institutions. Moreover,

complete factual support in the record for expert judgment calls of this nature is not required.

*Mortgage Investors Corp. of Ohio v. Gober*, 220 F.3d 1375, 1380-81 (Fed. Cir. 2000) (citing

*FCC v. Nat'l Citizens Committee for Broadcasting*, 436 U.S. 775, 813-14 (1978)). KTV also

argues that data covering 51 countries for 32 years should yield 1,632 observations, and

Treasury's data set had "undisclosed gaps" because its report includes only 1,273 observations.

KTV Br. 33. However, nothing in Treasury's report indicates that the data set includes

information from each of the 51 countries for all 32 years. In fact, a table in Treasury's report

that summarizes the data for each variable includes a column labeled "Avg. years" that indicates

Public Version

each country on average had 25 years of information. Treasury Report at PDF p. 21. KTV further claims that the $22 billion of net purchases of foreign exchange referenced in Treasury's report is inconsistent with another Treasury publication, yet KTV itself recognizes that Treasury's report is based on calendar year 2019 and the other publication is based on July 2018 through June 2019. KTV Br. 33 n.87. For the reasons explained in the Government's brief, there is no merit in KTV's assertion that the six alternate estimators in Treasury's report indicate that the GERAF model is less accurate than those other models. Gov't Resp. Br. 35-36; *see also* KTV Br. 35.

Finally, KTV is simply wrong that Commerce did not explain why it used Treasury's GERAF model and not the other available alternatives. KTV Br. 35-36. Commerce dedicated an entire section in its issues and decision memorandum to provide its reasons for using Treasury's GERAF model and to explain that no evidence on the record warranted a departure from Treasury's report. IDM at 23-26; *see also* Gov't Resp. Br. 33-35; *Currency Final Rule*, 85 Fed. Reg. at 6,038 (explaining Commerce normally will follow Treasury's evaluation and conclusion, unless substantial evidence on the record warrants a departure). For all of these reasons, Commerce's determination that the Vietnamese dong was undervalued was supported by substantial evidence and should be affirmed. Because the law does not prescribe any method for assessing whether a currency is undervalued, Commerce has the discretion to choose any methodology so long as it is reasonable. *JBF RAK*, 790 F.3d at 1363 (affording Commerce broad discretion to "perform its duties in the way it believes most suitable" when "a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of the statutory tests"); *Solarworld Americas, Inc. v. United States*, 182 F. Supp. 3d 1372, 1376 (Ct.

Int'l Trade 2016) (stating that "Commerce has considerable discretion to develop a methodology" when "neither the statute nor the regulation" dictate a methodology).

**E.    Commerce Properly Found that Each Element of a Countervailable Subsidy Exists**

KTV argues that the exchange of U.S. dollars for undervalued Vietnamese dong does not meet the three statutory requirements of a countervailable subsidy. KTV Br. 37-42. As explained below, KTV's arguments fail to demonstrate that Commerce's financial contribution, specificity, and benefit findings are unsupported by substantial evidence or otherwise not in accordance with law.

      1.    <u>The Exchange of U.S. Dollars for Vietnamese Dong Constitutes a Financial Contribution</u>

Commerce found that the receipt of Vietnamese dong in exchange for U.S. dollars from state-owned banks (or private banks entrusted or directed to exchange currency at rates within a range fixed by the GOV) is a "direct transfer of funds" within the meaning of 19 U.S.C. § 1677(5)(D)(i). IDM at 13-16; PDM at 20-22. KTV asserts that the exchange of currency does not constitute a "direct transfer of funds" because it is unlike any of the examples listed in the statute and "currency conversion is simply an exchange (at some exchange rate) of one currency into another, transferring one store of value into a different one." KTV Br. 37-38. However, Commerce correctly rejected the notion that "because the exchange of currency is reciprocal in nature it cannot constitute a direct transfer of funds within the meaning of {19 U.S.C. § 1677(5)(D)(i)}." IDM at 13.

Commerce referenced the SAA, which makes clear that the four types of financial contributions enumerated in the statute are broad generic categories of government practices and the examples provided for each category are not exhaustive. *Id.* at 13-14 (citing SAA at 927).

Commerce explained that loans and equity infusions are two examples of a "direct transfer of funds" in the statute and both "are characterized by reciprocity in some fashion, where a government provides funds in exchange for money in the form of interest payments at a later date (*i.e.*, loans) or provides funds in exchange for shares of stock (*i.e.*, equity infusions)." *Id.* at 13. The exchange of currency fits within the plain meaning of a "direct transfer of funds" because "{t}he word 'transfer' suggests a conveyance, passing or exchange of something from one person to another," and "{t}he word 'funds' suggests money or some monetary resource." *Id.*

KTV states that "there is nothing that prevents holders of the currencies from making the exchange at the exchange rate (whether that rate is set by the market or by government order) completely outside of government auspices." KTV Br. 38. It is unclear how this statement relates to the financial contribution analysis. That the recipient of a direct transfer of funds from the government *could have* obtained funds from a non-governmental entity does not somehow negate the existence of a financial contribution. To the extent KTV suggests that KTV's exchanges of foreign currency for Vietnamese dong through private banks would be "completely outside of government auspices," it is wrong because, as Commerce explained, the GOV entrusts or directs private banks that are Authorized Credit Institutions to exchange currency within a very narrow range of the exchange rate set by the State Bank of Vietnam. IDM at 14-16. KTV is, therefore, incorrect when it states that the GOV "did not dictate an exchange rate and require banks to convert currency at that rate …." KTV Br. 38.

