UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE TIMOTHY M. REIF, JUDGE

|  |  |  |
|---|---|---|
| KUMHO TIRE (VIETNAM) CO., LTD., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| UNITED STATES, | ) | Court No. 21-00397 |
| Defendant, | ) | |
| and | ) | |
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC | ) | |
| Defendant-Intervenor. | ) | |

REPLY BRIEF OF
KUMHO TIRE (VIETNAM) CO., LTD.

PUBLIC VERSION

PROPRIETARY INFORMATION SUBJECT TO
PROTECTIVE ORDER DELETED FROM PAGES 23 AND 25

WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C.  20036
(202) 774-5500

Attorneys for Kumho Tire (Vietnam) Co., Ltd.

May 25, 2022

Table of Contents

ARGUMENT ................................................................................................................ 2

    A.   Commerce's Decision to Countervail a Foreign Country's
        Alleged Practice of Currency Undervaluation Is Unlawful ................................. 2

        1.   Commerce Lacks the Authority to Countervail
            Alleged Currency Undervaluation Under the Statute ................................. 2

            a.   Congress Has Acquiesced to Commerce's Long-Standing
                Practice Against Countervailing Currency Undervaluation ................. 2

            b.   USW's Representation of the Court's
                Holding in Hammond Lead Is Wrong .................................................... 6

            c.   USW's and Defendant's Arguments Are Premised  on
                Irrelevant Case Law and Should Be Rejected ...................................... 7

        2.   Specificity........................................................................................... 10

            a.   Commerce's Assumption Is Unreasonable And
                Not Supported By Substantial Evidence ............................................. 10

            b.   Commerce Failed To Meet Its Statutory Burden ............................... 13

            c.   Commerce's Decisions in 2010 Not to
                Investigate Allegations of Currency
                Undervaluation in Are Not Distinguishable......................................... 14

        3.   Arguments Presented in KTV's Initial Brief Were Not Waived ............... 15

    B.   Commerce's Decision to Countervail KTV's Land Lease................................... 17

        1.   Question of Foreign Law Is a Question of Law .......................................... 17

        2.   Commerce's Finding That There Were
            Material Changes to KTV's 2006 Lease Agreement
            Was Not Supported by Substantial Evidence.............................................. 19

            a.   Commerce's Interpretation of Vietnamese
                Law in Relation to Becamex's Ability to Lease
                Land to KTV Under the 2006 Agreement is Wrong......................... 19

                (1)   Commerce's Reliance on Its Land
                      Memorandum Is Misplaced....................................................... 19

(2)   The Evidence on the Record Confirms
that the Interpretation Adopted in
Commerce's Final Determination Is Wrong .............................. 21

(3)   Commerce's Finding that Becamex Lacked
Authority to Enter into a Lease Transaction in 2006
Is Inconsistent with Commerce's Determination
that Becamex Is Itself a Government Authority......................... 22

b.   Commerce's Findings of Other Material Changes to the 2006
Agreement Are Not Supported by Substantial Evidence ................... 23

(1)   KTV Obtained Its Land-Use
Rights from the 2006 Agreement ................................. 23

(2)   Late Payment ............................................................ 24

(3)   The Provision of Security Services Does Not
Constitute a Modification to the 2006 Agreement ...................... 24

c.   Post-Hoc Rationalization Argument Should be Rejected ................. 26

CONCLUSION ..................................................................................... 26

Table of Authorities

Page

CASES

*Bamberger v. Clark,*
   390 F.2d 485 (D.C. Cir. 1968) ............................................................ 17, 18

*Bob Jones Univ. v. U.S.,*
   461 U.S. 574 (1983) ............................................................................ 8

*Central Bank of Denver v. First Interstate Bank of Denver,*
   511 U.S. 164 (1994) ............................................................................ 9

*Creswell Trading Co. v. U.S.,*
   15 F.3d 1054 (Fed. Cir. 1994) ............................................................ 14

*GPX Int'l Tire Corp. v. U.S.,*
   666 F.3d 732 (Fed. Cir. 2011) ............................................................ 10

*Juancheng Kangtai Chemical Co., v. U.S.,*
   2015 WL 4999476 (CIT 2015) ............................................................ 16

*Merck & Co. v. U.S. Int'l Trade Comm'n,*
   774 F.2d 483 (Fed. Cir. 1985) ............................................................ 17

*Mitsubishi Heavy Indus., Ltd. v. U.S.,*
   24 C.I.T. 275 (2000) ............................................................................ 26

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
   463 U.S. 29 (1983) .............................................................................. 26

*PSC VSMPO–Avisma Corp. v. U.S.,*
   688 F.3d 751 (Fed. Cir. 2012) ............................................................ 21

*Rhone Poulenc, S.A. v. U.S.,*
   583 F.Supp. 607 (CIT 1984) .............................................................. 17

*Solid Waste Agency of N. Cook County v. U.S. Army Corps of Engineers,*
   531 U.S. 159 (2001) ............................................................................ 9, 10

*South Corp. v. United States,*
   690 F.2d 1368 (Fed. Cir. 1982) .......................................................... 3

*Thai Plastic Bags Indus. Co. v. U.S.,*
   37 C.I.T. 354 (2013) ............................................................................ 12

*Trust Chem Co. Ltd. v. U.S.,*
   791 F.Supp.2d 1257 (CIT 2011) ........................................................ 16

*United States v. Cleveland Indians Baseball,*
   532 U.S. 200 (2001) ............................................................................ 4

*United States v. Hammond Lead Products,*
   440 F.2d 1024  (C.C.P.A. 1971) ........................................................ 2, 7

Page

STATUTES

19 U.S.C. § 1677 ............................................................................................ 22

19 U.S.C. § 3512 .............................................................................................. 6

Trade Agreements Act of 1979, Pub.L. 96–39, 93 Stat. 144, 177 § 101 ............................ 5

ADMINISTRATIVE DECISIONS

*Aluminum Extrusions from the People's Republic of China:*
    *Final Affirmative Countervailing Duty Determination,*
    76 Fed. Reg. 18521 (Apr. 4, 2011)............................................................. 3, 15

*Carbon Steel Wire Rod from Poland;*
    *Preliminary Negative Countervailing Duty Determination,*
    49 Fed. Reg. 6768 (Feb. 23, 1984)................................................................. 3

