Slip Op. 24-115

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **KUMHO TIRE (VIETNAM) CO., LTD.,** | |
| Plaintiff, | |
| v. | |
| **UNITED STATES,** | **Before: Timothy M. Reif, Judge** |
| Defendant, | **Court No. 21-00397** |
| and | **PUBLIC VERSION** |
| **UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,** | |
| Defendant-Intervenor. | |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part Commerce's Final Determination.]

Dated: October 18, 2024

<u>Vi N. Mai</u> and <u>Jeffrey M. Winton</u>, Winton & Chapman PLLC, of Washington, D.C., argued for plaintiff Kumho Tire (Vietnam) Co., Ltd.

<u>Elizabeth A. Speck</u>, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States. With her on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, and <u>Patricia M. McCarthy</u>, Director. Of counsel on the brief was <u>Rachel Bogdan</u>, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>Saad Y. Chalchal</u> and <u>Elizabeth J. Drake</u>, Schagrin Associates, of Washington, D.C., argued for defendant-intervenor the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC. With them on the brief was <u>Roger B. Schagrin</u>.

PUBLIC VERSION

Court No. 21-00397                                                                              Page 2

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 3

BACKGROUND ................................................................................................... 4

JURISDICTION AND STANDARD OF REVIEW ................................................. 9

LEGAL FRAMEWORK ...................................................................................... 10

DISCUSSION ..................................................................................................... 11

I.   Whether Commerce's determination that KTV's acquisition of land-use
     rights was a countervailable subsidy is supported by substantial evidence . 12

     A.   Legal framework ................................................................................. 12

     B.   Analysis .............................................................................................. 13

          1.   Standard of review ..................................................................... 14

          2.   Whether Becamex could lease to KTV prior to first obtaining
               the LURC ................................................................................... 17

II.  Whether the determination by Commerce that the currency undervaluation
     program of the Government of Vietnam is a countervailable subsidy is in
     accordance with law............................................................................................ 20

     A.   Legal framework relevant to analysis of Commerce's authority to
          determine whether undervaluation of currency is a countervailable
          subsidy................................................................................................ 20

     B.   Analysis .............................................................................................. 22

          1.   Whether Commerce has the authority to determine that undervaluation
               of currency is a countervailable subsidy ................................... 22

          2.   Whether legislative developments and Commerce's practice affect
               Commerce's authority to determine that currency undervaluation is a
               countervailable subsidy.............................................................. 26

III. Whether the determination by Commerce that KTV was a specific
     beneficiary of a financial contribution provided by Vietnam's currency
     undervaluation program was supported by substantial evidence and in
     accordance with law............................................................................................ 68

     A.   Legal framework ................................................................................. 68

     B.   Analysis .............................................................................................. 71

          1.   Financial contribution ................................................................. 71

          2.   Specificity.................................................................................... 77

          3.   Benefit ........................................................................................ 102

CONCLUSION ................................................................................................. 135

**PUBLIC VERSION**

Court No. 21-00397                                                                                                        Page 3

  Reif, Judge:  This action pertains to the final determination of the U.S.

Department of Commerce ("Commerce") in the countervailing duty ("CVD") investigation

on passenger vehicle and light truck ("PVLT") tires from the Socialist Republic of

Vietnam ("Vietnam") for the period of investigation ("POI") January 1, 2019, through

December 31, 2019.  *See Passenger Vehicle and Light Truck Tires from the Socialist*

*Republic of Vietnam: Final Affirmative Countervailing Duty Determination* ("*Final*

*Determination*"), 86 Fed. Reg. 28,566 (Dep't of Commerce May 27, 2021), PR 476, and

accompanying Issues and Decision Memorandum ("IDM"), PR 468.

  Plaintiff Kumho Tire (Vietnam) Co., Ltd. ("KTV"), a foreign manufacturer and

exporter of PVLT tires and "interested party" under 19 U.S.C. § 1677(9)(A), challenges

Commerce's Final Determination in a motion for judgment on the agency record with

respect to: (1) whether KTV's acquisition of land-use rights at preferential rent rates was

a countervailable subsidy; and (2) whether the Government of Vietnam's ("GOV")

currency undervaluation program constituted a countervailable subsidy.  Compl. ¶¶ 3, 9-

10(1)-(2), ECF No. 15[1]; *see* Pl.'s Mot. for J. on Agency R. ("Pl. Br."), ECF No. 30-31;

*see also* IDM at 4.  Defendant United States ("defendant" or the "Government") and

defendant-intervenor the United Steel, Paper and Forestry, Rubber, Manufacturing,

Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (the

"USW") assert that Commerce's determination is supported by substantial evidence and

---

[1] In the complaint, KTV also challenged "Commerce's determination that Plaintiff received countervailable subsidies under the GOV's Import-Duty Exemptions Program for Imported Inputs Used in Exported Products."  Compl. ¶ 10(3).  However, this issue is not discussed by KTV in the motion for judgment on the agency record or reply brief or by the Government or the USW in the responsive briefs.  *See generally* Pl. Br.; Def. Br.; Def.-Intervenor Br.

**PUBLIC VERSION**

is otherwise in accordance with law.  Def.'s Resp. in Opp'n to Pl.'s Mot. for J. on Agency

R. ("Def. Br.") at 1, ECF No. 36-37; *see* Def.-Intervenor's Resp. in Opp'n to Pl.'s Mot. for

J. on Agency R. ("Def.-Intervenor Br.") at 2, ECF No. 38-39.

As discussed herein, the court sustains in part and remands in part Commerce's

Final Determination.

## BACKGROUND

On May 13, 2020, the USW filed a CVD petition on PVLT tires from Vietnam.

Petition for the Imposition of Countervailing Duties pursuant to Sections 701 and 731 of

the Tariff Act of 1930, as amended (May 13, 2020), PR 9, PJA Tab 1.  On June 29,

2020, Commerce initiated the CVD investigation.  *Passenger Vehicle and Light Truck

Tires from the Socialist Republic of Vietnam: Initiation of Countervailing Duty

Investigation*, 85 Fed. Reg. 38,850 (Dep't of Commerce June 29, 2020), PR 92, PJA

Tab 3.

On July 8, 2020, Commerce selected KTV and Sailun (Vietnam) Co., Ltd. as

mandatory respondents and issued initial questionnaires.  *See* Letter from Minoo

Hatten, Program Manager, AD/CVD Operations, Office I, U.S. Department of

Commerce, to Bui Huy Son, Representative of Embassy of the Socialist Republic of

Vietnam Embassy of Vietnam - Trade Office, re: *Countervailing Duty Investigation of

Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam* (July 8,

2020), PR 98-99, PJA Tab 4.  The parties provided responses between July and

October 2020.  *Passenger Vehicle and Light Truck Tires from the Socialist Republic of

Vietnam: Preliminary Affirmative Countervailing Duty Determination and Alignment of

Final Determination With Final Antidumping Duty Determination* ("*Preliminary*

**PUBLIC VERSION**

*Determination*"), 85 Fed. Reg. 71,607 (Dep't of Commerce Nov. 10, 2020) and

accompanying Preliminary Decision Memorandum ("PDM"), C-552-829 (Dep't of

Commerce Oct. 30, 2020) at 2-3, PR 296, PJA 22.  In addition to issuing respondent

questionnaires, Commerce requested a report from the U.S. Department of the

Treasury ("Treasury") on "whether Vietnam's currency was undervalued during the

period of investigation."  PDM at 3.  On August 24, 2020, Commerce received the

Treasury report.  *Id.*  Commerce requested and received supplemental information from

Treasury on September 24, 2020.  *Id.*

Commerce postponed the deadline to issue its preliminary decision until October

30, 2020.  *Id.* (citing 19 U.S.C. § 1671b(c)(1)(A); 19 C.F.R. § 351.205(b)(2)).  Prior to

this deadline, on September 21, 2020, the USW "submitted two timely new-subsidy

allegations."  *Id.* at 4.  Commerce initiated investigations into these additional

allegations on October 2, 2020, and received responses to the additional questionnaires

from KTV and other respondents on October 13 and October 16, 2020.  *Id.*

On October 30, 2020, Commerce issued its PDM and a memorandum analyzing

Vietnam's land-use rights.  *See* PDM; Memorandum, "Countervailing Duty Investigation

of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam:

Analysis of Vietnam's Land-Use Rights" ("Land Mem.") (Oct. 30, 2020), PR 298-302,

PJA Tab 23.  On November 10, 2020, Commerce published its preliminary

determination for PVLT tires from Vietnam, determining the countervailable subsidy rate

for KTV to be 10.08 percent.  *Preliminary Determination*, 85 Fed. Reg. at 71,608.

On December 14, 2020, and February 4, 2021, KTV provided supplemental

questionnaire responses.  *See* KTV's December 14, 2020 Supplemental Response

**PUBLIC VERSION**

Court No. 21-00397                                                                 Page 6

("KTV Dec. Supp. Resp."), CR 138-140, PR 417-418, PJA Tab 29; KTV's February 4,

2021 Supplemental Response ("KTV Feb. Supp. Resp."), CR 170-171, PR 433-434,

PJA Tab 30.  On February 26, 2021, KTV also provided a submission responding to

Commerce's "In Lieu of Verification Questionnaire."  KTV's February 26, 2021

Submission, CR 174-177, PR 447-448, PJA Tab 31.

On March 9, 2021, KTV, the GOV and the USW filed case briefs.  IDM at 2 n.3.

KTV and the USW filed rebuttal briefs on March 24, 2021.  IDM at 2 n.4.

On May 21, 2021, Commerce issued both its IDM and its Final Analysis

Memorandum.  *See* IDM; Countervailing Duty Investigation of Passenger Vehicle and

Light Truck Tires from the Socialist Republic of Vietnam: Final Determination Analysis

Memorandum for Kumho Tire (Vietnam) Co., Ltd. (May 21, 2021), CR 190, PR 471, PJA

Tab 36 (hereinafter, "Final Analysis Memorandum").  On May 27, 2021, Commerce

issued its Final Determination, determining the countervailable subsidy rate for KTV to

be 7.89 percent.  *Final Determination*, 86 Fed. Reg. at 28,567.  Commerce found that

KTV received six countervailable subsidies, including a 5.16 percent subsidy rate for the

"preferential rent for areas with difficult socio-economic conditions" program and 1.69

percent for the "currency exchanges" program.  IDM at 4.  Between its Preliminary and

Final Determinations, Commerce changed its "benchmark" for evaluating KTV's

"adequacy of remuneration" for its land use from Kolkata, India, to Hyderabad, India, to

reflect more accurately population density, and "recalculated the net countervailability

for KTV accordingly."  *Id.* at 46-47.  Commerce made no other changes to its

methodology for calculating the subsidy rates for these programs.  *Id.* at 3-4.

**PUBLIC VERSION**

On the question of whether KTV's acquisition of land-use rights was

countervailable, Commerce found that KTV could not have acquired its land-use rights

before January 11, 2007, because under Vietnamese law, Becamex IDC Corporation

("Becamex")[2] could not have leased the land to KTV before Becamex's own rights were

"legally recognized by the issuance of [a] land-use rights certificate[]" ("LURC"), which

occurred on January 17, 2007.  IDM at 41 (quoting Land Mem. at 22 (citing 2013 Land

Law, Art. 26.2; OECF, *Agricultural Policies in Viet Nam* (2015), 210)).  Commerce noted

that "holding certification of one's land-use rights is necessary to transact the land."

Land Mem. at 22.  In addition, Commerce rejected KTV's argument that the terms of its

2012 land lease with Becamex ("2012 Agreement") were "consistent with those of the

2006 'in principle' agreement with KTV's parent company" ("2006 Agreement"), stating:

> the fact remains that KTV and KTV's parent are different entities.
> Accordingly, we find that one of the material terms of the land lease (*i.e.*,
> the parties to the lease) was not established until KTV *itself* signed the lease
> in 2012.  Therefore, the date that land use rights were conferred under even
> the earliest agreement and given the totality of the changes between the "in
> principle" agreement and the actual lease, we continue to find the program
> to be countervailable.

IDM at 41.[3]

---

[2] Becamex is a "government-controlled land development company" in Vietnam.  Pl. Br. at 7; *see* PDM at 25 (stating that "the GOV reported" that Becamex "is majority owned by the Binh Duong Provincial People's Committee").  On April 28, 2006, KTV's parent company and Becamex entered into an "in-principle" lease agreement ("2006 Agreement") for the land on which KTV's "head office and main factory were located." IDM at 40.

[3] Commerce noted that its analysis involving proprietary information was contained in the Final Analysis Memorandum.  IDM at 42; *see* Final Analysis Mem.

**PUBLIC VERSION**

In addition, Commerce concluded that there were "*at least two* material changes"

between the 2006 Agreement and the 2012 Agreement and that, therefore, "[[      ]] of

the essential terms and conditions of KTV's land use agreement were established prior

to January 11, 2007."  Final Analysis Mem. at 2-3 (discussing the [[

]] and the [[

]]).

Commerce also addressed five comments related to its preliminary determination

that the GOV's currency undervaluation program was a countervailable subsidy.[4]  IDM

at 5-26.  Specifically, Commerce discussed: (1) "Whether International and U.S. Law

Permits Commerce to Countervail Exchanges of Undervalued Currency"; (2) "Whether

Commerce's Promulgation of the Currency Regulations in the Absence of Legislative

Authority is Outside its Legal Authority"; (3) "Whether an Exchange of Currency

Constitutes a Financial Contribution"; (4) "Whether the Currency Program Is Specific";

and (5) "Whether the Vietnamese Dong [("VND")] was Undervalued During the POI."  *Id.*

at 1-2 (corresponding to Comments 1 through 5).  On each of these issues, Commerce

in its Final Determination made no changes to the position it took in its Preliminary

Determination.  *See id.* at 7-26.

On July 19, 2021, Commerce issued its CVD order for PVLT tires from Vietnam.

*Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam:*

*Countervailing Duty Order*, 86 Fed. Reg. 38,013 (Dep't of Commerce July 19, 2021), PR

487, PJA Tab 38.

---

[4] Commerce's findings on currency undervaluation are discussed *infra* Section III.

**PUBLIC VERSION**

KTV brought this action on August 11, 2021, Summons (Aug. 11, 2021), ECF No. 1, seeking remand, Compl. ¶ 11.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to sections 516A(a)(2)(A) and 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(A) and (a)(2)(B)(i) (2018), and 28 U.S.C. § 1581(c) (2018).[5]

The court will uphold Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  The substantial evidence standard "requires 'more than a mere scintilla'" of evidence "but is satisfied by 'something less than the weight of the evidence.'"  *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (first quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); and then quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)).  "When an agency changes its practice, it is obligated to provide an adequate explanation for the change."  *SKF USA Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)); *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he agency must show that there are good reasons for the new policy."); *see also Huvis Corp v. United States*, 570 F.3d 1347, 1354 (Fed. Cir. 2009).

---

[5] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition.

**PUBLIC VERSION**

Court No. 21-00397                                                                    Page 10

"Courts interpret statutes, no matter the context, based on the traditional tools of statutory construction, not individual policy preferences." *Loper Bright Enters. v. Raimondo,* 144 S. Ct. 2244, 2268 (2024).

"[I]n an agency case in particular, the reviewing court will go about its task with the agency's 'body of experience and informed judgment,' among other information, at its disposal." *Id.* at 2267 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). An agency's interpretation of a statute "cannot bind a court," but may be especially informative "to the extent it rests on factual premises within [the agency's] expertise." *Id.* (alteration in original) (quoting *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98 n.8 (1983)).

**LEGAL FRAMEWORK**

Commerce will impose a countervailing duty when: (1) Commerce "determines that the government of a country or any public entity within the territory of a country" has subsidized the "manufacture, production, or export of" such merchandise; and (2) the U.S. International Trade Commission ("Commission") determines that a U.S. industry has been "materially injured" or "threatened with material injury" or "the establishment of a[] [U.S.] industry is materially retarded" due to the subsidized imports. 19 U.S.C. § 1671(a)(1)-(2).

A subsidy is countervailable when "an authority . . . provides a financial contribution" that confers a benefit to a specific entity, industry, or group of entities or industries. 19 U.S.C. § 1677(5)(B); *see* § 1677(5A). The statute further defines "authority" as "a government . . . or any public entity within the territory of [a] country." *Id.* § 1677(5)(B). In addition, the statute lists four types of "financial contributions" that

can be countervailable subsidies: (1) "the direct transfer of funds"; (2) "foregoing or not

collecting revenue that is otherwise due"; (3) "providing goods or services"; and (4)

"purchasing goods."  *Id.* § 1677(5)(D).  Commerce will treat a benefit as conferred, "in

the case where goods or services are provided, if such goods or services are provided

for less than adequate remuneration."  *Id.* § 1677(5)(E)(iv).  Commerce will make its

determination with reference to the "prevailing market conditions," including "price,

quality, availability, marketability, transportation[] and other conditions of purchase or

sale."  *Id.* § 1677(5)(E).  A domestic subsidy must also be specific to a "foreign

enterprise or foreign industry" or "a group of such enterprises or industries."  *Id.* §

1677(5A)(D).

## DISCUSSION

The court addresses first the issue of whether Commerce's determination that

KTV's acquisition of land-use rights was a countervailable subsidy is supported by

substantial evidence and is in accordance with law.  Second, the court addresses

whether Commerce's determination that the GOV's currency undervaluation subsidy is

a countervailable subsidy is supported by substantial evidence and is in accordance

with law.  Third, the court addresses whether Commerce's determination that KTV was

the beneficiary of the countervailable subsidy of currency undervaluation is supported

by substantial evidence and is in accordance with law.  The court concludes that

Commerce's determination that the GOV's currency practices constitute a

countervailable subsidy does not provide a basis for the court to conclude that the

determination is supported by substantial evidence.

**PUBLIC VERSION**

**I.   Whether Commerce's determination that KTV's acquisition of land-use rights was a countervailable subsidy is supported by substantial evidence**

   **A.   Legal framework**

   Commerce is not required to impose a countervailing duty on merchandise "imported . . . into the United States from a nonmarket economy country if [Commerce] is unable to identify and measure subsidies provided by the government . . . or a public entity" in that "country because the economy of that country is essentially comprised of a single entity." *Id.* § 1671(f)(2).

   On January 11, 2007, Vietnam acceded to the World Trade Organization ("WTO"). *See* PDM at 5 (citing *Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 16,428 (Dep't of Commerce Apr. 1, 2010) ("*PRCBs from Vietnam*") and accompanying IDM at cmt. 3). Subsequently, Commerce determined that January 11, 2007, is the cut-off date before which alleged subsidies are not countervailable in Vietnam, a non-market economy ("NME"). *See id.*; *PCRBs from Vietnam* at cmt. 3.[6] Therefore, Commerce does not countervail transactions whose "essential terms and conditions are established prior to the . . . cut-off date." *Wire Decking from the People's Republic of China: Final Affirmative Countervailing Duty Determination* ("*Wire Decking from China*"),

---

[6] This Court has remanded for further explanation Commerce's use of a uniform cut-off date in cases with respect to an NME country. *TMK IPSCO v. United States*, 40 CIT __, __, 179 F. Supp. 3d 1328 (2016) ("Commerce has not explained why China's accession date was the first date where subsidies were identifiable and measurable, although the statute requires Commerce to countervail subsidies when they can be identified and measured."). In the instant case, neither petitioners before Commerce nor parties to the instant proceeding have challenged Commerce's use of the date of Vietnam's accession to the WTO as a cut-off date after which Commerce could "identify and measure" subsidies. 19 U.S.C. § 1671(f)(2). As a consequence, the court does not address the issue.

**PUBLIC VERSION**

75 Fed. Reg. 32,902 (Dep't of Commerce June 10, 2010) and accompanying IDM at

cmt. 14 (June 3, 2010); *see also* Pl. Br. at 6 (citing *Wire Decking from China* IDM at cmt.

14; *Certain New Pneumatic Off-the-Road Tires (OTR Tires) from the People's Republic

of China: Final Affirmative Countervailing Duty Determination and Final Negative

Determination of Critical Circumstances* ("*Certain OTR Tires from China*"), 73 Fed. Reg.

40,480 (Dep't of Commerce July 15, 2008) and accompanying IDM at section IV.D,

"Programs Determined To Be Not Used" (July 7, 2008)).  However, Commerce does

consider material changes in determining the date on which the essential terms were

established.  *See, e.g.*, *Certain Steel Wire Garment Hangers from the Socialist Republic

of Vietnam* ("*Hangers from Vietnam*"), 77 Fed. Reg. 75,973 (Dep't of Commerce Dec.

26, 2012) and accompanying IDM at cmt. 2 (using the date of a new lease contract).

Rule 44.1 of the Rules of the U.S. Court of International Trade governs the

determination of foreign law.  The rule states that "[i]n determining foreign law, the court

may consider any relevant material or source, including testimony, whether or not

submitted by a party or admissible under the Federal Rules of Evidence."  USCIT R.

44.1.  In addition, "[t]he court's determination must be treated as a ruling on a question

of law."  *Id.*

**B.    Analysis**

The court assesses Commerce's conclusion that Becamex could not have leased

the land prior to January 11, 2007 — the date after which Commerce stated that it was

able to "identify and measure" subsidies — because Becamex did not have a LURC

until January 17, 2007.  For the reasons discussed below, the court concludes that

Commerce's determination to countervail KTV's acquisition of land-use rights is

supported by substantial evidence and in accordance with law.

### 1.    Standard of review

Before the court considers the significance of Becamex's LURC, the court

addresses its standard of review of Commerce's interpretation of Vietnamese law.

KTV invokes USCIT Rule 44.1 and argues that the court is required to treat an

agency's interpretation of foreign law as a question of law.  Pl. Br. at 17 n.46 (citing

*Bugliotti v. Republic of Argentina*, 952 F.3d 410, 413 (2d Cir. 2020)).  In addition, KTV

contends that the court does not owe any deference to the agency's interpretation of

Vietnamese law because the underlying issue is not the meaning of the countervailing

duty statute itself but rather "the rights and obligations arising from a contract made

under Vietnamese law."  Reply Br. of Kumho Tire (Vietnam) Co. ("Pl. Reply Br.") at 18.

According to defendant, Commerce "regularly relies on foreign laws in support of

its countervailing duty determinations because such information, particularly during

investigations, routinely is placed on the agency record as factual information."  Def. Br.

at 41 (citing 19 C.F.R. § 351.102(b)).  Defendant cites a previous countervailing duty

investigation in which Commerce explained that it "does not rely on foreign laws in

countervailing duty proceedings 'for the purpose of making legal arguments concerning

U.S. law or international obligations, but for the purpose of determining relevant facts.'"

*Id.* (citing *Certain OTR Tires from China* IDM at cmt. F.13).  Defendant adds that this

Court "has also recognized that '[t]he agency's determination on the record of the

meaning and operation of foreign law is one of fact.'"  *Id.* at 41-42 (citing *Rebar Trade

Action Coal. v. United States*, Slip Op 16-88, 2016 WL 5122639, at *3 (CIT Sept. 21,

**PUBLIC VERSION**

2016)).  The USW adds that, even if the court is required to treat the issue of

Vietnamese law as a question of law, the court should defer to Commerce's

interpretation "because Commerce considered Vietnamese law for purposes of

administering the CVD law."  Def.-Intervenor Br. at 16 n.6 (citing *Bamberger v. Clark*,

390 F.2d 485, 488 (D.C. Cir. 1968); *Nuove Industrie Elettriche di Legnano S.p.A. v.

United States*, 14 CIT 334, 337-42, 739 F. Supp. 1567, 1571-74 (1990)).

      USCIT Rule 44.1 requires the court to treat an issue of foreign law as a question

of law.  USCIT Rule 44.1 provides:

> A party who intends to raise an issue about a foreign country's law must
> give notice by a pleading or other writing.  In determining foreign law, the
> court may consider any relevant material or source, including testimony,
> whether or not submitted by a party or admissible under the Federal Rules
> of Evidence.  *The court's determination must be treated as a ruling on a
> question of law*.

(emphasis supplied).  KTV has properly raised the issue of foreign law in its brief.  *See*

Pl. Br. at 4 (statement pursuant to Rule 44.1).

      This Court and the Federal Circuit have noted that federal courts review an

agency's interpretation of foreign law as a question of law under USCIT Rule 44.1.  *See,

e.g.*, *Nuove Industrie*, 14 CIT at 339, 739 F. Supp. at 1572; *Merck & Co., Inc. v. U.S.

Int'l Trade Comm'n*, 774 F.2d 483 (Fed. Cir. 1985) ("[I]n the federal courts foreign law is

a question of law to be determined by expert evidence or any other relevant source.").

For example, in *Nuove Industrie*, the court examined whether it could consider

attachments to plaintiff's motion for judgment on the agency record.  14 CIT at 337, 739

F. Supp. at 1570.  The attachments consisted of the opinion of an Italian law firm as to a

matter of Italian corporate law, as well as additional Italian legal documents.  *Id.*

Defendant asserted that the attachments "represent[ed] an impermissible attempt to

**PUBLIC VERSION**

amend or supplement the administrative record" and moved the court to strike the

attachments.  *Id.*  The court noted first that the Italian law in question was properly

raised before the agency and then determined that the rules permitted the court to

consider the attachments under USCIT Rule 44.1, stating:

> [The government's] argument would be of moment were those papers
> directed at the substantial-evidence-on-the-record review of section
> 1516a(b)(1)(B), . . . for the record here cannot be supplemented and the
> court cannot freely substitute its views thereof for those of the ITA.  But the
> papers attempt to address the accordance-with-law standard of that
> section, and, while the traditional rule that "[q]uestions of law are reviewed
> under the non-deferential, de novo standard" may not apply under that
> standard in the light of *Bamberger v. Clark* . . . that case certainly does not
> preclude full and fair consideration of plaintiff's argument by this court.

*Id.* at 339, 739 F. Supp. at 1572 (footnotes omitted).

Therefore, the court will treat Commerce's interpretation of Vietnamese law as a

question of law under USCIT Rule 44.1.[7]

---

[7] Parties disagree as to whether the court is required to interpret Vietnamese law de
novo or may defer to the agency's interpretation.  *Compare Kaho v. Ilchert*, 765 F.2d
877 (9th Cir. 1985) ("The provisions of Rule 44.1 indicate that a deferential standard of
review on a question of foreign law is inappropriate."), *with Bamberger v. Clark*, 390
F.2d 485, 488 (D.C. Cir. 1968) (addressing foreign law and stating that "in the context of
an administrative record . . . in some instances at least a court will defer to an agency's
view"), *and Valkia Ltd. v. United States*, 28 CIT 907, 919 (2004) (stating that "[t]he Court
must defer to the agency's interpretation" of an issue of foreign law "in the absence of
proof that it was unlawful").  The court need not address this issue, as the result is the
same regardless of the standard of review.  The 2003 Land Law is clear on its face;
Becamex could not lease the land to KTV until after Becamex obtained its LURC.
*Bullcreek v. Nuclear Regulatory Comm'n*, 539 F.3d 536, 541 (D.C. Cir. 2004) (holding
that the question of deference to the agency's interpretation was "moot . . . because the
result [was] the same whether the court applies de novo review [or] deference").

PUBLIC VERSION

      **2.    Whether Becamex could lease to KTV prior to first obtaining the LURC**

Under 19 U.S.C. § 1671(f)(2), Commerce cannot impose countervailing duties where it "is unable to identify and measure subsidies provided by the government of the nonmarket economy country . . . because the economy of that country is essentially comprised of a single entity." Commerce treats the date of an NME country's accession to the WTO as the "cut-off" date from which Commerce may "identify and measure" subsidies in that country. *See PRCBs from Vietnam* IDM at cmt. 3 (applying Vietnam's January 11, 2007, accession to the WTO as the date from which Commerce may countervail subsidies in Vietnam).

Commerce determined that KTV did not obtain its land-use rights in the instant case until after January 11, 2007. IDM at 41. Commerce reached this conclusion because Becamex, the company from which KTV claimed it leased the subsidized land, did not obtain its LURC until January 17, 2007. *Id.* Because, according to Commerce, Becamex "by law[] could not lease land to KTV until" Becamex received the LURC, Commerce concluded that "the provision of KTV's land did not occur until after Vietnam's accession to the WTO." *Id.*

Before the court, KTV relies on the statements placed on the agency record of a Vietnamese lawyer and argues that a LURC only "confirms the holder's existing rights and interests" but that "[n]othing in the law prevents the holder of land-use rights from leasing land to another entity before such a certificate was issued." Pl. Br. at 17-18. According to KTV, its "acquisition of land-use rights was governed by the agreements with [Becamex]" and not by "any land-use rights certificate." *Id.* at 16. Because KTV and Becamex entered into the 2006 Agreement prior to January 11, 2007, KTV

**PUBLIC VERSION**

maintains that the provision of that land to KTV for less than adequate remuneration is

not countervailable.  *Id.*

Defendant responds that under the Land Law of Vietnam, "holding a land-use

certificate is necessary to transact land."  Def. Br. at 39.  Defendant points out that

Becamex did not receive its LURC until January 17, 2007 — after Vietnam's accession

to the WTO.  *Id.* at 40 (citing Land Mem. at 22 (citing KTV's Dec. Supp. Resp. at 3-4,

apps. 2-3)).  Defendant concludes for this reason that "Becamex's rights to the land it

leased to KTV in 2012 attained legal significance only after Vietnam's January 11, 2007

WTO accession date, regardless of when Becamex and KTV-HK had agreed upon the

lease terms."  *Id.*  According to defendant, "[o]n this basis alone Commerce was lawfully

permitted to countervail this subsidy."[8]  *Id.*

The court concludes that under Vietnamese law Becamex was not able to lease

the land to KTV prior to first obtaining the LURC.[9]  As a result, KTV did not receive its

land-use rights until after Vietnam's accession to the WTO, and, for that reason, under

Commerce's existing practice KTV's preferential rent was countervailable.

