C-552-829
Remand – Slip Op. 24-115
**Public Document**
E&C/OI:  TES

*Kumho Tire (Vietnam) Co., Ltd. v. United States*,
**Consolidated Court No. 21-00397, Slip Op. 24-115 (CIT October 18, 2024)**
**Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam**

### FINAL RESULTS OF REDETERMINATION
### PURSUANT TO COURT REMAND

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT or

the Court) in *Kumho Tire (Vietnam) Co., Ltd. v. United States*, Court No. 21-00397, Slip Op. 24-

115 (CIT October 18, 2024) (*Remand Order*).  These final results of redetermination concern the

final determination of the countervailing duty investigation on passenger vehicle and light truck

tires from the Socialist Republic of Vietnam (Vietnam).[1]  The respondent in the underlying

investigation and plaintiff in this litigation is Kumho Tire (Vietnam) Co., Ltd. (KTV).

In the underlying investigation, Commerce determined that KTV's acquisition of land-

use rights at preferential rent rates was a countervailable subsidy and supported by record

evidence.  Additionally, Commerce determined that KTV's exchanges of U.S. dollars (USD) for

undervalued Vietnamese dong (VND) constituted countervailable subsidies.  KTV challenged

the *Final Determination*.  In its *Remand Order*, the Court held that Commerce's determination

that KTV's acquisition of land-use rights was a countervailable subsidy is supported by

substantial evidence.  The Court also affirmed most of Commerce's determination that KTV's

exchanges of USD for VND constitute countervailable subsidies under the Tariff Act of 1930, as

---

[1] *See Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam:  Final Affirmative Countervailing Duty Determination*, 86 FR 28566 (May 27, 2021) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).

amended (the Act), and Commerce's *Modification of Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings: Final Rule*, 85 FR 6031 (February 4, 2020) (*Final Rule*). However, in the *Remand Order*, the Court remanded Commerce to do the following:

- state clearly the statutory authority under which it relied upon the available data regarding USD inflows to Vietnam as a proxy for USD currency conversions. Specifically, Commerce is ordered to explain whether it relied on section 776(a)(2)(B) of the Act for determinations based on facts available, section 776(b) of the Act if Commerce considered that it was applying adverse facts available (AFA), or section 776(c) of the Act if Commerce considered that it was merely corroborating secondary information;

- provide as to its specificity analysis: (1) a clear statement of what precisely Commerce considered to be missing from the record as a result of the failure of the Government of Vietnam (GOV) to provide total USD inflows from the traded goods sector, the traded services sector and utilized foreign direct investment (FDI) and inbound portfolio investment (PI); and (2) the reasons that the alternative information provided by the GOV was not usable to perform the necessary analysis. Specifically with respect to (2), Commerce is provide: (a) specific reasons that Commerce did not use the GOV's third supplemental questionnaire response and whether that response met Commerce's request in its questionnaire that GOV (i) "explain how" the numbers it provided were obtained; (ii) explain "what went into {those} calculations"; and (iii) "report all original values requested"; and (b) specific reasons that Commerce did not accept the six elements of data that GOV provided to comprise total USD inflows and whether those data relate to Commerce's use of the four major channels of exchange to comprise an economy wide surrogate number for currency conversions;

- explain the reasons that Commerce designated the four major channels of exchange as the correct basis for estimating the total proportion of USD inflows that Vietnam received during the POI; (2) explain how, precisely, Commerce utilized "the information placed on the record by Commerce, which reflects data submitted by the State Bank of Vietnam to the IMF" to derive the four channels analysis; (3) explain what data were not provided in connection with Commerce's development of that analysis; and (4) explain why, together, these elements prevented Commerce from using those data in its four channels analysis;

- specify whether Commerce made the assumption in its specificity determination that use of the currency undervaluation subsidy is spread evenly in the traded goods sector; and

- provide a more clear and thorough explanation of the size of the discrepancy in net purchases in foreign exchange between the Treasury Report[2] and the Treasury's January 2020 Report,[3] including how the six-month non-overlapping period could have accounted for the discrepancy.[4]

---

[2] *See* U.S. Department of Treasury (Treasury)'s Letter to Commerce dated August 24, 2020 (Treasury Report).
[3] *See* KTV's Letter, "Submission of Factual Information in Response to Treasury Report," dated September 8, 2020 (KTV Treasury Rebuttal), at Attachment 17 (Treasury's January 2020 Report).
[4] *See Remand Order* at 1 and 4.

We have provided the explanations the Court requested in these final results of redetermination.

## II.    BACKGROUND

In the *Final Results*, Commerce determined, with respect to the Currency Exchanges program, that enterprises that buy or sell goods internationally are the predominant users of the GOV's currency undervaluation subsidy, and, therefore, the program is *de facto* specific under section 771(5A)(D)(iii)(II) of the Act.[5]  Commerce further determined, with respect to the Currency Exchanges program, that a benefit was provided based on the degree of undervaluation measured by Treasury in accordance with 19 CFR 351.528.[6]

Commerce released its draft results of redetermination on December 27, 2024.[7]  KTV submitted timely comments on the Draft Remand on January 3, 2025.[8]

## III.    ANALYSIS

### A.    Specificity

In the underlying investigation, Commerce investigated whether the respondents' exchanges, or conversions, of USD for VND with Vietnamese banks – either acting as authorities within the meaning of section 771(5)(B) of the Act or acting pursuant to government entrustment or direction within the meaning of section 771(5)(B)(iii) of the Act – constituted countervailable subsidies.  With respect to specificity under section 771(5A)(D)(iii) of the Act, Commerce examined whether an enterprise or industry, or group of enterprises or industries, was

---

[5] *See Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam:  Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 85 FR 71607 (November 10, 2020) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM) at 23-24, unchanged in *Final Determination*.

[6] *See Preliminary Determination* PDM at 24-25, unchanged in *Final Determination*.

[7] *See* Draft Results of Redetermination Pursuant to Court Remand, *Kumho Tire (Vietnam) Co., Ltd. v. United States*, Consolidated Court No. 21-00397, Slip Op. 24-115 (CIT October 18, 2024), dated December 27, 2024 (Draft Remand).