KTV also argues that "{t}he net balance of a government's purchases and sales of currency in the foreign-currency market do not meet the statutory definition of 'financial contribution,' because those actions do not constitute a 'direct transfer of funds' to KTV." *Id.* at

39. No such argument was included in KTV's administrative case brief and, therefore, is waived for failure to exhaust administrative remedies. Regardless, KTV confuses Commerce's financial contribution analysis with its analyses for specificity and benefit. Commerce considered the GOV's net purchases of foreign exchange in determining that the GOV contributed to the undervaluation of the Vietnamese dong during the POI (benefit) and in analyzing whether the exchange of foreign currency is disproportionately or predominately used by the traded goods sector (specificity). For financial contribution, Commerce found that the receipt of Vietnamese dong in exchange for U.S. dollars from state-owned banks (or private banks entrusted or directed to exchange currency at rates fixed by the GOV) is a "direct transfer of funds" within the meaning of 19 U.S.C. § 1677(5)(D)(i). Thus, KTV received a financial contribution through the exchange of U.S. dollars for Vietnamese dong.

2.   The Currency Undervaluation Subsidy Is *De Facto* Specific to the Traded Goods Sector

Commerce determined that the exchange of U.S. dollars for undervalued Vietnamese dong is *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(II) because the group of enterprises that buy and sell goods internationally, *i.e.*, the traded goods sector, accounts for 71.94 percent of U.S. dollar inflows into Vietnam and is the predominant user of the subsidy. IDM at 18-20; *see also* PDM at 23-24; USD Inflows Calculation Memorandum, P.D. 303 (October 30, 2020). KTV claims that there are "several fundamental problems" with Commerce's analysis because Vietnamese holders of foreign currency are not obligated to convert that currency into Vietnamese dong and "Commerce's focus on the actual conversions of foreign currency into *dong* fails to address the actual impact of the exchange rate on economic actors in Vietnam, or whether the exchange rate is disproportionately 'used' in certain sectors." KTV Br. 41-42. Once again, KTV did not include this argument in its administrative case brief. Nevertheless,

Commerce sufficiently addressed the issue in response to arguments raised by other interested parties.

Commerce explained that because the GOV does not collect data on U.S. dollar inflows or trading by field and sector, Commerce relied on information on U.S. dollar inflows to Vietnam submitted by the State Bank of Vietnam to the IMF as a proxy for currency conversions. IDM at 18; *see also* PDM at 23; IMF/OECD Data Memorandum, P.D. 254 (October 8, 2020). The information allowed Commerce to estimate the U.S. dollar inflows to Vietnam during the POI attributable to four major channels of exchange: exports of goods, exports of services, various forms of portfolio and direct investment, and earned income from abroad. IDM at 18. Commerce did not presume, as KTV suggests, that *all* U.S. dollar inflows attributable to exports of goods were converted to Vietnamese dong. Commerce recognized that companies buy *and* sell goods internationally and reasonably estimated this group's usage of the currency undervaluation subsidy by adjusting the U.S. dollar inflows downward by the percentage of imported content in exports of goods. USD Inflows Calculation Memorandum at Attachment. The result showed the currency undervaluation subsidy was not widely used throughout the economy because nearly 72 percent of U.S. dollars earned from exports and exchanged for undervalued Vietnamese dong benefitted the traded goods sector, which supports Commerce's *de facto* specificity finding that the traded goods sector is a predominant user of the subsidy. IDM at 20.

KTV argues that treating enterprises that buy or sell goods internationally as a "group" of enterprises or industries is inconsistent with the statute. KTV Br. 40-42. KTV cites no authority to support its argument other than a decision not to initiate an investigation into currency-related practices from over ten years ago. *Id.* at 42. As Commerce explained, it may change its

interpretation of the law as long as it provides a reasoned explanation, IDM at 20, which it did in the *Currency Final Rule*. 85 Fed. Reg. at 6,039. Enterprises that buy or sell goods internationally "constitute a subset of all economic actors within a country." *Id.* Commerce also explained that it previously has found state-owned enterprises and foreign-invested enterprises to comprise "groups" for purposes of analyzing specificity. *Id.* KTV has failed to show how Commerce's interpretation of the undefined term "group" is unlawful under the statute or as applied in this case.