*Certain Coated Paper Suitable for High-Quality Print Graphics*
    *Using Sheet-Fed Presses from the People's Republic of China:*
    *Final Affirmative Countervailing Duty Determination,*
    75 Fed. Reg. 59213 (Sept. 27, 2010).......................................................... 3, 15

*Final Negative Countervailing Duty Determination;*
    *Pork Rind Pellets from Mexico,*
    48 Fed. Reg. 39105 (Aug. 29, 1983) ............................................................... 3

*Lamb Meat from New Zealand;*
    *Preliminary Affirmative Countervailing Duty Determination,*
    46 Fed. Reg. 58128 (Nov. 30, 1981)................................................................ 3

*Phosphate Fertilizers from the Russia Federation: Final Affirmative Countervailing Duty*
    *Determination,*
    86 Fed. Reg 9479 (Feb.16, 2021)................................................................. 25

ADMINISTRATIVE MATERIALS

Memorandum from Team to R. Lorentzen re Countervailing Duty Investigation:
    Aluminum Extrusions from the People's Republic of China, Subsidy Allegation ..... 3, 14

Memorandum from Team to R. Lorentzen re Countervailing Duty Investigation: Certain
    Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from
    the People's Republic of China New Subsidy Allegation .......................................... 3, 14

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–
    316 (1994) *reprinted in* 1994 U.S.C.C.A.N. 4040............................................... 5

COURT RULES

Fed. R. Civil Procedure Rule 44.1 ....................................................................... 17

PUBLIC VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| KUMHO TIRE (VIETNAM) CO., LTD.,     ) | |
|     ) | |
| Plaintiff,     ) | |
|     ) | |
| v.     ) | |
|     ) | |
| UNITED STATES,     ) | |
|     ) | Court No. 21-00397 |
| Defendant,     ) | |
|     ) | |
| and     ) | |
|     ) | |
| UNITED STEEL, PAPER AND FORESTRY,     ) | |
| RUBBER, MANUFACTURING, ENERGY,     ) | |
| ALLIED INDUSTRIAL AND SERVICE WORKERS     ) | |
| INTERNATIONAL UNION, AFL-CIO, CLC     ) | |
|     ) | |
| Defendant-Intervenor.     ) | |
|     ) | |

REPLY BRIEF OF
KUMHO TIRE (VIETNAM) CO., LTD.

This brief is submitted on behalf of Kumho Tire (Vietnam) Co., Ltd. ("KTV") in reply to the response briefs filed by Defendant United States and Defendant-Intervenor United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union AFL-CIO, CLC ("USW") in the above-captioned appeal.[1]

---

[1] *See* Defendant's Response Brief (hereinafter "Defendant's Response Brief"), ECF Nos. 36-37; Defendant-Intervenor's Response Brief (hereinafter "USW's Response Brief"), ECF Nos. 38-39.

<u>ARGUMENT</u>

A.   *Commerce's Decision to Countervail a Foreign Country's Alleged Practice of Currency Undervaluation Is Unlawful*

1.   *Commerce Lacks the Authority to Countervail Alleged Currency Undervaluation Under the Statute*

a.   *Congress Has Acquiesced to Commerce's Long-Standing Practice Against Countervailing Currency Undervaluation*

As explained in KTV's initial brief, Commerce had a long-standing practice against treating currency devaluation as countervailable subsidies. That practice traces its origin at least back to the 1960s, when the Treasury Departments refused to apply countervailing duty in a case involving the Mexican government's devaluation of its currency.[2] When that practice was judicially challenged, the Court of Customs and Patent Appeals ("CCPA") in *Hammond Lead* found that, while an "undervalued" exchange rate may benefit exporters, a devaluation of the currency does not constitute a countervailable subsidy under U.S. countervailing duty laws. The CCPA found that Congress was "well aware" of the "problems" that currency undervaluation posed but had "elect{ed} to rely on executive discretion" in acquiescing in the Treasury's interpretation of the countervailing duty laws that excluded currency valuation practices from the definition of a subsidy.[3]

Commerce continued the Treasury's practice when responsibility for administering the countervailing duty statute was transferred from the Treasury Department to Commerce in 1980. In fact, one of Commerce's earliest countervailing duty decisions explicitly re-affirmed the longstanding Treasury position that devaluation of an exchange rate that applies equally to all imports and exports and is "freely available to all" does not

---

[2] *See United States v. Hammond Lead Products*, 440 F.2d 1024, 1030–31 (C.C.P.A. 1971).

[3] *See id.* at 1031.

PUBLIC VERSION

constitute a subsidy.[4]  Commerce continued this practice, relying on the court's holding in

*Hammond Lead* in some instances, until 2020 when it unilaterally and improperly decided

to reverse course.[5]

Defendant and USW contend that *Hammond Lead* is outdated.[6]  That argument is

misplaced.  As an initial matter, decisions issued by the CCPA prior to September 30,

1982, are binding unless overturned by the Court of Appeals for the Federal Circuit sitting

*en banc.*[7]  Defendant and USW have not suggested that the Federal Circuit overturned

*Hammond Lead*.  As such, regardless of how much time has passed since the issuance of

the decision*, Hammond Lead* is binding on this Court.  And, in the absence of subsequent

---

[4] *See Lamb Meat from New Zealand: Preliminary Affirmative Countervailing Duty Determination,* 46 Fed. Reg. 58128, 58131 (Nov. 30, 1981).

[5] *See Pork Rind Pellets from Mexico: Final Negative Countervailing Duty Determination*, 48 Fed. Reg. 39105, 39107 (Aug. 29, 1983); *Carbon Steel Wire Rod from Poland: Preliminary Negative Countervailing Duty Determination*, 49 Fed. Reg. 6768, 6771 (Feb. 23, 1984) (citing the CCPA's decision in *Hammond Lead* to support the conclusion that Commerce does not assess countervailing duties against countries which devalue their currency); *Aluminum Extrusions from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 76 Fed. Reg. 18521 (Apr. 4, 2011), and accompanying Issues and Decision Memorandum at cmt. 33; *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59213 (Sept. 27, 2010), and accompanying Issues and Decision Memorandum, at cmts. 5-7.  *See also* Memorandum from Team to R. Lorentzen re Countervailing Duty Investigation: Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China New Subsidy Allegation – Currency, Aug. 30, 2010, at 5 (Public Record (PR) 202-203; Confidential Record (CR)-76-80); Memorandum from Team to R. Lorentzen re Countervailing Duty Investigation: Aluminum Extrusions from the People's Republic of China, Subsidy Allegation – Currency, Aug. 30, 2010, at 5 (PR-202-203; CR-76-80).