In Vietnam, "[l]and belongs to the entire people," with "the State acting as the

owner's representative."  2003 Land Law, Art. 5.1.  The state may grant "land use

rights" to individuals or organizations through "land use rights certificates."  2003 Land

---

[8] The USW adds that Vietnam's Land Law "plainly states" that land users may lease
land only after first obtaining a LURC.  Def.-Intervenor Br. at 15, 15 n.5.

[9] In reaching a determination as to the meaning of Vietnamese law, the court has
considered the text of the 2003 Vietnamese Land Law, KTV's submissions to the
administrative record and parties' arguments before the court.  *See* USCIT R. 44.1
(allowing the court to "consider any relevant material or source").

**PUBLIC VERSION**

Law Arts., 50 (individuals), 52.1 (organizations); *see also* 2003 Land Law, Art. 10.1

("The State shall issue certificates of land use right [sic] to land users.")  Such

certificates are issued "for every land plot[]."  2003 Land Law, Art. 48.3.

      The terms of the 2003 Vietnamese Land Law are clear.[10]  Article 106 establishes

four conditions that must be met — one of which is that a land user first acquire a LURC

— before a land user may lease land:[11]

> 1. The land users are entitled to exercise their rights to exchange, transfer,
> *lease*, sublease, inherit, present or donate the land use rights . . . when the
> following conditions are met:
>
> > a) *They have land use rights certificates*;
> > b) The land is free from disputes;
> > c) Their land use rights are not inventoried to ensure the
> > execution of judgments;
> > d) Their land use duration has not yet expired.

(emphases supplied).

---

[10] The court notes that in the IDM and Land Memorandum Commerce cited to the 2013 Land Law and not the 2003 Land Law, which was the version of the law in effect at the time of the 2006 Agreement.  IDM at 41; Land Mem. at 22; *see* Oral Arg. Tr. at 73:17-25, 76:13-21.  In addition, Commerce did not cite to the relevant provisions of the 2013 Land Law that establish that obtaining a LURC is a precondition to transacting one's land-use rights in Vietnam.  IDM at 41; Land Mem. at 22.  However, the 2003 Land Law was placed on the record.  Land Mem., Attach. 1, CR 298-302, PJA Tab 23.  As a result, the court is able to reach its own independent determination of the meaning of Vietnamese law.

[11] KTV argues also Commerce's conclusion that Becamex "lacked authority" to enter into the 2006 Agreement prior to obtaining the LURC "is inconsistent with [Commerce's] finding that Becamex is a government 'authority' for purposes of imposing countervailing duty [sic]."  Pl. Reply Br. at 22.  However, KTV did not identify in the 2003 Land Law, and the court has not found, any exception for government-affiliated entities to the requirement of Article 106 that land users obtain a LURC prior to leasing the land.  For that reason, KTV's argument fails.

PUBLIC VERSION

Here, Commerce observed correctly that Becamex did not receive its LURC until January 17, 2007.  *See* Pl. Dec. Supp. Resp., App. 3 (stating that Becamex received its LURC on January 17, 2007).  As a matter of Vietnamese law, Becamex could not lease the land to KTV until that date.  Accordingly, Commerce's conclusion that KTV could not have obtained its preferential rent until after Vietnam's accession to the WTO is supported by substantial evidence and in accordance with law.[12]

## II.   Whether the determination by the Department of Commerce ("Commerce") that the currency undervaluation program of the Government of Vietnam ("GOV") is a countervailable subsidy is in accordance with law

Commerce's determination that currency undervaluation may be and in this case is a countervailable subsidy is consistent with the statute.

### A.   Legal framework relevant to analysis of Commerce's authority to determine whether undervaluation of currency is a countervailable subsidy

Commerce imposes countervailing duties when: (1) Commerce — as the "administering authority" — "determines that [a foreign] government or any public entity within th[at] . . . country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States"; and (2) the U.S. International Trade Commission ("Commission") determines that a U.S. industry is "materially injured" or "threatened with material injury," or the establishment of a U.S. industry is materially impacted, due to the imports.  19 U.S.C. § 1671(a).

---

[12] Because the court has sustained Commerce's conclusion that KTV did not obtain its land-use rights until after Vietnam's accession to the WTO, the court does not address KTV's other arguments challenging Commerce's decision to countervail KTV's preferential rent.

**PUBLIC VERSION**

As discussed, a subsidy is countervailable when a government or public body provides a financial contribution that confers a benefit to the recipient and is specific to an enterprise, industry or group of enterprises or industries.  19 U.S.C. § 1677(5)(B), 5(D), 5(E), (5A).  Commerce is the "administering authority" for countervailing and antidumping duties.  19 U.S.C. § 1677(1).

In 2020, Commerce promulgated a new regulation, 19 C.F.R. § 351.528, which establishes the process for Commerce to determine whether undervaluation of a currency constitutes a countervailable subsidy.  *See Modification of Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings* ("*Final Rule*"), 85 Fed. Reg. 6,031 (Dep't of Commerce Feb. 4, 2020).  Commerce promulgated this regulation to "fill [the] gap" in both the Tariff Act of 1930 and existing Commerce countervailing duty ("CVD") regulations on the issue of "how to determine the existence of a benefit or specificity when Commerce is examining a potential subsidy resulting from the exchange of currency under a unified exchange rate system."  *Id.*  Commerce explained that it created 19 C.F.R. § 351.528 to "govern the determinations of undervaluation and benefit when examining potential subsidies resulting from the exchange of an undervalued currency."  *Id.*  Commerce explained also that "[t]he regulatory modifications do not address financial contribution under section 771(5)(B) and section 771(5)(D) of the [Tariff Act of 1930]."  *Id.*  However, Commerce added that "[t]he receipt of domestic currency from an authority . . . in exchange for U.S. dollars could constitute a financial contribution under section 771(5)(D) of the [Tariff Act of 1930]," but noted that such a finding "will depend upon the facts on the record of the proceeding."  *Id.* (alterations in original).

19 C.F.R. § 351.528 provides that Commerce will "consider whether a benefit is conferred from the exchange of United States dollars for the currency of a country under review or investigation under a unified exchange rate system only if that country's currency is undervalued during the relevant period" and "normally will make an affirmative finding" of undervaluation only if "government action on the exchange rate . . . contributes to an undervaluation of the currency." 19 C.F.R. § 351.528(a)(1)-(2). The regulation also states that Commerce will "take into account the gap between the country's real effective exchange rate (REER) and the real effective exchange rate that achieves an external balance over the medium term that reflects appropriate policies (equilibrium REER)." *Id.* § 351.528(a)(1).

**B.    Analysis**

The court addresses first whether Commerce had the authority under U.S. law to promulgate its new regulation and, consequently, in this case to apply the regulation to determine that the GOV's undervaluation of currency was a countervailable subsidy. The court addresses in turn (a) the text of the CVD statute, taking into account (b) applicable legislative history and (c) past practice. The court concludes that Commerce had the authority to promulgate the regulation and to apply it in this case.

**1.    Whether Commerce has the authority to determine that undervaluation of currency is a countervailable subsidy**

**a.    Text of the CVD statute**

The text of the U.S. CVD statute authorizes Commerce to determine whether a subsidy is countervailable. 19 U.S.C. §§ 1671(a), 1677. As stated *supra* Section II.A, the statute establishes three requirements for Commerce to find that a subsidy provided by a foreign government or public body constitutes a countervailable subsidy: (1) the

**PUBLIC VERSION**

Court No. 21-00397                                                                 Page 23

provision of a financial contribution; (2) the conferral of a benefit; and (3) that the

subsidy is specific to an enterprise, industry or group of enterprises or industries.  19

U.S.C. § 1677(5), (5A).  There are no further statutory requirements or restrictions.  *See*

*generally id.* (providing no supplemental limitations on the types of subsidies that

Commerce can determine to be countervailable).  The statute does not exclude,

expressly or otherwise, the undervaluation of currency from the definition of a

countervailable subsidy.  *See id.* § 1677(5).

Plaintiff argues that congressional delegations of authority to Treasury in the area

of currency valuation and manipulation preclude Commerce from exercising its statutory

authority in that area.  *See* Pl. Br. at 29 (citing Trade Act of 1988, Pub. L. No. 100-418,

§§ 3004-3005, 22 U.S.C. §§ 5304-5305; Title VII Trade Facilitation and Trade

Enforcement Act of 2015, Pub. L. No. 114-125, Title VII (2016); H.R. Rep. No. 114-376,

at 75-79 (2015) (conference committee report); 161 Cong. Rec. H9,296-97 (daily ed.

Dec. 11, 2015) (adoption of conference committee recommendations)).

The U.S. CVD statute does not create an exception to Commerce's authority for

practices that might be considered similar, parallel or related to those as to which

another federal agency, such as Treasury, may itself have authority under a different

statute.  Commerce explained that its actions were not only "permissible" given its

authority under the CVD statute, but that Commerce had the *duty* to investigate and

impose countervailing duties in any circumstance in which the three requirements for a

countervailable subsidy had been met.  *See Final Rule*, 85 Fed. Reg. at 6,032 ("If the

domestic industry petitions Commerce alleging that a foreign currency is a mechanism

for subsidizing an imported product, Commerce generally must investigate the

allegations, despite the fact that other agencies have an interest in U.S. policy towards foreign currencies."); *see also* 19 U.S.C. § 1671(a).

In sum, the text of the CVD statute authorizes Commerce to determine whether a currency undervaluation program is a countervailable subsidy and does not preclude Commerce from countervailing a practice that other agencies may address by other means.

### b.    Legislative history

The legislative histories of trade statutes enacted since 1979 buttress these conclusions.

In the Trade Agreements Act of 1979 ("1979 Act"), Congress addressed the definition of a countervailable subsidy and expanded upon an illustrative list of domestic subsidies.  There is no indication in committee reports that Congress sought to limit the authority of the administering authority, which at that time was Treasury, to countervail currency undervaluation.  S. Rep. No. 96-249 at 85 (1979); H.R. Rep. No. 96-317 at 74 (1979).  To the contrary, the legislative history of the 1979 Act indicates that Congress intended the law to authorize the administering authority to countervail even those practices not listed as subsidies in the legislation so long as those practices met the statutory definition for a subsidy.  S. Rep. No. 96-249 at 85 (1979) ("The administering authority may expand upon the list of specified subsidies consistent with the basic definition."); H.R. Rep. No. 96-317 at 74 (1979) ("The Committee does not intend for this to be a comprehensive, exclusive enumeration of domestic practices which will be considered subsidies.  It is a minimum list . . . of those practices which are definitely subsidies.").  In short, the legislative history of the 1979 Act does not contain a limitation

on the ability of the administering authority to countervail currency undervaluation, so

long as it otherwise meets the definition of subsidy.

More recently, the Statement of Administrative Action ("SAA") accompanying the

Uruguay Round Agreements Act states that the Agreement on Subsidies and

Countervailing Measures ("SCM Agreement") "strengthens discipline on trade distorting

subsidies" and, along with other World Trade Organization measures, provides

"substantive and procedural tools for addressing . . . subsidized competition [from

abroad]."  *Uruguay Round Agreements Act Statement of Administrative Action*, H.R.

Doc. No. 103-316, Vol. I, at 911 (1994); *see Nucor Fastener Div. v. United States*, 34

CIT 1380, 1382 n.1, 751 F. Supp. 2d 1327, 1329 n.1 (2010) (providing that the SAA is

regarded as "an authoritative expression by the United States concerning the

interpretation and application of the Uruguay Round Agreements and [the Uruguay

Round Agreements] Act in any judicial proceeding in which a question arises

concerning such interpretation or application." (quoting 19 U.S.C. § 3512(d))).[13]  The

---

[13] In 1980, Commerce became the administering authority for CVD cases.  *See* Reorganization Plan No. 3 of 1979 (effective Jan. 2, 1980).  The adverse report of the House Committee on Government Operations on a resolution to disapprove the reorganization plan stated that the shift "will give [antidumping and CVD] functions high priority within a Department whose principle mission is trade."  H.R. Rep. No. 96-585, at 6 (1979).  Congress made clear that these actions were taken due to what it considered was inadequate enforcement of "the countervailing and antidumping duty laws": "The Committee feels very strongly that both the countervailing and antidumping duty laws have been inadequately enforced in the past, including the lack of resources devoted to this important area of law."  H.R. Rep. No. 96-317, at 48 (1979).  When Commerce became the administering authority in 1980, the House Committee on Government Operations explained its frustrations with earlier administration of the CVD statute: "In the past agencies have arbitrarily set a course of administration of [countervailing duty] statutes contrary to congressional intent.  Dilatory practices in countervailing duty proceedings, policy changes, failure to adequately countervail, arbitrary failure to collect antidumping duties imposed have been cited as reasons justifying the transfer of these operations."  *Id*.

**PUBLIC VERSION**

SAA states: "It is the Administration's view that . . . section 771(5)(B)(iii) encompass[es]

indirect subsidy practices like those which Commerce has countervailed in the past, and

that these types of indirect subsidies will continue to be countervailable, provided that

Commerce is satisfied that the standard under section 771(5)(B)(iii) has been met."

SAA at 926.  The SAA notes further: "To comply with this article, Commerce will issue

regulations setting forth the details of the methodologies used to identify and measure

the benefit of a subsidy."  *Id.* at 928.

 In sum, the legislative histories of the relevant amendments to the CVD law since

1979 do not support plaintiff's argument that the CVD law contains a limitation on

Commerce's ability to countervail currency undervaluation.  Moreover, there is no

indication in the legislative history that Congress intended to limit Commerce's ability to

countervail practices that might also be within the purview of other agencies.

> **2.    Whether legislative developments and Commerce's practice
>           affect Commerce's authority to determine that currency
>           undervaluation is a countervailable subsidy**

 KTV presents two main arguments that, it alleges, lead to the conclusion that

Commerce does not have the authority to countervail currency undervaluation.  *See* Pl.

Br. at 23-30.  KTV considers that (1) Commerce's administrative practice, and (2)

Congress' action or inaction on legislation involving countervailing currency

undervaluation, support the conclusion that Commerce does not have the authority to

countervail currency undervaluation.  *See id.*

 To address these arguments, the court considers in turn: (1) Commerce's

practice as to currency undervaluation; (2) unsuccessful legislative proposals to address

currency undervaluation under the CVD statute; (3) the pertinence of amendments to

**PUBLIC VERSION**

Court No. 21-00397                                                                                                Page 27

the CVD statute in trade acts since 1979; and (4) legislation on currency undervaluation as it pertains to Treasury's authorities to address currency undervaluation matters under other provisions of law.

### a.   Commerce's practice as to currency undervaluation

KTV argues that Treasury before 1980 and Commerce from 1980 to 2019 had an administrative practice that currency undervaluation was not a countervailable subsidy. *Id.* at 23-28.  In support of this contention, KTV cites a 1971 decision of the United States Court of Customs and Patent Appeals ("CCPA") — *United States v. Hammond Lead Prods., Inc.*, 440 F.2d 1024,1030-31 (CCPA 1971) — and five administrative decisions by Commerce in 1981, 1983, 1984, 2010 and 2011, to argue that Commerce had a clear and established practice in which Congress acquiesced.  *Id.* at 23-30; *see also* Pl. Reply Br. at 8.  KTV asserts that Commerce's regulation is invalid because it is "directly inconsistent" with Commerce's purported longstanding administrative practice and "[c]ongressional acquiescence" in that practice.  Pl. Br. at 4.  Therefore, KTV maintains that Commerce could not "unilaterally alter[] its approach."  *Id.* at 30.

The court concludes that: (1) Commerce did not have an administrative practice, let alone a longstanding one, not to countervail currency undervaluation; and (2) even if there had been such a practice, there was no congressional acquiescence in or ratification of any such practice.  The court considers in this section whether there was a practice, and in Section II.B.2.b through Section II.B.2.d *infra*, the issue of congressional acquiescence in or ratification of such practice.

**PUBLIC VERSION**

Court No. 21-00397                                                                   Page 28

### (1)   The *Hammond* case

The court examines first KTV's reliance on *Hammond* as evidence of a longstanding practice that currency undervaluation is not countervailable under the CVD law.[14]  *See* Pl. Br. at 23-25 (quoting *Hammond*, 440 F.2d at 1030-31); *see also* Pl. Reply Br. at 2-7.  KTV's reliance on the *Hammond* decision is puzzling because the issue of currency undervaluation was not before the administrative agency (at that time, Treasury), the U.S. Customs Court ("Customs Court") or the CCPA.

In the *Hammond* decision, the CCPA, in a jurisdictional ruling, held that the Customs Court did not have jurisdiction over a protest by a U.S. manufacturer under 19 U.S.C. § 1516(b) that challenged a 1967 determination by Treasury.  440 F.2d at 1027; *see Hammond Lead Prods., Inc. v. United States*, 306 F. Supp. 460, 462 n.2 (Cust. Ct. 1969) (relying on a prior holding in the same case and concluding again that the court had jurisdiction); *see Hammond Lead Prods., Inc. v. United States*, 289 F. Supp. 533 (Cust. Ct. 1968) (concluding that the court had jurisdiction over the protest).  In its decision, Treasury found that the Government of Mexico "did not pay or bestow a bounty or grant upon exportation."  *Hammond*, 306 F. Supp. at 462 n.2 (citing T.D. 67-142 (1967)).  The alleged bounty or grant involved the application of export taxes of the Government of Mexico to refined lead and litharge.  *See id.* at 468.

As noted, the issue of whether currency undervaluation constituted a countervailable subsidy was not before Treasury, the Customs Court or the CCPA.  For reasons that are unclear, the CCPA took "judicial notice" that "Mexico devalued the

---

[14] In the *Final Rule*, DOC said that it does not have an "established practice."  *Final Rule*, 85 Fed. Reg. at 6,033.

**PUBLIC VERSION**

Court No. 21-00397                                                                 Page 29

peso," and after issuing its holding, then proceeded to state in manifest dicta that: "[W]e
do not assess countervailing duties against countries because they devalue their
currencies." *Hammond*, 440 F.2d at 1031.  In generating this gratuitous statement, the
CCPA did not cite to any Treasury determinations to support the statement.  *Id.*  In an
even more bizarre twist, the CCPA then opined — again in dicta and in apparent
contradiction to its impromptu comments about currency devaluation — that the court
should "abstain if possible from passing on controversies not essentially judicial in
nature," such as a CVD determination.  *Id.* at 1030.  The court added that "[i]n the
assessment of a countervailing duty, the determination that a bounty or grant is paid
necessarily involves judgments in the political, legislative, or policy spheres."  *Id.*

        As the Supreme Court has stated: "Dictum settles nothing, even in the court that
utters it."  *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 351 n.12 (2005).  It is difficult
for this court to imagine a more apparent example of dicta.

### (2)    Determinations prior to 2010

        The court turns next to the administrative determinations to which KTV cites for
its position that Commerce had a practice of not countervailing currency undervaluation.
KTV alleges that certain preliminary and final determinations of Commerce in 1981,
1983 and 1984 were pursuant to a practice not to countervail currency undervaluation.
Pl. Br. at 25-27.  KTV argues further that Congress subsequently ratified that practice in
the Uruguay Round Agreements Act ("URAA") and the Omnibus Trade and
Competitiveness Act of 1988 ("OTCA").  *Id.* at 28.  The court examines in turn each of
the determinations to which KTV cites.

**PUBLIC VERSION**

The first administrative decision to which KTV refers is Commerce's 1981 preliminary determination in *Lamb Meat from New Zealand*. *Id.* at 25 (citing *Lamb Meat from New Zealand; Preliminary Affirmative Countervailing Duty Determination*, 46 Fed. Reg. 58,128, 58,131 (Dep't of Commerce Nov. 30, 1981)). In that instance, petitioner withdrew its petition and Commerce terminated the investigation, leading Commerce to conclude: "By virtue of the withdrawal of the petition and termination of the investigation, the preliminary determination and all preliminary conclusions reached therein, as to whether the programs investigated do or do not constitute subsidies are without legal force or effect." *Lamb Meat from New Zealand; Termination of Countervailing Duty Investigation*, 47 Fed. Reg. 1,316 (Dep't of Commerce Jan. 12, 1982); *see also* Def.-Intervenor Br. at 27. KTV's reliance on the conclusions reached in a preliminary determination — which Commerce stated were "without force or legal effect" — for evidence of an administrative practice of Commerce is unpersuasive.

The second instance that KTV presents is *Pork Rind Pellets from Mexico*. Pl. Br. at 25-26 (citing *Pork Rind Pellets from Mexico; Final Negative Countervailing Duty Determination*, 48 Fed. Reg. 39,105, 39,107 (Dep't of Commerce Aug. 29, 1983)). In *Pork Rind Pellets*, Commerce addressed the allegation that "the dual level exchange rate system existing in Mexico constitutes a [countervailable] benefit to the pork rind pellet industry." *Pork Rind Pellets from Mexico*, 48 Fed. Reg. at 39,107. Commerce found that the "operation of the Mexican exchange rate system does not confer an export bounty or grant on pork rind pellets because eligibility to use the controlled rate for making import purchases of pork skins is not contingent upon export performance." *Id.* In addition, Commerce found that Mexico's dual rate exchange system did not

**PUBLIC VERSION**

confer a domestic subsidy. *Id.* Specifically, Commerce explained that the system did not benefit a specific industry or enterprise because "all firms may import many different goods using the controlled exchange rate." *Id.*

There are three substantial differences between *Pork Rind Pellets* and the present case. First, in *Pork Rind Pellets*, Commerce examined the program as an *export bounty or grant* and concluded that the program did *not* confer such bounty or grant because the program lacked export contingency. *Id.* In this case, Commerce stated expressly that it "did *not* determine that currency undervaluation is an export subsidy." IDM at 28 (emphasis supplied); *see also Final Rule*, 85 Fed. Reg. at 6,040. Hence, the *Pork Rind Pellets* inquiry into export contingency is not relevant to this case, *compare* 19 U.S.C. § 1677(5A)(B), *with* 19 U.S.C. § 1677(5A)(D), *and Pork Rind Pellets from Mexico*, 48 Fed. Reg. at 39,107, and Commerce's conclusion as to export contingency in *Pork Rind Pellets* is inapposite.

The second difference is that Commerce's *Final Rule* and the facts of this case concern a *unified* exchange rate system, not a *dual level* system as in the *Pork Rind Pellets* case. *Final Rule*, 85 Fed. Reg. at 6,031, 6,033; 19 C.F.R. § 351.528(a)(1); *see* IDM at 15 (noting that the State Bank of Vietnam "sets the official exchange rate"); *see also* Def. Br. at 11; Def.-Intervenor Br. at 27-28.

The third difference is that in *Pork Rind Pellets*, after Commerce concluded that the program was not export contingent, Commerce then found that the program was not *specific* because the Mexican government's tariff list had not "singled out for benefit a specific industry or enterprise" or group thereof. 48 Fed. Reg. at 39,107; *see* Def.-Intervenor Br. at 27-29. In this case, by contrast, Commerce determined that the

currency undervaluation subsidy was specific.  *See* IDM at cmt. 4; *see also infra* Section

III.B.2.  For these reasons, the court finds that the *Pork Rind Pellets from Mexico*

determination is inapposite.

Finally, it is notable that in reaching its determination, Commerce did not rely on

any purported agency practice of not countervailing alleged currency undervaluation.

*Pork Rind Pellets from Mexico*, 48 Fed. Reg. at 39,107.

The third example that KTV raises is Commerce's preliminary determination in

*Carbon Steel Wire Rod from Poland*.  Pl. Br. at 26 (citing *Carbon Steel Wire Rod from*

*Poland; Preliminary Negative Countervailing Duty Determination*, 49 Fed. Reg. 6,767,

6,771 (Dep't of Commerce, Feb. 23, 1984)).  Importantly, Commerce's final

determination in that investigation relied upon Commerce's decision at that time that a

"bounty or grant" cannot be found in an NME country (in that case, Poland) — rather

than on a conclusion as to whether currency undervaluation is countervailable.  *Carbon*

*Steel Wire Rod from Poland from Poland; Final Negative Countervailing Duty*

*Determination* ("*Carbon Steel Wire Rod Final Determination*"), 49 Fed. Reg. 19,374,

19,375-78 (Dep't of Commerce May 7, 1984); *see Final Rule*, 85 Fed. Reg. at 6,033;

Def. Br. at 11-12.

This Court has stated: "It has long been recognized that Commerce is not bound

by the positions taken or the methodologies employed in its preliminary

determinations."  *U.S. Steel Corp.*, 34 CIT at 281, 712 F. Supp. 3d at 1355 (citing

*Peer Bearing Co. v. United States,* 22 CIT 472, 481-82, 12 F. Supp.

2d 445, 456 (1998)); *see, e.g.*, *Carbon Activated Tianjin Co. v. United States*, 45 CIT

__, __, 503 F. Supp. 3d 1278, 1286-87 (2021); *Timken Co. v. United States*, 22 CIT

**PUBLIC VERSION**

621, 628, 16 F. Supp. 2d 1102, 1108 (1998) (citing *Peer Bearing Co.*, 22 CIT at 481-82;

*Asociación Colombiana de Exportadores de Flores v. United States*, 22 CIT 173, __, 6

F. Supp. 2d 865, 879-80 (1998)); *Ferro Union, Inc. v. United States*, 23 CIT 178, 199,

44 F. Supp. 2d 1310, 1330-31 (1999) (citing *NTN Bearing Corp. v. United States*, 74

F.3d 1204, 1208 (Fed. Cir. 1995); *Tehnoimportexport v. United States*, 15 CIT 250, 254-

55, 766 F. Supp. 1169, 1174-75 (1991)); *see also Final Rule*, 85 Fed. Reg. at 6,033

(citing *Carbon Steel Wire Rod from Poland Final Determination*, 49 Fed. Reg. at 19,375)

(stating that Commerce's preliminary statements were "moot"); *see generally NTN*

*Bearing Corp.*, 74 F.3d at 1208 ("[P]reliminary determinations are 'preliminary' precisely

because they are subject to change.").  Further, Commerce itself clarified in its 2010

and 2011 determinations in *Certain Coated Paper* and *Aluminum Extrusions* that

Commerce's "assessment in the *Carbon Steel Wire Rod* preliminary determination that

no subsidy existed in the context of a unified rate is only informative, and not

dispositive, in the present case."  *Certain Coated Paper Suitable for High-Quality Print*

*Graphics Using Sheet-Fed Presses from the People's Republic of China: Final*

*Affirmative Countervailing Duty Determination* ("*Certain Coated Paper*"), 75 Fed. Reg.

59,213 (Dep't of Commerce Sept. 27, 2010), and accompanying IDM at cmt. 7;

*Aluminum Extrusions from the People's Republic of China: Final Affirmative*

*Countervailing Duty Determination* ("*Aluminum Extrusions*"), 76 Fed. Reg. 18,521 (Dep't

of Commerce Apr. 4, 2011), and accompanying IDM at cmt. 33.

       For the reasons noted above, the court concludes that, like the other

determinations discussed above, Commerce's preliminary determination in *Carbon*

*Steel Wire Rod from Poland* is inapposite.

### (3)   The 2010 and 2011 determinations

The court considers next the fourth and fifth determinations presented by KTV. Those determinations pertain to two decisions by Commerce not to initiate an investigation into allegations that currency undervaluation was an export subsidy or a domestic subsidy.  *See Certain Coated Paper* IDM at cmts. 5-7*; Aluminum Extrusions* IDM at cmt. 33.

Commerce's conclusion in those earlier initiation decisions was that it "was not required to initiate an investigation of a currency allegation that was not reasonably supported by the facts alleged by the Petitioners."  *Certain Coated Paper* IDM at cmt. 5; *Aluminum Extrusions* IDM at cmt. 33.  In memoranda addressing the subsidy allegations related to currency in each respective case, Commerce found that there was an insufficient basis to support the allegations.  KTV's September 8, 2020 Submission, Attach. 2-3 (Memorandum from Team to R. Lorentzen re: Countervailing Duty Investigation: Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China, New Subsidy Allegation – Currency, Aug. 30, 2010 ("Certain Coated Paper Currency Memo"); Memorandum from Team to R. Lorentzen re: Countervailing Duty Investigation: Aluminum Extrusions from the People's Republic of China, Subsidy Allegation, Aug. 30, 2010 ("Aluminum Extrusions Currency Memo"), CR 76-80, PR 202-203, PJA Tab 12 (collectively, "Currency Memos")).