[8] *See* KTV's Letter, "Comments on Draft Redetermination on Remand," dated January 3, 2025 (KTV's Draft Remand Comments).

the predominant user of the subsidy or received a disproportionately large amount of the subsidy.[9]  Pursuant to 19 CFR 351.502(c), Commerce considered the traded goods sector to be a group of enterprises or industries for specificity purposes.

Accordingly, Commerce sought information to determine whether the traded goods sector – in particular, companies that sell goods internationally in the context of this case – was the predominant user or received disproportionately large amounts of the subsidy resulting from the exchange or conversion of USD for VND.  Ideally, Commerce would conduct this analysis by comparing the amount of USD converted into VND by exporters in Vietnam to the total amount of USD converted into VND by all entities in Vietnam during the 2019 period of investigation (POI).  Commerce therefore requested the GOV to provide figures for the share of total USD inflow that was converted into VND throughout Vietnam and the share of these conversions attributable to the traded goods sector, the traded services sector, income earned from abroad, and utilized FDI and inbound PI.[10]  However, the GOV unequivocally stated that it "does not maintain the total value of USD inflow converted into VND" and "is also unaware of any other sources that compile these data."[11]

In the absence of data pertaining to actual currency conversions in Vietnam, Commerce looked to data regarding USD inflows to Vietnam.  Commerce placed on the record official data from the International Monetary Fund (IMF) regarding USD denominated inflows to Vietnam, figures which were reported to the IMF by the GOV.  This aggregated set of data that the GOV provided the IMF was further decomposed by, among other things, USD inflows earned through

---

[9] *See Preliminary Determination* PDM at 23-24.
[10] *See* Commerce's Letters, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam," dated July 8, 2020 (Initial Questionnaire), at Government Currency Undervaluation Appendix Question 8; and, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam," dated September 24, 2020, at Question 5.
[11] *See* GOV's Letter, "GOV's Second Supplemental Questionnaire Response," dated October 13, 2020 (GOV SQR2), at 4.

exports of goods.[12]  The GOV in its questionnaire responses also reported its purported data on USD inflows.[13]  However, the GOV-provided data pertained to "net commodity trade" and were not broken down further.  Therefore, Commerce asked the GOV to "explain how these numbers were obtained and what went into these calculations and report all original values requested including total USD inflow from the traded goods sector and the traded services sector along with a citation for where this info was obtained."[14]  In its response, the GOV did not report the values that went into its "net commodity trade" figure, instead simply stating that the data came from the General Department of Customs statistics for imported and exported goods.[15]

Based on this record, in the *Preliminary Determination*, Commerce stated that it "relied upon the available data regarding USD inflows to Vietnam as a proxy for USD currency conversions."[16]  Commerce also explained that the GOV reported USD inflows on a different basis than requested, namely, on a "net commodity trade" basis.[17]  The GOV did not report USD inflows for the traded goods sector.  Therefore, Commerce relied upon the IMF data that it placed on the record, finding that, based on these data, 71.94 percent of USD inflows to Vietnam during the POI came from the export of goods.[18]  Accordingly, Commerce preliminarily found that the traded goods sector was the predominant user of the Currency Exchanges program and that the subsidy was *de facto* specific within the meaning of section 771(5A)(D)(iii)(II) of the Act.[19]

---

[12] *See* Memorandum, "International Monetary Fund and the Organization for Economic Co-operation and Development Data," dated October 8, 2020 (IMF/OECD Memorandum).

[13] *See* GOV's Letter, "GOV's Initial Questionnaire Response," dated August 24, 2020 (GOV IQR), at Exhibit F-1 at 4.

[14] *See* Commerce's Letter, "Countervailing Duty Investigation of Passenger Vehicle and Light Truck Tires from the Socialist Republic of Vietnam," dated October 8, 2020 (GOV SQ3).

[15] *See* GOV's Letter, "GOV's Third Supplemental Questionnaire Response," dated October 19, 2020 (GOV SQR3) at 1-2.

[16] *See Preliminary Determination* PDM at 23.

[17] *Id.*

[18] *Id.* at 23-24.

[19] *Id.* at 24.

After the *Preliminary Determination*, the GOV argued that Commerce's preliminary specificity analysis and reliance on the IMF USD value for export of goods failed to account for companies that buy goods internationally.[20]  Commerce rejected this argument, explaining that the subsidy at issue was the exchange of USD for the undervalued VND and that buyers of goods internationally were not the beneficiaries of this subsidy.[21]  Therefore, Commerce did not use the GOV's figures, which included values for the import of goods, and instead relied on the IMF data.[22]  Commerce affirmed its preliminary specificity finding in the *Final Determination*.

The Court remanded portions of Commerce's final specificity determination and raised several questions concerning that determination.  We address each of these questions in turn below.

1.    Commerce's Statutory Authority for Relying on USD Inflows as a Proxy

First, the Court ordered "that on remand Commerce is to state clearly the statutory authority under which it relied upon the available data regarding USD inflows to Vietnam as a proxy for USD currency conversions.  Specifically, Commerce is ordered to explain whether it relied on {section 776(a)(2)(B) of the Act} for determinations based on facts available, {section 776(b) of the Act} if Commerce considered that it was applying adverse facts available, or {section 776(c) of the Act} if Commerce considered that it was merely corroborating secondary information."[23]

There are two issues here:  (1) Commerce's use of USD inflows as a proxy for USD conversions in Vietnam; and (2) Commerce's use of the IMF data in place of the information submitted by the GOV in its questionnaire responses during the investigation.

---

[20] *See Final Determination* IDM at 18-19.
[21] *Id.*
[22] *Id.*  Commerce, however, did account for buyers of goods internationally when those buyers purchased intermediary inputs that were then subsequently used for re-exportation.  Commerce adjusted the IMF figures to account for imports of these intermediary inputs.
[23] *See Remand Order* at 135.