3.   The Benefit Is the Extra Vietnamese Dong Received Because of the Currency Undervaluation

Commerce determined that KTV received a countervailable benefit at a rate of 1.69 percent based on its exchanges of U.S. dollars for undervalued Vietnamese dong during the POI. IDM at 4; PDM at 24-25. KTV asserts that "Commerce's analysis ignored the fact that KTV and its suppliers also make extensive purchases in foreign currency" and that any benefit realized by exchanging U.S. dollars for undervalued Vietnamese dong is, in effect, offset by increased costs for purchasing equipment and inputs denominated in U.S. dollars. KTV Br. 40. Because KTV failed to raise this argument in its administrative case brief, it is not properly before the Court and should be treated as waived. The argument also has no merit because, as Commerce explained in the *Currency Final Rule*, 19 U.S.C. § 1677(6) provides for a limited number of adjustments in calculating the net subsidy rate, and it does not include an offset for increased costs resulting from an undervalued currency. 85 Fed. Reg. at 6,037. As the Government points out, this Court previously rejected a similar argument and ruled that it is lawful for Commerce to calculate a benefit for the provision of goods without offsets for purchases of government-provided goods that were for more-than-adequate remuneration. Gov't Resp. Br. 37 (citing *Canadian Solar Inc. v. United States*, Ct. No. 18-00184, 2020 WL 898557 (Ct. Int'l Trade

44

Public Version

February 25, 2020)). In addition, the 1998 preamble to the CVD regulations explained that the benefit analysis concerns what goes into a company and does not consider the net effect that a subsidy has on a company's bottom line. *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,361 (Dep't Commerce November 25, 1998).

Continuing to raise arguments for the first time before the Court, KTV claims that Commerce's finding is inconsistent with past decisions that indicate there is no benefit "when the same exchange rate applies to both exports and imports by an exporter." KTV Br. 40. As already explained, Commerce is not bound by the decisions it made in the 1980s and provided a reasoned explanation for its interpretation that subsidies resulting from the exchange of undervalued currency can be countervailable. Further, both *Lamb Meat from New Zealand* and *Pork Rind Pellets from Mexico* explained that, under the pre-URAA version of the law, the currency exchange subsidies at issue were not countervailable because they were not specific. Neither decision states that there is no benefit. Although *Carbon Steel Wire Rod from Poland* suggests that there would be no countervailable benefit if the same exchange rate applied to imports and exports, that discussion comes from a pre-URAA preliminary determination that was never finalized. Commerce also explained that *Carbon Steel Wire Rod from Poland* can be viewed as *dicta* because it dealt with multiple exchange rates and not a unified exchange rate system. *Currency Final Rule*, 85 Fed. Reg. at 6,033.

For all of these reasons, the Court should reject KTV's arguments and affirm Commerce's determination that Vietnam's undervalued exchange rate provided a countervailable benefit.

Public Version

## <u>CONCLUSION</u>

For the foregoing reasons, the USW respectfully requests that the Court deny the

plaintiff's motion for judgment on the agency record and sustain Commerce's final

determination as supported by substantial evidence and in accordance with law.

<div style="margin-left: 50%;">

Respectfully submitted,

/s/ Roger B. Schagrin
Roger B. Schagrin
Elizabeth J. Drake
Saad Y. Chalchal*
SCHAGRIN ASSOCIATES
900 Seventh St. N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel for United Steel, Paper and
Forestry, Rubber, Manufacturing, Energy,
Allied Industrial and Service Workers
International Union AFL-CIO, CLC*

</div>

Date:  March 28, 2022          *Only admitted in New York and New
Jersey. Practice limited to matters before
federal courts and agencies.

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing reply brief contains 13,995 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in this Court's Chamber's Procedures. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

Dated: March 28, 2022                                   /s/  Roger B. Schagrin
                                                                          NAME

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**Before the Honorable Timothy M. Reif, Judge**

| | |
|---|---|
| KUMHO TIRE (VIETNAM) CO., LTD., | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| *v.* | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| *Defendant,* | ) |
| | ) Court No. 21-00397 |
| *and* | ) |
| | ) |
| UNITED STEEL, PAPER AND | ) |
| FORESTRY, RUBBER, | ) |
| MANUFACTURING, ENERGY, ALLIED | ) |
| INDUSTRIAL AND SERVICE WORKERS | ) |
| INTERNATIONAL UNION AFL-CIO, | ) |
| CLC, | ) |
| | ) |
| *Defendant-Intervenor.* | ) |
| | ) |

## ORDER

Upon consideration of the motion for judgment on the agency record filed by the plaintiff, the responses thereto filed by the defendant and the defendant-intervenor, the plaintiff's reply, the administrative record, all other papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that the plaintiff's motion for judgment on the agency record is **DENIED**; it is further

**ORDERED** that the U.S. Department of Commerce's final determination in the countervailing duty investigation of passenger vehicle and light truck tires from the Socialist Republic of Vietnam is sustained; and it is further

**ORDERED** that judgment is entered in favor of the United States.

**SO ORDERED**.

 

 

_____

Honorable Timothy M. Reif, Judge

U.S. Court of International Trade

Dated: _____, 2022

       New York, New York