[6] *See* Defendant's Response Brief, at 9-10; USW's Response Brief, at 25-26.

[7] *See South Corp. v. U.S.*, 690 F.2d 1368, 1370 n.2 (Fed. Cir. 1982).

legislation mandating otherwise, the interpretation described in *Hammond Lead* has "the effect of law."[8]

Defendant also contends that the *Hammond Lead* decision is "hardly persuasive, much less binding," because it was purported to interpret the meaning of a "bounty or grant ... , a term that no longer exists in today's statute."[9]  There is no dispute that the terminology used in the countervailing duty statute has undergone substantial changes since the *Hammond Lead*  decision was issued in 1971.[10]  But it is equally clear that the changes in terminology were not intended by Congress to change the core substantive concepts.  To the contrary, Congress has repeatedly affirmed that the term "subsidy" in the current statute has the same meaning as the term "bounty or grant" under the statute that was in effect when *Hammond Lead* was decided.[11]  Thus, in 1979, when the term "bounty or grant" was first replaced with the term "subsidy," Congress adopted a definition of the term "subsidy" that explicitly equated the meaning of that term with the meaning of "bounty or grant" under prior law:

> The term "subsidy" has the *same meaning* as the term "bounty or grant" as that term is used in section 303 of this Act, and includes, but is not limited to, the following:

---

[8] *See United States v. Cleveland Indians Baseball*, 532 U.S. 200, 220 (2001).

[9] *See* Defendant's Response Brief, at 9.

[10] *See* KTV's Initial Brief, at 24-30, ECF Nos. 30-31.

[11] The countervailing duty provisions of the statute were substantially re-written in 1979 to implement the results of the "Tokyo Round" of multilateral negotiations, and again in 1995 to implement the results of the "Uruguay Round."  The terminology used to describe the criteria for finding subsidies has changed considerably to reflect international agreement, as embodied most recently in the Uruguay Round Agreement on Subsidies and Countervailing Measures.

(A) Any export subsidy described in Annex A to the Agreement (relating to illustrative list of export subsidies).

(B) The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:

    (i) The provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations.

    (ii) The provision of goods or services at preferential rates.

    (iii) The grant of funds or forgiveness of debt to cover operating losses sustained by a specific industry.

    (iv) The assumption of any costs or expenses of manufacture, production, or distribution.[12]

Similarly, when Congress amended the countervailing duty laws in 1994 to reflect the results of the Uruguay Round WTO negotiations, Congress explicitly adopted the following statement as "an authoritative expression … concerning the interpretation and application" of the amendments:

> In general, the Administration intends that the definition of "subsidy" will have the *same meaning* that administrative practice and courts have ascribed to the term "bounty or grant" and "subsidy" under prior versions of the statute, unless that practice or interpretation is inconsistent with the definition contained in the bill. Absent such inconsistency, and subject to other relevant changes enacted in the implementing bill (*e.g.*, rules regarding non-countervailable subsidies and *de minimis* countervailable subsidies), practices countervailable under the current law will be countervailable under the revised statute.[13]

---

[12] *See* Trade Agreements Act of 1979, Pub.L. 96–39, 93 Stat. 144, 177 § 101 (adding Section 771(5) to the Tariff Act of 1930) (emphasis added).

[13] *See* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, 255 (1994) *reprinted in* 1994 U.S.C.C.A.N. 4040.

*(footnote continued on following page)*

In short, Defendant's assertion that *Hammond Lead* was rendered obsolete by the change of terminology from the older "bounty or grant" to the term "subsidy" is contrary to law, and reflects, at best, a reckless disregard for the facts that is inconsistent with the obligations of counsel in these proceedings.

> b. *USW's Representation of the Court's Holding in* <u>*Hammond Lead*</u> *Is Wrong*

For its part, USW contends that the CCPA's decision in *Hammond Lead* only concerned a jurisdictional matter, and that the language in that decision concerning the countervailability of currency undervaluation is *dicta*.[14]  USW's argument is, fundamentally, irrelevant.  The issue in this case is not whether *Hammond Lead* is binding precedent, but, instead, whether there was a longstanding practice by Treasury and Commerce in which Congress acquiesced.  The discussion in *Hammond Lead,* whether *dicta* or not, demonstrates the existence of a longstanding Treasury practice, as well as the deliberate failure by Congress (at least until the time that *Hammond Lead* was decided) to overturn that practice.

And, in any event, USW's reading of the *Hammond Lead* decision is simply wrong. The *Hammond Lead* court relied upon the congressional acquiescence doctrine in relation to the countervailability of currency practices to resolve the appeal.  In particular, the *Hammond Lead* court addressed the issue whether Congress intended, under Section

---

*(footnote continued from previous page)*

In this regard, the Uruguay Round Agreements Act ("URAA") explicitly mandated that the Statement of Administrative Action serves as "an authoritative expression by the United States concerning the interpretation and application of the {URAA} … in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d).

[14] *See* USW's Response Brief at 25.

516(b) of the Tariff Act of 1930 ("the Act"), to subject Treasury's decision *not* to impose

countervailing duty based on a foreign government's devaluation of its currency to judicial

review.[15]  In answering in the negative, the CCPA observed that Congress was "well

aware" of the issue of currency undervaluation by foreign governments to encourage

exports but, nevertheless, did not change the statute to allow for the imposition of

countervailing duty in response to such undervaluation.[16]  The court then held that

Congress had delegated the authority to countervail such currency practices to the Treasury

and acquiesced in the agency's interpretation of the countervailing duty statute that

excluded currency undervaluation practices from the definition of a subsidy.[17]  As a result,

the CCPA found that the trial court erred in reviewing the Treasury's negative

countervailing duty determination and reversed the trial court's decision and judgment.[18]

Therefore, the court's language on the countervailability of currency undervaluation was

central to its holding and cannot be dismissed as *dicta*.

c.   *USW's and Defendant's Arguments Are Premised*
*on Irrelevant Case Law and Should Be Rejected*

USW also claims that KTV's congressional acquiescence argument is flawed in part

because the Trade Preferences Extension Act of 2015 and the Trade Facilitation and Trade

Enforcement Act of 2015 did not reenact the relevant provisions of the countervailing duty

---

[15] *See Hammond Lead*, 440 F.2d at 1027, 1030-31 (taking judicial notice that Mexico devalued the peso in 1954).