In its IDM in each case, Commerce reiterated that foreign invested enterprises (FIEs) do not convert the "vast majority of their foreign exchange earnings" and that, as to exporters, the unified exchange rate in China "applies to all enterprises and

Court No. 21-00397                                                                Page 35

individuals in the economy." *Certain Coated Paper* IDM at cmts. 6-7; *Aluminum Extrusions* IDM at cmt. 33. Commerce added that the cases raised by petitioners "addressed only multiple exchange rate regimes." *Certain Coated Paper* IDM at cmt. 7; *Aluminum Extrusions* IDM at cmt. 33. Commerce explained further that the petitioners relied on a requirement in China — that had since been terminated — to surrender "foreign exchange earned from export activities [to] be converted to RMB at the government-prescribed rate and only at government-owned banks or government-authorized exchange facilities." Certain Coated Paper Currency Memo at 2; Aluminum Extrusions Currency Memo at 2; *see Certain Coated Paper* IDM at cmt. 5; *Aluminum Extrusions* IDM at cmt. 33.

   The court concludes that *Aluminum Extrusions* and *Certain Coated Paper* do not reflect a practice of Commerce that currency undervaluation is not countervailable under the CVD law.

   To start, as Commerce noted in the *Final Rule*, 85 Fed. Reg. at 6,033, the prior determinations are procedurally distinct from the instant determination and are, as a consequence, governed by a section of the statute with a different legal standard than applies in the instant case.[15] In both prior determinations, Commerce decided not to *initiate* an investigation based on *allegations* made by petitioners on the ground that

---

[15] Commerce in the 2010 and 2011 determinations "determined not to initiate on subsequent currency undervaluation subsidy allegations because [Commerce] determined that the petitioners' allegations *in those particular proceedings* were unsupported by reasonably available information regarding the statutory elements for imposition of a CVD." *Final Rule*, 85 Fed. Reg. at 6,033 (emphasis supplied); *see also Aluminum Extrusions* IDM at cmt. 33 (Commerce "was not required to initiate an investigation of a currency allegation that was not reasonably supported by the facts alleged by Petitioners"); *see Certain Coated Paper* IDM at cmts. 5, 7; *see also* Def. Br. at 12-13; Def.-Intervenor Br. at 30-31.

those *allegations* were not reasonably supported by the facts alleged in the petition. *Certain Coated Paper* IDM at cmts. 6-7; *Aluminum Extrusions* IDM at cmt. 33; *see also* 19 U.S.C. § 1671a(b)(1). Section 1671a(b)(1), which governs the requirements for initiation of CVD proceedings, requires that such a petition allege the elements necessary for the imposition of countervailable duties. The statute requires also that petitions include "information reasonably available to the petitioners supporting those allegations." *Id.* In the 2010 and 2011 determinations, Commerce declined to initiate an investigation because petitioners failed to satisfy the requirements for initiation: namely, "Petitioners' allegations relied on factual assertions about China's currency regime that were contradicted by Petitioners' own information." *Certain Coated Paper* IDM at cmt. 6; *see also Aluminum Extrusions* IDM at cmt. 33; Aluminum Extrusions Currency Memo at 4-5; Certain Coated Paper Currency Memo at 4-5.

By contrast, the instant case involves an investigation and final determination by Commerce, which are governed by 19 U.S.C. § 1671d. Section 1671d provides that Commerce "shall make a final determination of whether or not a countervailable subsidy is being provided with respect to the subject merchandise." *See also* IDM at cmt. 1. This legal standard is distinct on its face from the initiation standard at issue in the *Aluminum Extrusions* and *Certain Coated Paper* cases in which Commerce found that the facts alleged by petitioners did not reasonably support their allegations.

Accordingly, the court concludes that the 2010 and 2011 Commerce decisions not to initiate an investigation into the subsidy allegations in those cases do not reflect a practice that currency undervaluation is not countervailable under the CVD law.

**PUBLIC VERSION**

KTV maintains that in *Aluminum Extrusions* and *Certain Coated Paper*

Commerce considered that treating currency undervaluation as countervailable was

"contrary to both the statute and to Commerce's established practice." Pl. Reply Br. at

15.  In support of its position, KTV relies on a single statement of Commerce in the

Currency Memos in which Commerce stated that "treating exporters as a 'group' for

purposes of finding a domestic subsidy" would "set [the statutory scheme] on its head."

*Id.* at 14 (citing Aluminum Extrusions Currency Memo at 5; Certain Coated Paper

Currency Memo at 5).

KTV's reliance on this statement to support a purported practice that currency

undervaluation is not countervailable under the CVD law is not persuasive.

Commerce's analysis in the IDM and Commerce's response to parties' arguments belie

KTV's view that Commerce declined to initiate due to an administrative interpretation

that currency undervaluation is not countervailable.[16]  To the contrary, Commerce's

language makes clear that Commerce conducted a fact-specific inquiry of petitioners'

allegations and concluded that those allegations were not supported by facts

reasonably available as required by 19 U.S.C. § 1671a(b)(1) for Commerce to initiate an

investigation of an alleged countervailable subsidy.  For example, in reference to the

Currency Memos, petitioners "object[ed] to the Department's assertion that currency

subsidies only exist in multiple exchange rate systems."  *Aluminum Extrusions* IDM at

cmt. 33; *Certain Coated Paper* IDM at cmt. 7.  Petitioners cited also to the *Carbon Steel*

*Wire Rod Preliminary Determination*, in which, according to petitioners, Commerce

---

[16] The court addresses whether Commerce adequately explained its ostensible change
in its definition of "group" in the context of currency undervaluation *infra* Section
III.B.2.b.

**PUBLIC VERSION**

Court No. 21-00397                                                                                   Page 38

indicated that countervailable subsidies may exist in the context of a multiple exchange

rate system, but not a unified rate system.  *Aluminum Extrusions* IDM at cmt. 33;

*Certain Coated Paper* IDM at cmt. 7.  In response to these arguments, Commerce first

rejected the notion that Commerce ever stated in the Currency Memos that only multiple

exchange rate systems may include countervailable subsidies.  *Aluminum Extrusions*

IDM at cmt. 33 ("In the Currency Memorandum, the Department did not state that the

CVD law only applied to countries with multiple exchange rate regimes.").  And, in

response to petitioners' reference to the *Carbon Steel Wire Rod Preliminary*

*Determination*, Commerce rejected also the proposition that Commerce's statements in

that preliminary determination precluded Commerce from countervailing the unified

exchange rate regime in *Aluminum Extrusions* and *Certain Coated Paper*.  *Aluminum*

*Extrusions* IDM at cmt. 33; *Certain Coated Paper* IDM at cmt. 7.  Specifically,

Commerce stated that "the Department's assessment that no subsidy existed in the

context of a unified rate is only informative, not dispositive, in the present case."

*Aluminum Extrusions* IDM at cmt. 33; *Certain Coated Paper* IDM at cmt. 7.

Similarly, the Government of China ("GOC") argued that "currency manipulation

allegations are not within the jurisdiction of [Commerce]."  *Certain Coated Paper* IDM at

cmt. 5; *see also Aluminum Extrusions* IDM at cmt. 33.  In this way, the GOC invited

Commerce to adopt the position — advocated by KTV in the instant case — that

Commerce could not countervail currency undervaluation under the CVD law.  *Certain*

*Coated Paper* IDM at cmt. 5; *see also Aluminum Extrusions* IDM at cmt. 33.  As with

petitioners' broad brush assertions, Commerce notably did not endorse this argument or

otherwise respond to it.  *Certain Coated Paper* IDM at cmt. 5; *see also Aluminum*

*Extrusions* IDM at cmt. 33.  Instead, Commerce engaged in a fact-specific inquiry and

concluded that the petitioners' allegations were not supported by facts reasonably

available.  *Certain Coated Paper* IDM at cmt. 5; *see also Aluminum Extrusions* IDM at

cmt. 33.  The court considers Commerce's silence in response to this invitation to be a

further indication that Commerce did not, in fact, rely on a purported practice that

currency undervaluation is not countervailable under the CVD law.

Accordingly, the statements of Commerce in the 2010 and 2011 determinations

not to initiate fall far short of either establishing or reflecting a uniform practice on the

issue.[17]

### (4)    Conclusion as to prior practice

In sum, the above five unrelated and factually distinct decisions over 40 years do

not comprise a practice by Commerce that currency undervaluation "is not within the

purview of the countervailing duty laws."  *See* Pl. Br. at 30.  As this Court recently

---

[17] KTV argues also that in promulgating the *Final Rule* Commerce "did not address"
comments citing *Aluminum Extrusions* and *Certain Coated Paper* as evidence of a prior
practice of Commerce that currency undervaluation is not countervailable.  Pl. Br. at 28.
To the contrary, Commerce responded specifically to commenters' arguments that
*Certain Coated Paper* and *Aluminum Extrusions* supported the existence of a prior
practice:

> [C]ontrary to this commenter's claims that this alleged "practice" was further
> upheld in subsequent determinations by Commerce not to initiate on
> currency undervaluation allegations, Commerce determined not to initiate
> on subsequent currency undervaluation subsidy allegations because we
> determined that the petitioners' allegations in those particular proceedings
> were unsupported by reasonably available information regarding the
> statutory elements for imposition of a CVD.  Commerce's determinations
> not to initiate were not based on any practice regarding currency-related
> subsidies.

*Final Rule*, 85 Fed. Reg. at 6,033 (citing *Certain Coated Paper* IDM at cmts. 5-7;
*Aluminum Extrusions*, 76 Fed. Reg. at 18,521).

**PUBLIC VERSION**

stated: "'isolated investigations [do] not prove the existence of past practice[]' but rather

only that 'Commerce thought differently on different facts and [at] different times.'"

*Ancientree Cabinet Co., Ltd. v. United States*, 46 CIT __, __, 565 F. Supp. 3d 1373,

1381 (2022).  The decisions and determinations presented by KTV addressed different

kinds of programs (e.g., multiple versus unified exchange rate systems), reached

conclusions on different legal issues (e.g., treatment of a subsidy in an NME country

rather than treatment of the particular possible currency undervaluation subsidy in that

country), applied distinct legal standards (e.g., the initiation standard versus the final

determination standard) and emphasized the factually distinct nature of the alleged

subsidy programs under consideration.  These sundry and sporadic instances do not

comprise a practice.

       Based on the foregoing, the court concludes that Commerce did not have a

practice against countervailing the undervaluation of currency.

            **b.**   **Whether there was congressional *acquiescence* in a
Commerce practice — in particular, unsuccessful
legislative proposals to address currency undervaluation
under the CVD law**

       The CVD law grants authority to Commerce to countervail any practice that

meets the statutory definition of a countervailable subsidy under 19 U.S.C. § 1677(5).

*See supra* Section II.B.1.a-b.  Commerce has the authority to countervail a practice that

provides a financial contribution, confers a benefit, and is specific.  *See* 19 U.S.C. §

1677.  There is no limitation in the text or legislative history of the law to Commerce's

ability to countervail currency undervaluation should such practice meet the statutory

definition of a countervailable subsidy.  *See supra* Section II.B.1.a-b.

**PUBLIC VERSION**

Notwithstanding the CVD law's plain language, KTV argues that Congress failed to enact legislative proposals that would have "overturned Commerce's practice and required 'currency manipulation' to be treated as a countervailable subsidy."  Pl. Br. at 29.  KTV asserts further that by failing to enact these legislative proposals, Congress acquiesced to a purported Commerce practice not to countervail currency undervaluation.  *Id.* at 24-25, 28-30.  According to KTV, "[t]his [c]ongressional acquiescence . . . precludes Commerce from unilaterally altering its approach."  *Id.* at 30.

As noted above, the court concludes that Commerce did not have a practice with respect to currency undervaluation.  As a consequence, there was no practice to which Congress could have acquiesced.

Nonetheless, assuming for the sake of argument that Commerce had a practice, the court examines KTV's arguments in light of the Supreme Court's consistent conclusion that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," *Wright v. West*, 505 U.S. 277, 295 n.9 (1992) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980)), and that "subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history

**PUBLIC VERSION**

prior to its enactment."[18]  *Doe v. Chao*, 540 U.S. 614, 626-27 (2004) (quoting *Consumer Prod. Safety Comm'n*, 447 U.S. at 118 n.13 (1980)).  Therefore, as "subsequent history is less illuminating than the contemporaneous evidence," KTV "fac[es] a difficult task in overcoming the plain text and import" of the CVD law.  *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps. of Engineers*, 531 U.S. 159, 170 (2001); *Butterbaugh v. Dep't of Justice*, 336 F.3d 1332, 1342 (Fed. Cir. 2003) ("[C]ongressional inaction is perhaps the weakest of all tools for ascertaining legislative intent . . . ."); *see also supra* Section II.B.1.a-b.

The Supreme Court has outlined on repeated occasions the parameters for application — to be done with "extreme care," *Solid Waste Agency of N. Cook Cnty.*, 531 U.S. at 169 — of the doctrine of acquiescence "as an expression of congressional intent":

> [The Court's] observations on the acquiescence doctrine indicate its limitations as an expression of congressional intent.  "It does not follow . . . that Congress' failure to overturn a statutory precedent is reason for this Court to adhere to it.  It is 'impossible to assert with any degree of assurance that congressional failure to act represents' affirmative congressional approval of the [courts'] statutory interpretation . . . .  Congress may legislate, moreover, only through the passage of a bill which is approved by

---

[18] *See* Barrett, *Statutory Stare Decisis in the Courts of Appeals*, 73 Geo. Wash. L. Rev. 317, 337 (2004-2005) (quoting *Consumer Prod. Safety Comm'n*, 447 U.S. at 118) (footnotes omitted):

> As the Supreme Court has explained, "'[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'"  Yet the acquiescence rationale relies not on the intent of the enacting Congress, but on the intent of subsequent Congresses whose inaction may ratify the Court's statutory gloss.  If the intent of the enacting Congress is what counts, why should a court take account of what later Congresses think or whether they decline to act?  The supposed acquiescence of a later Congress is simply irrelevant.

both Houses and signed by the President.  Congressional inaction cannot amend a duly enacted statute."

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164, 186 (1994) (second alteration in original) (quoting *Patterson v. McLean Credit Union,* 491 U.S. 164, 175, n.1 (1989)); *see also id.* (first citing U.S. Const., Art. I, § 7, cl. 2; and then citing *Helvering v. Hallock,* 309 U.S. 106, 121 (1940) (Frankfurter, J.) ("[W]e walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle.")).  The Supreme Court has added: "A bill can be proposed for any number of reasons, and it can be rejected for just as many others."  *Solid Waste Agency of N. Cook Cnty.*, 531 U.S. at 170.

Similarly, the Supreme Court has explained: "Although we have recognized congressional acquiescence to administrative interpretations of a statute in some situations, we have done so with extreme care."  *Id.* at 169; *cf. Rapanos v. United States*, 547 U.S. 715, 750 (2006) ("[W]e have sometimes relied on congressional acquiescence when there is evidence that Congress considered and rejected the '*precise* issue' presented before the Court." (citing *Bob Jones Univ. v. United States*, 461 U.S. 574, 600, (1983) (emphasis in original))); *Bob Jones Univ.*, 461 U.S. at 599 (noting "an unusually strong case of legislative acquiescence in and ratification by implication of" two IRS rulings where Congress was "acutely aware" of them and where there had been "vigorous and widespread debate" on the pertinent issue before the Court).

In *Central Bank of Denver*, the Supreme Court described three bills that failed to pass and concluded that "failed legislative proposals are 'a particularly dangerous ground on which to rest an interpretation of a prior statute.'"  511 U.S. at 186-87

**PUBLIC VERSION**

Court No. 21-00397                                                                                   Page 44

(quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990)).  The

Court reiterated: "Congressional inaction lacks persuasive significance because several

equally tenable inferences may be drawn from such inaction, including the inference

that the existing legislation already incorporated the offered change."  *Id.* at 187 (quoting

*Pension Benefit Guar. Corp.*, 496 U.S. at 650) (internal quotation marks omitted) (citing

*United States v. Wise*, 370 U.S. 405, 411 (1962)); *see* Barrett, *supra*, at 335

("Congressional silence is meaningless.").

      In this case, the circumstances involving subsequent legislative proposals to

address currency undervaluation constitute precisely such a "particularly dangerous

ground on which to rest an interpretation" of the CVD statute.  *Cent. Bank of Denver*,

511 U.S. at 186-87 (quoting *Pension Benefit Guar. Corp.*, 496 U.S. at 650).  In

particular, KTV has failed for three reasons to demonstrate congressional acquiescence

to any purported practice.

      First, as discussed above, the determinations on which KTV relies were not

pursuant to an administrative practice by Commerce in which it found that it lacked the

authority under the CVD law to countervail currency undervaluation.  *See supra* Section

II.B.2.a.  The Supreme Court's acquiescence cases demonstrate that, to find implied

congressional acquiescence, there must be "consistent administrative construction" of

the act in question.  *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 382 (1969); *see*

*also Bob Jones Univ.*, 461 U.S. at 599-601 (holding that Congress had acquiesced to

two IRS rulings that interpreted § 501(c)(3) of the tax code to exclude racially

discriminatory institutions from tax exempt status); *United States v. Riverside Bayview*

*Homes, Inc.*, 474 U.S. 121, 135-36 (1985) (finding that "Congress acquiesced in the

**PUBLIC VERSION**

administrative construction"); *Schism v. United States*, 316 F.3d 1259, 1297 (Fed. Cir. 2002) ("[T]he Supreme Court has repeatedly made clear that an important foundation of acquiescence is that Congress as a whole was made aware of the administrative construction or interpretation . . . ."). The determinations raised by KTV do not reflect a "consistent administrative construction" that Commerce lacked the authority to countervail currency undervaluation under the CVD statute. *See supra* Section II.B.2.a. Therefore, that the 2010 and 2011 bills were not enacted into law does not limit the authority of Commerce to countervail currency undervaluation.

Second, the House Report accompanying the House bill, as well as statements of Senators surrounding the Senate's consideration of its bill, indicate that Congress considered that the bills were to *clarify* that Commerce had the authority to countervail currency undervaluation under existing legislation. *See United States v. Craft*, 535 U.S. 274, 287 (2002) (rejecting acquiescence argument because the legislative history of a failed amendment "indicate[d] that the House intended the amendment to be nothing more than a 'clarification' of existing law").

On September 29, 2010, the House passed the Currency Reform for Fair Trade Act. *See* H.R. 2378, 111th Cong. (2010). The stated purpose of the bill was to "amend title VII of the Tariff Act of 1930 *to clarify* that countervailing duties may be imposed to address subsidies relating to a fundamentally undervalued currency of any foreign country." H.R. 2378 at 1 (emphasis supplied); *see* H.R. Rep. No. 111-646, at 6-7 (2010) (explaining that the "provision provides certain clarifications"). H.R. 2378 would have clarified the definition of "export subsidy" and added language to 19 U.S.C. § 1677 to define "fundamentally undervalued currency" and "real effective exchange rate

undervaluation" and to describe the benefit from such practice.  H.R. 2378 § 2(a)-(d).

The Senate did not take up the legislation in the remaining months of the 111th

Congress.[19]

In addition, the Ways and Means Committee report supporting the bill stated

expressly that the bill was intended to "clarify" U.S. law:

> This legislation *clarifies* that maintenance by a foreign government of a fundamentally undervalued currency can be considered to be contingent upon exportation, and so to constitute a countervailable export subsidy, notwithstanding that the subsidy is also available in circumstances other than export.  The change responds to the determinations described above, in which Commerce found that the receipt of potential subsidies through China's currency regime was not contingent upon exportation, because such subsidies were provided not only to exporters, but also to parties not engaged in exportation.

H.R. Rep. No. 111-646, at 7-8 (emphasis supplied).

On October 11, 2011, the Senate passed the Currency Exchange Rate Oversight

Reform Act.  *See* S. 1619, 112th Cong. (2011).  As it pertained to Commerce, the bill

would have: (1) amended 19 U.S.C. § 1671a(c) to clarify that Commerce initiate an

investigation as to whether currency undervaluation provided a countervailable subsidy

when an adequate petition is filed; and (2) defined calculation methodologies by which

Commerce would determine the percentage of undervaluation and the benefit to the

recipient.  S. 1619 §§ 2-5, 10-11, 14-15.  The bill also would have clarified the definition

of export subsidy to specify that the provision of a subsidy "in circumstances that do not

---

[19] 157 Cong. Rec. 14,603 (2011) (statement of Sen. Carl Levin) ("Last Congress, the House of Representatives passed a bill, H.R. 2378, the Currency Reform For Fair Trade Act.  That narrower currency manipulation bill made it clear that the Department of Commerce is to fight the illegal subsidization of foreign currencies by using U.S. countervailing duty laws.  Unfortunately, the Senate ran out of time at the end of the session and we did not take up the bill.")

**PUBLIC VERSION**

involve export, shall not, for that reason alone, mean that the subsidy cannot be

considered contingent upon export performance." *Id.* § 11(c).  The House did not take

up the bill.

The Senate Finance Committee did not file a report with its bill; however,

numerous senators, include Senators Sherrod Brown and Dianne Feinstein, noted that

the legislation "makes it clear" that Commerce has such authority.  157 Cong. Rec.

14,601 (2011) (statement of Sen. Sherrod Brown) ("Some argue the Commerce

Department already has the authority to treat currency manipulation as an export

subsidy and apply countervailing duties."); 157 Cong. Rec. 14,998 (2011) (statement of

Sen. Dianne Feinstein) ("This bill does not mandate any countervailing tariffs due to an

undervalued currency.  It simply restates that Commerce has the authority to investigate

whether such duties are appropriate if a domestic company provides the proper

documentation.").  Similarly, Senator Carl Levin explained that the bill "clarifies that U.S.

countervailing duty laws can address currency undervaluation."[20]  157 Cong. Rec.

14,603 (2011) (statement of Sen. Levin).  As with the 2010 House bill, the legislative

history of the 2011 Senate bill makes clear that it was intended to clarify, not expand,

Commerce's authority under the CVD statute.

---

[20] Other senators expressed similar views.  *See* 157 Cong. Rec. 14,436 (statement of
Sen. Chuck Schumer) ("Commerce already has the authority under U.S. law . . . ."); 157
Cong. Rec. 14,452 (statement of Sen. Olympia Snowe) (stating that "Commerce
has failed to use its authority" and that the bill would "make clear that Commerce has the
ability to investigate"); 157 Cong. Rec. 14,599 (2011) (statement of Sen. Robert P.
Casey, Jr.) ("[The bill] doesn't put into place a new rule for international trade . . . .");
157 Cong. Rec. 14,692 (2011) (statement of Sen. Ben Cardin) ("[T]his legislation will
allow U.S. manufacturers . . . to use existing countervailing duty laws . . . .").

**PUBLIC VERSION**

These legislative histories demonstrate that Congress did not consider and reject proposed legislation that would have overridden a purported Commerce practice of which Congress disapproved. Rather, the House committee report and statements of Senators evince a congressional intent to make plain that Commerce had the authority to countervail currency undervaluation under existing law — despite Commerce's decisions in two instances that petitioners' allegations were unsupported by reasonably available information.

KTV's acquiescence argument, attenuated as it is by the lack of any established practice of Commerce, is weakened further by Congress' apparent recognition that Commerce did in fact have the authority under existing law to countervail currency undervaluation. *Craft*, 535 U.S. at 287 (stating that where subsequent legislative history "indicate[d] that the House intended" a proposed amendment "to be nothing more than a 'clarification' of existing law," the Senate's rejection of the amendment as superfluous "lack[ed] persuasive significance"); *see also Central Bank of Denver, N.A.*, 511 U.S. at 187 ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change.").

The third reason that KTV's acquiescence argument is not persuasive is that the content and circumstances of the House and Senate bills do not support KTV's argument that Congress "considered and rejected the '*precise* issue,'" *Rapanos*, 547 U.S. at 750 (quoting *Bob Jones Univ.*, 461 U.S. at 600) — namely, Commerce's authority to countervail currency undervaluation as a domestic subsidy. As to the House bill, the language of the bill, reinforced by the report of the Ways and Means

**PUBLIC VERSION**

Committee, addressed the issue of export contingency for an alleged *export* subsidy,

not any issue related to identification or measurement of currency undervaluation as a

*domestic* subsidy.  *See* H.R. Rep. No. 111-646, at 6-9; H.R. 2378 § 2(b).  By contrast,

the 2020 *Final Rule* and the changes under it that Commerce effected to 19 C.F.R. §

351.502 provide for the consideration of currency undervaluation as a *domestic subsidy*.

*See Final Rule*, 85 Fed. Reg. at 6,040 (declining "to opine on the one commenter's

statement that treating currency undervaluation as an export subsidy is never proper

under international law"); IDM at 28 (stating that Commerce "did not determine that

currency undervaluation is an export subsidy" (citing PDM at 23-24; IDM at cmt. 4)).

Therefore, H.R. 2378 did not address the issue that Commerce later distilled in its

regulations in 2020.

        The court notes that the Senate bill was far broader than the House bill and

sought to address alleged currency undervaluation of foreign trading partners through

multiple different mechanisms.  For example, the Senate bill would have, among other

things, required the Secretary of the Treasury to "analyze on a semiannual basis the

prevailing real effective exchange rates of foreign currencies" and "consult bilaterally"

with a country maintaining a currency that Treasury designates as "fundamentally

misaligned."  S. 1619 §§ 2-5.  To find congressional acquiescence, the court would be

required to assume that the Senate bill was not enacted into law because of opposition

to the CVD-related currency undervaluation provisions rather than to other provisions.

The court declines to make that assumption because "[t]o explain the cause of non-

action by Congress when Congress itself sheds no light is to venture into speculative

PUBLIC VERSION

unrealities." *Helvering*, 309 U.S. at 119-20; *see also Solid Waste Agency of N. Cook Cnty.*, 531 U.S. at 169 n.5.[21]

Finally, KTV contrasts the instant case with *Solid Waste Agency*, in which the Supreme Court declined to find congressional acquiescence because "the agency offered no persuasive evidence that the failed legislation was proposed in response to the agency expanding its jurisdiction under the statute." Pl. Reply Br. at 9-10 (citing *Solid Waste Agency of N. Cook Cnty.*, 531 U.S. at 170-71). According to KTV, "[i]n this case, by contrast, its [sic] is clear Congressional [sic] acquiescence came years *after* the policy was first adopted by the relevant agency." *Id.* KTV asserts that, as a consequence, "there is no bases [sic] for Defendant's suggestion that Congress was unaware of the agency practice." *Id.*

KTV is correct that the 2010 bill and part of the 2011 bill appear to have been at least in part in response to Commerce's decision not to initiate investigations into alleged currency undervaluation in *Aluminum Extrusions* and *Certain Coated Paper*. *See* H.R. Rep No. 111-646, at 7. However, the court has concluded that there was no administrative construction of the CVD statute to which Congress could have acquiesced. *See supra* Section II.B.2.a. In addition, there is no indication in the 1979 Act, the OTCA or the URAA that Congress was aware of any ostensible practice of Commerce not to countervail currency undervaluation. *See infra* Section II.B.2.c. The awareness by Congress of the 2010 and 2011 determinations — or that certain Members of Congress disapproved of Commerce's decision not to initiate an

---

[21] *See* Barrett, *supra*, at 335 ("A host of explanations other than congressional approval of an opinion may account for legislative inaction.").

**PUBLIC VERSION**

Court No. 21-00397                                                    Page 51

investigation in the two instances — cannot give rise to congressional acquiescence in the absence of a consistent administrative construction of the CVD statute that Commerce did not have the authority under existing law to countervail currency undervaluation. *Bob Jones Univ.*, 461 U.S. at 600-01; *Schism*, 316 F.3d at 1297.

In sum, the court concludes that Congress did not acquiesce to any purported practice of Commerce that it lacked the authority to countervail currency undervaluation under the CVD statute.