With respect to issue (1), as explained above, Commerce ideally would use data regarding conversions of USD into local currency for its specificity analysis. This is because the subsidy at issue consists of the exchange of USD by a respondent with an "authority" bank or an entrusted or directed private bank for local currency when that local currency is undervalued within the meaning of 19 CFR 351.528. The specificity analysis should compare the exchanges or conversions done by a particular enterprise or industry or group of enterprises or industries – in this case, exporters in Vietnam – with the total amount of exchanges or conversions in Vietnam. However, the GOV reported that it does not maintain information on total currency conversions in Vietnam or conversions by the traded goods sector.[24] Further, the IMF data placed on the record by Commerce did not contain information on actual currency conversions in Vietnam. Rather, it contained data on USD denominated inflows to Vietnam.[25]

Accordingly, for issue (1), Commerce's statutory authority was section 776(a)(1) of the Act, which states that if "necessary information is not available on the record," Commerce may rely on the facts otherwise available to reach a determination. As facts otherwise available in place of necessary information regarding currency conversions, Commerce "relied upon the available data regarding USD inflows to Vietnam as a proxy for USD currency conversions."[26] The GOV reported,[27] and KTV appears to have argued before the Court,[28] that Vietnamese exporters are not required to convert their earned USD into VND, so there may not be a one-to-one correlation between USD inflows and currency conversions. But in the absence of necessary information regarding conversions, within the meaning of section 776(a)(1) of the Act, Commerce had no choice but to use a proxy, and we chose USD inflows to Vietnam.

---

[24] *See* GOV SQR2 at 4.
[25] *See* IMF/OECD Memorandum.
[26] *See Preliminary Determination* PDM at 23.
[27] *See, e.g.*, GOV SQR2 at 4.
[28] *See Remand Order* at 100-102. The Court in this portion of the opinion recognized that "Commerce had to rely on substitute data comprising overall USD inflows as a proxy for USD currency conversions."

With respect to issue (2), Commerce's authority to use the IMF data in place of the GOV's data reported in its questionnaire responses resided in section 776(a)(2)(A) of the Act or, alternatively, section 776(a)(2)(B) of the Act. In the absence of data pertaining to USD conversions by exporters in Vietnam, Commerce needed data pertaining to USD inflows to Vietnam by exporters, *i.e.*, companies that sell goods internationally. Commerce requested this information from the GOV in the initial questionnaire.[29] The GOV responded with data on "net commodity trade."[30] The data the GOV provided appeared to represent the USD value of Vietnamese merchandise goods exports minus Vietnamese goods imports. In other words, they represented USD inflows *and* outflows, not solely USD inflows from companies that sell goods internationally.

Commerce therefore issued a supplemental questionnaire to the GOV that requested the GOV to "explain how these numbers were obtained and what went into these calculations and report all original values requested including total USD inflow from the traded goods sector and the traded services sector along with a citation for where this info was obtained."[31] In response, the GOV did not provide the figures that went into the "net commodity trade" data originally reported and did not report the original values for USD inflows from the traded goods sector. The GOV did not even provide reasonable estimates for the balance of inflows verses outflows. Rather, the GOV only stated that "{d}ata regarding net commodity trade is calculated from the General Department of Customs statistics for imported and exported goods, and the survey results on insurance and freight for international trade of goods are used to convert CIF values of imported goods to FOB values."[32] In other words, the GOV confirmed that it did not report USD inflows from Vietnamese exports but rather included both exports and imports in its "net" value

---

[29] *See* Initial Questionnaire at Government Currency Undervaluation Appendix Question 7.
[30] *See* GOV IQR at Exhibit F-1 at 4.
[31] *See* GOV SQ3.
[32] *See* GOV SQR3 at 1-2.

reporting without a reasonable basis from which to differentiate the two.  Therefore, the GOV withheld information that was requested of it, within the meaning of section 776(a)(2)(A) of the Act.[33]

Alternatively, as the Court suggests, section 776(a)(2)(B) of the Act allowed Commerce to rely on the facts otherwise available because the GOV did not provide the requested information "in the form and manner" requested.  As just described, despite Commerce's repeated requests for USD inflows from the traded goods sector, the GOV only reported "net commodity trade," without reporting the component values of this "net" value.  This was not the only problem with the GOV's responses.  Commerce also asked for USD inflows from the traded services sector, but the GOV only responded with a net figure for services.[34]

Section 776(a)(2)(B) of the Act is subject to section 782(c)(1) and (e) of the Act.  In this case, section 782(c)(1) of the Act does not apply because the GOV never claimed any difficulties in responding to Commerce's requests for information.  Further, section 782(e) of the Act does not apply because the information submitted by the GOV is so incomplete that it cannot serve as a reliable basis for reaching a determination on specificity.  As described above, the GOV did not report USD inflows for the traded goods sector or for the traded services sector, but instead reported net values, which would have included underlying values for imports.  The GOV's information was incomplete because it did not provide the additional detail requested by Commerce concerning the underlying values that went into the net values.[35]

The GOV objected during the investigation that Commerce's specificity calculations failed to include enterprises that buy goods internationally.[36]  Commerce explained in the *Final*

---

[33] The GOV must have had information pertaining to total USD inflows from the traded goods sector within its possession because it reported that information to the IMF, as the GOV confirmed in its third supplemental questionnaire response.  *See* GOV SQR3 at 1.

[34] *See* Initial Questionnaire at Government Currency Undervaluation Appendix Question 7; GOV SQ3; and GOV SQR3 at 1-3.

[35] *See* GOV SQR3 at 1-3.

[36] *See* GOV's Letter, "GOV's Case Brief," dated March 9, 2021, at 30-31.

*Determination* that "this subsidy program benefits companies exchanging USD for VND, not companies exchanging VND for USD."[37]  Commerce continued that "{b}ecause companies that buy goods internationally are unlikely to be exchanging USD for VND, we have determined that it would not be appropriate to incorporate them into our analysis of USD inflows to Vietnam as a proxy for USD conversions to VND."[38]  Therefore, the GOV's submissions, which incorporated import values into the "net" reported figures, could not be used within the meaning of sections 782(e) and 776(a)(2)(B) of the Act.

Finally, Commerce did not apply AFA pursuant to section 776(b) of the Act, and we are not doing so in this remand redetermination either, because we do not find that the GOV failed to cooperate by not acting to the best of its ability in responding to our requests for information. Further, Commerce did not rely on section 776(c) of the Act because we did not rely on secondary information in making our specificity determination, as that term is defined in 19 CFR 351.308(d).