[16] *See id.*

[17] *See id.*

[18] *See id.*

statute.[19]  In support of that argument, USW relies on a U.S. Supreme Court case holding

that the doctrine of congressional *ratification* applies only when Congress reenacts a

statute without relevant changes.[20]

USW's arguments simply ignore the fact that Congress did reenact the countervailing

duty laws in both 1979 and 1994 without overturning the longstanding practice by

Treasury and Commerce concerning the countervailability of currency undervaluation.

And, more generally, USW's suggestion that Commerce would be bound by that practice

only if the practice had been ratified by Congress is misplaced.  Although "ratification"

and "acquiescence" are similar in that each involves an inference that Congress has chosen

to leave an interpretation unchanged, there is a fundamental difference:  ratification

purports to involve interpretation of duly enacted legislation, while acquiescence attributes

significance to Congress's failure to act.  Acquiescence also places a significant

importance on the congressional awareness of the statutory interpretation at issue in

conjunction with the failure to act.[21]  As KTV's argument rests on the doctrine of

congressional acquiescence, USW's argument relying on a different ground for statutory

interpretation should be dismissed as irrelevant.

Defendant also argues that congressional inaction should not be taken as an

expression of congressional intent, relying on  the  Supreme Court decisions in *Central*

---

[19] *See* USW's Response Brief, at 31-32.

[20] *See id*.

[21] *See Bob Jones Univ. v. U.S.*, 461 U.S. 574, 601 (1983); *United States v. Rutherford*, 442 U.S. 544 (1979) (finding acquiescence and pointing to congressional hearings as evidence of congressional awareness of the agency policy).  As argued in its initial brief, Congress was very aware of Commerce's practice of not countervailing currency practices, yet it elected to not to disturb Commerce's practice by amending the statute.  *See* KTV's Initial Brief, at 29 n.73.

*Bank of Denver* and *Solid Waste Agency of N. Cook Country.* But the facts of those decisions are quite different from those of this case.[22]

*Central Bank of Denver* involved a situation in which there were *conflicting* judicial interpretations of a statute. Although Congress was aware that the courts had adopted conflicting interpretations, it failed to amend the statute to indicate which interpretation was correct.[23] The Court in that case held that the doctrine of congressional acquiescence was inapplicable, since the existence of conflicting judicial interpretations of the statute meant that Congress could not be said to have acquiesced in just one of them.[24] That case obviously has no relevance to the present situation, where the agency practice was fully in accord with the CCPA's 1971 decision in *Hammond Lead* until Commerce abruptly changed its regulations in 2020.

The holding in *Solid Waste Agency* is similarly inapposite. In that case, the agency tasked with interpreting the Clean Water Act attempted to argue that Congress had acquiesced in the agency's 1987 interpretation of a statutory term because Congress failed to pass amendments in 1977 —ten years *before* the agency adopted interpretation at issue — limiting the definition of the relevant term.[25] The Court held that the agency did not establish congressional acquiescence, where the agency's statutory interpretation that broadened its jurisdiction came ten years after the failed 1977 amendments and where the

---

[22] *See* Defendant's Response Brief, at 10 (citing *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 187 (1994) and *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 170 (2001).

[23] *See Central Bank*, 511 U.S. at 185-86.

[24] *See id.*

[25] *See Solid Waste*, 531 U.S. at 170-71.

agency offered no persuasive evidence that the failed legislation was proposed in response to the agency expanding its jurisdiction under the statute.[26]

In this case, by contrast, its is clear Congressional acquiescence came years *after* the policy was first adopted by the relevant agency. Since *Hammond Lead* was decided in 1971, Congress reenacted the countervailing duty statute employing the same substantive definition of "subsidy" on at least two occasions: in 1979 and again in 1994. In addition, Congress also specifically addressed the issue in 2015 by assigning responsibility for addressing currency undervaluation to Treasury, not Commerce.[27] In such circumstances, there is no bases for Defendant's suggestion that Congress was unaware of the agency practice or that Congress had not acquiesced in that practice.[28]

    2.   *Specificity*

        a.   *Commerce's Assumption Is Unreasonable And*
            *Not Supported By Substantial Evidence*

A single unified exchange rate that applies to all currency-exchange transactions in a given country would appear, on its face, to be generally available to all entities that hold or want to hold the currency, and thus not "specific," either by its terms or in its application to any particular enterprise, industry, or group of enterprises or industries. To avoid this conclusion, Commerce relied on its newly amended regulation, 19 C.F.R. § 351.502(c), to

---

[26] *See id.*

[27] *See* KTV's Initial Brief at 29.

[28] Defendant also contends that *GPX Int'l Tire Corp. v. U.S.*, 666 F.3d 732, 740 (Fed.Cir. 2011) is not applicable here because the court in that case relied on previous Federal Circuit precedent and prior agency briefs to find that Congress, by not amending the act, had ratified the agency interpretation at issue. *See* Defendant's Response Brief, at 13. That argument ignores the clear evidence of agency practice provided by the CCPA's decision in *Hammond Lead,* as well as by the various Commerce decisions cited in KTV's initial brief. *See* KTV's Initial Brief, at 25-30.

claim that it could satisfy the "specificity" statutory requirement by treating the exporters in the country under examination as a single "group" of enterprises or industries.[29]

In this case, Commerce concluded that enterprises that buy or sell goods internationally are the predominant users of the alleged Vietnamese government's currency undervaluation subsidy, because 71.94 percent of U.S. dollar inflows coming into Vietnam during the investigation period came from goods exports. According to Commerce, this high percentage indicates that importing and exporting enterprises are the predominant users of the currency conversions affected by the alleged undervaluation, and that the specificity requirement was therefore satisfied under 19 U.S.C. § 1677(5A)(D)(iii)(II).[30] But Commerce admitted that it did not actually have data on what portion of actual dollar-to-*dong* currency conversions was related to exporters. Instead, Commerce relied on U.S. dollar "inflows as a proxy" for "data on USD trading by field or sector."[31]

As a matter of logic, however, that reliance is inappropriate, because it ignores the fact that exporters do not have to convert their U.S. dollar export earnings into *dong*. An enterprise that imports inputs and exports a finished product may well keep U.S. dollar export earnings in U.S. dollars for many reasons, including, most obviously, to pay for U.S.-dollar imports. It would make no sense economically for such an enterprise to pay a commission to convert U.S. dollars earned on exports into *dong,* and then pay another commission to convert those *dong* back into dollars to pay for future imports. As explained in KTV's initial brief, the record does not support a finding that Vietnamese

---

[29] *See* Preliminary Determination Memorandum at 23 (PR-296). *See* Final Determination Memorandum, at 19 (PR-486).