> c.   **Whether there was congressional *ratification* of judicial decisions or a Commerce interpretation or practice — in particular, ratification through legislative actions to the CVD statute in trade acts since 1979**

KTV argues next that Congress was aware of and *ratified* what KTV argues are administrative or judicial interpretations of the CVD statute in which Commerce concluded or the courts decided that currency undervaluation is not a countervailable subsidy. *See* Pl. Br. at 25, 29-30.[22]   KTV's argument is that Congress, aware of what KTV describes as Commerce's administrative practice that Commerce did not have the authority to countervail currency undervaluation, amended the CVD statute in 1979, 1994, 2015 and 2016, but did not, according to KTV, amend the law to provide such authority to Commerce to countervail currency undervaluation. *See id.* at 29-30 (quoting *Lorillard*, 434 U.S. at 580; *GPX Int'l Tire Corp.*, 666 F.3d at 740) (citing *Forest*

---

[22] KTV quotes the Federal Circuit's statement in *GPX*: "Once Congress has ratified a statutory interpretation through reenactment, agencies no longer have discretion to change this interpretation." Pl. Br. at 30 (citing *GPX Int'l Tire Corp. v. United States*, 666 F.3d 732, 740 (Fed. Cir. 2011)). KTV attempts later to assert that it does not base its argument on ratification. *See* Pl. Reply Br. at 8. However, given KTV's initial argumentation and additional reliance on *Lorillard v. Pons*, 434 U.S. 575 (1978), in its reply brief, the court addresses both doctrines.

**PUBLIC VERSION**

*Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-240 (2009); *Faragher v. City of Boca Raton*, 524 U.S. 775, 792 (1998)).  KTV argues further that, because of Congress' supposed ratification, Commerce "no longer [has] discretion" to countervail currency undervaluation.  *Id.* at 30 (quoting *GPX Int'l Tire Corp.*, 666 F.3d at 740).

As noted above, the court concludes that Commerce did not have a practice with respect to currency undervaluation.  Similarly, there were no court decisions on the matter.  As a consequence, there was no interpretation or practice that Congress could have ratified.

Nonetheless, assuming for the sake of argument that there was such an interpretation or practice that Congress could have ratified, the court concludes that no such ratification occurred.

### (1)    Congressional ratification of judicial or administrative interpretation

To support its ratification argument, KTV relies on decisions of the Supreme Court in which the Court stated that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."  Pl. Br. at 30 (citing *Lorillard*, 434 U.S. at 580).  However, the Supreme Court has stated also that this presumption of congressional awareness requires that there be a "settled judicial construction," *Jama*, 543 U.S. at

**PUBLIC VERSION**

351, or a "longstanding administrative interpretation,"[23] C*ommodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986).  Similarly, the Supreme Court has held that where "the record of congressional discussion preceding reenactment makes no reference" to the agency's purported interpretation, and where "there is no other evidence to suggest that Congress was even aware" of the agency's "interpretive position," the reenactment is "without significance."  *Brown v. Gardner*, 513 U.S. 115, 121 (1994) (quoting *United States v. Calamaro*, 354 U.S. 351, 359 (1957)); *see also Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) (observing that "[a]ll indications are that Congress was well aware of the position taken by [the agency] when enacting the ADA and intended to give that position its active endorsement").

In addition, the Supreme Court has also cautioned that where "Congress has not comprehensively revised a statutory scheme but has made only isolated amendments . . . 'it is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval'" of the prior interpretation.  *Alexander v. Sandoval*, 532 U.S. 275, 292-93 (2001) (quoting *Patterson*, 491 U.S. at 175 n.1).

### (2)    The 1979 Act

KTV argues that the *Hammond* decision by the CCPA and subsequent determinations of Commerce evince a "longstanding administrative practice" of not

---

[23] For example, in *NLRB v. Gullet Gin Co., Inc.*, 340 U.S. 361, 365-66 (1951), the Supreme Court addressed the role of a past practice followed for "many years" by the National Labor Relations Board: "During this period, the Board's practice had been challenged before the courts in only two cases, and in both, the Board's position was sustained."  Because Committee reports demonstrated that "Congress considered in great detail the provisions of the earlier legislation as they had been applied by the Board," the Supreme Court concluded that it was "a fair assumption" that "Congress accepted the construction placed [on the statute] by the Board and approved by the courts" when Congress reenacted the provision without pertinent change.  *Id.*

**PUBLIC VERSION**

countervailing currency undervaluation.  Pl. Br. at 23-24.  KTV notes also that the CVD statute was "amended on several occasions" after the *Hammond* decision, most notably in 1979 to implement the results of the Tokyo Round of multilateral negotiations, and again in 1994 in the URAA.  *Id.*  KTV argues on this basis that "Congress was fully aware" of the ostensible practice and "made no effort to overturn it."  As a consequence, KTV maintains, Commerce lacked the authority to modify that purported practice.  *Id.* at 24-25.

As noted, for Congress to ratify a judicial interpretation of a statute, the Supreme Court has established a requirement that there be a "settled judicial construction."  *See Jama*, 543 U.S. at 351 (holding that "the decisions of two Courts of Appeals" were "too flimsy to justify that Congress endorsed [the interpretation] when the text and structure of the statute are to the contrary").[24]  Here, only one court, on one occasion, in 1971, discussed in dicta whether currency undervaluation could be a countervailable subsidy.[25]  *See Hammond*, 440 F.2d at 1030-31; *see also supra* Section II.B.2.a(1).  Even setting aside the non-germane and in any event non-precedential nature of the dicta in that case (as noted previously), a single case by itself is "too flimsy" to constitute a "settled judicial construction" in this instance.  *Jama*, 543 U.S. at 351-52; *see Pierce v.*

---

[24] In *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414 n.8 (1975), the Supreme Court cited the "unanimous" views of *six* federal courts of appeal as support for the conclusion that "Congress plainly ratified [the considered] construction" of Title VII of the Civil Rights Act of 1964 after rejecting a contrary provision during the later consideration of the Equal Employment Opportunity Act of 1972.  Unlike in *Albemarle Paper Co.*, only one opinion addressed, in dicta, the countervailability issue presented here.  *See Hammond*, 440 F.2d at 1030-31.

[25] Justice Barrett also argues: "A court of appeals opinion does not represent settled law; it represents developing law."  Barrett, *supra*, at 334.

**PUBLIC VERSION**

*Underwood*, 487 U.S. 552, 567 (1988) (distinguishing the situation before the Supreme

Court in that case from one "in which Congress reenacted a statute that had in fact

been given a consistent judicial interpretation").

Congress in the 1979 Act changed core provisions of U.S. countervailing duty

law in part to implement the Tokyo Round.  Congress in that act also expressed

dissatisfaction with the work of the Department of the Treasury in administering the law

and transferred authority to the Department of Commerce.  *See, e.g.*, H.R. Rep. 96-317,

at 24; *see also* Reorganization Plan No. 3 of 1979, 44 Fed. Reg. 69,273, 93 Stat. 1381,

*as amended* Pub. L. No. 97-195, § 1(c)(6).  There is no indication in the language of the

act or its legislative history that Congress was even aware of, let alone sought to ratify,

the 1971 *Hammond* decision, which reversed the Customs Court on jurisdictional

grounds and commented in dicta on currency undervaluation.  440 F.2d at 1030-31.

Accordingly, the *Hammond* decision neither provides nor contributes to a basis for

Congress to have ratified any purported practice, or judicial or administrative

interpretation prior to the 1979 Act.

### (3)    The OTCA and URAA

KTV argues next that in the Omnibus Trade and Competitiveness Act of 1988

("OTCA") and the Uruguay Round Agreements Act of 1994 ("URAA") Congress ratified

Commerce's alleged practice against countervailing currency undervaluation because,

according to KTV, in those laws "Congress did not direct Commerce to modify its

treatment of currency valuation in countervailing duty cases."  Pl. Br. at 28-30; Pl. Reply

Br. at 7-10.  As with KTV's reliance on the 1979 Act, there is no support for KTV's

ratification argument in either the OTCA or the URAA.

**PUBLIC VERSION**

As stated, there was neither a "settled judicial construction" nor a "longstanding administrative interpretation" that Commerce did not have the authority to countervail currency undervaluation.  As discussed, the *Hammond* case does not constitute "settled judicial construction."  *Supra* Section II.B.2.c(2).

Similarly, there was no "long-standing administrative interpretation," an important factor to which courts have turned to assess whether Congress was aware of a purported practice.  *Id.*; *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000) (stating that Congress had "effectively ratified the FDA's long-held position"); *Schor*, 478 U.S. at 845-46.

For example, in *Fogarty v. United States*, 780 F.2d 1005, 1008-10 (Fed. Cir. 1986), plaintiff alleged that "the IRS improperly changed a 60-year administrative practice" that "had acquired the force of law" and could not be reversed "absent a change by Congress in the statute."  The Federal Circuit noted that "[l]ongstanding treasury [sic] regulations that have not been affected by subsequent reenactment or amendment of the underlying statutes are deemed to have acquired the force of law."  *Id.* at 1012.  However, the court concluded that the alleged practice of Treasury in that case was insufficient to support congressional ratification because "the prior administrative practice at most was expressed in revenue rulings and private letter rulings interpreting or applying an office decision."  *Id.*; *see also Schor*, 478 U.S. at 846; *Bernardo ex rel. M & K Eng'g, Inc. v. Johnson*, 814 F.3d 481, 489 (1st Cir. 2016) (distinguishing instances in which the agency had "declared by *regulation* its interpretation" from the isolated decisions of the agency before the court, which were

**PUBLIC VERSION**

"plainly insufficient" to conclude that "Congress knew of and endorsed" any agency interpretation).

Likewise, in the instant case, there was no regulation *at all* that Commerce could not countervail currency undervaluation and there were only scattered Commerce determinations.  These determinations did not constitute a uniform interpretation by Commerce that it could not determine that currency undervaluation constitutes a countervailable subsidy.  *See supra* Section II.B.2.a; *see also Gullett Gin Co.*, 340 U.S. at 365 (noting that the NLRB "had for many years been following the practice"); *Schor*, 478 U.S. at 846 (describing a "longstanding administrative interpretation without pertinent change"); *Nat'l Lead Co. v. United States*, 252 U.S. 140, 146-47 (1920) (noting an "established usage," that "the practice was continued" for 24 years and was "constantly employed" and the government had "widely applied" a rule); *GPX Int'l Tire Corp.*, 666 F.3d at 734, 744 (mentioning that "Congress legislatively ratified earlier consistent administrative and judicial interpretations" and characterizing the practice of not applying CVD law to NME countries to be "longstanding").[26]

Moreover, even supposing that the interpretation of the CVD statute alleged by plaintiff existed, Congress did amend the operative CVD provisions after the *Hammond* decision.  In this regard, plaintiff has not directed the court's attention to any indication in the legislative history of those amendments that Congress was aware of and sought

---

[26] Further, the circumstances in this case differ from those in *Lorillard*, on which plaintiff relies.  Unlike the law considered in *Lorillard*, Congress did not incorporate part of one law for which there was an established interpretation into a separate, new law.  *See Lorillard*, 434 U.S. at 580.  Instead, Congress simply considered, on occasions, amendments to the CVD statute.

**PUBLIC VERSION**

to ratify any purported longstanding interpretation or practice of Commerce not to

countervail currency undervaluation.

Where "the record of congressional discussion preceding reenactment makes no

reference to the . . . [interpretation at issue], and there is no other evidence to suggest

that Congress was even aware of the [agency's] interpretive position," the Supreme

Court has stated that "the . . . re-enactment [is] without significance." *Brown*, 513 U.S.

at 121. By contrast, where "legislative history shows that Congress was fully aware of

the agency regulations and practices at the time of legislating in their area, . . . absent

some special circumstance the failure to change or refer to existing practices is

reasonably viewed as ratification thereof*." San Huan New Materials High Tech, Inc. v.

Int'l Trade Comm'n*, 161 F.3d 1347, 1355 (Fed. Cir. 1998). For example, in *San Huan

New Materials High Tech, Inc.*, 161 F.3d at 1355, the Federal Circuit held that a Senate

report "[left] no doubt that Congress was aware of, and approved of," the Commission's

"long-standing practice of imposing civil penalties for violations of consent orders," such

that by enacting the OTCA, Congress had effectively ratified those rules and practices.

The rules in controversy had been in place "since at least 1981" and continued to the

time of the enactment of the OTCA. *Id.* Moreover, the Senate report accompanying the

bill cited to the Commission's practice and stated that the proposed legislation "is

intended to put to rest any doubts regarding the Commission's authority to terminate

investigations by issuance of consent orders." *Id.* Therefore, because the Senate

report referred approvingly to the Commission's rules, this legislative history established

"that Congress was fully aware of the agency regulations and practices at the time"

Congress passed the OTCA. *Id.* The court held that the "failure [of the OTCA] to

**PUBLIC VERSION**

change or refer to existing practices is reasonably viewed as ratification thereof." *Id.*  As

in *Brown* — and in contrast to the facts in *San Huan New Materials High Tech, Inc.* —

"there is no . . . evidence to suggest that Congress was even aware of the [agency's]

interpretive position."  *Brown*, 513 U.S. at 121.

      Likewise, KTV's reliance on the Federal Circuit's decision in *GPX*, *see* Pl. Br. at

30 n.78, is not only unavailing, it proves the opposite of KTV's argument.  In *GPX*, 666

F.3d at 734, the Federal Circuit held that Congress had ratified Commerce's practice of

not imposing countervailing duties on imports from NME countries.  In reaching its

holding, the Federal Circuit first noted the overwhelming evidence in the legislative

history of three separate statutes that Congress was aware of both (1) a Commerce

practice that the CVD law did not apply to NMEs and (2) a Federal Circuit decision

affirming that practice.  *Id.* at 741-43.  In particular, the Federal Circuit observed that in

the conference report for the OTCA, Congress referenced expressly that court's

previous decision in *Georgetown Steel*, the holding of which the conference report cited

as "present law."  *Id.*

      The Federal Circuit in *GPX* noted further that after three additional Commerce

investigations in which the agency declined to apply the CVD law to NMEs, Congress

passed the URAA.  *Id.* at 743.  The Federal Circuit noted the express reference to

*Georgetown Steel* in the URAA SAA, a further indication that Congress was aware of

both Commerce's practice and the Federal Circuit's express affirmance of that

**PUBLIC VERSION**

practice.[27]  *Id.* at 743; *see also Kemira Fibres Oy v. United States*, 61 F.3d 866, 873-74

(Fed. Cir. 1995) (holding that language in the SAA endorsing Commerce's interpretation

of the regulation meant that "when Congress enacted the current antidumping statute, it

ratified Commerce's position").

By contrast, KTV has not pointed to any legislative history in either the OTCA or

the URAA that indicates that Congress was aware of any ostensible practice not to

countervail currency undervaluation.  *See Micron Tech., Inc. v. United States*, 243 F.3d

1301, 1311-12 (Fed. Cir. 2001) (declining to find ratification because plaintiff "presented

no evidence that Congress, when it amended the antidumping statute, was aware of

Commerce's interpretation of the pertinent provisions of the pre-URAA statute");

*Bernardo ex rel. M & K Eng'g, Inc.*, 814 F.3d at 489 ("[H]ere we have no evidence that

Congress was even aware of the purported administrative interpretation, let alone

intended to adopt it.").

---

[27] The Federal Circuit noted additional evidence of Congress' awareness of
Commerce's interpretation.  For example, in 1984, soon after Commerce determined for
the first time that the CVD law could not be applied to NMEs, Commerce informed
Congress of its interpretation in a hearing before the Senate Subcommittee on
International Trade.  *GPX Int'l Tire Co.*, 666 F.3d at 740-41.  In addition, in the Trade
and Tariff Act of 1984, Congress "rejected provisions that would have affected trade
remedies on NME imports," and explained that Commerce's interpretation was "pending
judicial resolution."  *Id.* at 741 (citing Trade and Tariff Act of 1984, Pub. L. No. 98-573,
98 Stat. 2948; 130 Cong. Rec. 30,453 (1984)).  The Federal Circuit stated also that
Congress again considered applying the CVD law to NMEs in the OTCA but ultimately
decided "to retain the 'present law,' which was described simply as the holding of
*Georgetown Steel*."  *Id.* at 741-43 (citing H.R. Rep. No. 100-576, at 628 (1988) (Conf.
Rep.), *as reprinted in* 1988 U.S.C.C.A.N. 1547, 1661).  Given the clear evidence of
congressional ratification of Commerce's interpretation in *GPX*, as opposed to the lack
of any indication in the 1979 Act, the OTCA or the URAA that Congress was aware any
purported interpretation in the instant case, KTV's reliance on *GPX* is unavailing.

Rather, KTV presents only the following quotation from Congress' findings in the

OTCA that:

> Policy initiatives by some major trading nations that manipulate the value of
> their currencies in relation to the United States dollar to gain competitive
> advantage continue to create serious competitive problems for United
> States industries.

Pl. Br. at 28 (citation omitted).  KTV submits that this quotation demonstrates that, prior

to the OTCA and prior to the URAA, Congress was aware of the issue of currency

undervaluation.  *Id.* (citing Pub. L. No. 100-418, § 3002(6), 102 Stat. 1107, 1372, 22

U.S.C. § 5302(6)).  The court is prepared to accept that conclusion.  However, to

succeed in a ratification argument, KTV would have to have shown that Congress was

aware of a *judicial or administrative interpretation or practice* not to *countervail* currency

undervaluation.  KTV has not done so.  That is because there is no indication that, in

enacting either the OTCA or the URAA, Congress was aware of and endorsed any

purported practice that currency undervaluation was not countervailable.  Therefore, the

court "do[es] not assume that Congress silently intended to adopt" that purported

practice.  *Micron Tech., Inc.*, 243 F.3d at 1311.

In sum, the court may not and does not draw an assumption or inference that

such legislation ratified a judicial or administrative interpretation or practice of not

countervailing currency undervaluation.  Rather, the court concludes that Congress did

not ratify in the 1979 Act, the OTCA or the URAA any ostensible administrative or

judicial interpretation that currency undervaluation is not countervailable under the CVD

law.

### (4)   TPEA and TFTEA

KTV points finally to the Trade Preferences Extension Act of 2015 ("TPEA") and the Trade Facilitation and Trade Enforcement Act of 2015 ("TFTEA"), arguing for the court to find "congressional acquiescence" based also on those enactments.[28]   *See* Pl. Br. at 29 (citing TPEA, Pub. L. No. 114-27, 129 Stat. 362, 383-87 (2015); TFTEA, Pub. L. No. 114-125, 130 Stat. 122, 156-61 (2016)).   KTV maintains that Congress again amended the CVD statute but "has not altered the definition of subsidy" or addressed currency undervaluation as a potential subsidy.   *Id.* (citing 161 Cong. Rec. 6,570-71 (2015) (text of Senate Amendment 1224); Pub. L. No. 114-27, 129 Stat. 362, 383-87; Pub. L. No. 114-125, 130 Stat. 122, 156-61).

The court concludes for two reasons that KTV's ratification argument as to the TPEA and TFTEA is not persuasive.   First, there was no settled judicial construction or longstanding administrative interpretation or practice not to countervail currency undervaluation that Congress could have ratified in those laws.   Second, even assuming that there had been such a construction, interpretation or practice, the terms

---

[28] KTV raises the TPEA and TFTEA as evidence of congressional acquiescence.   *See* Pl. Br. at 29-30.   However, the doctrine of congressional acquiescence addresses the impact of congressional *silence* on the weight of prior judicial or administrative interpretations of a previously enacted statute.   *See supra* Section II.B.2.b.   By contrast, KTV's argument concerning the TPEA and the TFTEA pertains to the impact of *enacted legislation* on prior judicial or administrative interpretation of the CVD law.   *See* Pl. Br. at 29-30 ("[A]lthough Congress has reenacted the relevant provisions of the countervailing duty statute in 2015 and 2016, it has not altered the definition of subsidy to overturn Commerce's longstanding practice.")   Therefore, the court considers that the relevance of the TPEA and TFTEA is appropriately analyzed under the doctrine of congressional ratification.   *See* William N. Eskridge Jr., *Interpreting Legislative Inaction*, 87 Mich. L. Rev. 67, 79 (1988) ("[A]cquiescence . . . is closely related to the reenactment rule, which the Court generally treats as a separate doctrine.").

**PUBLIC VERSION**

of the TPEA and the TFTEA do not support KTV's argument that Congress ratified any

such construction, interpretation or practice in either statute or even in the two statutes

taken together.

The Supreme Court has stated that the doctrine of congressional ratification

applies only to instances in which "Congress comprehensively revised the statutory

scheme but did not amend" the ostensibly ratified provision. *Sandoval*, 532 U.S. at 292

(citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 381-82

(1982)). By contrast, where Congress "has made only isolated amendments . . . '[i]t is

impossible to assert with any degree of assurance that [a] congressional failure to act

represents affirmative congressional approval'" of the prior interpretation. *Id.* (quoting

*Patterson*, 491 U.S. at 175 n.1).

Both the TPEA and TFTEA consisted of "only isolated amendments," at best,

with respect to the CVD law. *Id.*

Turning first to the TPEA, Congress did not, in that law, amend *any* aspect of

Commerce's countervailing duty methodology. Rather, Congress amended: (1) the

definition of "material injury" in 19 U.S.C. § 1677(7); and (2) three provisions that affect

Commerce's *antidumping* methodology.[29] *See* Pub. L. No. 114-27, Title V, § 503-505,

129 Stat. at 384-85. The TPEA also changed two *procedural* provisions that apply to

both AD investigations and reviews and CVD investigations and reviews — use of facts

available under 19 U.S.C. § 1677e and the number of voluntary respondents under 19

---

[29] With respect to antidumping methodology, the TPEA amended the definition of "ordinary course of trade" in 19 U.S.C. § 1677(15), the definitions of "normal value" and "constructed value" and certain language related to price or cost distortion in 19 U.S.C. § 1677b. *See* Pub. L. No. 114-27, Title V, §§ 503-505.

**PUBLIC VERSION**

U.S.C. § 1677m.  *Id.* §§ 502 (facts otherwise available), 506 (number of voluntary

respondents), 129 Stat. at 383, 386.  Isolated amendments such as these that were

unrelated to CVD methodology do not provide a basis for the court to draw an inference

of congressional ratification.  *Sandoval*, 532 U.S. at 292 (citation omitted).[30]

Accordingly, the TPEA did not affect the authority of Commerce to countervail

subsidies.  *See supra* Section II.B.1.

 Similarly, Subtitle A of the TFTEA, "Actions Relating to Enforcement of Trade

Remedy Laws," did not amend any provision of Commerce's countervailing duty

methodology either.  Pub. L. No. 114-125, subtit. A, §§ 411-415, 130 Stat. 122, 156-61.

Rather, Congress, inter alia, added provisions to address evasion of antidumping and

countervailing duty orders under the Enforce and Protect Act ("EAPA"), included trade

enforcement provisions not related to the administration of the CVD law and established

enhanced engagement on currency exchange rates outside of the context of the CVD

law.  *Id.* §§ 401-433, 601-611, 701-702, 130 Stat. at 155-171, 180-194, 195-198.  The

content and context of these amendments make clear that Congress' passage of the

TFTEA did not ratify any ostensible practice not to countervail potential currency

undervaluation.  *See Sandoval*, 532 U.S. at 292 (noting the strong disinclination of the

Court to read meaning into congressional inaction when "Congress has not

comprehensively revised a statutory scheme but has made only isolated amendments"

(quoting *Patterson*, 491 U.S. at 175 n.1)).

---

[30] As discussed above, when Congress wanted to amend a provision of the CVD law related to subsidy identification and measurement, Congress knew exactly how to do so.  *Supra* Section II.B.2.c.

**PUBLIC VERSION**

In sum, due to the absence of a settled judicial construction or longstanding administrative interpretation of the CVD law as to currency undervaluation, *Bragdon v. Abbott*, 524 U.S. 624, 645, and because "Congress [did] not comprehensively revise[ ] [the] statutory scheme but . . . made only isolated amendments," *Sandoval*, 532 U.S. at 292, Congress did not ratify any such practice in the TPEA or TFTEA.

> ### d.    Legislation on currency undervaluation as it pertains to Treasury

KTV next submits that U.S. law accords exclusive authority to Treasury to address currency undervaluation matters, including in the trade context.  Pl. Br. at 29 (citing Pub. L. No. 114-125, Title VII (2016); H.R. Rep. No. 114-376, at 75-79 (2015) (conference committee report); 161 Cong. Rec. H9,296-97 (daily ed. Dec. 11, 2015) (adoption of conference committee recommendations)).  KTV maintains that, for this reason as well, Commerce does not have authority under the CVD law to address currency undervaluation.  *See* Oral Arg. Tr. at 13:9-14:6.

There is no basis in the statute or legislative histories of CVD law enactments including and since 1974 to support this contention.

First and foremost, the U.S. CVD statute does not create an exception to Commerce's authority for areas in which another federal government agency, such as Treasury, may have authority under a different statute.  19 U.S.C. §§ 1671, 1677 (enumerating no restrictions beyond those pertaining to financial contribution, benefit and specificity); *see Final Rule*, 85 Fed. Reg. at 6,037-38 ("Commerce makes its determination regarding CVDs pursuant to a different legal authority from Treasury's

**PUBLIC VERSION**

Court No. 21-00397                                                                    Page 66

statutory currency determinations, and for a different statutory purpose."); *see supra*

Section II.B.1.[31]

      In addition, Congress has given a large number of entities — including the

Chairman of the Board of Governors of the Federal Reserve System, the Secretary of

State, the Comptroller General of the United States, the U.S. Trade Representative

("USTR"), and other parts of the Commerce Department *in addition to* Treasury — roles

in addressing currency undervaluation.  Treasury responsibilities related to currency

undervaluation in the OTCA (Pub. L. No. 100-418, § 1124, 102 Stat. at 1146 (codified at

22 U.S.C. § 5304); Pub. L. No. 100-418, § 3004(b), 102 Stat. at 1373; Pub. L. No. 100-

418, § 3005(a)-(b)(1), 102 Stat. at 1374), in the TFTEA (Pub. L. No. 114-125, § 701(a),

130 Stat. at 195; *Id.* § 701(b), 130 Stat. at 196; *Id.* § 702(a)(2), 130 Stat. at 198 (codified

at 19 U.S.C. § 4422)); President and executive agencies and departments other than

Treasury responsibilities (Bipartisan Congressional Trade Priorities and Accountability

Act of 2015, Pub. L. 114-26, § 102(b)(11)-(12), 129 Stat. 319, 320 (codified at 19 U.S.C.

§ 4201(b)(11)-(12)), the Trade Act of 2002 Pub. L. No. 107-210, § 2102(c)(12), 116

---

[31] Commerce addressed this issue directly in its *Final Rule*:

> Congress gave Commerce the authority to remedy injurious subsidies,
> regardless of what form they take.  The CVD law gives U.S. domestic
> producers the right to petition Commerce to investigate allegedly injurious
> foreign subsidies, and it requires Commerce to conduct such investigations
> (provided that the applicable requirements for initiation are met).  This is
> true even with respect to issues in which other U.S. Government agencies
> or international bodies may have an overlapping interest . . . . Commerce
> routinely investigates programs involving, e.g., export credits and equity
> infusions, which are potential forms of subsidization that may also be
> practices monitored by other governmental and international entities.

*Final Rule*, 85 Fed. Reg. at 6,032.

**PUBLIC VERSION**

Stat. 933, 1003 (2002) (codified at 19 U.S.C. § 3802(c)(12)), the OTCA, Pub. L. No. 100-418, § 3004(a), 102 Stat. at 1373 (codified at 22 U.S.C. § 5304), and the TFTEA, Pub. L. No. 114-125, § 701(c), 130 Stat. at 196).[32]  None of these authorities diminishes Commerce's mandate under 19 U.S.C. § 1671(a) and § 1677(5) to investigate alleged subsidy practices that meet the requirements of those provisions.

Accordingly, the court concludes that U.S. CVD law provides the authority for Commerce to promulgate its regulations in 2020 and to apply them in the context of investigations and reviews.

---

[32] Even within the Treasury's 1988 Act reporting requirement, Treasury is required to consult with the Chairman of the Board of Governors of the Federal Reserve System. Pub. L. No. 100-418, § 3005(a), 102 Stat. at 1374 (codified at 22 U.S.C. § 5305(a)); *see* Conf. Rep. 100-576 at 845.  In fact, the Board of Governors was also given a reporting requirement on "the impact of the exchange rate of the dollar on [economic] trends." Pub. L. No. 100-418, § 3005(c), 102 Stat. at 1375 (codified at 12 U.S.C. § 225a (1988)). More recently, in the TFTEA, when reporting on trade enforcement by Customs, the Comptroller General of the United States must provide a report that includes "a description of trade enforcement activities to address undervaluation."  Pub. L. No. 114-125, § 102(b), 130 Stat. 129 (codified at 19 U.S.C. § 4311).  Congress also instructed Commerce to chair an interagency trade data advisory committee and establish the National Trade Data Bank, with data on average exchange rates.  Pub. L. No. 100-418, §§ 5402(c), 102 Stat. at 1464; 5406(a), (b)(3)(B) (codified at 15 U.S.C. §§ 4902(c); 4906(a), (b)(3)(B)).  To add to the various executive agencies above, Congress also gave the Secretary of State the responsibility to provide country reports to Congress on policies that affect countries' exchange rates.  Pub. L. No. 100-418, § 2202, 102 Stat at 1327 (codified at 15 U.S.C. § 4711 (repealed)).  Last, the TFTEA established the Trade Enforcement Trust Fund under Treasury, but which would provide, inter alia, capacity building funds for the USTR in areas that include "foreign currency manipulation."  Pub. L. No. 114-125, § 611(d)(1)(D), 130 Stat. at 193 (codified at 19 U.S.C. § 4405(d)(1)(D)).