    2.    <u>The Information Commerce Considered Missing from the Record and the Reasons the Alternative Information Provided by the GOV Was Not Useable</u>

Second, the Court ordered on remand that:

> Commerce provide as to its specificity analysis (1) a clear statement of what precisely Commerce considered to be missing from the record as a result of the failure of the GOV to provide total USD inflows from the traded goods sector, the traded services sector and utilized FDI and inbound portfolio investment; and (2) the reasons that the alternative information provided by the GOV was not useable to perform the necessary analysis.  Specifically with respect to (2), Commerce is provide:  (a) specific reasons that Commerce did not use the GOV's third supplemental questionnaire response and whether that response met Commerce's request in its questionnaire that GOV (i) "explain how" the numbers it provided were obtained; (ii) explain "what went into [those] calculations"; and (iii) "report all original values requested"; and (b) specific reasons that Commerce did not accept the six elements of data that GOV provided to comprise total USD inflows and whether those data relate to Commerce's use of the four major channels of

---

[37] *See Final Determination* IDM at 19.
[38] *Id.*

exchange to comprise an economy wide surrogate number for currency conversions.[39]

As explained above, the GOV failed to provide total USD inflows from exporters, *i.e.*, enterprises that sell goods internationally within the meaning of 19 CFR 351.502(c), and therefore this information was missing from the GOV's responses. Instead, the GOV only provided data regarding "net commodity trade," which represented the USD denominated value of merchandise exports minus imports.[40] The total USD inflows from exporters was necessary for Commerce's specificity analysis because it constitutes the numerator in the *de facto* specificity analysis. The traded goods sector, which in this case means companies that sell goods internationally,[41] was the "group" Commerce analyzed for specificity purposes to determine whether it was the predominant user of currency exchanges or received disproportionately large amounts of currency exchanges.

A similar problem existed with respect to the traded services sector. The GOV failed to provide total USD inflows from the traded services sector, instead only providing dollar denominated values for "net services" in its third supplemental questionnaire response.[42] This meant that information relating only to the value of the export of services (as opposed to the value of exports minus imports of services) was missing from the record. Commerce needed the USD value for the export of services because the export of services is a source of USD into the Vietnamese economy, and therefore constituted part of the denominator in the *de facto* specificity analysis.[43]

---

[39] *See Remand Order* at 135-36.
[40] *See* GOV IQR at Exhibit F-1 at 4; GOV SQR3 at 1-3.
[41] *See Final Determination* IDM at 19 (explaining that import values are not relevant in the context of this subsidy program).
[42] *See* GOV SQR3 at 3.
[43] We note that the GOV's reporting of "net services," if accepted, would actually *reduce* the value of the denominator in the *de facto* specificity calculation, compared to the value that Commerce used. *Compare* GOV SQR3 at 3 *with* Memorandum, "Calculation Based on USD Inflows Calculation," dated October 30, 2020 (Specificity Calculation Memorandum).

With respect to FDI and PI, there was nothing substantial missing from the record as a result of the GOV's responses. The USD values reported by the GOV in its questionnaire responses were identical to the values in the IMF data and were used by Commerce in the denominator in its specificity analysis.[44]

We now turn to the reasons that the alternative information provided by the GOV, and specifically the information in its third supplemental questionnaire response, was not useable. In that response, the GOV attempted to explain to Commerce "what went into {the} calculations" for USD inflows from the GOV's initial response and attempted to respond to Commerce's request for "all original values requested including total USD inflow from the traded goods sector and the traded services sector…"[45] The GOV also provided a table listing six elements of purported USD inflows to Vietnam.[46]

The GOV's third supplemental response did not satisfy Commerce's request to explain how the numbers from the GOV's initial response were obtained and "what went into" the calculations in the initial response. In the initial response, the GOV reported "Net commodity trade" in response to Commerce's request for total USD inflow from the traded goods sector.[47] As explained above, the "net" figure is based on the USD value of exports minus imports.[48] It is not the value of USD inflow of exports. In its third supplemental response, the GOV reported the same net figure and stated that "{d}ata regarding net commodity trade is calculated from the

---

[44] The GOV reported 2019 USD values of 16.12 billion for FDI and 3.0 billion for PI. *See* GOV SQR3 at 3. In the IMF data that Commerce placed on the record, the values are 16.12 billion for FDI and 2.995 billion for PI. *See* IMF/OECD Memorandum. In Commerce's calculations, it used 16.12 billion for FDI and 2.995 billion for PI. *See* Specificity Calculation Memorandum. The difference between 2.995 billion and 3.0 billion is likely due to rounding in the GOV's responses.

[45] *See* GOV SQR3 at 1.

[46] *Id.* at 3.

[47] *See* GOV IQR at Exhibit F-1 at 4.

[48] This is evident from the GOV's answer to the first question in its third supplemental response. In that answer, it explained the minor discrepancy between its reported net figure for 2019, 21.22 billion USD, and the net figure in the IMF data for 2019, 21.49 billion USD. *See* GOV SQR3 at 1. The net figure in the IMF data for 2019 is based on the value of exports minus the value of imports: 264,189.0 million USD in exports minus 242,694.8 million USD in imports equals 21,494.2 million USD, or 21.49 billion USD. *See* IMF/OECD Memorandum.

General Department of Customs statistics for imported and exported goods, and the survey results on insurance and freight for international trade of goods are used to convert CIT values of imported goods to FOB values."[49]  Even if this is a cursory explanation of "how these numbers were obtained and what went into these calculations," it is not responsive to the fundamental question:  what was the value of USD *inflows* from the traded goods sector?  The GOV again did not provide this critical number; it did not provide "all original values requested including total USD *inflow* from the traded goods sector…" (emphasis added).

Commerce's regulation at 19 CFR 351.528(a)(1) states that any potential benefit "is conferred from the exchange of United States dollars for the currency of a country under review or investigation…."  As Commerce explained in the *Final Determination*, "this subsidy program benefits companies exchanging USD for VND, not companies exchanging VND for USD," and thus it was appropriate not to include imports in the specificity analysis.[50]  Further, in the *Final Determination*[51] and in the *Final Rule*,[52] Commerce explained its rationale for revisiting its prior statements that exporters cannot be considered a "group" for domestic specificity purposes, and the Court affirmed Commerce on this point.[53]  Therefore, Commerce did not use the "Net commodity trade" information provided by the GOV in its third supplemental questionnaire response, because it was not information pertaining to USD inflows from the traded goods sector, *i.e.*, from exporters.