[30] *See* Preliminary Determination Memorandum at 24 (PR-296).

[31] *See* Final Determination Memorandum, at 19 (PR-486).

holders of U.S. dollars are compelled, either by law or by practice, to formally convert those U.S. dollars into *dong*.[32]  In such circumstances, even if exporters accounted for 71.94 percent of U.S. dollar *inflows* into Vietnam, that would say nothing about the percentage of currency conversions accounted for by those exporters.

Defendant argues that "it is reasonable to assume Vietnamese firms would convert their export earnings from U.S. dollars to Vietnamese *dong* because the firms use the *dong* currency in their daily operations."[33]  But "unfounded assumptions are not evidence…."[34] There is no evidence on the record that the Vietnamese government imposes a currency surrender requirement.  Therefore, Vietnamese holders of U.S. dollar earnings are not compelled to convert their U.S. dollars to *dong*.  Instead, they may choose to retain their U.S. dollars for other operational reasons.

Evidence on the record shows that almost all of KTV's imported inputs were purchased in U.S. dollars.[35]  Furthermore, as recognized by the Vietnamese government, KTV has the "right" to transfer abroad its income in foreign currency.[36]  Consequently, there is no basis for assuming that KTV or other exporters would have converted the U.S. dollars received from exports into *dong*.  And, as a result, there is no basis to assume that

---

[32] USW's claim that KTV did not raise this argument below is incorrect and should be rejected.  *See* USW's Response Brief, at 48.  *See also* KTV's March 9 Case Brief, at 15 (PR-454; CR-184).

[33] *See* Defendant's Response Brief, at 24-25.

[34] *See Thai Plastic Bags Indus. Co. v. U.S.*, 37 C.I.T. 354, 363 (2013).

[35] *See* KTV's August 24, 2020, Section III Submission, at Appendix 7-A-2 (PR-159-163, CR-32-40).

[36] *See* KTV's February 4, 2021, Supplemental Response, at Appendix S7-4 (PR-433-434, CR-170-171).

exporters represent a meaningful "group" for purposes of analyzing the impact of the alleged undervaluation.

> ### b.   Commerce Failed To Meet Its Statutory Burden

Defendant asserts that Commerce accounted for U.S. dollar inflows that did not result in currency conversion by discounting the value of Vietnam's exports of goods by the amount of intermediate imported inputs.[37]  Defendant's arguments are self-defeating because: (1) they essentially concede that the proxy used by Commerce overstates the economic reality of currency exchanges, and (2) they admit that not all Vietnamese holders of U.S. dollars would exchange their dollars for Vietnamese *dong* because other reasons can compel them to keep their U.S. dollars from export earnings.  In other words, Commerce's methodology, while purported to rectify one deficient aspect of its assumption (*i.e.*, that Vietnamese holders of U.S. dollars may retain their U.S. dollar earnings to purchase imported inputs) revealed the crux of the problematic assumption supporting its analysis (*i.e.*, that, in the absence of a surrender requirement forcing Vietnamese exporters to surrender the foreign exchange they earn and accept *dong* in return, Vietnamese holders of U.S. dollar earnings may never convert their U.S. dollar earnings to *dong*).  As such, Commerce's methodology is baseless and unreasonable.

Defendant also argues that Commerce's specificity finding should be upheld because KTV provided no alternative to Commerce's calculation.  But that argument is misplaced.  The burden to establish a *prima facie* case for imposing a countervailing duty is on

---

[37] *See* Defendant's Response Brief, at 25-26.

Commerce.[38]  Therefore, KTV is not obligated to provide alternatives to Commerce's deficient approach.

> c. *Commerce's Decisions in 2010 Not to Investigate Allegations of Currency Undervaluation in Are Not Distinguishable*

As explained in KTV's initial brief, Commerce declined to investigate alleged currency-undervaluation practices in two investigations in 2010 involving *Aluminum Extrusions* and *Certain Coated Paper* from China.  Defendant and USW attempt to distinguish Commerce's decisions in those case based on the claim that Commerce's decisions were premised on the insufficiency of the petitioners' allegations.[39]  But their arguments misrepresent Commerce's actual reasoning in those cases.

When Commerce decided not to initiate investigations of the alleged currency-undervaluation practices in those 2010 cases, Commerce stated that:

> Petitioners are also incorrect in framing their allegations regarding exporters as a "group" receiving domestic subsidies.  Under the statutory scheme, subsidies to exporters are countervailable as export subsidies…. That scheme is set on its head by treating exporters as a "group" for purposes of finding a domestic subsidy under section 771(5A)(D) of the Act.[40]

---

[38] *See Creswell Trading Co. v. U.S.*, 15 F.3d 1054, 1060 (Fed. Cir. 1994) ("The ultimate burden of proof is thus upon Commerce to establish by a preponderance of the evidence that a government, or an agency thereof, has delivered to an exporter products or services for use in the production of exported goods on terms or conditions more favorable than those commercially available to the exporter on world markets.").

[39] *See* Defendant's Response Brief, at 12-13.

[40] *See Certain Coated Paper* New Subsidy Allegation Memorandum (PR-202-203; CR-76-80); *Aluminum Extrusions* Subsidy Allegation Memorandum (PR-202-203; CR-76-80).

As Commerce explained in those cases, a suggestion that exporters as a whole constitute a "group" for purposes of finding specificity under the countervailing duty statute is contrary to both the statute and to Commerce's established practice.

The petitioners in those cases subsequently argued that Commerce erred by refusing to initiate investigations of China's currency practices. In responding to those arguments in its final determinations, Commerce relied in large part on the fact that the currency regime at issue was a unified exchange rate available to all enterprises and individuals in the economy, and therefore, was not "specific."[41] Commerce also pointed to the fact that the alleged subsidy recipients actually used the vast majority of their foreign currency earnings to purchase imported inputs or for profit repatriation and, thus, did not convert those foreign currency earnings at the allegedly undervalued exchange rate.[42] In these circumstances, Commerce's decisions not to investigate alleged Chinese currency undervaluation cannot plausibly be distinguished from the situation presented in the current case.