PUBLIC VERSION

III.   **Whether the determination by Commerce that KTV was a specific beneficiary of a financial contribution provided by Vietnam's currency undervaluation program was supported by substantial evidence and in accordance with law**

A.    **Legal framework**

Commerce imposes countervailing duties when: (1) Commerce — as the "administering authority" — "determines that [a foreign] government or any public entity within th[at] . . . country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States"; and (2) the U.S. International Trade Commission ("Commission") determines that a U.S. industry is "materially injured" or "threatened with material injury," or the establishment of a U.S. industry is materially retarded, due to the imports.  19 U.S.C. § 1671(a).

A subsidy is countervailable when "an authority . . . provides a financial contribution" — or otherwise "entrusts or directs a private entity to make a financial contribution, if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments" — that confers a benefit to a specific enterprise, industry or group of enterprises or industries.  19 U.S.C. § 1677(5)(B), 5(D), 5(E); *see id*. § 1677(5A).  The statute further defines "authority" as "a government . . . or any public entity within the territory of [a] country."  *Id*. § 1677(5)(B).  In addition, the statute defines four categories of "financial contribution": (1) "the direct transfer of funds, *such as* grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees"; (2) "foregoing or not collecting revenue that is otherwise due"; (3)

**PUBLIC VERSION**

"providing goods or services"; and (4) "purchasing goods." *Id.* § 1677(5)(D) (emphasis supplied).

A domestic subsidy must also be specific to an "enterprise or industry" or "a group of such enterprises or industries." *Id.* § 1677(5A)(D). With respect to the determination of a "group," Commerce "is not required to determine whether there are shared characteristics among the enterprises or industries that are eligible for, or actually receive, a subsidy." 19 C.F.R. § 351.502(b). Further, Commerce "normally will consider enterprises that buy or sell goods internationally to comprise such a group." *Id.* § 351.502(c). A subsidy is *de facto* specific if, inter alia, an "enterprise or industry is a predominant user of the subsidy." 19 U.S.C. § 1677(5A)(D)(iii)(II).

Commerce will treat a benefit as conferred "where there is a benefit to the recipient." *Id*. § 1677(5)(E).

In addition, 19 C.F.R. § 351.528 defines the process that Commerce is to use to determine currency undervaluation and benefit for a potential countervailable subsidy. The regulation provides:

§ 351.528 Exchanges of undervalued currencies.

(a) Currency undervaluation—

(1) In general. The Secretary normally will consider whether a benefit is conferred from the exchange of United States dollars for the currency of a country under review or investigation under a unified exchange rate system only if that country's currency is undervalued during the relevant period. In determining whether a country's currency is undervalued, the Secretary normally will take into account the gap between the country's real effective exchange rate (REER) and the real effective exchange rate that achieves an external balance over the medium term

**PUBLIC VERSION**

that reflects appropriate policies (equilibrium REER).

(2) Government action.  The Secretary normally will make an affirmative finding under paragraph (a)(1) of this section only if there has been government action on the exchange rate that contributes to an undervaluation of the currency.  In assessing whether there has been such government action, the Secretary will not normally include monetary and related credit policy of an independent central bank or monetary authority.  The Secretary may also consider the government's degree of transparency regarding actions that could alter the exchange rate.

(b) Benefit—

(1) In general.  Where the Secretary has made an affirmative finding under paragraph (a)(1) of this section, the Secretary normally will determine the existence of a benefit after examining the difference between:

(i) The nominal, bilateral United States dollar rate consistent with the equilibrium REER; and

(ii) The actual nominal, bilateral United States dollar rate during the relevant time period, taking into account any information regarding the impact of government action on the exchange rate.

(2) Amount of benefit.  Where there is a difference under paragraph (b)(1) of this section, the amount of the benefit from a currency exchange normally will be based on the difference between the amount of currency the firm received in exchange for United States dollars and the amount of currency that firm would have received absent the difference referred to in paragraph (b)(1) of this section.

(c) Information sources.  In applying this section, the Secretary will request that the Secretary of the Treasury provide its evaluation and

>   conclusion as to the determinations under paragraphs (a) and (b)(1)
>   of this section.

19 C.F.R. § 351.528.

### B.   Analysis

#### 1.   Financial contribution

The first question presented in this case is whether Commerce's determination that the exchange of USD for Vietnamese *dong* constitutes a "direct transfer of funds," and, therefore, a financial contribution, is supported by substantial evidence and is in accordance with law.

The *Final Rule* provides that the exchange of currency may constitute a financial contribution. *Final Rule*, 85 Fed. Reg. at 6,034 (citing *Modification of Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings; Proposed Rule and Request for Comments*, 84 Fed. Reg. 24,406, 24,408 (Dep't of Commerce May 28, 2019)).   In the Preliminary Determination in this case, Commerce found that, on the facts before it, the exchange of currency constituted a "financial contribution," whether the exchange was handled by a state-owned commercial bank ("SOCB") or a private bank entrusted or directed by the GOV.   PDM at 20-21.   In the Final Determination, Commerce concluded again that the exchange of USD for Vietnamese *dong* constituted a financial contribution.   IDM at 13-16.

KTV disagrees with Commerce's conclusion, arguing that "[c]urrency conversion is not like any of those transactions" that are presented as "examples" of direct transfers of funds set forth in § 1677(5)(D)(i).   Pl. Br. at 37-38.   KTV adds that "currency

## PUBLIC VERSION

conversion is simply an exchange (at some exchange rate) of one currency into

another, transferring one store of value into a different one." *Id.* at 38.

The court concludes based on the analysis below that the determination by

Commerce that the exchange of currency in this case was a direct transfer of funds —

and, consequently, constituted a financial contribution — is in accordance with the

statute.

The language of the statute is clear. There are four types of financial

contributions; the examples offered as to the first type are illustrative: "The term

'financial contribution' means — the direct transfer of funds, *such as* grants, loans, and

equity infusions, or the potential direct transfer of funds or liabilities, *such as* loan

guarantees . . . ." 19 U.S.C. § 1677(5)(D)(i) (emphasis supplied).

The use of the term "such as" means that the list set out at § 1677(5)(D)(i) is

illustrative. *See id.*[33] The SAA underscores this point: "The examples of particular

types of practices falling under each of the categories are not intended to be

exhaustive." SAA at 927; *see* IDM at 13 (quoting SAA at 927). At oral argument,

---

[33] For other direct transfers of funds that are distinct from the four examples in the statute, see *Forged Steel Fluid End Blocks from India: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 79,999 (Dep't of Commerce Dec. 11, 2020) and accompanying IDM (Dep't of Commerce Dec. 7, 2020) at cmt. 8 (renewable energy certificates); *Coated Free Sheet Paper from Indonesia: Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,642 (Dep't of Commerce Oct. 25, 2007) and accompanying IDM (Dep't of Commerce Oct. 17, 2007) at cmt. 27 (repayment of debt by assets with no market value); *Preliminary Affirmative Countervailing Duty Determination: Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 68 Fed. Reg. 16,766, 16,776 (Dep't of Commerce Apr. 7, 2003), unchanged in *Final Affirmative Countervailing Duty Determination: Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 68 Fed. Reg. 37,122 (Dep't of Commerce June 23, 2003) and accompanying IDM (Dep't of Commerce June 16, 2023) at cmt. 1 (debt-for-equity swaps and extensions of debt maturities).

**PUBLIC VERSION**

plaintiff conceded that the list is not exhaustive. *See* Oral Arg. Tr. at 41:9-11 ("I don't

think you can say that a direct transfer of funds is limited to the four instances.").

Moreover, in conjunction with the note in the SAA that the examples listed were not

intended to be "exhaustive," the SAA explains that the "generic categories," one of

which is "direct transfer of funds," were intended to be "sufficiently broad so as to

encompass the types of subsidy programs generally countervailed by Commerce in the

past, although determinations with respect to particular programs will have to be made

on a case-by-case basis." SAA at 927. Accordingly, Commerce's finding that currency

undervaluation is a direct transfer of funds is further supported by the SAA.[34]

Commerce explained that "[a]n exchange of currency clearly falls within th[e]

common meaning of the terms 'transfer' and 'funds.'" IDM at 13; *see Final Rule*, 85

Fed. Reg. at 6,034 ("The word 'transfer' suggests a conveyance, passing or exchange

of something from one person to another. The word 'funds' suggests money or some

monetary resource."). Commerce noted that a direct transfer of funds can exist

---

[34] Before Commerce, the GOV attempted to use WTO jurisprudence to support its view
that currency conversion does not constitute a direct transfer of funds. IDM at 13 (citing
Government of Vietnam's March 10 Case Brief (Mar. 10, 2021) at 10, PR 456, CR 186,
PJA Tab 33 (citing Appellate Body Report, *United States – Large Civil Aircraft (2nd
Complaint)*, WTO Doc. WT/DS353/AB/R (Mar. 23, 2012), ¶ 613)). First, WTO
jurisprudence is not pertinent to the decision of the court. *See Hyundai Elecs. Co. v.
United States*, 23 CIT 302, 311, 53 F. Supp. 2d 1334, 1343 (1999). Second, even if
WTO jurisprudence were pertinent, Commerce nonetheless explained that the list of
examples is not exhaustive and that there is a parallel between the reciprocity in the
instant case and reciprocity in the context of loans and equity infusions — both of which
are listed in the statute — such that reciprocity is not a characteristic that disqualifies
the exchange of currency from constituting a direct transfer of funds. IDM at 13 n.88;
*see* 19 U.S.C. § 1677(5A)(D)(i).

regardless of whether it is reciprocal.  IDM at 13.[35]  Commerce also stated that the

exchange of currency is "like," Pl. Br. at 37 — in the sense of being similar to — loans

and equity infusions, albeit not grants.  IDM at 13; *see* Def.-Intervenor Br. at 41; *see*

*also* Def.-Intervenor's Resp. Ct. Questions at 8, ECF No. 63 (asserting that loans and

equity infusions are reciprocal).[36]

In the *Final Rule*, as reiterated in the IDM, Commerce also disagreed that "the

question of whether 'equivalent value' was exchanged is relevant to a financial

contribution analysis."  85 Fed. Reg. at 6,034; *see* IDM at 15.  The consideration by

Commerce as to whether there was a *financial contribution* is separate from the

---

[35] Commerce stated:

> We disagree with the GOV's notion that because the exchange of currency is reciprocal in nature it cannot constitute a direct transfer of funds within the meaning of section 771(5)(D)(i) of the Act, as the GOV's arguments seem to suggest.  Loans and equity infusions are examples of financial contributions that are characterized by reciprocity in some fashion, where a government provides funds in exchange for money in the form of interest payments at a later date (*i.e.*, loans) or provides funds in exchange for shares of stock (*i.e.*, equity infusions). The GOV appears to be reading a requirement into the statute that only grant-like transfers can constitute a direct transfer of funds – a requirement that plainly does not exist *via* the inclusion of loans and equity infusions as specifically enumerated examples of direct transfers of funds.

IDM at 13.

[36] Other instances of direct transfers of funds with an element of reciprocity include debt forgiveness and corporate restructuring.  *See Ilva Lamiere E. Tubi S.R.L. v. United States*, 26 CIT 380, 381, 196 F. Supp. 2d 1347, 1350 (2002).  In addition, reciprocity appears in the purchase or provision of goods sold to companies by a foreign government (or a body entrusted or directed by a government) for less than adequate remuneration, another category of "financial contribution" under the statute.  *See RZBC Grp. Shareholding Co. v. United States*, 39 CIT __, __, 100 F. Supp. 3d 1288, 1302 (2015).  These examples demonstrate generally that transactional relationships between a foreign government and enterprises or industries are not incompatible with financial contributions.

**PUBLIC VERSION**

consideration by Commerce of any *benefit* that KTV and similarly situated Vietnamese

exporters would receive, as discussed *infra* Section III.B.3.a.  As Commerce stated,

such financial contribution "occurs regardless of whether the domestic currency is

undervalued."  IDM at 14.

KTV also challenges Commerce's determination that Vietnamese banks were

entrusted or directed by the GOV.  Pl. Br. at 38-39 (arguing that "Commerce's complaint

was with the overall impact of *all* sales and purchases in the foreign-currency markets,

not the purchases of foreign currency from one individual exporter.  Consequently,

Commerce's imposition of countervailing duties is not based on any actual 'transfers'

from the [GOV], but instead on net transfers by the [GOV] with numerous other

parties.").

Under 19 U.S.C. § 1677(5)(B)(iii), a financial contribution may be made by a

public body or private entity that has been entrusted or directed by the government to

take such action.  *See generally* SAA at 926 ("[T]he Administration intends that the

'entrusts or directs' standard shall be interpreted broadly.  The Administration plans to

continue its policy of not permitting the indirect provision of a subsidy to become a

loophole when unfairly traded imports enter the United States and injure a U.S.

industry.").

Commerce explained that the currency exchanges handled by the SOCBs and

private banks constituted a "direct transfer of funds."  IDM at 14, 16.  Specifically,

Commerce described that the SOCBs are required to receive approval from the State

Bank of Vietnam ("SBV") to exchange currency.  *Id.* at 14.  Commerce noted further that

Vietinbank and Vietcombank are SOCBs with majority government ownership.  *Id.*

**PUBLIC VERSION**

Court No. 21-00397                                                    Page 76

Commerce determined that the banks "are vested with government authority" based on the broad government control "observed at the highest level of SOCBs' corporate structures." *Id.* In addition, Commerce concluded that the GOV "entrust[ed] or direct[ed] private banks to provide dong at an undervalued rate" because the currency handled by private banks "must be [exchanged] within the SBV established rate of +/ – 3 percent to +/-1 percent." *Id.* at 15 (citing Petition – Volume VI (May 12, 2020) at Ex. VI-49, PR 9); *see also id.* at 16 ("[B]y requiring private banks to exchange currency with any party wishing to do so, the GOV entrusts or directs private banks to provide this financial contribution."); *see* Def.-Intervenor Br. at 41 (citing IDM at 14-16) (noting the "very narrow range of the exchange rate set by the [SBV]"). In sum, Commerce's conclusion that the control and influence of the GOV over the exchange rates used by SOCBs and private banks satisfies the "entrusts or directs" provision of the statute is supported by substantial evidence and in accordance with law.

Last, KTV argues that "Commerce's finding of a 'financial contribution' in this case based on net purchases and sales with entities other than KTV is not consistent with the statute":

> Commerce's complaint was with the overall impact of *all* sales and purchases in the foreign-currency markets, not the purchases of foreign currency from one individual exporter. Consequently, Commerce's imposition of countervailing duties is not based on any actual "transfers" from the Government of Vietnam, but instead on net transfers by the Government with numerous other parties. Because the statutory definition requires that subsidies be evaluated in terms of a specific "recipient," Commerce's finding of a "financial contribution" in this case based on net purchases and sales with entities other than KTV is not consistent with the statute.

Pl. Br. at 39 (footnote omitted).

KTV's characterization of Commerce's decision is not correct.  Commerce considered net purchases as part of the benefit determination,[37] *see* Letter from Treasury to Commerce ("Treasury Report") (Aug. 24, 2020) at 1-2, PR 165, PJA Tab 7 (concluding that "net purchases of foreign exchange [undertaken by the GOV] had the effect of undervaluing Vietnam's REER by 4.2%"); IDM at 24, and for the predominant user determination, *see* IDM at 18-20.

As described previously, Commerce found that there was a financial contribution for KTV because there was a direct transfer of funds under the statute.  *See* IDM at 16. In the Preliminary Determination, Commerce found on the facts before it that the exchanges of currency at issue "constitute[d] financial contributions in the form of direct transfers of funds to KTV."  PDM at 22.  In the Final Determination, Commerce concluded that "*KTV's* . . . exchanges of currency constitute financial contributions." IDM at 16 (emphasis supplied).

In view of the foregoing, Commerce's determination that KTV's exchange of USD for Vietnamese *dong* constitutes a financial contribution under 19 U.S.C. § 1677(5)(D)(i) is supported by substantial evidence and in accordance with law.

    **2.    Specificity**

Commerce determined that Vietnam's currency undervaluation subsidy was specific based on two core findings: (1) the traded goods sector was a group; and (2)

---

[37] With respect to benefit, Commerce also noted preliminarily: "For each POI currency exchange transaction of USD to VND, KTV . . . reported the total value of USD exchanged, the exchange rate used for each of these transactions, and the authorized credit institution which processed the currency exchange transaction."  PDM at 25 (citing KTV August 24 Submission (Aug. 24, 2020) at App. 9-A, CR 34, PR 160, PJA Tab 6).

**PUBLIC VERSION**

the traded goods sector was the predominant user of the currency undervaluation

subsidy.  PDM at 23-24; IDM at 16-20.

To determine whether a subsidy "may be specific as a matter of fact," §

1677(5A)(D)(iii)(II) directs Commerce to examine whether "[a]n enterprise or industry [or

group of such enterprises or industries] is a predominant user of the subsidy."  The SAA

provides that the purpose of the specificity test "is to function as an initial screening

mechanism to winnow out only those foreign subsidies which truly are broadly available

and widely used throughout an economy."[38]  SAA at 929; *see also* IDM at 20 (quoting

same (with emphasis)).  A group need not be limited in number for a benefit to be

conferred:

> [G]iven the purpose of the specificity test as a screening mechanism, the
> weight accorded to particular factors will vary from case to case.  For
> example, where the number of enterprises or industries using a subsidy is
> not large, the first factor alone would justify a finding of specificity . . . .  On
> the other hand, where the number of users of a subsidy is very large, the
> predominant use and disproportionality factors would have to be assessed.
> Because the weight accorded to the individual *de facto* specificity factors is
> likely to differ from case to case, clause (iii) makes clear that Commerce
> shall find *de facto* specificity if one or more of the factors exists.

SAA at 931.

As discussed *infra* Section III.B.2.b, Commerce may find that a subsidy is

specific in fact if a large group is a predominant user of the subsidy.

Further, the SAA makes clear that the numerator and denominator can shift

depending on the number of users of the subsidy.  SAA at 931.  If the number is

---

[38] Congress has provided that the SAA "shall be regarded as an authoritative
expression by the United States concerning the interpretation and application of the
Uruguay Round Agreements and this Act in any judicial proceeding in which a question
arises concerning such interpretation or application."  19 U.S.C. § 3512(d).

**PUBLIC VERSION**

smaller, then the first factor is the most relevant to the analysis, whereas if the number

is larger, the other factors of disproportionality and predominant use come into play, as

they do in the instant action.  *Id.*  In fact, the SAA explains that the specificity test was

intended to function as a "rule of reason":

> The specificity test was intended to function as a rule of reason and to avoid
> the imposition of countervailing duties in situations where, because of the
> widespread availability *and use* of a subsidy, the benefit of the subsidy is
> spread throughout an economy.  Conversely, the specificity test was not
> intended to function as a loophole through which narrowly focussed [sic]
> subsidies provided to or used by discrete segments of an economy could
> escape the purview of the CVD law.

SAA at 930.

Based on the analysis below, the court is unable to ascertain whether

Commerce's determination that Vietnam's currency undervaluation subsidy was specific

is supported by substantial evidence and in accordance with the statute.  Accordingly,

the court remands aspects of Commerce's determination, as specified below.

### a.   Commerce determination

Commerce noted at the outset that the provision on the traded goods sector in its

regulation on specificity, 19 C.F.R. § 351.502(c), is consistent with the statute because

the traded goods sector constitutes a "subset of companies that either sell goods

internationally or that buy goods internationally [and] is known to account for a particular

portion of USD inflow in the Vietnamese economy."  IDM at 20; Def. Br. at 23 (citing

*Final Rule*, 85 Fed. Reg. at 6,031, 6,039).  Commerce explained further that this

regulatory modification was similar to prior interpretations of the statutory term "group"

in prior determinations.  IDM at 20 (citing *Final Rule*, 85 Fed. Reg. at 6,039; Import

Administration Policy Bulletin 10.1, "Specificity of Subsidies Provided to State-owned

**PUBLIC VERSION**

Court No. 21-00397                                                         Page 80

Enterprises," 2010; *Citric Acid and Certain Citrate Salts from the People's Republic of*
*China: Final Affirmative Countervailing Duty Determination*, 74 Fed. Reg. 16,836 (Dep't
of Commerce Apr. 13, 2009) and accompanying IDM ("*Citric Acid* IDM") (Dep't of
Commerce Apr. 6, 2009) at cmt. 16).[39]

     Commerce explained that using these data and applying the statute and its
regulations, Commerce determined that "companies that buy or sell goods
internationally comprise a group . . . within the meaning of section 771(5A)(D)(iii)(II) of
the Act." IDM at 20.  Commerce added that its finding that companies that buy or sell
goods internationally comprise a "group" for specificity purposes is consistent with
Commerce's interpretation of the term "group" in other contexts. *Id.* For example,
Commerce stated, "we have found that state-owned enterprises comprise a 'group' and
that foreign-invested enterprises comprise a 'group.'" *Id.*

     Commerce then continued as per § 1677(5A)(D)(iii)(II) to assess whether the
traded goods sector "group" was a "predominant user." The predominant user factor
calls for a comparative analysis.  In this case, Commerce found that the numerator, as
noted, was the group of enterprises or industries comprising the "traded goods sector"
and the denominator was "USD currency conversions." PDM at 23.  Since SBV did not
provide Commerce with USD inflows or trading by field or sector, Commerce relied on
USD inflows to Vietnam as a proxy for currency conversions, IDM at 18, and determined

---

[39] In *Citric Acid*, Commerce concluded that FIEs — across a variety of sectors —
comprised a "group" of enterprises under § 1677(5A)(D).  *Citric Acid* IDM at cmt. 16.
This finding demonstrates that a group may be comprised of enterprises from multiple
sectors for a specificity analysis, lending support to Commerce's conclusion in the
instant case, notwithstanding that *Citric Acid* involved a *de jure* subsidy.  *See id.*

that the universe of annual currency conversions would be comprised of "four major channels of exchange: (a) exports of goods, (b) exports of services, (c) various forms of portfolio and direct investment, and (d) earned income from abroad." PDM at 23-24.

The court next sets out the steps Commerce appears to have taken — based on the PDM and IDM, Commerce questionnaires and the GOV's IQR, SQR2 and SQR3 — to develop data sets representing (1) the traded goods sector, which Commerce identified as the group or numerator for Commerce's predominant use comparative analysis, and (2) the universe of all currency conversions, which Commerce identified as the denominator for that analysis. *See* GOV Initial Questionnaire Response ("GOV IQR") (Aug. 25, 2020), Ex. F-1, PR 166, CR 51, PJA Tab 8; GOV Second Supp. Questionnaire Response ("GOV SQR2") (Oct. 13, 2020), PR 272-273, PJA Tab 19; GOV Resp. to Third Supp. Questionnaire ("GOV SQR3") (Oct. 19, 2020), PR 287, CR 121, PJA Tab 21. Commerce's first step was to request from the GOV "total USD inflow from the 'traded goods sector,'" and how much came from (i) "the traded services sector" and (ii) "utilized FDI and inbound portfolio investment." PDM at 23 (citing to GOV IQR, Ex. F-1 at 4).

The GOV did not provide the requested information, stating: "the State Bank does not collect data of USD capital inflows or USD trading by field and by sector." GOV IQR, Ex. F-1 at 7. Instead, the GOV "reported the 'total USD inflow'" in several categories including "net commodity trade," "One-way money transfers of the net private sector," "FDI in Vietnam," "PI in Vietnam" and "Net Foreign debt." *Id.* at 4.

Commerce responded, again requesting the specific categories of information as well as seeking an explanation from the GOV for its data as reported:

**PUBLIC VERSION**

> Please explain how these numbers were obtained and what went into these calculations and report all original values requested including total USD inflow from the traded goods sector and the traded services sector along with a citation for where this info was obtained.

GOV SQR3 at 1, Question 2.

The GOV responded with bulleted specifications for net commodity trade (sourced by the Vietnam General Department of Customs statistics), one-way money transfer data (compiled by the SBV), FDI data (sourced from the Foreign Investment Department in the Ministry of Planning and Investment), data for PI (sourced from the State Securities Commission in the Ministry of Finance), net foreign loans data from the Ministry of Finance and enterprises' disbursement and repayments by authorized credit institutions.  GOV SQR3 at 1-3.  Notably, the GOV did not account for the original values requested, including total USD inflow concerning the traded goods sector and the traded services sector in particular.  *Id.*; PDM at 23; IDM at 18.

Commerce then stated that, in the absence of the data that Commerce had requested from the GOV but which the GOV had not provided, "we relied upon the available data regarding USD inflows to Vietnam as a *proxy* for USD currency conversions."[40]  PDM at 23 (emphasis supplied); *see also* IDM at 18.  Commerce

---

[40] In reaching this conclusion, Commerce appears to have been relying on facts available on the basis that necessary information as requested by Commerce on multiple occasions was not on the record.  However, notably, Commerce did not cite to any statutory authority that would allow it to rely on this information.  For example, Commerce did not invoke § 1677e(a)(2)(B) for determinations on the basis of facts available or § 1677e(b) if Commerce considered that it was applying adverse facts available and if so, why it was doing so or why under the circumstances it chose not to do so but to rely only on facts available.  Instead, it appears that Commerce relied on § 1677e(c) in which Commerce was just corroborating secondary information.  The court directs Commerce to state clearly the statutory authority under which it relied on these data.

explained that while its "Initial Questionnaire requested that the GOV provide us with total USD inflow from the 'traded goods sector,' 'the traded services sector and utilized FDI and inbound portfolio investment,' . . . the GOV reported values on a different basis as explained below."  PDM at 23.  That basis was "net commodity trade."  *Id*. (citing GOV SQR3 at 3).  Commerce therefore determined to consider "information placed on the record by Commerce, which reflects data submitted by the State Bank of Vietnam to the IMF."  *Id.*

Commerce then added: "To add precision to the amount of USD inflows received from Vietnam's exports [sic] of goods, we discounted Vietnam's exports [sic] of goods value by the amount of intermediary imported inputs (based on OECD estimates) to arrive at a reasonable estimate of exports that earned foreign exchange."  *Id*. at 24.

Following this statement, Commerce then pivoted to announce that it "estimated the total proportion of USD inflows Vietnam has received in the POI through the following four major channels of exchange: "(a) exports of goods, (b) exports of services, (c) various forms of portfolio and direct investment, and (d) earned income from abroad."  *Id*. 23-24.

What is clear from Commerce's description is that it repeatedly requested certain information from the GOV, which the GOV repeatedly declined to provide.  What is less clear, in some cases lacking altogether in explanation, are the following four points: (1) a clear statement of what precisely Commerce considered to be missing from the record; and (2) the reasons that the alternative information provided by the GOV was not useable to perform the necessary analysis.  Specifically on these two points, the court takes note that Commerce in its supplemental questionnaire asked the GOV to

**PUBLIC VERSION**

Court No. 21-00397                                                                                           Page 84

take three steps with respect to each of the four requested categories: (1) "explain how these numbers were obtained"; (2) "what went into these calculations"; and (3) "report all original values requested."  GOV SQR3 at 1.  However, Commerce did not provide specific reasons that it did not use the GOV response, including whether the response met or did not meet each of the three elements of Commerce's request quoted above. *See* PDM at 23-24; IDM at 18-19.  The court notes further that the GOV offered six elements for a number to comprise total USD inflows.  GOV SQR3 at 3.  Commerce did not explain why it did not accept these data and how the data relate to Commerce's use of the four categories to comprise an economy wide surrogate number for currency conversions.  In sum, Commerce did not explain in a manner that allows the court to determine if Commerce's finding that the four major channels of exchange represent the denominator with which the traded goods sector should be compared in the predominant use test is supported by substantial evidence or is in accordance with law.

The third point that is not clear in Commerce's explanation is how these missing data related to Commerce's next steps; in particular, what were the reasons that Commerce designated the four major channels of exchange as the correct basis for "estimat[ing] the total proportion of USD inflows" that Vietnam received during the POI, PDM at 23-24 (citing IMF/OECD Mem. (Oct. 7, 2020) at attach. 2, PR 254, PJA Tab 17), and the reason that Commerce did not use the other data supplied by the GOV that were also detailed by Commerce in the PDM and in GOV's supplemental questionnaire response.  *See* PDM at 23; GOV SQR3 at 1.