With respect to the traded services sector, similar problems existed in the GOV's third supplemental questionnaire response.  Commerce requested inflows from the traded services sector, which means USD inflows from the export of services, but instead of reporting this

---

[49] *See* GOV SQR3 at 2.
[50] *See Final Determination* IDM at 19.  Of course, Commerce did include imports in the analysis to the extent that it excluded from the specificity numerator the portion of exported goods "which is attributable to intermediary imported goods that are subsequently used for re-exportation."  *Id.*; *see also Remand Order* at 91, 102.
[51] *See Final Determination* IDM at 20.
[52] *See Final Rule*, 85 FR at 6039-40.
[53] *See Remand Order* at 91-94.

figure, the GOV reported a net figure.[54]  Further, the GOV did not provide a detailed explanation of "what went into" this figure and only made a cursory statement that the net figure was obtained from the General Statistics Office.[55]  In any event, it is difficult to see how the GOV or KTV could object to Commerce's treatment of the traded services sector.  This information served as part of the denominator in the specificity calculation, and the figure used by Commerce, 16.65 billion USD,[56] is larger than the figure reported by the GOV, negative 1.19 billion USD.[57]  So if anything, Commerce's decision benefited the GOV and KTV.

With respect to FDI and PI, the GOV in its third supplemental response explained how these numbers were obtained.  Commerce used the numbers reported by the GOV in its calculation of the denominator for the specificity calculation, although Commerce used the more precise US$2.995 billion figure for PI rather than the rounded US$3.0 billion figure.[58]  These figures also appeared in the IMF data that the GOV supplied, and which are relied upon by Commerce.[59]

The Court also ordered Commerce to provide specific reasons why it did not use the six categories reported by the GOV on the third page of its third supplemental response.  We have explained above why Commerce could not use the figures for "net commodity trade" and "net services."  They are net figures, rather than amounts of USD inflows from the export of goods and the export of services.  We have also explained that Commerce did in fact use the figures reported for FDI and PI; they were the same as in the IMF data.

There are two other categories reported in the GOV's third supplemental response:  "Net One-way money transfers of the private sector" and "Net foreign debt."  It appears that the

---

[54] *See* GOV SQR3 at 1-3.
[55] *Id.* at 3.
[56] *See* Specificity Calculation Memorandum.
[57] *See* GOV SQR3 at 3.
[58] *Compare* Specificity Calculation Memorandum *with* GOV SQR3 at 3.
[59] *See* IMF/OECD Memorandum.

category "Net One-way money transfers of the private sector" relates to "Earned Income from Abroad," which is the category identified by Commerce based on the IMF data for primary and secondary income.[60]  The record is less clear with respect to the GOV's reporting of "Net foreign debt" and how that relates to the IMF data for 2019 or to the four categories used by Commerce. It is worth noting that both of these categories appear to be plagued by the same problem as with goods and services, *i.e.*, they are net figures.

In short, Commerce did not use the six categories and figures reported by the GOV, except for FDI and PI, because the most important of those figures, covering the traded goods sector, was a net figure and not a figure representing total USD inflows from the export of goods. The IMF data, on the other hand, clearly provided USD inflows from the export of goods.[61] Similarly, the IMF data provided USD inflows from the export of services, rather than a net figure as reported by the GOV.  At this point, given that two of the most important elements in the specificity calculation came from the IMF data, it would have made little sense for Commerce to use the GOV-reported information for the remainder.

In any event, even if Commerce had used the remainder of the information from the GOV's third supplemental response in the denominator calculation for the specificity analysis, the ultimate finding of predominant use would not have changed.  Commerce found that the traded goods sector – in this case, the group of companies that sell goods internationally – accounted for 71.94 percent of USD inflows to Vietnam in 2019 and was the predominant user of the subsidy.[62]  Below is a table representing the specificity denominator calculation if Commerce had used the GOV's information from the third supplemental response, except, of

---

[60] *See* Specificity Calculation Memorandum; IMF/OECD Memorandum.  Commerce added primary income and secondary income to arrive at the USD inflow from Earned Income from Abroad for 2019.
[61] *See* IMF/OECD Memorandum.  As the Court recognized, Commerce adjusted USD inflow for export of goods to account for intermediary imported inputs, based on OECD estimates.  *See Remand Order* at 83; *Preliminary Determination* PDM at 24.
[62] *See* Specificity Calculation Memorandum; *see also Final Determination* IDM at 18.

course, for the information regarding "Net commodity trade" and "Net services," which, as explained above, could not be used.

| ITEM | 2019 VALUE (unit: billion USD) |
|---|---|
| Exports of Goods (Without Import Content) (Source: IMF and OECD) | 149.04 |
| Exports of Services (Source: IMF) | 16.65 |
| Net One-Way money transfers of the private sector (Source: GOV SQR3) | 9.08 |
| FDI in Viet Nam | 16.12 |
| PI in Viet Nam | 3.0 |
| Net foreign debt | 5.2 |
| TOTAL DENOMINATOR FOR USD INFLOWS | 199.09 |

This dataset yields a denominator of 199.09 billion USD. Of that, 149.04 billion USD is inflow from the export of goods. Therefore, even using some of the denominator information provided by the GOV in its third supplemental response, the traded goods sector would still be the predominant user of the subsidy, accounting for 74.86 percent of the USD inflows (149.04 divided by 199.09) to Vietnam. To be clear, Commerce is not using these calculations for purposes of this remand redetermination, because, as described above, we find that the IMF information is more reliable. Nonetheless, on remand we find much of the specificity denominator issue to be moot.

3.    Explanation of the "Four Channels" Analysis

Third, the Court ordered "that on remand Commerce: (1) explain the reasons that Commerce designated the four major channels of exchange as the correct basis for estimating the total proportion of USD inflows that Vietnam received during the POI; (2) explain how, precisely, Commerce utilized 'the information placed on the record by Commerce, which reflects data submitted by the State Bank of Vietnam to the IMF' to derive the four channels analysis; (3) explain what data were not provided in connection with Commerce's development of that

analysis; and (4) explain why, together, these elements prevented Commerce from using those data in its four channels analysis."[63]

Commerce based its four channels of analysis on the information from the IMF that Commerce placed on the record. Specifically, the IMF/OECD Memorandum at Attachment 1 details the balance of payments data for Vietnam during 2019. Commerce's four channels of analysis in the Specificity Calculation Memorandum are based on the IMF balance of payments line items for "Goods, credit (exports)," "Services, credit (exports)," "Primary income, credit," "Secondary income, credit," "Direct investment, liabilities," "Portfolio investment, liabilities," and "Other investment, liabilities."[64] The IMF is a credible international institution that tracks and disseminates international monetary and financial data, broadly from data it collects directly from its member countries, which in this case includes Vietnam. As such, Commerce appropriately can rely on such data and regularly relies on it in other contexts.[65] Further, as the Court affirmed, Commerce relies on similar information in other contexts, such as using the World Bank Doing Business Report as a source of brokerage and handling valuation in antidumping duty proceedings.[66] Finally, as the Court recognized, the IMF data used by Commerce was originally reported to the IMF by the State Bank of Vietnam.[67] Therefore, Commerce based its four channels of analysis for specificity on the IMF data.