### 3. Arguments Presented in KTV's Initial Brief Were Not Waived

USW contends that KTV failed to exhaust administrative remedies regarding certain aspects of KTV's challenge to Commerce's application of countervailing duty law to

---

[41] *See Aluminum Extrusions* Issues and Decision Memorandum, at cmt. 33; *Certain Coated Paper* Issues and Decision Memorandum, at cmts. 5-7.

Commerce also cited to the fact that China had repudiated its previous law on currency surrender. Significantly, there is no evidence of any Vietnamese law in effect during the investigation period that was similar to the law on currency surrender that China had repudiated.

[42] *See Certain Coated Paper* Issues and Decision Memorandum, at cmt. 6. *See, e.g.*, KTV's February 4, 2021, Supplemental Response, at Appendix S7-4 (PR-433-434; CR-170-171).

currency undervaluation, and therefore waived those arguments.[43]  More specifically, USW alleges that the following arguments were waived:

- Commerce's undervaluation determination cannot be sustained because it was based exclusively on the conclusions set forth in the Treasury Report, and did not reflect any independent analysis by Commerce itself.[44]

- The net balance of a government's purchases and sales of currency in the foreign-country market do not meet the statutory definition of "financial contribution" because those actions do not constitute a "direct transfer of funds" to KTV.[45]

- Commerce's analysis ignored the fact that KTV and its suppliers also make extensive purchases in foreign currency and any benefit realized by exchanging U.S. dollars for undervalued Vietnamese dong is, in effect, offset by increased costs for purchasing equipment and inputs denominated in U.S. dollars.[46]

However, USW ignores the fact that the KTV arguments in question simply "expand" arguments made by interested parties, including KTV, during the proceedings before Commerce.[47]  As such, they are not new issues raised for the first time on appeal.

More generally, the issue of Commerce's statutory authority to countervailing currency undervaluation is a purely legal question.  As this Court has held, the requirement that administrative remedies be exhausted does not apply to issues that are purely questions

---

[43] *See* USW's Response Brief, at 32, 41-42, and 44.

[44] *See id.* at 32.

[45] *See id.* at 41.

[46] *See id.* at 42.

[47] *See, e.g.*, Government of Vietnam's March 10 Case Brief, at 10-11 (PR-456; CR-186). *See Trust Chem Co. Ltd. v. U.S.*, 791 F. Supp. 2d 1257, n.27 (CIT 2011); *Juancheng Kangtai Chemical Co., v. U.S.*, 2015 WL 4999476 (CIT 2015) ("The exhaustion doctrine does not prevent a plaintiff from expanding on an argument based on the final record before the court, and an argument raised below does not need to be worded exactly as it is to the court.").

of law.[48]  In these circumstances, USW's claim that KTV waived specific arguments is

without merit.

>  B.   *Commerce's Decision to Countervail KTV's Land Lease*

>    1.   *Question of Foreign Law Is a Question of Law*

Defendant argues that the interpretation of the relevant Vietnamese law pertaining to

the land-use rights certificate is a matter of fact that should be reviewed under the

substantial evidence standard.[49]  Defendant is wrong.  It is well-settled that a question of

foreign law is treated in the federal courts as calling for a ruling on a question of law rather

than fact.[50]  Rule 44.1 of this Court (which is the same as Rule 44.1 of the Federal Rules of

Civil Procedure) states that:

> A party who intends to raise an issue concerning the law of a foreign
> country shall give notice by pleadings or other reasonable written
> notice. The court, in determining foreign law, may consider any
> relevant material or source, including testimony, whether or not
> submitted by a party or admissible under the Federal Rules of
> Evidence. The court's determination shall be treated as a ruling on a
> question of law.[51]

Therefore, this Court should reject Defendant's argument.

Relying on the D.C. Circuit opinion in *Bamberger v. Clark*, USW argues that

deference should be given to Commerce because it considered Vietnamese law to

administer the countervailing duty statute.[52]  That argument is misplaced.  The *Bamberger*

---

[48] *See, e.g.*, *Rhone Poulenc, S.A. v. U.S.*, 583 F.Supp. 607, 610 (CIT 1984).

[49] *See* Defendant's Response Brief, at 41-42.

[50] *See Merck & Co. v. U.S. Int'l Trade Comm'n*, 774 F.2d 483, 488 (Fed. Cir. 1985).

[51] *See* Fed. R. Civil Procedure Rule 44.1.

[52] *See* USW's Response Brief, at 16 (citing *Bamberger v. Clark*, 390 F.2d 485 (D.C. Cir. 1968)).

court was tasked with interpreting two provisions of the German Civil Code in determining the parties' rights and obligations arising from a contract, which it found to be "questions of a kind customarily entrusted to courts, and which may be disposed of without fear of clogging the wheels of the executive process."[53]  As a result, the court addressed the issue *de novo,* gave no deference to the agency, and rejected the agency determination as unlawful under German law.[54]

In the present case, the issue is whether Commerce erred in its interpretation of Vietnamese law.  In particular, Commerce interpreted Vietnamese law to require KTV's landlord Becamex to have been issued a land-use rights certificate before it could lease the land on which KTV's headquarters and main factory are located.  Because Becamex was not issued a land-use rights certificate until 2007, Commerce concluded that, under Vietnamese law, Becamex could not have leased the land to KTV pursuant to the In-Principle Agreement adopted in 2006.  As in *Bamberger*, then, the issue in this case does not involve the meaning of the countervailing duty statute, but instead concerns the rights and obligations arising from a contract made under Vietnamese law.  Therefore, Commerce's interpretation of the relevant Vietnamese law should not be accorded deference.

In the end, however, it does not matter whether the Vietnamese legal issues are considered legal or factual issues.  As discussed more fully below, Commerce's conclusion relied solely on a statement in Commerce's Land Memorandum concerning the significance of land-use-rights certificates under Vietnamese law that does not actually

---

[53] *Id*. at 488 ("Indeed, as we understand the state of the administrative docket, the issue before us will not arise in any other case.").

[54] *Id.* at 488-89.

support the conclusion Commerce reached.  The only probative evidence on the record

concerning the legal relevance of land-use certificates under Vietnamese law was a legal

opinion submitted by KTV, which confirmed that land-use rights are obtained from leases,

and not from certificates.