The fourth point that requires a more clear and detailed explanation by Commerce is its comment that "there [we]re certain places where [the GOV] was unable

**PUBLIC VERSION**

to provide the information we requested for our evaluation."[41]  PDM at 23.  Commerce

did not describe or explain adequately: (1) how, precisely, Commerce utilized the

"information placed on the record by Commerce, which reflects data submitted by the

State Bank of Vietnam to the IMF" *to derive the four channels analysis*; (2) what data

were not provided in connection with Commerce's development of that analysis; and (3)

why, together, these elements prevented Commerce from using those data in its four

channels analysis.  *Id.*  The court is aware that the failure of the GOV to provide the

requested data required that Commerce develop an alternative.  The court does not,

however, understand *how* the missing GOV information led Commerce to identify and

rely upon the four major channels of exchange as Commerce did.  Hence, the court is

not able to conclude at this time whether Commerce's determination on this aspect is

supported by substantial evidence and in accordance with law.

      In sum, the court concludes that Commerce has not explained sufficiently how or

why those four major channels of exchange represent the denominator with which the

traded goods sector should be compared in the predominant use test.

---

[41] The GOV described as follows the IMF data on USD inflow from the traded goods
sector that the GOV provided to the IMF:

> Data regarding net commodity trade is calculated from the General
> Department of Customs statistics for imported and exported goods, and the
> survey results on insurance and freight for international trade of goods are
> used to convert CIF values of imported goods to FOB values[.]

GOV SQR3 at 2.

Court No. 21-00397                                                                    Page 86

### b.   KTV's challenges

KTV presents five principal arguments challenging Commerce's decision.  The court addresses each in turn.

KTV Argument #1: Commerce's definition of "group" is tautological

KTV's first argument is that Commerce's classification of "exporters as a whole" as a "group" of enterprises for the purpose of analyzing whether the GOV's currency undervaluation subsidy was "specific" under 19 U.S.C. § 1677(5A)(D) is "contrary to . . . the statute."  Pl. Br. at 42.  KTV states that "if the 'group' is defined (as in this case) to encompass virtually all users in the manufacturing and agricultural sectors, the use of the program by that 'group' will necessarily constitute a relatively high percentage of overall use."  Resp. Kumho Tire (Vietnam) Co., Ltd. Ct.'s Questions ("KTV Resp. Ct. Questions") at 5, ECF No. 62.  KTV adds: "As a matter of mathematics . . . Commerce's finding is simply a reflection of its overbroad definition of the relevant 'group.'"  *Id.* at 4.  As KTV stated at oral argument: "[Y]ou can define a group of industries in such a way . . . [as] everyone who uses the subsidy.  Therefore, that group is the predominant user of the subsidy.  [T]hat to me is a tautology[;] that's not an independent finding."  Oral Arg. Tr. at 66:6-10.

KTV mischaracterizes Commerce's determination, as discussed above. Commerce determined that the numerator was the dollar inflows accounted for by the traded goods sector, while the denominator was all inflows not just from the traded goods sector but also from exports of services, various forms of portfolio and direct investment and earned income from abroad.  IDM at 18.

**PUBLIC VERSION**

Further, as the SAA contemplates expressly, the specificity provisions of the statute provide a "rule of reason" approach due to the highly fact-specific determinations that Commerce is required to make.  SAA at 930.  For example, if 10 years from now Vietnam's economy were to shift to become a predominant exporter of services, then Commerce's determination of a numerator in this case might well not meet the predominant user standard.[42]  This example further illustrates that Commerce's formulation is fact dependent, not tautological.

KTV argues next that Commerce should have but did not treat the traded goods sector the same way that Commerce treats the agricultural sector.  KTV Resp. Ct. Questions at 5; 19 C.F.R. § 351.502(e) ("The Secretary will not regard a subsidy as being specific . . . solely because the subsidy is limited to the agricultural sector (domestic subsidy).").  This argument conflicts with the plain and express language of Commerce's regulations.  Commerce decided this case under § 351.502(c), which pertains to the "traded goods sector" and specifically *contemplates* that Commerce normally will treat the traded goods sector as a group.  By contrast, Commerce decides cases pertaining to "[*a*]*gricultural subsidies*" under § 351.502(e), which expressly *proscribes* Commerce from "regard[ing] a subsidy as being specific under section

---

[42] The USW states:

> [E]ach economy is different.  In Costa Rica or New Zealand, to take hypothetical examples, tourism (the export of a service) and remittances (income from abroad), may account for more dollar inflows than net exports of goods, and the traded goods sector thus would not be the predominant user of any currency undervaluation program that either country may employ."

Def.-Intervenor's Resp. Ct. Questions at 11, ECF No. 63.

**PUBLIC VERSION**

771(5A)(D) of the Act solely because the subsidy is limited to the agricultural sector

(domestic subsidy)."

Finally, KTV states further that "the foregoing analysis of the relationship

between the definition of the 'group' and the calculation of usage by the group is based

on the assumption that use is spread relatively evenly throughout various sectors of the

economy." KTV Resp. Ct. Questions at 5. The court does not understand the

relevance of the point. If related to the consideration in a specificity analysis of the

economic diversity of the economy of Vietnam, the court notes that Commerce

addressed this point, described extensive information on the record, and stated: "the

level of economic diversification in Vietnam does not detract from finding a program to

be *de facto* specific where other information so indicates in accordance with section

771(5A)(D)(iii) of the Act (*e.g.*, where the number of recipients are [sic] limited in

number)." PDM at 19. Put differently, information on the record demonstrated that

Commerce's finding that the currency program is *de facto* specific was not due merely

to the lack of economic diversification in Vietnam. *See id.*; *see also* Def.'s Resp. Ct.

Questions at 7, ECF No. 61. Further, the issue of widespread use throughout the

economy is one about which Commerce sought information in the context of the

diversification of economic activities. *See* GOV IQR. The court remands so that

Commerce may ensure to address KTV's argument fully. Specifically, the court

instructs Commerce to specify whether Commerce made the assumption in its

determination that use of the currency undervaluation subsidy is spread evenly in the

traded goods sector.

KTV Argument #2: Inconsistent with Commerce practice I

KTV's second argument relies on a recent Commerce determination involving fertilizer from Russia. KTV maintains that this determination demonstrates that "Commerce has held that the analysis of *de facto* specificity requires a comparison of use by the defined group to overall use by the *manufacturing sector*" and that therefore "a comparison of use of currency conversions by the 'traded goods' sector to overall use in all sectors . . . is not consistent with the statute. Instead, the comparison should have been between use by the 'traded goods' sector and . . . [the] 'manufacturing sector.'" KTV Resp. Ct. Questions at 3-4 (citing *Urea Ammonium Nitrate Solutions from the Russian Federation: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 37,836 (Dep't of Commerce June 24, 2022) and accompanying IDM ("*Urea Ammonium Nitrate Solutions from Russia* IDM") (Dep't of Commerce June 17, 2022) at cmt. 7).

Commerce's determination in *Urea Ammonium* is inapposite to the instant case. In that determination, Commerce *excluded* data from non-manufacturing sectors to obtain a specificity analysis that Commerce concluded was required by the statute, noting:

> [T]he agro-chemical industry's share of natural gas consumption is also likely understated because it is calculated on the basis of total consumption data that includes [sic] non-manufacturing sectors such as household consumers, the housing and utilities sector, and electricity and heat generators, which comprise a combined majority of total natural gas consumption.[43]

---

[43] The data showed that "the largest consumers of natural gas in Russia were electricity and heat generators (33 percent), household consumers (11 percent), the oil industry (ten percent), the housing and utilities sector (eight percent), the agrochemical industry (seven percent), and metallurgy (six percent)." *Urea Ammonium Nitrate Solutions from Russia* IDM at cmt. 6.

**PUBLIC VERSION**

Court No. 21-00397                                                                 Page 90

*Urea Ammonium Nitrate Solutions from Russia* IDM at cmt. 6 (footnotes omitted).

Therefore, Commerce explained that "[its] analysis reasonably *excludes natural gas*

*consumption by non-manufacturing sectors*." *Id.* (emphasis supplied).  Commerce

stated further that "[t]his approach is consistent with prior CVD Russia proceedings." *Id.*

(citing *Phosphate Fertilizers from the Russian Federation: Final Affirmative*

*Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Dep't of Commerce Feb. 16,

2021) and accompanying IDM (Dep't of Commerce Feb. 8, 2021) at cmt. 3d;

*Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the*

*Russian Federation: Final Affirmative Countervailing Duty Determination and Final*

*Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (Dep't of

Commerce July 29, 2016) and accompanying IDM (Dep't of Commerce July 20, 2016)

at cmt. 2).

In *Urea*, Commerce *excluded* non-manufacturing sectors to pare down the

denominator so that Commerce might ascertain whether an enterprise or industry, or

group thereof — in that case, the agrochemical industry — was a predominant user of

the subsidy.  *Id.*  The decision illustrates one instance in which, based on the facts

before Commerce, it determined that the language of the statute as buttressed by the

SAA's "rule of reason" approach required Commerce to exclude certain non-trade-

involved sectors — in that case, non-manufacturing sectors of the economy.  As

discussed above, the statute does not specify how Commerce is to determine either the

numerator or the denominator in ascertaining a group or analyzing its use of a subsidy.

19 U.S.C. § 1677(5A)(D)(iii).  Accordingly, the *Urea* determination does *not* stand for the

proposition, as KTV advocates, that the manufacturing sector is the correct denominator

**PUBLIC VERSION**

in all cases.[44]  In this respect, Commerce's selection of the traded goods sector to the

economy as a whole is consistent with the statute.

> KTV Argument #3: Inconsistent with Commerce Practice II

KTV's third argument is that Commerce classification of "exporters as a whole"[45]

as a "group" of enterprises is "contrary to . . . Commerce's established practice" in two

Commerce determinations from 2010 and 2011.  Pl. Br. at 42 (citing Certain Coated

Paper Currency Memo at 5; Aluminum Extrusions Currency Memo at 5); *see also* Pl.

Reply Br. at 14-15.  In its argument, KTV relies primarily on the following quotation from

a staff memorandum that accompanied both determinations:

> Petitioners are also incorrect in framing their allegations regarding exporters
> as a "group" receiving domestic subsidies.  Under the statutory scheme,
> subsidies to exporters are countervailable as export subsidies. . . .  That
> scheme is set on its head by treating exporters as a "group" for purposes of
> finding a domestic subsidy under section 771(5A)(D) of the Act.

Pl. Reply Br. at 14 (quoting Certain Coated Paper Currency Memo at 5; Aluminum

Extrusions Currency Memo at 5).

---

[44] Indeed, KTV then concedes that "[s]uch a comparison would . . . be tautological,
because the 'traded goods' sector necessarily encompasses the manufacturing sector."
KTV Resp. Ct. Questions at 4

[45] Addressing the "exporters of goods" as a group, Commerce stated:

> In evaluating the portion of USD inflows attributable to exporters of goods,
> we have considered and adjusted this value to reflect the portion of these
> goods which is attributable to intermediary imported goods that are
> subsequently used for re-exportation.  This adjustment is indicative of the
> reality that Commerce has included information about companies which are
> engaged in both the buying and selling of goods internationally in its
> analysis.

IDM at 19.

PUBLIC VERSION

Commerce addressed KTV's argument directly, "acknowledge[d] [the] statement" made in the Currency Memos and noted that "it is a fundamental principle of administrative law" that an agency is allowed to change its practice, provided "the change is reasonable and explained":

> With respect to KTV's argument that treating exporters as a "group" for domestic subsidy purposes turns the statutory scheme on its head, we acknowledge our statement to that effect from more than ten years ago. However, it is a fundamental principle of administrative law that an agency is allowed to change its practice, provided the change is reasonable and explained.  As explained in the *Final Rule*, upon further consideration of the statutory scheme and section 771(5A)(D) of the Act, treating companies that buy or sell goods internationally as a "group" is entirely consistent with the Act.  The term "group" is not defined in the Act, and our finding in this investigation is consistent with the broad approach to that term that is reflected in 19 CFR § 351.502(b) and our past practice.

IDM at 20 (footnote omitted).

Commerce made an ostensible shift in its approach to defining a group in the context of currency undervaluation — from its statement in the Currency Memos but not in the PDM or IDM, which were framed around whether the statutory requirements of the initiation standard had been met — to the determination before the court.[46] *Compare* Certain Coated Paper Currency Memo at 4, *and* Aluminum Extrusions Currency Memo at 3-4, *with Final Rule*, 85 Fed. Reg. at 6,039.  It is well-established that an agency may change prior practice so long as two requirements are met: (1) the agency adequately explains the reasons for the change; and (2) the change in practice

---

[46] Commerce in the Currency Memos stated that it would not treat exporters as a "group" for purposes of a de facto domestic subsidy analysis.  In the IDMs in those determinations, Commerce's analysis was limited to whether the petitioners' allegations were sufficient to initiate an investigation into whether the currency undervaluation programs at issue constituted an export subsidy.  *Certain Coated Paper* IDM at cmts. 5-7; *Aluminum Extrusions* IDM at cmt. 33; *see supra* Section II.B.2.a.

**PUBLIC VERSION**

is in accordance with the statute. *Huvis Corp. v. United States*, 570 F.3d 1347, 1353

(Fed. Cir. 2009) (Commerce's change in practice will not be disturbed if "its

methodology is permissible under the statute and . . . it had good reasons for the new

methodology"); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

In this case, Commerce's actions meet both requirements. Commerce provided

a clear roadmap to its determination, including a reasoned explanation for its shift in

practice, provided in the context of a notice-and-comment rulemaking. *Final Rule* at

6,039-40; IDM at 20; *see Fox Television*, 556 U.S. at 515; *see also Huvis Corp.*, 570

F.3d at 1354.

In addition, Commerce's shift in practice is consistent with the statute. *See* 19

U.S.C. § 1677(5A). There is no limitation in the statute on the size of a "group of . . .

enterprises or industries," nor is there a requirement that there be shared characteristics

among such a group. *Id.* As Commerce stated in the *Final Rule*, enterprises that buy

and sell goods internationally are "an identifiable set of enterprises" that "constitute a

subset of all economic actors within a country." 85 Fed. Reg. at 6,039; *see also supra*

Section III.B.2 (citing the SAA and emphasizing the function of the specificity test "as an

initial screening mechanism to winnow out only those foreign subsidies which truly are

broadly available and widely used throughout an economy"); SAA at 931 ("[W]here the

number of users of a subsidy is very large, the predominant use and disproportionality

factors would have to be assessed.").

Commerce's conclusion in the instant case is consistent also with Commerce's

definition of a "group of . . . enterprises or industries" in previous determinations. *See,*

*e.g.*, *Citric Acid* IDM at cmt. 16. In *Citric Acid*, as discussed above, Commerce

**PUBLIC VERSION**

concluded that FIEs — across a variety of sectors — comprised a "group" of enterprises

under § 1677(5A)(D).  *Id.*

　　In sum, the court's reading of the statute is that the traded goods sector is

comprised of a "group of . . . enterprises or industries" within the meaning of §

1677(5A)(D*).  See Loper Bright*, 144 S. Ct. at 2266 (holding that there is a best reading

of a statute, which is "'the reading the court would have reached' if no agency were

involved").[47]

　　　　KTV Argument #4: Currency undervaluation is an export subsidy

　　KTV argues also that treating "exporters as a whole" as a "'group' for purposes of

finding specificity" is contrary to the statute because "'subsidies to exporters are

countervailable as export subsidies.'"  Pl. Reply Br. at 14-15 (quoting Certain Coated

Paper Currency Memo; Aluminum Extrusion Currency Memo).

　　KTV's argument is not supported by the statute.  The court starts with the

language of the statute.  As discussed, § 1677(5) requires that Commerce determine

---

[47] In *Loper Bright*, the Supreme Court reiterated that the agency's position "constitute[s]
. . . informed judgment" to which the court can "properly resort":

> [I]n *Skidmore v. Swift*, 323 v. Swift & Co., 323 U.S. 134, 65 S. Ct. 161, 89
> L.Ed. 124 (1944), the Court explained that the "interpretations and opinions"
> of the relevant agency, "made in pursuance of official duty" and "based upon
> . . . specialized experience," "constitute[d] a body of experience and
> informed judgment to which courts and litigants [could] properly resort for
> guidance," even on legal questions.  "The weight of such a judgment in a
> particular case," the Court observed, would "depend upon the thoroughness
> evident in its consideration, the validity of its reasoning, its consistency with
> earlier and later pronouncements, and all of those factors which give it
> power to persuade, if lacking power to control."

144 S. Ct at 2259 (internal citations omitted) (alterations in original).

**PUBLIC VERSION**

that three elements are present to find the existence of a countervailable subsidy: a

financial contribution, specificity and a benefit conferred.  Section 1677(5A)(A) sets forth

multiple ways for Commerce to find specificity, of which two are discussed by the

parties: "a subsidy is specific if it is an export subsidy described in subparagraph (B) . . .

or if it is *determined* to be specific pursuant to subparagraph (D)."  (emphasis supplied).

Section 1677(5A)(B) in turn provides that "[a]n export subsidy is a subsidy that is, in law

or in fact, *contingent upon export performance*."  Section 1677(5A)(D) establishes four

different ways for Commerce to identify a domestic subsidy.

      In this respect, this Court's decision in *Gov't of Sri Lanka v. United States*, 42 CIT

__, __, 308 F. Supp. 3d 1373, 1378 n.2 (2018), is instructive:

> Section 1677 defines the various categories of specific subsidies in the
> alternative, e.g., a subsidy can be specific if it is *either* an export subsidy *or*
> a qualifying domestic subsidy.  19 U.S.C. § 1677(5A)(A).  Having found that
> substantial evidence supports Commerce's conclusion that the TCENTP
> program constituted an export subsidy, the court need not assess GSL's
> arguments regarding the degree to which the TCENTP program satisfied
> the definition of a domestic subsidy.

      The Court there continued: "Export subsidies are one class of specific subsidy."

*Id.* at __, 308 F. Supp. 3d at 1378.  In that case, the Court affirmed a decision of

Commerce based on the specific facts of that determination: "[T]he fact that the

subsection under which [plaintiff] qualified was contingent upon export performance

demonstrates that the TCENTP program constituted an export subsidy *as applied to*

**PUBLIC VERSION**

[*plaintiff*], and was thus specific for purposes of Section 1677(5A)." *Id.* (emphasis supplied).[48]

Similarly, in this case, Commerce made a determination that the undervaluation of the *dong* satisfied the specificity requirements of subsection (D) by providing benefits to KTV — and was, therefore, specific for purposes of § 1677(5A)(D). IDM at 19. The requirements of subsection (D) are different from those of subsection (B). As the *Sri Lanka* decision illustrates, the statute provides that an export subsidy under subsection (B) is per se specific so long as the subsidy is "contingent upon export performance." By contrast, the statute stipulates that for the domestic subsidy program at issue in this case — currency undervaluation — specificity does not exist per se but must be *determined* by Commerce under the provisions of § 1677(5A)(D).

---

[48] In *Gov't of Sri Lanka*, the subsidy program under review was a government program that provided tax concessions for the following "specified undertakings":

> (i) the export of non-traditional goods, manufactured, produced or purchased by such undertaking; or
> (ii) the performance of any service of ship repair, ship breaking repair and refurbishment of marine cargo containers, provision of computer software, computer programs, computer systems or recording computer data, or such other services as may be specified by the Minister by Notice published in the Gazette, for payment in foreign currency.

*Id.* at __, 308 F. Supp. 3d at 1378.

The Court held that subsection (i) of the program was "clearly contingent upon export performance" because it explicitly iterated tax concessions for the export of non-traditional goods. *Id.* "The statute does not require that exporters be the only foreseeable beneficiaries of the [financial contribution], or that the number of exporters impacted be limited, in order for it to be classified as an export subsidy vis-à-vis [the beneficiary]." *Id.*

**PUBLIC VERSION**

For the currency undervaluation program at issue in this case, any party that is a potential beneficiary, regardless of whether they export, is eligible to receive the subsidy.  Commerce found that the traded goods sector of which KTV is a part comprised "71.94 percent of USD inflows into Vietnam" and therefore constituted "the predominant user of the subsidy."  IDM at 19.

Commerce defined the group consistent with the statute.  *See supra* Section III.B.2.b.  Commerce rendered a fact-specific determination based on the record before it to conclude that the traded-goods sector constitutes a "group of enterprises" and further constitutes a predominant user of the subsidy.  IDM at 18-19.  The court is required to decide whether this record determination by the administering authority is consistent with the statute.  Whether the currency undervaluation program with the traded goods sector as the predominant user might be determined to be countervailable in the future is not, as KTV would have it, a foregone conclusion invalidating Commerce's application of § 1677(5A)(D) to the group of enterprises in this case; rather, any such future determination would depend on a number of variables.  For example, were Vietnam to shift the composition of its exports heavily toward services as Vietnam continued to climb the ladder of economic development, it is quite possible that the traded goods sector would no longer qualify as a predominant user.  In that circumstance, contrary to KTV's proffered view, it would be unlikely that Commerce would be able to determine that the subsidy was specific as to the traded goods sector.  Rather, Commerce would have to assess whether one of the other provisions of subsection (D), such as subsections (D)(iii)(III)-(IV), might apply.  If none applied, the subsidy would be a non-specific domestic subsidy and not countervailable.  By contrast,

**PUBLIC VERSION**

were the program determined to be an export subsidy, it would be per se specific.

Further, in the scenario noted, the Vietnam services sector would receive potentially

substantial benefits from the program but not export a single pallet of goods.

      Converse to the Court's finding in *Sri Lanka*, the court is not in a position to

assess KTV's arguments that someday a hypothetical similar subsidy program to the

one before the court as applied to KTV under section (D) could be considered specific

under subsection (B).

      In sum, there is no indication in the statute that application of one subsection of §

1677(5A) precludes application of another.  Congress knows how to draft to achieve

that result if it wants to.  *See* Senate Office of the Legislative Counsel, Legislative

Drafting Manual § 302 (1997) (instructing drafters to "use 'or' . . . to indicate that a thing

is included in the class if it meets *1 or more* of the criteria" (emphasis supplied)); *see

also New York v. Arm or Ally, LLC*, No. 22-CV-6124 (JMF), 2024 WL 756474, at *6

(S.D.N.Y Feb. 23, 2024) ("Disjunctive clauses separated by 'or' are normally read to be

inclusive, not mutually exclusive.").

      In addition, Congress has made clear that the countervailing duty statute is

remedial in nature.  SAA at 877 (emphasizing the "remedial effect" of AD and CVD

orders); 19 U.S.C. § 1671(a) (directing Commerce to calculate a CVD "*equal to* the

amount of the net countervailable subsidy") (emphasis supplied); *Guangdong Wireking

Housewares & Hardware Co. v. United States*, 745 F.3d 1194, 1203 (Fed. Cir. 2014)

("The congressional intent behind the enactment of [the] countervailing duty . . . law

generally was to create a civil regulatory scheme that remedies the harm unfair trade

practices cause.").  The statute is intended to provide a remedy to address subsidies so

**PUBLIC VERSION**

Court No. 21-00397                                                                                          Page 99

long as the three core conditions are met.  The remedial nature of the statute would

appear to apply with particular force in the case of the subsidy program at issue in this

case, which, Commerce concluded in its *Final Rule*, "distorts international trade on a

systemic basis with the same direct adverse impact on trade as the simultaneous

provision of import-substitution and export subsidies" (both of which U.S. law treats as

per se specific).  *Final Rule,* 85 Fed. Reg. at 6,039.[49]   The decisions of this Court and

the Federal Circuit have consistently upheld that the trade remedy laws are "generally

remedial in nature."  *GPX Int'l Tire Corp. v. United States*, 37 CIT 19, 29-30, 893 F.

Supp. 2d 1296, 1309-10 (2013), *aff'd*, 780 F.3d 1136 (Fed. Cir. 2015); *Chaparral Steel

Co. v. United States*, 901 F.2d 1097, 1103-04 (Fed. Cir. 1990); *Badger-Powhatan, Div.*

---

[49] Commerce explained that the currency undervaluation subsidy is both distinct from the categories of export contingent and import competing subsidies identified under U.S. law and international rules, as well as being a grossly trade-distorting subsidy whose impacts are precisely the kinds that U.S. law and those rules were written to address:

> [S]ection 771(5A)(A) of the Act deems export subsidies and import-substitution subsidies to be specific per se, without regard to whether there is a narrow or diverse array of industries or companies reflected by the recipients of those two categories of subsidies, or whether there are any other common characteristics among those recipients. The SCM Agreement not only likewise deems these two categories of subsidies to be specific, but also prohibits them outright.  Specifically in the context of undervalued currency, moreover, we note that if an exchange rate is too low or undervalued, it underprices exports and overprices imports. This directly distorts international trade on a systemic basis with the same direct adverse impact on trade as the simultaneous provision of import-substitution and export subsidies. Accordingly, treating importers and exporters of goods as a group for specificity purposes is entirely consistent with the international trade focus and remedial purposes of the trade remedy laws.

*Final Rule,* 85 Fed. Reg. at 6,039 (footnote omitted).

**PUBLIC VERSION**

*of Figgie Int'l, Inc. v. United States,* 9 CIT 213, 216-17, 608 F. Supp. 653, 656-57

(1985).

The court concludes that subsection (D) as applied in this case is consistent with

the statute.  KTV argues that the application of subsection (D) in this case precludes per

se application of subsection (B) and, therefore, Commerce's action is inconsistent with

the statute.  It is not for the court to determine whether a hypothetical subsidy program

similar to the one before the court and determined by Commerce to be specific under

section (D) could in the alternative be considered specific under subsection (B).  That

case is not before the court.[50]

Just because the traded goods sector is benefitting from a domestic subsidy by

exporting its goods does not convert the subsidy into a subsidy that is contingent on

export under § 1677(5A)(B).  Other sectors also benefit that do *not* export goods.

KTV Argument #5: Conversion

KTV's fifth argument is that Commerce's "focus on the actual conversions of

foreign currency into *dong* fails to address the actual impact of the exchange rate on

---

[50] The court notes that no party to this action challenges the consistency of 19 C.F.R. § 351.528 with § 1677(5A).

economic actors in Vietnam." Pl. Br. at 41-42 (citing IDM at 19).[51] KTV adds that

nowhere in the record does Commerce show that the industries or enterprises in the

traded goods sector are "compelled to convert their U.S. dollars to *dong*." Pl. Reply Br.

at 12. Instead, KTV maintains, these industries or enterprises "may choose to retain

their U.S. dollars for other operational reasons." *Id.* In sum, KTV avers that Commerce

erred in relying on USD inflows as a proxy for unavailable field- or sector-related USD

trade data because "exporters do not have to convert their U.S. dollar export earnings

into *dong*." *Id.* at 11-14.

As a threshold matter, the conversion issue at its core appears to relate to

whether the company actually received a benefit at the time of the conversion. This

issue is addressed *infra* Section III.B.3.

Next, the issue raised by KTV arises only because the GOV did not provide the

data that Commerce required. PDM at 23. As discussed above, Commerce explained

that it had requested data from the Government of Vietnam that would have provided

"USD inflows or USD trading by field or sector." IDM at 18; PDM at 23. Those data in

turn would have enabled Commerce to ascertain conversion numbers with greater

precision. However, the GOV stated in its initial questionnaire response that the SBV

[51] The USW argues that plaintiff failed to present this line of argument in the administrative review and therefore waived the issue before this court. Def.-Intervenor Br. at 32, 41-42, 44. The court concludes that plaintiff did not waive its argument because it expands on prior argumentation. *Juancheng Kangtai Chemical Co., v. United States*, Slip Op. 15-93, 2015 WL 4999476, at *42 (CIT Aug. 21, 2015) ("The exhaustion doctrine does not prevent a plaintiff from expanding on an argument based on the final record before the court, and an argument raised below does not need to be worded exactly as it is to the court."). Notably, the substance of the argument does not alter the court's ultimate decision with respect to this aspect of Commerce's determination.

**PUBLIC VERSION**

does not collect those data.  GOV IQR, Ex. F-1 at 6-7.  Accordingly, Commerce had to

rely on substitute data comprising overall USD inflows as a proxy for USD currency

conversions.  IDM at 18; PDM at 23; *see also* discussion at *supra* Section III.B.2.a.

Third, Commerce included in its analysis companies that buy and sell goods

internationally, including companies in Vietnam that "buy intermediary imported goods."

IDM at 19.  Commerce noted that it "adjusted the [portion of USD inflows attributable to

exporters of goods] to reflect the portion of these goods which is attributable to

intermediary imported goods that are subsequently used for re-exportation."  *Id*.

The court finds Commerce's points to be persuasive.  Defendant in its

submissions to the court noted further that businesses in the traded goods sector

typically have obligations related to their in-country operations, including wages, and

purchases of inputs that need to be paid in *dong*.  Def. Br. at 25.  Conversely, KTV

asserts that "KTV and its suppliers also make extensive purchases in foreign currency."

Pl. Br. at 40.  This point would appear highly relevant, including to both conversion and

benefit issues, and merits further discussion.  The court is not able to take defendant's

point into account in evaluating Commerce's determination because Commerce does

not appear to have discussed the point in the IDM or in other related documents during

the administrative proceedings.  *See generally* IDM; *see also* PDM.