We believe our explanations above have already answered items (3) and (4) in this particular section of the *Remand Order*. Nevertheless, for the sake of completeness, we reiterate

---

[63] *See Remand Order* at 136.

[64] *See* IMF/OECD Memorandum at Attachment 1. In the Specificity Calculation Memorandum, Commerce adjusted the "Goods, credit (export)" figure to deduct intermediary imported inputs, as reported by the OECD and as described elsewhere in this remand redetermination and in the *Remand Order*.

[65] *See, e.g.*, *Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 FR 29237 (June 1, 2021), and accompanying IDM at 39-40 (using IMF lending rates as benchmarks); and *Polyethylene Terephthalate Film, Sheet, and Strip from India: Final Results of Countervailing Duty Administrative Review*, 76 FR 76948 (December 9, 2011), and accompanying IDM at 4 (using lending rates from the IMF for the discount rate for non-recurring subsidies).

[66] *See Remand Order* at 129.

[67] *Id.* at 85.

that the GOV's questionnaire responses during the investigation never provided the critical number for USD inflows from the export of goods.  By reporting "Net commodity trade," the GOV reported inflows and outflows, rather than inflows alone.  As Commerce explained, "this subsidy program benefits companies exchanging USD for VND, not companies exchanging VND for USD."[68]  Further, "{b}ecause companies that buy goods internationally are unlikely to be exchanging USD for VND, we have determined that it would not be appropriate to incorporate them into our analysis of USD inflows to Vietnam as a proxy for USD conversions to VND."[69]  The GOV's reporting of "Net services" suffered from the same flaw, and Commerce therefore did not use the GOV's reported figure.  However, Commerce did in fact use identical numbers (except for rounding) as the GOV reported for FDI and PI.

    4.   <u>Assumption that the Use of the Currency Subsidy Is Spread Evenly in the Traded Goods Sector</u>

Fourth, the Court ordered Commerce on remand to "specify whether Commerce made the assumption in its specificity determination that the use of the currency undervaluation subsidy is spread evenly in the traded goods sector."[70]

As an initial matter, we reiterate that only companies that sell goods internationally benefit from the exchange of USD for the undervalued VND.  Therefore, it was essential that the numerator in the specificity calculation only include USD inflows from Vietnamese exporters.  As Commerce noted in the *Final Determination*, the traded goods sector includes companies "that either sell goods internationally or that buy goods internationally;" in this case, it was the companies that sell goods internationally that benefited.  This was the "group" within the meaning of section 771(5A)(D) of the Act.

---

[68] *See Final Determination* IDM at 19.
[69] *Id.*
[70] *See Remand Order* at 136.

Further, we have made no assumption, one way or the other, whether the subsidy usage was spread evenly within the traded goods sector, *i.e.*, within the group of companies that sell goods internationally. With due respect to the Court's inquiry, we do not find this question relevant under section 771(5A)(D) of the Act. A "group" within the meaning of section 771(5A)(D) of the Act is a unitary whole, similar to an "industry" or "enterprise." The question under section 771(5A)(D) of the Act is not whether the subsidy is distributed or used evenly *within* the beneficiary group or industry or even enterprise, but rather whether it is distributed or used evenly *among* different groups or industries or enterprises. For example, if the question is whether the steel industry is a predominant user, or receives a disproportionately large amount of, a subsidy, it does not matter whether the subsidy is distributed evenly within the steel industry. Rather, what matters is whether the steel industry receives a predominant or disproportionate share compared to other industries. The same principle holds true for a "group." The issue is not the distribution of the subsidy within the group, but rather the distribution of the subsidy compared to other groups.

Perhaps KTV's real complaint is that a "group" composed of Vietnamese exporters is too large compared to the Vietnamese economy as a whole. Yet the Court affirmed Commerce's finding that exporters can constitute a "group" within the meaning of section 771(5A)(D) of the Act.[71] Further, Commerce found, and the Court agreed, that the Vietnamese economy is diversified such that a *de facto* specificity finding was not due merely to lack of economic diversification.[72] In any event, as Commerce explained in the *Final Determination*, when nearly 72 percent of a subsidy benefits one particular group it the economy, "it cannot be said that the subsidy is widely used throughout the economy."[73]

---

[71] *Id.* at 91-94.
[72] *See Preliminary Determination* PDM at 19; *Remand Order* at 88.
[73] *See Final Determination* IDM at 20.

In sum, we have responded to the Court's questions and orders regarding our specificity determination, and we continue to find that currency exchanges are de facto specific because the traded goods sector – in this case, companies that sell goods internationally – was the predominant user of the subsidy.

B.    Benefit

In the underlying investigation, Commerce examined whether a benefit was conferred to KTV from its exchanges of USD for VND only to the extent that the VND was undervalued during the POI.  In determining whether the VND was undervalued, Commerce requested Treasury's evaluation and conclusion as to whether there was a gap between Vietnam's real effective exchange rate (REER) and the equilibrium REER and, if so, whether there was government action on the exchange rate that contributed to this undervaluation, consistent with 19 CFR 351.528(a) and (c).  Consistent with 19 CFR 351.528(b) and (c), Commerce also requested Treasury's evaluation and conclusion as to whether there was a difference between (1) the nominal, bilateral USD rate consistent with the equilibrium REER and (2) the actual nominal, bilateral USD rate during the POI, taking into account any information regarding the impact of government action on the exchange rate.