> 2. *Commerce's Finding That There Were*
> *Material Changes to KTV's 2006 Lease Agreement*
> *Was Not Supported by Substantial Evidence*

>> a. *Commerce's Interpretation of Vietnamese*
>> *Law in Relation to Becamex's Ability to Lease Land*
>> *to KTV Under the 2006 Agreement is Wrong*

>>> (1) *Commerce's Reliance on Its Land*
>>> *Memorandum Is Misplaced*

In its final determination, Commerce stated that Becamex (the company that operated

the industrial zone in which KTV's facilities are located) had no right to lease land in the

zone to KTV until Becamex received its own land-use-rights certificate.  Because

Becamex's land-use-rights certificate for the land at issue was dated in 2007 (after

Vietnam joined the World Trade Organization), Commerce concluded that Becamex could

not legally lease the land to KTV in 2006.

Significantly, Commerce did not engage in any meaningful analysis of the applicable

Vietnamese law before reaching its conclusion.  Instead, Commerce's conclusion that

Becamex could not lease the land to KTV in 2006 was premised solely on one sentence

taken out of context from its Land Memorandum.[55]  The full passage from the Land

Memorandum actually reads as follows:

> Land-use rights in Vietnam are legally recognized by the issuance of
> land-use rights certificates.  According to the *Land Law*, it is the state's

---

[55] *See* Final Determination Memorandum, at 41 (PR-468) (citing Land Memorandum, at 22
(PR-298-302)).

> responsibility to issue land-use rights certificate "to land users who are eligible as prescribed by law."  In practice, it is found that holding land-use rights certificates significantly improves land-use rights security, which is an important determinant of *farm production* outcomes, with farmers holding formal certificates having significantly higher yield than those without.[56]

As the Land Memorandum indicates, land-use-rights certificates provide convenient evidence, particularly for farmers, that the holder has the right to use the land.  However, the Land Memorandum does not state that, in the absence of a land-use-rights certificate, the land-holder has no right to enter into land-lease transactions.

The text of the Vietnamese 2003 Law on Land ("2003 Land Law"), which governs the interpretation of the 2006 In-Principle Agreement between Becamex and KTV's parent, supports the conclusion that Becamex was authorized to enter into land-lease transactions before it obtained its land-use-rights certification.[57]  Article 4.20 of the 2003 Land Law reads as follows:  "Land use right certificates mean the certificates granted by competent State agencies to land users in order to protect their legitimate rights and interests."  In short, neither Commerce's Land Memorandum nor the actual Vietnamese law indicate that Becamex lacked the legal ability to lease land to KTV before Becamex received its own land-use-rights certificate.

Defendant asserts that Commerce's interpretation of Vietnamese law is supported by the text of a later Land Law adopted by Vietnam in 2013.[58]  The simple answer is that the 2013 Land Law cited by Defendant *was not in effect* until seven years after the land-use

---

[56] *See* Land Memorandum, at 22 (PR-298-302).

[57] *See id.* at Att. 1 (PR-298-302).

[58] *See* Defendant's Response Brief, at 39 (citing Articles 26.2 and 48 of the 2013 Land Law).  USW also cites the 2013 Law Land in its argument but concedes that the 2003 version of the law should govern the issue.  *See* USW's Response Brief, at 15 n.5.

agreement between Becamex and KTV's parent was signed.  And, in any event, the 2013

Land Law does not state that a land-rights holder cannot enter into land-lease transactions

before it obtains a land-use-rights certificate.  Instead, the 2013 Land Law states only that

the government, in considering and approving land-use plans, will issue land-use-rights

certificates.  Nothing in the 2013 Land Law indicates that Becamex needed such a

certificate to lease land to KTV.

> (2)  *The Evidence on the Record Confirms*
>       *that the Interpretation Adopted in*
>       *Commerce's Final Determination Is Wrong*

During the course of the investigation, KTV submitted an opinion from an expert on

Vietnamese law concerning the legal significance of a land-use-rights certificate under

Vietnamese law.  In that opinion, the expert confirmed that such a certificate "does not

define the rights and obligations of the land user."[59]  Instead, according to the expert, those

rights and obligations are defined by the lease agreement and by the relevant provisions of

the Law on Land.[60]

Expert opinions constitute factual evidence.[61]  Commerce has not identified any

evidence that refutes the expert opinion that KTV submitted.  Consequently, even if

questions of foreign law were factual issues, the only evidence addressing whether a land-

use-rights certificate is needed under Vietnamese law to make transactions in land

confirms that Commerce's interpretation of Vietnamese law was wrong.

---

[59] *See* KTV's December 14, 2020, Supplemental Response, at Appendix 5 (PR-417-418, CR-138-140).

[60] *See id.*

[61] *See, e.g.*, *PSC VSMPO–Avisma Corp. v. U.S.,* 688 F.3d 751, 760–61 (Fed. Cir. 2012).

(3) *Commerce's Finding that Becamex Lacked*
    *Authority to Enter into a Lease Transaction in 2006*
    *Is Inconsistent with Commerce's Determination*
    *that Becamex Is Itself a Government Authority*

As explained in our initial brief, Commerce's finding of a subsidy from the provision of land-use rights to KTV was entirely premised on its finding that Becamex is a government "authority" for purposes of imposing countervailing duty.[62]  Furthermore, Commerce's finding that KTV received land-use rights for less than adequate remuneration was based solely on an analysis of the lease payments that KTV was required to pay to Becamex under the lease terms that were negotiated between Becamex and KTV's parent, and incorporated first in the 2006 In-Principle Agreement and subsequently in the lease agreement between Becamex and KTV.[63]  Commerce's subsidy finding was not based on any other actions by any other government authority.

In such circumstances, Commerce's assertion that Becamex lacked authority to act on behalf of the Vietnamese government when it entered into the 2006 In-Principle Agreement is fundamentally inconsistent with its finding that the terms of that Agreement constituted a subsidy.  If, as Commerce asserted, Becamex lacked government authority to enter into a lease agreement in 2006, then its 2006 agreement with KTV's parent cannot have been government action, and the terms of the 2006 In-Principle Agreement could not have provided a subsidy to KTV.[64]  In short, Commerce's attempt to treat the 2006 In Principle Agreement as lacking government authority is fatal to its claim that the government leased land to KTV at less than adequate remuneration.