### 3.   Benefit

The third required statutory element to impose countervailing duties is whether

Commerce's determination that the undervaluation of Vietnamese *dong* conferred a

benefit to KTV.  19 U.S.C. § 1677(5)(B)(iii).  KTV challenges two core points: (a)

Commerce's finding of undervaluation based on Treasury's evaluation and conclusion; and (b) KTV's receipt of a benefit.  Pl. Br. at 32-36, 40; *see* IDM at 25-26.

For the reasons discussed below the court is unable to conclude that Commerce's determination as to the benefit received by the recipient is supported by substantial evidence and is in accordance with § 1677(5)(E) and 19 C.F.R. § 351.528.

### a.    Finding of undervaluation

KTV presents two arguments that Commerce's determination of undervaluation was not supported by substantial evidence or in accordance with law: (1) Commerce "outsourc[ed]" the finding of undervaluation to Treasury; and (2) the Commerce determination that the Vietnamese *dong* was undervalued during the POI was not supported by substantial evidence.  Pl. Br. at 31-36.  Separately, the USW argues that KTV did not exhaust its administrative remedies with respect to its outsourcing argument.  *See* Def.-Intervenor Br. at 32-33; Pl. Reply Br. at 15-17.  The court addresses each of these arguments.

### (1)    Whether KTV exhausted administrative remedies

The court addresses first the procedural question of whether KTV exhausted administrative remedies for its outsourcing argument.  *See* Def.-Intervenor Br. at 32-33; Pl. Reply Br. at 15-17.  The court concludes that the USW's argument that KTV failed to exhaust administrative remedies lacks merit.

"[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  Under 19 C.F.R. § 351.309(c)(2), "[t]he case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination."  And, "[b]oth the

**PUBLIC VERSION**

Court No. 21-00397                                                      Page 104

Federal Circuit and this court have held that failure to raise a specific argument in a

case brief, even if the general issue is addressed, constitutes a failure to exhaust

administrative remedies." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 33 CIT

533, 545, 616 F. Supp. 2d 1354, 1366 (2009), *aff'd in part*, 596 F.3d 1365 (Fed. Cir.

2010) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir.

1990); *Unemployment Comp. Comm'n. of Alaska v. Aragon*, 329 U.S. 143, 155 (1946);

*Paul Muller Industrie GmbH & Co. v. United States*, 31 CIT 1084, 1087-88, 502 F. Supp.

2d 1271, 1274-75 (2007), *aff'd*, 283 F. App'x 789 (Fed. Cir. 2008)).  However, "[t]he

exhaustion doctrine does not prevent a plaintiff from expanding on an argument based

on the final record before the court, and an argument raised below does not need to be

worded exactly as it is to the court."  *Juancheng Kangtai Chem. Co. v. United States*,

Slip. Op 15-93, 2015 WL 4999476, at *42 (CIT Aug. 21, 2015).  "The determinative

question is whether Commerce was put on notice of the issue, not whether Plaintiff's

exact wording below is used in the subsequent litigation."  *Tr. Chem Co. v. United

States*, 35 CIT 1012, 1023 n.27, 791 F. Supp. 2d 1257, 1268 n.27 (2011).

        KTV asserts that its "outsourcing" argument is an outgrowth of arguments

presented in the underlying proceeding and falls under an exception to the exhaustion

requirement because "countervailing currency undervaluation is a purely legal

question."  Pl. Reply Br. at 16-17 (citing KTV's March 9 Case Brief ("KTV Case Br.") at

10-11, PR 454, CR 184, PJA Tab 32; *Tr. Chem Co.*, 35 CIT at 1023 n.27, 791 F. Supp.

2d at 1268 n.27; *Juancheng Kangtai Chem. Co.*, 2015 WL 4999476, at *42; *Rhone

Poulenc, S.A. v. United States*, 7 CIT 133, 135, 583 F. Supp. 607, 610 (1984)).  In

KTV's case brief before Commerce, KTV stated that Commerce's undervaluation finding

## PUBLIC VERSION

"was based entirely on" the Treasury Report and that "any finding of currency undervaluation must be made by the Department based on the evidence on the record of this proceeding."  KTV Case Br. at 18, 20 (citing PDM at 24).  KTV set out such statements, albeit as part of its broader argument that Commerce "[c]annot [r]ely on the Treasury Department [r]eport," and, therefore, that the undervaluation finding was not supported by substantial evidence.  *Id.* at 18-20; *see infra* Section III.B.3.a(3).

Both arguments — on Commerce's treatment of the Treasury Report, and on whether Commerce's finding of undervaluation is supported by substantial evidence — are an appropriate reflection of KTV's statements in the underlying proceeding.[52]  *See* Pl. Br. at 32, 34.

### (2)    Commerce's consideration of Treasury's evaluation and conclusion

The court turns next to the substance of KTV's "outsourcing" argument: whether Commerce fulfilled its obligations under the statute and Commerce's regulations as the "administering authority" with respect to the determination of benefit under §§ 1671b(b)(1), 1671d(a)(1), 1677(1), or whether it "outsourced" that determination to Treasury.  *See* Pl. Br. at 31-32.

Commerce's 2020 regulation provides the following as to the determination of whether a benefit has been conferred:

> (b) Benefit—
>
> > (1) In general.  Where the Secretary has made an affirmative finding under paragraph (a)(1) of this section, the Secretary normally will determine the

---

[52] Because the court concludes that KTV's argument is otherwise properly before the court, it does not consider KTV's argument that the exhaustion argument does not apply because KTV presented a "purely legal" argument.  Pl. Reply Br. at 16-17.

existence of a benefit after examining the difference between:

> (i) The nominal, bilateral United States dollar rate consistent with the equilibrium REER; and

> (ii) The actual nominal, bilateral United States dollar rate during the relevant time period, taking into account any information regarding the impact of government action on the exchange rate.

> (2) Amount of benefit.  Where there is a difference under paragraph (b)(1) of this section, the amount of the benefit from a currency exchange normally will be based on the difference between the amount of currency the firm received in exchange for United States dollars and the amount of currency that firm would have received absent the difference referred to in paragraph (b)(1) of this section.

> (c) Information sources.  In applying this section, the Secretary will request that the Secretary of the Treasury provide its evaluation and conclusion as to the determinations under paragraphs (a) and (b)(1) of this section.

19 C.F.R. § 351.528(b)-(c).

In regard to subsection (c), the regulation provides further that Commerce is to receive Treasury's submission in the same way that any federal agency would receive "advice and policy recommendations":

> In recognition of Treasury's experience in the area of evaluating currency undervaluation, Commerce will defer to Treasury's expertise, but we will not delegate to Treasury the ultimate determination of whether currency undervaluation involves a countervailable subsidy in a given case.  It is lawful for one federal agency to turn to another for "advice and policy recommendations" in an area where that other agency might have particular expertise.  Accordingly, we intend to defer to Treasury's expertise with respect to currency undervaluation.

**PUBLIC VERSION**

*Final Rule*, 85 Fed. Reg. at 6,038 (footnote omitted) (citing *U.S. Telecom Ass'n v. FCC*,

359 F.3d 554, 568 (D.C. Cir. 2004)),[53] *cert. denied*, 543 U.S. 925 (2004); *Bellion Spirits,*

*LLC v. United States*, 393 F. Supp. 3d 5, 15-17 (D.D.C. 2019)).  Commerce added: "We

expect that we will normally follow Treasury's evaluation and conclusion regarding

undervaluation, and any departure from Treasury's evaluation and conclusion will be

based on substantial evidence on the administrative record."  *Id.*

       The issues presented by KTV are whether Commerce "outsourc[ed]" the

currency valuation issue to Treasury.  The court concludes, as explained below, that

Commerce made such determinations with an appropriate level of outreach to Treasury

consistent with Commerce's statutory responsibilities as the "administering authority"

under §§ 1671b(b)(1), 1671d(a)(1), 1677(1), and as provided in paragraph (c) of the

regulation.

       To assess Commerce's actions, the court sets forth the following brief chronology

of the actions taken by Commerce in respect of its determination of undervaluation.

       On July 8, 2020, Commerce requested that Treasury provide its "evaluation and

conclusion" with respect to paragraphs (a) and (b)(1) of 19 C.F.R. § 351.528 and "the

underlying information on which Treasury's evaluation and conclusion rely."  Letter from

Commerce to Treasury (July 8, 2020) at 1, PR 101, PJA Tab 5.  Commerce also invited

the parties to the underlying proceeding "to submit factual information to rebut, clarify or

---

[53] Commerce in the *Final Rule* attributed this decision to a 2017 decision of the U.S.
District Court for the District of Columbia, *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381,
382 (D.D.C.  2017) (per curiam).  *See Final Rule*, 85 Fed. Reg. at 6,038 n.27.  However,
the reporter information, reporter page and sentence that Commerce quoted in its
explanatory parenthetical correspond instead to the 2004 decision of the U.S. Court of
Appeals for the District of Columbia Circuit ("D.C. Circuit") cited herein.

**PUBLIC VERSION**

Court No. 21-00397                                                                    Page 108

correct Treasury's submission."  *Id.* at 2; *see also* 19 C.F.R. § 351.301(c)(4).  On

August 24, 2020, Treasury complied with Commerce's request and instructions and

provided its submission to Commerce.  *See* Treasury Report.

On August 25, 2020, the GOV submitted a July 2019 IMF report on Vietnam.

*See* GOV IQR at Ex. 2 (Vietnam 2019 Article IV Consultation—Press Release; Staff

Report; and Statement by the Executive Director for Vietnam, IMF Country Report No.

19/235 (July 2019)).  On August 28, 2020, KTV also submitted a 2019 IMF report on the

external balance assessment methodology and a 2006 IMF report on exchange rate

assessments.  *See* KTV's Sept. 8, 2020 Submission at Ex. 10 (Luis Cubeddu et al.,

2019, "The External Balance Assessment Methodology: 2018 Update," IMF Working

Paper 19/65, International Monetary Fund: Washington, DC) and Ex. 11 (International

Monetary Fund, Methodology for CGER Exchange Rate Assessments, November 8,

2006), CR 76-80, PR 202-203, PJA Tab 12.

On September 17, 2020, Commerce posed additional questions to Treasury

about its report.  Commerce Clarification Questions (Sept. 17, 2020), PR 215, PJA Tab

14.  On September 24, 2020, Treasury provided supplemental responses pertaining to

its evaluation and conclusion.  Treasury Supp. Resp. (Sept. 24, 2020), PR 227, PJA

Tab 15.

On November 10, 2020, Commerce issued the Preliminary Determination.

*Preliminary Determination*, 85 Fed. Reg. at 71,607; *see* PDM; *see also* 19 U.S.C. §

1671b(b)(1).  On May 27, 2021, Commerce issued the Final Determination.  *Final*

*Determination*, 86 Fed. Reg. at 28,566; *see* IDM at 25-26; *see also* 19 U.S.C. §

1671d(a)(1).

**PUBLIC VERSION**

At the outset, it is notable that KTV does not offer any precedent — binding or persuasive — for its outsourcing argument.  *See generally* Pl. Br. at 31-32.  By contrast, Commerce relied in its *Final Rule* on *U.S. Telecom Association* and *Bellion Spirits* to demonstrate that requesting "advice and policy recommendations" from another agency, such as Treasury, does not amount to "delegat[ing] . . . the ultimate determination" of an issue.  *Final Rule*, 85 Fed. Reg. at 6,038 n.27; *see also* Def. Br. at 14-15; Def.-Intervenor Br. at 32-35; *see also City of Boston Delegation v. FERC*, 897 F.3d 241, 255 (D.C. Cir. 2018) (citation omitted) (second alteration in original) (rejecting plaintiff's challenge to an agency's reliance on another federal agency's expert conclusion because "[a]gencies can be expected to 'respect [the] views of such other agencies as to those problems' for which those 'other agencies are more directly responsible and competent'").

In *U.S. Telecom Association*, the D.C. Circuit acknowledged that there are "three specific types of legitimate outside party input into agency decision-making processes: (1) establishing a reasonable condition for granting federal approval; (2) fact gathering; and (3) advice giving."  *U.S. Telecom Ass'n*, 359 F.3d at 566.

The *U.S. Telecom Association* court ultimately held that the order of the Federal Communications Commission ("FCC") in that case did not fall into any of these categories.  *Id.*  However, with respect to the third category, the D.C. Circuit stated that "a federal agency may turn to an outside entity for advice and policy recommendations, provided the agency makes the final decisions itself."  *Id.* at 568.  "An agency may not, however, merely 'rubber-stamp' decisions made by others under the guise of seeking their 'advice.'"  *Id.* (quoting *Assiniboine & Sioux Tribes v. Bd. of Oil & Gas*, 792 F.2d

**PUBLIC VERSION**

782, 795 (9th Cir. 1986)).  Moreover, the D.C. Circuit noted: "nor will vague or

inadequate assertions of final reviewing authority save an unlawful subdelegation."  *Id.*

(citing *Nat'l Park & Conservation Ass'n v. Stanton,* 54 F. Supp. 2d 7, 19, 20-21 (D.D.C.

1999)).

 The *Bellion Spirits* court distinguished *U.S. Telecom Association* on the grounds

that in that case the FCC had "entirely outsourced" its decision-making authority

"without retaining the ability to review those decisions," whereas in *Bellion Spirits* the

Treasury's Alcohol and Tobacco Tax and Trade Bureau ("TTB") appropriately sought

agency input.  *Bellion Spirits*, 393 F. Supp. 3d at 15-16 (quoting *U.S. Telecom Ass'n*,

359 F.3d at 564-66).  Specifically, the *Bellion Spirits* court stated that, in adopting the

Food and Drug Administration's factual determinations, the TTB "explained why those

determinations were, in its view, apposite to the analysis of Bellion's petition, and it

enumerated why it agreed with each finding it adopted."  *Id.* at 16 (citing to the record

and noting the TTB's appropriate outreach to "'other agencies as to those problems' for

which those 'other agencies are more directly responsible and more competent'"

(quoting *City of Boston Delegation*, 897 F.3d at 255)).

 This Court and the Federal Circuit have applied pertinent aspects of the *U.S.

Telecom Association* opinion in the past.  *See, e.g.*, *Ethicon Endo-Surgery, Inc. v.

Covidien LP*, 812 F.3d 1023, 1031 (Fed. Cir. 2016) (quoting *U.S. Telecom Ass'n*, 359

F.3d at 565); *Selivanoff v. U.S. Sec'y of Agric.*, 30 CIT 567, 574 (2006) (citing *U.S.

Telecom Ass'n*, 359 F.3d at 564-568); *see also Save Our Wetlands, Inc. v. Sands*, 711

F.2d 634, 641-43 (5th Cir. 1983); *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974),

*cert. denied*, 421 U.S. 994 (1975); *Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1349

**PUBLIC VERSION**

Court No. 21-00397                                                                                          Page 111

(Fed. Cir. 2003).  For example, in *Selivanoff*, which involved a question of whether the

U.S. Department of Agriculture ("USDA") subdelegated to the IRS a determination as to

net income, this Court explained that it "cannot discern from the record whether [the

Foreign Agricultural Service] actually undertook analysis."  30 CIT at 574.  Moreover, in

another case involving USDA's determination of net income, this Court observed that

"something more than simply looking, and citing to, a line on a tax return is necessary"

and that "both *Steen* and *Selivanoff* seem to contemplate a certain level of analysis in

order for the Secretary to make a *determination*."  *Lady Kim T. Inc. v. U.S. Sec'y of

Agric.*, 30 CIT 1948, 1953, 469 F. Supp. 2d 1262, 1266-67 (2006) (citing *Steen v.

United States*, 468 F.3d 1357, 1364 (Fed. Cir. 2006); *Selivanoff*, 30 CIT at 571).

        In the instant case, the record demonstrates that Commerce (i) scrutinized the

Treasury Report, (ii) issued a supplemental questionnaire to Treasury requesting

clarifications in five areas, (iii) explained Commerce's decision to use the Treasury

Report and methodology rather than a different report and (iv) responded to parties'

concerns about the Treasury GERAF model.  *See* Commerce Clarification Questions at

3-4; IDM at 23-26.  After receiving Treasury's evaluation and conclusion, Commerce

issued a supplemental questionnaire to Treasury to seek clarification in five areas.

Commerce Clarification Questions at 3-4.  First, Commerce *inquired* as to the reasons

that Treasury included two indices in the GERAF model and excluded a specific

variable.  *Id.*  Second, Commerce then queried the existence of any impact from any

government action taken before the POI.  *Id.*  Third, Commerce asked Treasury to

address also the percent of undervaluation that Treasury reported in its instant report in

light of other percentages of undervaluation and appreciation noted in Treasury's

**PUBLIC VERSION**

January 2020 report, entitled "*Macroeconomic and Foreign Exchange Policies of Major Trading Partners of the United States*" ("January 2020 Report"). *Id.* (citation omitted). Fourth, Commerce asked Treasury to clarify specific aspects of the data and information in the table that Treasury provided. *Id.* at 3-4; *see* Treasury Supp. Resp. Fifth, Commerce requested that Treasury confirm its view that "the difference between (i) the nominal, bilateral United States dollar rate consistent with the equilibrium REER, and (ii) the actual nominal, bilateral United States dollar rate during calendar year 2019 was 4.7 percent." Commerce Clarification Questions at 3.

After receiving Treasury's supplemental response, Commerce stated in its Final Determination: "Treasury's model provides a reasonable and economically sound methodology for assessing the level of VND undervaluation due to government action on the exchange rate." IDM at 25-26. Commerce added that it had determined to "use the model as *a basis* for calculating the amount of benefit resulting from its undervaluation in this final determination." *Id.* (emphasis supplied).

Commerce's actions demonstrate that it probed Treasury's initial report to ascertain whether to use it in reaching a determination. *See* Commerce Clarification Questions at 3-4; IDM at 23-26. In addition, Commerce explained the reasons that it followed Treasury's findings. *See Bellion Spirits*, 393 F. Supp. 3d at 16-17 (quoting *City of Boston Delegation*, 897 F.3d at 255).[54] Specifically, in the IDM, Commerce examined and noted several important aspects of the GERAF model that supported using its conclusions: its similarity to other models, its incorporation of an additional variable and

---

[54] Moreover, Commerce has acknowledged that Treasury "has expertise in currency-related matters." *Final Rule*, 85 Fed. Reg. at 6,038.

**PUBLIC VERSION**

"an additional analytic element" and its increased "precision" because it "extend[s] its

analysis to include valuation assessments vis-à-vis the USD."  IDM at 23-24, 26.

The record demonstrates further that Commerce did more than take a cursory

look at the Treasury Report.  *See Lady Kim T. Inc.*, 30 CIT at 1953, 469 F. Supp. 2d at

1266.  Rather, Commerce "actually undertook analysis."  *Selivanoff*, 30 CIT at 574.

Commerce explained the reasons that it declined to consider conclusions based

alternatively on the equilibrium real exchange rate model of the IMF and the reasons

that the GERAF model was effective at assessing government action.  IDM at 24-25.  In

addition, Commerce scrutinized the model and its metrics and parameters as shown by

Commerce's comparison of the "alternative estimators and extensions" for the GERAF

model and the statistical values for the GERAF model to conclude that "the robustness

indicators are generally consistent and not indicative of the GERAF model's inaccuracy

when compared to the other iterations provided in Appendix C."  *Id.* at 25.

Commerce also responded to parties' critiques of the GERAF model and its

statistical measures to conclude that the GOV had not shown that the GERAF model

was "invalid[]" or "unusable" or that "the data or results are clearly flawed."  *Id.*  For

instance, Commerce noted the lack of support in the record for the GOV's claims as to

the cause of undervaluation.  *Id.* at 24.  Commerce also explained the way in which the

statistics and alternatives in Appendix C of the Treasury Report "strengthen the results"

of the GERAF model.  *Id.* at 25.  Commerce added that "[w]hile Commerce agrees with

the GOV that there may be other methods of measuring an equilibrium exchange rate,

we note that Treasury's analysis appears reasonable and the GOV has not provided

any record information invalidating Treasury's model."  *Id.*

**PUBLIC VERSION**

"Where the evidence is reasonably reliable, the court 'will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology.'" *China First Pencil Co. v. United States*, 30 CIT 1200, 1202, 427 F. Supp. 2d 1236, 1239 (2006) (quoting *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404-05, 636 F. Supp. 961, 966 (1986), *aff'd* 810 F.2d 1137 (Fed. Cir. 1987)); *see Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 837, 159 F. Supp. 2d 714, 718 (2001), *aff'd sub nom. Shandong Huarong Gen. Grp. Corp. v. United States*, 60 F. App'x 797 (Fed. Cir. 2003).

In sum, KTV's assertions that Commerce "outsourc[ed]" its determination to Treasury, Pl. Br. at 31-32, "rubber-stamp[ed]" Treasury's findings, *U.S. Telecom Ass'n*, 359 F.3d at 568 (quoting *Assiniboine & Sioux Tribes*, 792 F.2d at 795), or that Commerce ceded its ability to review those findings, *Bellion Spirits*, 393 F. Supp. 3d at 15-16 (quoting *U.S. Telecom Ass'n*, 359 F.3d at 564-66), are contradicted by the record. To the contrary, Commerce fulfilled its responsibilities as the administering authority under § 1677(1) and consistent with the decisions of the Federal Circuit, this Court and other courts by reviewing, questioning and conducting analysis of the information and conclusions provided by Treasury.

### (3)    Substantial evidence for Commerce's determination

KTV next argues that Commerce lacked substantial evidence for its determination as to the undervaluation of the Vietnamese *dong* during the POI because: (1) Treasury did not include on the record data underlying its report and Commerce "failed to obtain the information from Treasury that would be needed to assess the validity and reliability of Treasury's analysis"; and (2) Commerce did not explain the

**PUBLIC VERSION**

reason that the GERAF model was "more reliable than the other iterations provided by Treasury." Pl. Br. at 32-36.

Commerce obtained from Treasury, an agency with pertinent expertise, extensive information on the record relating to each of the two core elements of the Treasury Report: (1) the data sources for the report and their reputability; and (2) the validity and reliability of the GERAF model and the resultant calculations that Treasury employed for the instant evaluation and conclusion of undervaluation. *See* IDM at 23-26; *see also* Treasury Report. In addition, Commerce addressed expressly in the IDM Commerce's reasons for accepting Treasury's use of the GERAF model rather than other alternatives, including those noted in the Treasury Report. *See* IDM at 23-26.

Accordingly, Commerce's determination that there was 4.7 percent undervaluation of the Vietnamese *dong* against the U.S. dollar during the POI is adequately explained and supported by substantial evidence. IDM at 4, 25; PDM at 24; *see PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761 (Fed. Cir. 2012) ("[C]ourts must not improperly intrude upon an agency's power to implement and enforce proper procedures for constructing an agency record.").

### i.    Basis for Commerce's determination

The question presented is whether the record, including the Treasury Report and supplemental response, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477-78 (1951)). "Where the evidence is reasonably reliable, the court 'will not impose its own views as to the sufficiency of the agency's investigation or question the

**PUBLIC VERSION**

agency's methodology.'" *China First Pencil Co.*, 30 CIT at 1202, 427 F. Supp. 2d at

1239 (quoting *Ceramica Regiomontana, S.A.*, 10 CIT at 404-05, 636 F. Supp. at 966).

Commerce explained in the *Final Rule* its approach to reviewing Treasury's

contributions: "All information and evidence on the administrative record will be

reviewed, and all estimates of REER gaps, U.S. dollar exchange rate gaps and the

underlying methodologies and data will be assessed after receiving any input from

Treasury and in light of interested party comments." *Final Rule*, 85 Fed. Reg. at 6,035.

To reach its determination in the instant case, Commerce requested initially that

Treasury "provide the underlying information on which Treasury's evaluation and

conclusion rely." Letter from Commerce to Treasury at 1. Commerce noted that it

would "treat the information . . . as if it is information placed on the record by Commerce

under 19 C.F.R. 351.301(c)(4)." *Id.*; *see* 19 C.F.R. § 351.301(c)(4) ("The Department

may place factual information on the record of the proceeding at any time.").

In response, Treasury provided its evaluation and conclusion on undervaluation.

*See* Treasury Report. The Treasury Report included a literature review, a discussion of

the facets and contributions of GERAF to currency valuation, a description of Treasury's

GERAF calculations, an explanation of the way that exchange rate gaps are derived

from current account gaps, lists of data sources and countries included and "robustness

checks and regression extensions" for the GERAF model. *Id.* at 6, App. C; *see id.* at 3

(describing role of data from 51 countries in creating a "panel series"), 22-23 (including

details as to methodology and variable construction relative to other sources). In its

report, Treasury provided "[c]alculations supporting Treasury's conclusions," as well as

the values calculated based on its application of the various steps of the GERAF

PUBLIC VERSION

methodology to the instant case.  *Id.* at 2.  Specifically, Treasury also included the

calculations underlying the GERAF methodology in general and as applied to the instant

case and identified the sources from which it derived different variables for Treasury's

model.  *See id.* at 3, 3-12, App. A.  Treasury and Commerce also noted that GERAF

"builds" on the IMF model.  *Id.* at 3; IDM at 23 (noting that GERAF "is similar to existing

equilibrium [REER] models" (citing Treasury Report at 2)).  Both Treasury and

Commerce described the specific "contributions" that GERAF makes beyond the IMF

methodology.[55]  Treasury Report at 2-3; *see* IDM at 23-24 (citing Treasury Report at 2-

4).  In addition, as described above, Commerce then sought and Treasury provided

further information on five aspects of the Treasury Report and its conclusions.  *See*

*supra* Section III.B.3.a(2); *see also* Commerce Clarification Questions at 1-4; Treasury

Supp. Resp.

      KTV requested thereafter that "the data utilized by . . . Treasury . . . be put on the

record . . . to allow interested parties a meaningful opportunity to review and respond

fully to the information included in the Treasury Memorandum."  KTV's August 28, 2020

Letter at 1 (citing Treasury Report), PR 187, PJA Tab 10.  Notably, KTV's letter did not

state what information — or even categories of information — provided by Treasury to

Commerce was insufficient or in error; KTV also did not specify what information *not*

provided was sought.  *Id*.

      Treasury provided Commerce detailed information about its findings, including

calculations, sources, variables and robustness checks.  *See, e.g.*, Treasury Report at

---

[55] The parties have not alleged that Treasury included on any unreliable data sources.
*See generally* IDM at 23-26; Pl. Br. at 32-36.

**PUBLIC VERSION**

1-3 (letter and table), 3-32 (using a "panel series of 51 countries (comprising 91% of

world GDP in 2018)"), Apps. A-C.  As described above, in addition to receiving and

analyzing the Treasury Report, Commerce sought and received supplemental

responses from Treasury.  *See* Commerce Clarification Questions at 3-4; *see* Treasury

Supp. Response at 1-5.  Commerce also explained the reason that the GERAF model

was sound and responded to comments from parties about the GERAF model and its

statistical measures.  *See* IDM at 23-26.

On August 24, 2020, Treasury submitted its report to Commerce.  Treasury

Report.  On September 17, 2020, Commerce issued a supplemental questionnaire to

Treasury, which included the following detailed follow up questions pertaining to

Treasury's application of the GERAF model:

> (1) Please confirm that, in Treasury's view, the difference between (i) the
> nominal, bilateral United States dollar rate consistent with the equilibrium
> REER, and (ii) the actual nominal, bilateral United States dollar rate during
> calendar year 2019 was 4.7 percent.

Commerce Clarification Questions at 3.  Treasury responded that it "assesses that the

difference between (i) the nominal, bilateral United States dollar rate consistent with the

equilibrium REER, and (ii) the actual nominal, bilateral United States dollar rate during

calendar year 2019, taking into account the impact of government action on the

exchange rate, was 4.7%.  The uncertainty range around this assessment, based on

one standard error, spans from bilateral undervaluation of 4.2% to 5.2%."  Treasury

Supp. Resp. at 1.

Commerce continued: "The GERAF model used by Treasury in this proceeding

to assess the VND's valuation is similar to existing equilibrium real effective exchange

rate (REER) models – including, most notably, the multilaterally consistent Current

**PUBLIC VERSION**

Account balance model developed and used by the IMF in its External Balance

Assessment (EBA) methodology." *Id.*

      Commerce also noted that the GOV put forth an IMF Article IV Report for

Vietnam.  Commerce explained the reasons that that it did not consider the report to be

reliable.  IDM at 24.