Treasury reported that the VND was undervalued during the 2019 POI, because there was a gap between Vietnam's REER and its equilibrium REER, and that the GOV's action on the exchange rate vis-à-vis all of Vietnam's trading partners contributed to this undervaluation.[74] Treasury also reported that the GOV's actions on the exchange rate had the direct effect of undervaluing the VND *vis-à-vis* the USD by 4.7 percent.[75]  Therefore, Commerce found that the VND was undervalued in 2019 by 4.7 percent compared to the USD and calculated KTV's benefit from the Currency Exchanges program using this number.

---

[74] *See* Treasury Report; *see also Preliminary Determination* PDM at 24-25; and *Final Determination* IDM at 23-26.
[75] *See* Treasury Report; *see also Preliminary Determination* PDM at 25.

The Court affirmed most of Commerce's benefit determination and found Commerce's determination "that there was 4.7 percent undervaluation of the Vietnamese dong against the U.S. dollar during the POI is adequately explained and supported by substantial evidence."[76] However, the Court remanded the *Final Determination* on one specific issue, addressed below.

Discrepancy Between Treasury Reports

With respect to benefit, on remand the Court ordered Commerce "to provide a more clear and thorough explanation of the size of the discrepancy in net purchases in foreign exchange between the Treasury Report and the Treasury's January 2020 Report, including how the six-month non-overlapping period could have accounted for the discrepancy."[77]

The Court found that Commerce failed to address this discrepancy between the Treasury Reports in the *Final Determination*. Therefore, we clarify in this remand redetermination that the discrepancy in the net foreign exchange transactions is largely attributable to inconsistent time periods between the Reports. Treasury's information reported to Commerce in the context of the CVD investigation covers the entire 2019 POI (*i.e.*, January-December 2019).[78] By contrast, the 2020 Treasury Report "Macroeconomic and Foreign Exchange Policies of Major Trading Partners of the United States" only covered the first six months of the relevant POI (*i.e.*, January-June 2019), as well as six months prior to the POI.[79]

Neither the GOV nor KTV demonstrated why periods outside of the 2019 POI would be relevant to our benefit analysis. However, Commerce finds the non-overlapping period to be a critical factor in contributing to the size of the net foreign exchange discrepancy. In fact, there is

---

[76] *See Remand Order* at 115.
[77] *Id.* at 136.
[78] *See* Treasury Report; *see also* Treasury's Letter to Commerce dated September 24, 2020 (Treasury Supplement) at 4.
[79] *See* KTV Treasury Rebuttal at Attachment 17, containing Treasury January 2020 Report.

nothing in the Treasury January 2020 Report that detracts from our findings in this investigation.

In that Report, Treasury stated:

> Vietnam intervened in both directions over the course of these four quarters: The authorities sold foreign exchange over the second half of 2018 as financial turbulence in a few large emerging markets led to a pullback from other smaller emerging markets and created downward pressure on many emerging market currencies, including the dong. As global financial conditions eased and holiday-related remittances increased in early 2019, the authorities shifted to purchasing foreign exchange, with net purchases over the first half of 2019 modestly outweighing net foreign exchange sales over the prior six months.[80]

In other words, the Treasury January 2020 Report explains that Vietnam was increasing its foreign exchange purchases during 2019, in contrast to its behavior during the last six months of 2018. This means that the inclusion of the 2018 information skewed the overall conclusion for the time period July 2018 through July 2019. If Treasury had only included the first six months of 2019 in its January 2020 Report to Congress, the result presumably would have been much different than the $2.1 billion net figure, which was weighed down by the 2018 data. The Court focuses on the "size of the apparent discrepancy – $22 billion versus $2.1 billion,"[81] but if the comparison were actually the first six months of 2019 to the entire 12 months of 2019, the discrepancy would be smaller, based on the above excerpt from the Treasury January 2020 Report.

Further, with respect to the entire 2019 POI, the majority of Vietnam's foreign exchange purchases occurred in the latter half of 2019. It is clear that the Treasury January 2020 Report did not take this time period into account when reporting the quantified net foreign exchange at 0.8 percent of GDP.[82] The sharp increase in net purchases of foreign reserves in the second half of 2019 is likely attributable to the GOV's efforts to depreciate the VND vis-à-vis the USD during the period leading up to and including the holiday season in the United States, the largest

---

[80] *Id.* at 37.
[81] *See Remand Order* at 124.
[82] *See* Treasury Report at 8, 19, 35-37.

consumer market for its goods.  After all, a devalued VND will help make Vietnamese goods cheaper on U.S. markets, and therefore more competitive.

Finally, we note that the Court affirmed every other aspect of Commerce's benefit determination, including Commerce's reliance on the GERAF model in the Treasury Report.[83] Further, the *Final Rule* explains that Commerce "will defer to Treasury's expertise"[84] on currency undervaluation, and the Court affirmed that Commerce's reliance on Treasury is lawful.[85]  In light of the Court's affirmance of our reliance on the GERAF model and our recognition of Treasury's expertise, we find that the discrepancy in net foreign exchange purchases – a discrepancy that is clearly due to the differing time periods and the GOV's increasingly aggressive role in foreign exchange purchases throughout 2019 – is not a basis to reverse our ultimate finding of benefit in this remand redetermination.

## IV.    INTERESTED PARTY COMMENTS

**Comment 1:  Specificity**

The following is the entire argument submitted by KTV (internal citations omitted). KTV's entire argument consists of fewer words than the maximum word count limit for a public executive summary.  KTV did not submit a separate executive summary.

*KTV's Argument:*

> The Draft Redetermination's finding that the exchange rate was used "disproportionately" by the "traded goods" sector appears to be based, in the end, on the mere assertion that the "traded goods" sector received more benefits from alleged government exchange-rate programs than other sectors.  Thus, quoting the original Final Determination, the Draft Redetermination asserts that "when nearly 72 percent of a subsidy benefits one particular group in the economy, 'it cannot be said that the subsidy is widely used throughout the economy.'"

> That type of simplistic analysis has, however, been rejected by the Courts.  For example, a recent CIT decision addressing Commerce's specificity analysis for Korean electricity usage explained that:

---

[83] *See Remand Order* at 115-130.
[84] *See Final Rule*, 85 FR at 6038.
[85] *See Remand Order* at 105-114.