---

[62] *See* Preliminary Determination Memorandum, at 25-26 (PR-296).

[63] *See id.* at 26-27.

[64] *See* 19 U.S.C. § 1677(5)(b).

> b. *Commerce's Findings of Other Material Changes to the 2006*
> *Agreement Are Not Supported by Substantial Evidence*

> (1) *KTV Obtained Its Land-Use*
> *Rights from the 2006 Agreement*

Defendant and USW both argue that, because the 2006 In-Principle Agreement was signed by KTV's parent company, KT-HK, KTV's subsequent Sub-lease agreement in 2012 constituted a material change because the identity of the contractual parties had changed. [65]  USW also argues that [

].[66]  Those arguments are simply wrong both in law and in fact.  Not only was KTV referenced as a party in the 2006 In-Principle Agreement, but the agreement also contains clear language indicating that KTV was the intended party whose land-use rights were defined by the terms of the agreement.

As explained in our initial brief, Vietnamese law permits the parent company (such as KT-HK) of a foreign-owned Vietnamese enterprise (such as KTV) to sign contracts to serve the incorporation and operation of the foreign-owned Vietnamese enterprise prior to the enterprise's registration and incorporation.[67]  KT-HK was, therefore, legally authorized to sign the 2006 In-Principle Agreement with Becamex on behalf of KTV.  And, as a result,  both KTV and Becamex remained bound by the valid terms of the 2006 In-

---

[65] *See* Defendant's Response Brief, at 43; USW's Response Brief, at 17-18.

[66] *See* USW's Response Brief, at 17-18.

[67] *See* KTV's Initial Brief, at 21.  *See also* Article 14.1 of the 2005 Law on Enterprises (provided in Appendix 5 of KTV's December 14, 2020, Supplemental Response (PR-417-418, CR-138-140)).  An explanation of the implications of Article 14.1 for KTV's land-use rights was set forth in a statement by a Vietnamese legal expert.  *See* Letter from Vu Son Tung, December 12, 2020 (provided in Appendix 5 of KTV's December 14, 2020, Supplemental Response (PR-417-418, CR-138-140)).

Principle Agreement even in the absence of the subsequent lease agreement between KTV and Becamex.

### (2) Late Payment

Defendant and USW both argue that KTV's failure to make certain payments that were due earlier until 2008 modified the material terms of the 2006 Agreement.[68] However, as explained in KTV's initial brief, a failure of one party to comply with the terms of an agreement does not void the original agreement or constitute the negotiation of a new agreement.[69]  In fact, parties are allowed to waive certain breaches under the contract.

Defendant argues that the failure of the 2012 Lease Agreement to state that Becamex was extending the payment deadline (or waiving penalties for late payment) proves that the contract was materially changed.[70]  That argument is misplaced, because there was absolutely no reason for the 2012 Agreement to address the issue.  After all, the "waiver" occurred in 2008 (when KTV made the late payments and Becamex did not impose a penalty), not in 2012.

### (3) The Provision of Security Services Does Not Constitute a Modification to the 2006 Agreement

USW contends that the 2006 Agreement did not include a contractual obligation for Becamex to provide security services to KTV, and that the inclusion of more detailed

---

[68] *See* Defendant's Response Brief, at 44-45; USW's Response Brief, at 19.

[69] *See* KTV's Initial Brief at 12.

[70] *See* Defendant's Response Brief at 45.

description of such services in the 2012 Agreement represents a modification of the terms of the agreement.[71]  But USW's argument is misplaced.

First, USW has failed to explain how the security-service terms of the 2012 Agreement represent a new obligation on Becamex.  As noted in KTV's initial brief, the 2006 In-Principle Agreement clearly required Becamex to maintain order on and around KTV's site.  In particular, Article 9 of the 2006 In-Principle Agreement provided that:

[

][72]

That obligation clearly encompassed the security and traffic-control services described in the 2012 Agreement.  And, under Commerce's past decisions, such technical changes after the cut-off date do not transform the pre-cut-off government action into a countervailable subsidy.[73]

Furthermore, USW has not explained how the provision of allegedly new security and traffic-control services constitutes the provision of *land-use* rights.  As noted in our initial brief, there has been no claim in this case that the Vietnamese government provided security and traffic-control services for less-than-adequate remuneration.  In such circumstances, the security and traffic-control provisions referenced by USW have no

---

[71] *See* USW's Response Brief at 21.

[72] *See* 2006 In-Principle Agreement, at Art. 9 (provided in KTV's December 14, 2020, Supplemental Response, at Appendix 1 (PR-417-418, CR-138-140)).

[73] *See Phosphate Fertilizers from the Russia Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9479 (Feb.16, 2021), at cmt. 2d (denying to countervail mining-rights licenses obtained before the cut-off date despite changes of technical nature).

bearing on the issue before Commerce, which was whether KTV obtained *land-use* rights

prior to the date that Vietnam joined the WTO.

        c.   *Post-Hoc Rationalization Argument Should be Rejected*

Finally, USW attempts to argue that there were other "material changes" to the 2006

In-Principle Agreement.[74]  Because Commerce's final determination did not consider those

alleged changes, this Court should reject USW's argument as impermissible post-hoc

rationalization.[75]

CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant KTV's motion

for judgment on the agency record, and remand this matter to Commerce for disposition in

a manner consistent with the judgment of this Court.

                Respectfully submitted,

                /s/Jeffrey M. Winton

                Jeffrey M. Winton
                Vi N. Mai

                WINTON & CHAPMAN PLLC
                1900 L Street, N.W., Suite 611
                Washington, D.C.  20036
                (202) 774-5500

                Attorneys for Kumho Tire (Vietnam) Co., Ltd.

May 25, 2022

---

[74] *See* USW's Response Brief, at 21-22.

[75] *See Mitsubishi Heavy Indus., Ltd. v. U.S.*, 24 C.I.T. 275, 281 n.9 (2000), *aff'd*, 275 F.3d 1056 (Fed. Cir. 2001) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 50 (1983) (" '{T}he courts may not accept appellate counsel's post hoc rationalizations for agency action.... It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself' ")).

Certificate of Compliance

Pursuant to the Court's "Standard Chambers Procedures," I, Jeffrey M. Winton, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the brief contains 6,990 words including headings, footnotes, and quotations, but not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block.


/s/ Jeffrey M. Winton
_____


May 25, 2022