      On October 30, 2020, Commerce issued its Preliminary Determination, in which

Commerce determined based on the information and analysis in the Treasury Report

that "Vietnam's currency vis-à-vis the U.S. dollar was undervalued during the period of

investigation by 4.7 percent" due to government action.  PDM at 24-25.  Commerce

reached its conclusion after examining Treasury's model, Treasury's application of the

model, and extensive amounts of information provided on the record to Commerce by

Treasury related to the information used in the model.  *See* Treasury Report; *see also*

Commerce Clarification Questions; Treasury Supp. Resp.  In this context, Commerce

noted that Treasury was able to ascertain the impact of government action through a

"complex and interdependence [sic] country economic model":

> With respect to government action on the exchange rate within the meaning
> of 19 CFR 351.528(a)(2), Treasury also determined that Vietnam's
> undervaluation in the POI was exclusively a result of GOV action.  It did so
> by analyzing the GOV's purchase and sales of foreign exchange reserves
> over the POI.  Using a complex and interdependence [sic] country economic
> model, where the sale of foreign exchange reserves in one country affected
> changes in the stock of foreign exchange in more than 50 other considered
> countries, Treasury was able to estimate that all of the undervaluation of the
> dong was attributable to changes in the stock of Vietnam's foreign exchange
> reserves.

PDM at 24-25 (citing Treasury Report).

Commerce then applied the model to the information that KTV itself reported —

"the total value of USD exchanged, the exchange rate used for each of these

transactions, and the authorized credit institution which processed the currency

exchange transaction" — to calculate benefit under 19 C.F.R. § 351.528(b)(2).  PDM at

25 (citing KTV IQR at App. 9-A).  Specifically, Commerce relied on the GERAF model

and "appl[ied] the 4.7 percent undervaluation reported by Treasury to each currency

exchange transaction reported by KTV and Sailun during the POI," and "then

aggregated the total benefits in USD based on the sum of . . . individual transactional

[sic] during the POI."  *Id.* (citing USD Inflow Calculation Mem. (Nov. 4, 2020), PR 303,

PJA Tab 24).  Commerce ultimately determined the subsidy rate to be 1.69 percent *ad

valorem* for KTV.  IDM at 4 (citing KTV Final Analysis Mem.).

### ii.    Underlying information

KTV presents four arguments as to why Commerce's decision is not supported

by substantial evidence.  All of the arguments are based on the fact that Commerce did

not have certain data on which Treasury relied in preparing its report and consequently,

according to KTV, Commerce's determination was not supported by substantial

evidence.  *See* Pl. Br. at 33 n.85.  As elaborated below, the court does not find KTV's

arguments persuasive.

KTV's first argument is that "several key variables (including the variables for

intervention in foreign exchange markets) were based on Treasury staff estimates," that

Treasury's use of assumptions based on those estimates was not reasonable and that

"Treasury has failed to articulate what these assumptions might have been."  *Id.*

**PUBLIC VERSION**

Treasury provided detailed explanations of its use of "estimates" in applying the

GERAF model.[56]  Treasury Report at 6.  Further, the GERAF estimates themselves are

well established and are ones on which Treasury relies in a variety of contexts and are

"consistent with the methodology used in Treasury's Report to Congress on

Macroeconomic and Foreign Exchange Policies of Major Trading Partners of the United

States."  *Id.* at 3.  Moreover, Treasury did identify the values as to which it made

assumptions and provided context about the estimates that were derived from those

assumptions.  *Id.* at 6 (noting that estimates may be "based on valuation-adjusted

foreign exchange reserves" and referring to "estimations of transactions in foreign

exchange derivatives markets").  Commerce discussed Treasury's model, noting in

particular that it "builds upon the IMF's REER EBA model . . . by incorporating and

quantifying the impact of foreign exchange intervention on current accounts across

countries with varying degrees of capital account mobility."  IDM at 23.  Commerce

indicated that it was satisfied with this approach as reflected in Treasury's model, noting

that Commerce understood that the GERAF model is "an assessment" with an

"uncertainty range," but that "Treasury's analysis appears reasonable."  *Id.* at 25; *see*

Treasury Supp. Resp. at 1 ("The uncertainty range around this assessment, based on

---

[56] Treasury clarified the derivation of estimates for the GERAF model, elaborating that:

> Estimates are normally based on publicly available data for intervention on
> foreign asset purchases by authorities or estimated based on valuation-
> adjusted foreign exchange reserves.  This adjustment requires assumptions
> about both the currency and asset composition of reserves in order to
> isolate returns on assets held in reserves and currency valuation moves
> from actual purchases and sales, including estimations of transactions in
> foreign exchange derivatives markets.

Treasury Report at 6.

**PUBLIC VERSION**

one standard error, spans from bilateral undervaluation of 4.2% to 5.2%."); *see also*

Treasury Report at pdf 3 (chart); IDM at 23 ("[T]he regulation does not require that

Treasury provide all of the data that is used in its model and analysis."), 26; *see also*

*City of Boston Delegation*, 897 F.3d at 255; *Bellion Spirits*, 393 F. Supp. 3d at 15-17

(stating that "to the extent the FDA standards in question pertain to assessing the

credibility of scientific evidence, reliance on those standards seems necessarily entailed

in consulting FDA on whether the studies at issue are reliable").  To the extent that

Treasury applies its methodology to the determination of undervaluation, reliance on

such methodology — and any assumptions involved therein — "seems necessarily

entailed," *Bellion Spirits*, 393 F. Supp. 3d at 17, in seeking Treasury's "evaluation and

conclusion," 19 C.F.R. 351.528(c).

      KTV argues second that Treasury's data set "had numerous undisclosed gaps"

because Treasury included only 1,273 sets of observations in its Summary Statistics

table instead of 1,632 sets of observations for 51 countries over 32 years.  Pl. Br. at 33;

*see id*. at 33 n.86.  However, as the Summary Statistics table notes, the average

number of years of data for each variable was 25.  *See* Treasury Report at 6, 16 tbl. 1.

Twenty-five years of data would yield 1,275 sets of observations; however, as the

column heading in the table notes, the data are for an *average* number of years.  *Id.* at

16 tbl. 1.  The 1,273 sets of observations that Treasury used for the GERAF baseline

regression specification reflect almost precisely the sets of observations for 25 years.

      It is well established that an agency's dataset need not be flawless.  *Hisp. Affs.*

*Project v. Acosta*, 901 F.3d 378, 392 (D.C. Cir. 2018) ("The mere fact that a 'dataset

was less than perfect' . . . 'does not amount to arbitrary decision-making.'" (quoting *Dist.*

**PUBLIC VERSION**

*Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46,61 (D.C. Cir 2015))); *Home Meridian Int'l Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014) ("The data on which Commerce relies . . . must be the 'best available information,' but there is no requirement that the data be perfect."); *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1052 (D.C. Cir. 2001) (per curiam) ("That a model is limited or imperfect is not, in itself, a reason to remand agency decisions based upon it.").  KTV has made no suggestion that the use of 1,273 observations — as opposed to 1,632 — rendered invalid, unusable or unreasonable the data sets used over a 32-year period.

KTV's third argument is that there were "inconsistencies with other Treasury Reports."  Pl. Br. at 33.  As an illustrative example, KTV claims that there is an inconsistency between the Treasury Report and the Treasury's January 2020 Foreign Exchange Report to Congress.  *Id.* at 33 n.87.  In that report, Treasury noted: "The Vietnamese authorities have credibly conveyed to Treasury that net purchases of foreign exchange were 0.8 percent of GDP over the four quarters through June 2019." January 2020 Report at 8.  KTV says that that percentage equates to "roughly $2.1 Billion."  Pl. Br. at 33 n.87.  In the Treasury Report, KTV recounts, Treasury concluded that "the Vietnamese government—through the State Bank of Vietnam—undertook net purchases of foreign exchange in 2019 totaling about $22 billion."  *Id.* (quoting Treasury Report at 1).  The inconsistency between the $22 billion reported in the Treasury Report and the $2.1 billion reported in Treasury's January 2020 Report represents to KTV an issue which Commerce failed to address in the Final Determination.

To the extent that the values of net purchases differ between these two reports, Commerce maintains that it is reasonable that the six-month time difference is one

**PUBLIC VERSION**

cause for the differential (e.g., different data may be involved).  Def.-Intervenor Br. at

39.

Commerce explained more generally in the *Final Rule* that Treasury's analysis

for the reports to Congress are distinct from Treasury's analysis for reports on

undervaluation in a CVD proceeding:

> We therefore agree with those commenters who argue that the statutory
> provisions pursuant to which Treasury conducts its analysis differ from the
> statutory provisions governing Commerce's CVD analysis. Accordingly,
> whereas the analysis in Treasury's semiannual reports examining possible
> currency manipulation may have relevance to Commerce's determination,
> Treasury's analysis in its semiannual reports is distinct from the analysis as
> to whether there is undervaluation for purposes of a CVD proceeding.  In
> other words, Treasury conducts a different analysis, pursuant to a different
> statutory authority and subject to different statutory criteria, in its
> semiannual reports.

*Final Rule*, 85 Fed. Reg. at 6,038; *see, e.g.*, January 2020 Report at 2-3 (explaining that

Treasury provides the semiannual reports to Congress pursuant to Section 3004 of the

Omnibus Trade and Competitiveness Act of 1988 and Section 701 of the Trade

Facilitation and Trade Enforcement Act of 2015).  Last, in response to a request from

Commerce for supplemental information, Treasury explained that the IMF's REER

estimate in 2018 in Treasury's January 2020 Report "was made without regard to the

question of 'government action on the exchange rate' as described in 19 C.F.R.

351.528(a)(2)."  Treasury Supp. Resp. at 3.

The court recognizes that the different figures that KTV has identified did not

correspond to a precisely overlapping period of time, and, moreover, that the differing

figures may be a result of differing methodologies.  However, due to the size of the

apparent discrepancy — $22 billion versus $2.1 billion — the court considers

**PUBLIC VERSION**

Commerce's explanation insufficient.  For that reason, the court remands to Commerce to provide a more clear and more thorough explanation.  In particular, the court orders Commerce to provide an explanation of the size of the discrepancy between the two reports in net purchases in foreign currency and how — if that is the case — the six-month non-overlapping period could have accounted for the discrepancy.

Last, KTV insists that "[t]here may also have been mathematical or model-specification errors that have been hidden by the lack of transparency."  Pl. Br. at 33.  To support this point, KTV quotes a 2007 "occasional paper" written by three Treasury officials who describe the potential for exchange rate modeling inadequacies or shortcomings.  *Id.* at 33 n.88 (quoting T. Ashby McCown, Patricia Pollard and John Weeks, Department of the Treasury, "Equilibrium Exchange Rate Models and Misalignments: Occasional Paper No. 7," March 2007 ("McCown"), at 1).[57]

KTV does not provide any basis for its allegation that there may have been errors in the GERAF model.  *See* Pl. Br. at 33 n.88.  As to the paper authored by three Treasury economists and cited to by respondents, Commerce stated in the IDM that the paper "did not constitute an official U.S. government policy statement but rather reflected only the views of the authors."  IDM at 25 (citing KTV's September 8 Submission, Attach. 7 (McCown) at 2).

For the foregoing reasons, the court is not persuaded that Commerce failed to seek underlying data with respect to any hypothetical errors in the GERAF model.

---

[57] Before Commerce, KTV cited the same 2007 paper to argue that "Treasury has long counseled against reliance on a single model to address such [modeling] issues."  KTV Case Br. at 20-22 (citing McCown at 1-2, 7, 10, 18); *see* IDM at 25 (citing KTV Case Br. at 20-22).

iii.    Commerce's treatment of input from other
agencies and entities

Commerce's acceptance and use of the "detailed model information and support"
from Treasury parallels Commerce's acceptance and use of information from other
agencies and entities.  IDM at 23.  The court reviews four such circumstances that
Commerce referenced in the IDM and two additional noted by the Government in its
response brief.  The court concludes that Commerce's use of the Treasury Report is
consistent with the statute and Commerce's regulations.  Neither requires that
Commerce place all underlying data on the record when Commerce relies on another
agency's inputs.

The first example to which Commerce points in its IDM pertains to Commerce's
treatment under 19 C.F.R. § 351.524(d)(2) of IRS asset depreciation tables: "Commerce
relies on asset depreciation tables of the Internal Revenue Service for purposes of
allocating non-recurring subsidies, without placing the IRS's underlying data on the
record."  *Id.*  That regulation addresses allocation of non-recurring benefits over time,
and states that Commerce is to use IRS tables to establish average useful life ("AUL"),
unless a party demonstrates that those tables "do not reasonably reflect" the company
or country data, and that the difference is "significant."  19 C.F.R. § 351.524(d)(2)(i).

Notably, in the case of the asset depreciation tables, the presumption and burden
on the objecting party is to "claim and establish" a reason for Commerce not to use the
IRS table in a particular case.  *Id.*  There is no requirement that the IRS provide to
Commerce or the parties the data underlying the tables and result.  The IRS publishes
the tables for the public but does not publish or provide the data underlying the tables.
*See, e.g.*, *IRS Publication 946 (2023), How To Depreciate Property*, at App. B — Table

of Class Lives and Recovery Periods (Sept. 9, 2024),

https://www.irs.gov/publications/p946#en_US_2023_publink1000107773; *see also*

*Toscelik Profil ve Sac Endustrisi A.S. v. United States*, 38 CIT 1534, 1535 n.1 (2014)

(noting that the associated IDM referenced Table B-2 from Publication 946 for 2008).

Further, Commerce regulations provide that it is to presume the correctness of the data

unless a party is able to show that the data are significantly different from those relating

to the party's.[58]  *See* 19 C.F.R. § 351.524(d)(2)(i).

    In sum, both the IRS tables and the Treasury Report are non-confidential

sources that Commerce takes into consideration to measure countervailable subsidies.

*See* 19 C.F.R. § 351.524(d); *see id.* § 351.528(c).  Neither regulation requires that the

agency that provides the information and analysis to Commerce also provide all of the

data underlying the other agency's calculations and analysis.  *See id.* § 351.524(d); *id.* §

---

[58]  19 C.F.R. § 351.524(d)(2) provides in part:

> [Commerce] will presume the allocation period for non-recurring subsidies
> to be the AUL of renewable physical assets for the industry concerned as
> listed in the Internal Revenue Service's ("IRS") 1977 Class Life Asset
> Depreciation Range System (Rev. Proc. 77–10, 1977–1, C.B. 548 (RR–
> 38)), as updated by the Department of Treasury.  The presumption will apply
> unless a party claims and establishes that the IRS tables do not reasonably
> reflect the company-specific AUL or the country-wide AUL for the industry
> under investigation, subject to the requirement, in paragraph (d)(2)(ii) of this
> section, that the difference between the company-specific AUL or country-
> wide AUL for the industry under investigation and the AUL in the IRS tables
> is significant. If this is the case, [Commerce] will use company-specific or
> country-wide AULs to allocate non-recurring benefits over time (see
> paragraph (d)(2)(iii) of this section).

Court No. 21-00397                                                          Page 128

351.528(c).  Further, in both cases, Commerce regulations require that it use the data

provided by Treasury.

The second example that Commerce offered in its IDM was Commerce's reliance

on information submitted by parties with respect to the establishment of benchmarks to

measure the adequacy of remuneration in a CVD investigation.  IDM at 23 (citing 19

C.F.R. § 351.301(c)(3)(i)).  Commerce noted that "19 CFR 351.301(c)(3)(i) allows

parties to submit benchmark information to measure the adequacy of remuneration

[with] no requirement that they submit specific underlying sale-by-sale data, rather than

aggregate data."  *Id.*; *see generally Certain Steel Grating from the People's Republic of

China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final

Countervailing Duty Determination with Final Antidumping Duty Determination*, 74 Fed.

Reg. 56,796, 56,801 (Dep't of Commerce Nov. 3, 2009) (describing purchases that a

party reported "as one aggregate number," after which Commerce then averaged

monthly prices to calculate a benchmark).

There is a parallel between the evaluation and conclusion of Treasury on

undervaluation and the aggregate data of the parties on adequacy of remuneration.  In

both circumstances, there may be imperfect information and about what is embedded

within the respective sets of information on the record.  Here, Treasury provided a table

with the intermediate values that it calculated at each step of the GERAF methodology.

Treasury Report at pdf 3 (chart).  Treasury also provided further explanation about the

information on which the table is based and the measurement of such information.

Treasury Supp. Resp. at 3-5.

**PUBLIC VERSION**

Commerce presented a third analogy involving the lack of a comparable requirement under 19 U.S.C. § 1677j(e) for advice from the Commission in certain anti-circumvention inquiries.  IDM at 23.  Commerce stated: "Similarly, section 781e of the Act provides that in certain anti-circumvention inquiries, the U.S. International Trade Commission may provide advice to Commerce, but there is no requirement that the Commission provide to Commerce its underlying analysis or data upon which it bases this advice."  *Id*.  In fact, the Commission generally does not provide underlying information to Commerce.

Fourth, Commerce noted in the IDM that Commerce has also treated the data underlying reports from the IMF and World Bank in a similar way to the instant approach.  Commerce noted that "the GOV did not place on the record the underlying data used in reports on which it relies, such as IMF reports."  IDM at 23.  Moreover, the Court has upheld Commerce's reliance, without having the underlying data, on the World Bank Doing Business report "as a reliable and accurate source" of brokerage and handling in the context of a surrogate value determination.  *Aristocraft of Am., LLC v. United States*, 41 CIT __, __, 269 F. Supp. 3d 1316, 1328 (2017).[59]  Commerce's treatment of Treasury's evaluation and conclusion is similar to Commerce's treatment of such information from the IMF and World Bank.

The Government raises as another analogy Commerce's treatment of information relating to whether a firm receiving a loan is uncreditworthy under 19 C.F.R. §

---

[59] In that case, the court agreed with Commerce that "it may reasonably rely on the Doing Business reported [brokerage and handling] values without 'going behind the data' unless [the plaintiffs] can establish a precise breakdown of which costs they did not incur and what segment of the $115 document preparation cost is attributable to those specific costs."  *Aristocraft of Am., LLC*, 41 CIT at __, 269 F. Supp. 3d at 1329.

**PUBLIC VERSION**

Court No. 21-00397                                                    Page 130

351.505(a)(4)(i)(D).  Def. Br. at 32.  The regulation states that Commerce "may

examine, among other factors": "Evidence of the firm's future financial position, such as

market studies, country and industry economic forecasts, and project and loan

appraisals prepared prior to the agreement between the lender and the firm on the

terms of the loan."  19 C.F.R. § 351.505(a)(4)(i)(D).  The regulation is silent as to

whether data underlying such evidence should also be placed on the record.

      Finally, the Government notes that Commerce's use of the USTR's "list of

'developing countries'" is similar to Commerce's use of Treasury's evaluation and

conclusion in the instant case in that neither of the respective provisions requires the

submission to Commerce of underlying data or analysis.  Def. Br. at 32.  Under 19

U.S.C. § 1671b(b)(4)(B), Commerce is required to use the USTR's list of developing

countries as part of Commerce's preliminary determination on whether a countervailable

subsidy is de minimis.

      Commerce's reliance on USTR's conclusion is highly consequential.  That is

because a country on USTR's developing country list could result in Commerce

applying a substantially higher de minimis level (2.0 percent rather than 1.0 percent) for

countervailable subsidies, resulting in a negative determination for that country.  19

U.S.C. § 1671b(b)(4)(A).  Notably, the statute does not require that USTR provide to

Commerce the underlying data or analysis for its conclusions and Commerce has never

requested those data or that analysis.

### (4)    Calculation of benefit conferred to KTV

      The next and final issue before the court is whether Commerce's finding of a

benefit — the existence of which Commerce considered due to the undervaluation of

**PUBLIC VERSION**

the Vietnamese *dong*, *see* 19 U.S.C. 351.528(a)(1) — is supported by substantial

evidence and in accordance with law.  KTV argues that the alleged currency

undervaluation does not confer a benefit under the statute because: (1) any additional

income from conversions of U.S. dollars into Vietnamese *dong* was "balanced by

increased costs (in *dong*) from converting input prices into *dong* at the same [allegedly]

inflated rate"; and (2) under Commerce's past practice, "when the same exchange rate

applies to both exports and imports by an exporter, there is no benefit."  Pl. Br. at 40

(citing Pl. Br. at 25-27).  The court is not persuaded by these arguments and concludes

that Commerce's determination is supported by substantial evidence and is in

accordance with law.

Commerce acted consistently with 19 U.S.C. § 1677(5)(E) and 19 C.F.R. §

351.528(b).  *See* IDM at 25-26; *see generally* 19 C.F.R. § 351.503 (stating that

Commerce will follow any "specific rule for the measurement of a benefit" in Subpart E

of its regulations).  In the Preliminary Determination, Commerce described the way in

which its approach in this case followed the framework set forth in the regulation on

"[e]xchanges of undervalued currencies":

> In order to determine the benefit provided to respondents by this currency
> undervaluation in a manner consistent with 19 CFR 351.528(b)(2), we
> calculated "the difference between the amount of currency the firm received
> in exchange for United States dollars and the amount of currency that a firm
> would have received absent the difference referred to in paragraph (b)(1) of
> this section" by applying the 4.7 percent undervaluation reported by
> Treasury to each currency exchange transaction reported by KTV and
> Sailun during the POI.  For each company, we then aggregated the total
> benefits in USD based on the sum of these individual transactional [sic]
> during the POI.

**PUBLIC VERSION**

Court No. 21-00397                                                                          Page 132

PDM at 25 (citing Prelim. Calc. Memo for KTV).  In the Final Determination, Commerce

maintained its same methodology, IDM at 4, and "use[d] [Treasury's] model as a basis

for calculating the amount of benefit resulting from [VND] undervaluation," *id.* at 25-26.

Further, § 1677 does not provide for Commerce to consider increased costs in

*dong* for inputs that would allegedly offset any benefit.  By statute, there are only three

kinds of values that Commerce "may subtract from the gross countervailable subsidy."

19 U.S.C. § 1677(6)(A)-(C).[60]  Increased costs of inputs due to currency-related issues

is not among the three.  *See* 19 U.S.C. § 1677(6)(A)-(C); *see also Final Rule*, 85 Fed.

Reg. at 6,037 (noting "such an offset is not contemplated by section 771(6) of the [Tariff]

Act [of 1930]").

Commerce's decision in this case is consistent also with the decisions of the

Federal Circuit and this Court.  *See Kajaria Iron Castings Pvt. Ltd. v. United States*, 156

F.3d 1163, 1174 (Fed. Cir. 1998) ("19 U.S.C. § 1677(6) provides the exclusive list of

permissible offsets" (citing *Geneva Steel v. United States*, 20 CIT 7, 62-63, 914 F.

---

[60] 19 U.S.C. § 1677(6) provides the three kinds of values:

> For the purpose of determining the net countervailable subsidy, the administering authority may subtract from the gross countervailable subsidy the amount of—
>
> > (A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the countervailable subsidy,
> >
> > (B) any loss in the value of the countervailable subsidy resulting from its deferred receipt, if the deferral is mandated by Government order, and
> >
> > (C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received.

**PUBLIC VERSION**

Supp. 563, 609-10 (1996); *IPSCO, Inc. v. United States*, 12 CIT 359, 367, 687 F. Supp.

614, 621-22 (1988)); *see also Canadian Solar Inc. v. United States*, Slip Op. 20-23,

2020 WL 898557, at *7 (CIT Feb. 25, 2020) (holding that Commerce acted consistently

with 19 U.S.C. § 1677(5)(E)(iv) by countervailing purchases made below less than

adequate remuneration ("LTAR") without an offset for "inputs at or above LTAR").

> For example, in *Canadian Solar*, this Court stated:

> Commerce's method assumes that countervailing duties are not assessed on purchases at or above the world market rate. The government is correct that Canadian Solar functionally asks for the offsetting of its LTAR purchases with its at or above LTAR purchases. The government's practice of not calculating a "negative benefit" is in accordance with the statute as a respondent still receives a countervailable benefit in situations where only some of its inputs were provided for less than adequate remuneration. *See* 19 U.S.C § 1677(5)(e)(iv). By countervailing only those purchases made below LTAR, Commerce is simply effectuating its statutory mandate. At base, Canadian Solar has benefitted from receiving reduced-cost inputs and Commerce properly countervailed those benefits, regardless of whether Canadian Solar also purchased some inputs at or above LTAR. A countervailable subsidy remains countervailable regardless of the extent of use by a respondent.

*Canadian Solar*, 2020 WL 898557, at *7.

Court No. 21-00397                                                          Page 134

Moreover, even for *qualifying* costs, the regulation does not *require* that

Commerce calculate such increased costs and offset that amount against the amount of

a benefit.  *See* 19 C.F.R. § 351.528(b)(2); *see also Final Rule*, 85 Fed. Reg. at 6,036.[61]

Last, in *Aluminum Extrusions from China* and *Certain Coated Paper from China*,

Commerce discussed documentation that demonstrated that a "vast majority" of "foreign

exchange earnings" were not converted.  *Aluminum Extrusions from China* IDM at cmt.

33 (citing Aluminum Extrusions Currency Memo at 4-5); *Certain Coated Paper from*

*China* IDM at cmt. 6 (citing Certain Coated Paper Currency Memo at 4-5).  Here, on the

other hand, Commerce calculated the benefit based on actual conversions.  *See* PDM

at 25 (citing Prelim. Calc. Memo for KTV; KTV August 24 Submission at App. 9-A); IDM

at 4.  Specifically, Commerce "relied upon the available data regarding USD inflows to

Vietnam as a proxy for USD currency conversions."  PDM at 23; *see* IDM at 18-19.[62]

Therefore, the issue of whether conversion occurred based on foreign exchange

---

[61] The 1998 preamble to the CVD regulations explained that the benefit analysis
concerns what a company receives and does not consider the net effect that a subsidy
has on a company's bottom line:

> Thus, if there is a financial contribution and a firm pays less for an input than
> it otherwise would pay in the absence of that financial contribution (or
> receives revenues beyond the amount it otherwise would earn), that is the
> end of the inquiry insofar as the benefit element is concerned. The
> Department need not consider how a firm's behavior is altered when it
> receives a financial contribution that lowers its input costs or increases its
> revenues.

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,361 (Dep't of Commerce Nov. 25,
1998).

[62] As described *supra* in Section III.B.2.a as to whether the subsidy was specific, "in
order to account for USD inflows which may not have resulted in currency conversion,
[Commerce] discounted Vietnam's exports of goods by the amount of intermediary
goods inputs."  IDM at 18-19 (citing PDM at 24).

earnings, which arose in those determinations, is not relevant to Commerce's

consideration of benefit in this case.

In view of the foregoing, the court is unable to conclude that Commerce's benefit

determination was supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that on remand Commerce is to state clearly the statutory authority

under which it relied upon the available data regarding USD inflows to Vietnam as a

proxy for USD currency conversions.  Specifically, Commerce is ordered to explain

whether it relied on 19 U.S.C. § 1677e(a)(2)(B) for determinations based on facts

available, § 1677e(b) if Commerce considered that it was applying adverse facts

available, or § 1677e(c) if Commerce considered that it was merely corroborating

secondary information; it is further

**ORDERED** that on remand Commerce provide as to its specificity analysis (1) a

clear statement of what precisely Commerce considered to be missing from the record

as a result of the failure of the GOV to provide total USD inflows from the traded goods

sector, the traded services sector and utilized FDI and inbound portfolio investment; and

(2) the reasons that the alternative information provided by the GOV was not useable to

perform the necessary analysis.  Specifically with respect to (2), Commerce is provide:

(a) specific reasons that Commerce did not use the GOV's third supplemental

questionnaire response and whether that response met Commerce's request in its

questionnaire that GOV (i) "explain how" the numbers it provided were obtained; (ii)

explain "what went into [those] calculations"; and (iii) "report all original values

**PUBLIC VERSION**

requested"; and (b) specific reasons that Commerce did not accept the six elements of

data that GOV provided to comprise total USD inflows and whether those data relate to

Commerce's use of the four major channels of exchange to comprise an economy wide

surrogate number for currency conversions; it is further

     **ORDERED** that on remand Commerce (1) explain the reasons that Commerce

designated the four major channels of exchange as the correct basis for estimating the

total proportion of USD inflows that Vietnam received during the POI; (2) explain how,

precisely, Commerce utilized "the information placed on the record by Commerce,

which reflects data submitted by the State Bank of Vietnam to the IMF" to derive the

four channels analysis; (3) explain what data were not provided in connection with

Commerce's development of that analysis; and (4) explain why, together, these

elements prevented Commerce from using those data in its four channels analysis; it is

further

     **ORDERED** that on remand Commerce specify whether Commerce made the

assumption in its specificity determination that use of the currency undervaluation

subsidy is spread evenly in the traded goods sector; it is further

     **ORDERED** that on remand Commerce is to provide a more clear and thorough

explanation of the size of the discrepancy in net purchases in foreign exchange

between the Treasury Report and the Treasury's January 2020 Report, including how

the six-month non-overlapping period could have accounted for the discrepancy; it is

further

     **ORDERED** that the remand results shall be due ninety (90) days following the

date of this Opinion and Order; it is further

**PUBLIC VERSION**

Court No. 21-00397                                                          Page 137

   **ORDERED** that any comments on the remand results shall be submitted within

30 days of the filing of the results; and it is further

   **ORDERED** that any replies to the comments are due 15 days thereafter.


              /s/  Timothy M. Reif
              Timothy M. Reif, Judge


Dated: October 18, 2024
    New York, New York