The term disproportionate refers to "having or showing a difference that is not fair, reasonable, or expected," and disproportionality exists when something is "too large or too small in relation to something {else}." Thus, when analyzing whether an industry or group of industries receives a disproportionate amount of the benefit conferred by the subsidy pursuant to 19 U.S.C. § 1677(5A)(D)(iii), receipt of a greater monetary benefit from the program than others is not determinative of disproportionality. Rather, the disproportionality inquiry involves a case-by-case analysis which assesses benefits, not in relation to the benefits of others, but in relation to some other comparator depending on the circumstances...

Commerce elides the reality that programs designed to confer benefits on usage levels will necessarily result in larger users receiving a proportionally larger percentage of the subsidy. Disproportionality requires that an enterprise or industry is favored in some way (*i.e.*, it receives more than its fair share). Commerce must explain how the combined industries it identifies benefit more than would be expected, based on their usage given that the subsidy in question is designed to confer benefits on usage levels, or in relation to some other comparator.

Under the standard enunciated by the Court, the assertion that the "traded goods" sector received 72 percent of the benefits from alleged exchange-rate programs is insufficient. That assertion simply reflects the claim that the "traded goods" sector engaged in 72 percent of exchanges from U.S. dollars into Vietnamese dong. In order to find that the benefit to the "traded goods" sector is "disproportionate," {Commerce} must engage in further analysis to show that the "traded goods" sector "receive{d} more than its fair share." Since neither the original Final Determination nor the Draft Redetermination has made such a showing, the finding of "disproportionality" is unlawful.

No other party commented on this issue.

**Commerce's Position:** KTV's argument is based upon a fundamental misunderstanding of Commerce's finding. Commerce did not find that the traded goods sector received disproportionately large amounts of the Currency Exchanges program, but rather that the traded goods sector was the predominant user of this subsidy program. As we explained above, we find that the traded goods sector – in this case, companies that sell goods internationally – accounted for 71.94 percent of USD inflows to Vietnam during the POI. This constitutes predominant usage by the traded goods sector.[86]

---

[86] *See Predominant*, *Merriam-Webster's Dictionary*, https://www.merriam-webster.com/dictionary/predominant (last visit January 3, 2025) (defining "predominant" as "being most frequent or common"); *see also Predominant*, *Cambridge English Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/predominant (last visit January 3, 2025) (defining "predominant" as "more noticeable or important, or larger in number, than others").

The *Hyundai Steel* case cited by KTV in its comments is not on point.[87]  That case involved a finding of disproportionality under section 771(5A)(D)(iii)(III) of the Act, not a finding of predominant usage under section 771(5A)(D)(iii)(II) of the Act.  The Court found that under section 771(5A)(D)(iii)(III) of the Act, Commerce should have examined what the expected distribution of the subsidy should have been.[88]  However, our specificity finding in this case, as described above, is based on section 771(5A)(D)(iii)(II) of the Act.

**Comment 2:   Explanation of the Discrepancy in Vietnam's Purchases of Foreign Exchange Reported in Different Treasury Reports**

KTV did not provide an executive summary of its comments.  For further details, *see* KTV's Draft Remand Comments.

No other party commented on this issue.

**Commerce's Position:**  KTV's argument concerning the discrepancy between the Treasury Reports on Vietnam's foreign exchange purchases in 2018 and 2019 fails to address the relevance of data outside the 2019 POI and overlooks key facts on the record.  The Treasury January 2020 Report included Q3 and Q4 of 2018 and only Q1 and Q2 of 2019 POI.[89]  KTV has not provided any substantive reasoning for why 2018 data is relevant when reporting the quantified net foreign exchange at 0.8 percent of GDP, or why Commerce should rely on 2018 data when Treasury reported to Commerce the entire 2019 data.  As noted above, it is clear that the Treasury January 2020 Report did not take the full 12-month POI time period into account when reporting the quantified net foreign exchange at 0.8 percent of GDP.[90]  Again, the discrepancy between the two Treasury Reports noted by the Court arose from the inclusion of information that falls outside of the 2019 POI in the Treasury January 2020 Report.[91]  The

---

[87] *See Hyundai Steel Company v. United States*, Slip Op. 24-135 (CIT December 12, 2024).
[88] *Id.* at 10-12.
[89] *See* Treasury January 2020 Report at 37.
[90] *Id.*
[91] *Id.*

inclusion of periods outside of the 2019 POI not only skewed the overall conclusion for the time period July 2018 through July 2019 but is also irrelevant to Commerce's 2019 POI.

With respect to the 2019 POI, the majority of Vietnam's foreign exchange purchases occurred in the latter half of 2019. As explained, the same Treasury January 2020 Report cited by KTV states that Vietnam significantly increased its foreign exchange purchases through 2019. Additionally, the record contains the IMF Balance of Payments table from 2019, which further supports Treasury's findings.[92] When Commerce originally put this information on the record during the investigation, the data for the fourth quarter of 2019 was inadvertently cut off.[93] During this remand, we completed the record by placing the complete version of the 2019 IMF Balance of Payments table, containing all quarterly data, on the record.[94] Under the column for Reserve Assets, the full IMF table shows that Vietnam's foreign currency reserves nearly increased four times from 2018 to 2019.[95] The IMF table also indicates that the GOV was increasing its foreign currency purchases in the latter half of 2019.[96] Contrary to KTV's arguments,[97] the IMF table shows that Vietnam had roughly 1.5 times more reserve assets in quarters 3 and 4 of 2019 than in quarters 1 and 2.[98] Therefore, KTV is mistaken in its assertion that there is no record support for the finding that Vietnam's foreign exchange purchasing behavior changed significantly from 2018 to 2019, including in the final two quarters of 2019.

---

[92] *See* Memorandum, "International Monetary Fund Data – Correction," dated January 10, 2025 (IMF Correction Memo).
[93] *See* IMF/OECD Memorandum.
[94] *See* IMF Correction Memo.
[95] *Id.* at Attachment.
[96] *Id.*
[97] *See* KTV's Draft Remand Comments at 4-5.
[98] *Id.*

## V.    FINAL RESULTS OF REDETERMINATION

In accordance with the Court's *Remand Order*, Commerce has provided the explanations requested by the Court.  However, Commerce has not revised its subsidy calculations for the Currency Exchanges program as a result of these final results of redetermination.  For the reasons explained above, we have made no changes to the *Final Determination*.

1/15/2025

X _Elouaradia_

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance